# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| ARCHER AND WHITE SALES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 2:12-CV-00572-JRG-RSP |
| HENRY SCHEIN, INC., DANAHER | ) | |
| CORPORATION, INSTRUMENTARIUM | ) | **ORAL ARGUMENT REQUESTED** |
| DENTAL INC., DENTAL EQUIPMENT | ) | |
| LLC, KAVO DENTAL TECHNOLOGIES, | ) | **FILED UNDER SEAL** |
| LLC AND DENTAL IMAGING | ) | |
| TECHNOLOGIES CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' JOINT SEALED MOTION TO EXCLUDE
## THE TESTIMONY OF ARCHER'S EXPERT WITNESSES

## TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. ii

BACKGROUND .....................................................................................................................1

ARGUMENT AND AUTHORITIES......................................................................................3

I.     The Court Should Exclude Archer from Using Its Experts as Mouthpieces to Tell Its Liability Story. .........................................................................................................3

II.    The Court Should Preclude Archer's Experts from Offering Legal Opinions and Conclusions....................................................................................................................8

III.   Drs. Magee's and Ikizler's Economic Analysis Should Be Excluded as Unreliable and Unsupported. .............................................................................................................9

IV.   The Court Should Exclude Dr. Magee's and Dr. Ikizler's Improper and Unsupported Market Definition Opinions. .....................................................................20

      A.     Drs. Magee and Ikizler Fail To Define the Relevant Product Market. .................21

      B.     Drs. Magee and Ikizler Fail To Define the Relevant Geographic Market.............24

      C.     The Failure To Define the Relevant Market Reveals the Hollowness of Drs. Magee's and Ikizler's Analysis.............................................................................26

V.     The Court Should Exclude Dr. Abernathy from Offering Unsupported Economic Opinions That He Is Not Qualified To Give.....................................................................29

CONCLUSION......................................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alldread v. City of Grenada*,
  988 F.2d 1425 (5th Cir. 1993) ............................................................................8

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ..............................................................21, 23, 24

*Assoc. Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)...........................................................................................9, 14

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).............................................................................................22

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988).............................................................................................26

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ...........................................................................13

*Culberson, Inc. v. Interstate Elec. Co.*,
  821 F.2d 1092 (5th Cir. 1987) ...........................................................................28

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)...........................................................................................4, 9

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*,
  123 F.3d 301 (5th Cir. 1997) ........................................................20, 21, 26, 28

*El Aguila Food Prod., Inc. v. Gruma Corp.*,
  131 F. App'x 450 (5th Cir. 2005) ................................................................17, 20

*Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*,
  213 F.3d 198 (5th Cir. 2000) .............................................................................17

*Ellipsis Inc. v. Color Works, Inc.*,
  428 F. Supp. 2d 752 (W.D. Tenn. 2006)............................................................9

*Factory Mut. Ins. v. Alon USA L.P.*,
  705 F.3d 518 (5th Cir. 2013) ............................................................................4, 7

*Garcia v. Navasota Indep. Sch. Dist.*,
  No. H-09-3892, 2011 WL 335253 (S.D. Tex. Jan. 31, 2011)......................8

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).............................................................................................9

*GWTP Invs., L.P. v. SES Americom, Inc.*,
  No. 3:04-CV-1383-L, 2007 WL 7630459 (N.D. Tex. Aug. 3, 2007)......................................30

*H&B Equipment Co. v. Int'l Harvester Co.*,
  577 F.2d 239 (5th Cir. 1978) ........................................................................................18, 19

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.*,
  297 F.2d 906 (2d Cir. 1975)...........................................................................................10, 14

*In re Air Crash Disaster at New Orleans*,
  795 F.2d 1230 (5th Cir. 1986) ..........................................................................................8, 18

*In re Folding Carton Antitrust Litig.*,
  88 F.R.D. 211 (N.D. Ill. 1980).................................................................................................14

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
  No. 04-md-1628, 2009 WL3241401 (S.D.N.Y. Sept. 30, 2009)...............................4, 7, 21, 22

*In re H&M Oil & Gas, LLC*,
  511 B.R. 408 (Bankr. N.D. Tex. 2014)..............................................................................4, 5, 7

*In re Med Diversified, Inc.*,
  334 B.R. 89 (Bankr. E.D.N.Y. 2005)........................................................................................9

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015)...............................................................................................14

*JES Props., Inc. v. USA Equestrian, Inc.*,
  253 F. Supp. 2d 1273 (M.D. Fla. 2003).................................................................................23

*Ky. Speedway, LLC v. NASCAR, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ...................................................................................21, 22, 24

*Lantec, Inc. v. Novell, Inc.*,
  306 F.3d 1003 (10th Cir. 2002) ..........................................................................21, 22, 24, 25

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007).................................................................................................................28, 29

*Mendelovitz v. Adolph Coors Co.*,
  693 F.2d 570 (1977)...................................................................................................................26

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)....................................................................................................................28

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
  889 F.2d 524 (4th Cir. 1989) ....................................................................................................21

iii

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
    472 U.S. 284 (1985) ..................................................................................................20

*Owen v. Kerr–McGee Corp.,*
    698 F.2d 236 (5th Cir. 1983) .....................................................................................8

*Park v. El Paso Bd. of Realtors,*
    764 F.2d 1053 (5th Cir. 1985) .........................................................................9, 10, 16

*Pipitone v. Biomatrix, Inc.,*
    288 F.3d 239 (5th Cir. 2002) .....................................................................................9

*Robroy Indus.-Tx., LLC v. Thomas & Betts Corp.,*
    No. 2:15-cv-512, 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ..............................4, 5, 7, 22

*S. Pac. Co. v. Darnell-Taenzer Lumber Co.,*
    245 U.S. 531 (1918) ..................................................................................................10

*Salas v. Carpenter,*
    980 F.2d 299 (5th Cir. 1992) .................................................................................4, 7

*Snap-Drape Inc. v. C.I.R.,*
    98 F.3d 194 (5th Cir. 1996) .......................................................................................8

*Stinson Air Ctr, LLC v. XL Specialty Ins.,*
    No. SA-03-CA-61, 2005 WL 5979096 (W.D. Tex. July 8, 2005) ...........................7

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961) ..............................................................................................21, 23

*United States v. E.I. du Pont de Nemours & Co.,*
    353 U.S. 586 (1957) ..................................................................................................21

## OTHER AUTHORITIES

Fed. R. Evid. 702 ............................................................................................................7

Fed. R. Evid. 703 ............................................................................................................4

Fed. R. Civ. P. 26 ............................................................................................................7

Archer's experts claim the alleged group boycott in this case, which they say began in 2008, resulted in <span style="color:red">REDACTED</span>, starting in 2002 (more than five years *before* the alleged illegality) and continuing through 2023 (nearly six years *after* the early-2018 finding of liability Plaintiff's counsel asked them to assume). Yet, from 2006 to 2016, Archer's tax returns show Archer earned an average net income <span style="color:red">REDACTED</span>, with a peak net income of <span style="color:red">REDACTED</span> in 2012.[1]   Archer's experts support this demand by (1) summarizing Archer's liability case based on hearsay, self-serving assertions, and other inadmissible evidence; (2) making bottom-line legal conclusions regarding liability; (3) advancing a patently unreliable damages analysis that lacks any support in the factual record or accepted economic theory; and (4) defining a purported antitrust market based on their and Mr. Archer's say-so.  These opinions are unreliable and inadmissible under *Daubert*, and will not assist the trier of fact.  The Court should exclude them.

## BACKGROUND

On October 13, 2017, Archer served two expert reports: (1) the Expert Report of Professor Stephen P. Magee and Dr. Devrim Ikizler, Ex. 1, and (2) the Expert Report of Dr. Michael Abernathy, Ex. 2.  Drs. Magee and Ikizler, an academic and a litigation consultant, respectively, offered sweeping factual assertions and conclusions of law.  Ex. 1 ¶¶ 1–10, 20. They concluded that Archer's harm from this conspiracy resulted in damages of <span style="color:red">REDACTED</span>. *Id.* ¶ 290.  Dr. Abernathy, a dentist, opined from personal experience that prices were anticompetitively high and competition was stifled even though he is not a trained economist and has done no study of transactional data.

---

[1] *See* Ex. 20 (Dep. Ex. 1053 & supporting materials).

1

On November 6, 2017, Defendants served two expert rebuttal reports: (1) the Expert Report of Robert Maness, Ex. 3, and (2) the Rebuttal Expert Report of Keith Ugone, Ex. 4.  Dr. Maness and Dr. Ugone are both economists.  Dr. Maness rebutted Drs. Magee's and Ikizler's factual and economic liability opinions by explaining the economic underpinnings of the Distributor Defendants' full-service business model, which relies on extensive infrastructure to provide dentists with local sales, installation, service, training, and support for the complex capital dental equipment at issue in this case.  Ex. 3 ¶¶ 10–16.  He also explained why the evidence demonstrates that Archer's termination by the Dental Company Defendants did not result in any harm to competition and, in fact, had procompetitive effects.  *Id.* ¶¶ 17–20.  Finally, Dr. Maness rebutted Dr. Abernathy's assertions regarding the buying habits of dentists.  *Id.* ¶ 21.  Dr. Ugone's report explained why Drs. Magee's and Ikizler's grossly overstated damages rested on unreliable and unsupported facts, assertions, and economic opinions.  Ex. 4 ¶¶ 5–13.  He offered an alternative damages estimate of zero dollars or, at most, $1.4 million after correcting Drs. Magee's and Ikizler's unreasonable and unreliable assumptions regarding such things as profit margin and assumed rates of growth.  *Id.* at 7 n.12.

On November 21, 2017, without leave of Court, Archer served the Amended Report of Professor Stephen P. Magee and Dr. Devrim Ikizler.  Ex. 5 ("Am. Rpt.").  All told, the Amended Report covers 451 paragraphs across 161 pages, *id.*, whereas the original Report covered an already considerable 296 paragraphs across 109 pages, Ex. 1.  Drs. Magee and Ikizler responded in the Amended Report to some, but not all, of the Maness and Ugone critiques and reduced their damages number from           REDACTED           .  Am. Rpt. ¶ 440.[2]  Virtually none of the

---

[2] On December 1, Archer again changed its damages analysis, reducing its damages by another     REDACTED     .  Ex. 22 (Email from P. Aurentz (Dec. 1, 2017)).

new material in the Amended Report was even arguably based upon information unavailable to

Drs. Magee and Ikizler at the time they issued their initial report.[3]

## ARGUMENT AND AUTHORITIES

Four fatal flaws should result in the Court excluding all or part of the Amended Report.

First, throughout the report, Archer uses Drs. Magee and Ikizler to summarize its liability case

and tell Archer's story to the jury.  Second, Drs. Magee and Ikizler offer impermissible legal

conclusions.  Third, the Amended Report is filled with unsupported assumptions and unreliable

opinions that grossly inflate Archer's claimed damages and would mislead the jury.  Just two

examples of the many discussed below include (1) requesting[REDACTED]          in damages REDACTED

                                    s) for alleged lost sales of consumables (non-durable dental goods)

that Archer has not sold since 2004, prior to any alleged conspiracy, based largely on Mr.

Archer's say-so, and (2) assumptions that Archer would achieve a       REDACTED

                              without attempting to justify this based on any reasonable benchmark or

economic theory.  Finally, Drs. Magee and Ikizler, who are not themselves experts on the dental

equipment market, have failed to define a relevant antitrust market using reliable economic

principles.  In addition, Archer uses Dr. Abernathy to offer unsupported econometric and

antitrust opinions that are well outside his expertise or experience.

## I.     The Court Should Exclude Archer from Using Its Experts as Mouthpieces to Tell Its Liability Story.

The bulk of the Magee/Ikizler Amended Report is nothing more than a vehicle for Archer

to tell its liability story to the jury by aggregating hearsay and other evidence—including

---

[3] As a result of Plaintiffs' tactics—including their service of a new expert report just one day before the planned November 22 deposition of Dr. Magee, neither Dr. Magee nor Dr. Ikizler have yet been deposed.  Defendants reserve the right to supplement this Motion based on these depositions and further analysis of Plaintiffs' unauthorized rebuttal report.

conversations with Jim Archer, Jr., Archer's own interrogatory responses, and the speculation of various witnesses who admit they lack personal knowledge—and summarizing it into a liability "story." This is not permissible, and the Court should exclude these experts from offering such testimony to the jury.

Although experts may rely on hearsay, Rule 703 only permits this if the facts and data derived from that hearsay are "'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (quoting Fed. R. Evid. 703). The danger of allowing such testimony is that "the expert will become a vehicle through whom the party can summarize its case for the jury, with the imprimatur of the expert's asserted 'expertise.'" *Robroy Indus.-Tx., LLC v. Thomas & Betts Corp.*, No. 2:15-cv-512, 2017 WL 1319553, at *9–10 (E.D. Tex. Apr. 10, 2017).

Thus, it is critical that courts "serve a gate-keeping function . . . to ensure the expert isn't being used as a vehicle for circumventing the rules of evidence" by becoming a "mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion," thereby allowing "oblique evasions of the hearsay rule." *Factory Mut. Ins. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (internal quotation marks omitted). This is particularly true when the expert brings no expertise to bear on the hearsay statements they summarize for the jury. *Robroy*, 2017 WL 1319553, at *10; *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 WL3241401, at *16 (S.D.N.Y. Sept. 30, 2009). Courts regularly exclude such parroted testimony. *See, e.g.*, *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Factory Mut. Ins. Co.*, 705 F.3d at 524; *Robroy*, 2017 WL 1319553, at *9–10 (collecting cases); *In re H&M Oil & Gas, LLC*, 511 B.R. 408, 413 (Bankr. N.D. Tex. 2014).

The most egregious example of this is found in the "Conduct" section of the Amended

Report.  Am. Rpt. ¶¶ 207–324.  There, Drs. Magee and Ikizler do nothing more than collect and purport to interpret documents, deposition transcripts, interrogatory responses, conversations with Mr. Archer, and other "evidence," and spin it into a story for the jury about what Drs. Magee and Ikizler claim occurred as a factual matter.  *Id.*  This is improper in itself, but Drs. Magee and Ikizler then take the extra step of telling the jury what conclusions and inferences to draw from this factual account.  *See, e.g.*, Am. Rpt. ¶ 207; *see also id.* at 76, 98, 102.

Drs. Magee and Ikizler do the same thing in other sections of their Amended Report.  For example, under the headings                    REDACTED

                                                they again collect and purport to interpret numerous documents, testimony, and other forms of hearsay into a narrative, and then attempt to supplant the jury's role by telling it what these facts mean and the supposed intent that can be inferred from them.  Am. Rpt. ¶¶ 332–343, 374–384.  Drs. Magee and Ikizler offer such bottom-line conclusions as,                    REDACTED


Although these are the primary sections in which Archer uses its experts as mouthpieces to tell its liability story, they are not the only instances where this occurs.  Drs. Magee and Ikizler do the same thing in their sections entitled        REDACTED        Am. Rpt. ¶¶ 128–136, and       REDACTED        Am. Rpt. ¶¶ 137–145.  In the former, Drs. Magee and Ikizler engage in particularly egregious hearsay summarizing.  For example, they purport to have

reviewed a website called                              REDACTED

390.

Drs. Magee and Ikizler also repeatedly offer these types of bottom-line assertions with

either no record support at all, or by supporting their assertions through (1) conversations with

Mr. Archer, Am. Rpt. nn.6, 7, 118, 146, 150, 157, 162, 197, 199, 224, 230, 233, 237, 245, 267,

269, 270, 311, 333, 336, 357, 631; (2) unproven allegations from the Second Amended

Complaint ("SAC"), *id.* nn.9, 14, 25, 37, 48, 247, (3) Archer's own interrogatory responses, *id.*

nn.420, 426, 427, 432, 466, or (4) undisclosed expert opinions obtained from "conversations"

with Dr. Abernathy (as opposed to from his report), *id.* nn.173, 225, 269.  For example, from

conversations with Mr. Archer, Drs. Magee and Ikizler offer double hearsay from non-party

manufacturers who were never deposed, *see, e.g.*, *id.* ¶¶ 216, 243, 246 and      REDACTED

<span style="color:orange">REDACTED</span>

*id.* ¶ 6.[4]  *See also id.* ¶¶ 63, 80.

It is improper to use purported "expert opinions" to slip such testimony past the gatekeeper and into the jury room.  *Factory Mut. Ins.*, 705 F.3d at 524.  Not only do these examples violate the general rule against using an expert as a mouthpiece to tell Archer's story, they also violate the rule that an expert cannot give opinions "based solely on the representations of a party with an interest in the outcome" of the lawsuit.  *Stinson Air Ctr, LLC v. XL Specialty Ins.*, No. SA-03-CA-61, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005); *In re H&M*, 511 B.R. at 416–17.

There is nothing about Drs. Magee's and Ikizler's expertise that would be helpful to the jury on these issues of fact, intent, or liability—they reflect no "scientific, technical, or other specialized knowledge," and apply no "reliable principles and methods."  Fed. R. Evid. 702; *Salas*, 980 F.2d at 380.  They do nothing to assist the jury, which is fully capable of reviewing and interpreting documents and testimony, and reaching liability conclusions on that basis. *Salas*, 980 F.2d at 380; *Robroy*, 2017 WL 1319553, at *10; *In re Fresh Del Monte Pineapples*, 2009 WL 3241401, at *16.  The Court should exclude Drs. Magee and Ikizler from summarizing Archer's case for the jury and adding their "expert" imprimatur to a factual account that Archer must put into evidence through fact witnesses.

---

[4] Mr. Archer is not qualified to give these opinions and does not have the personal knowledge necessary to do so.  But even if he did, Archer did not disclose Mr. Archer as a fact witness through which it intends to offer opinion testimony in accordance with Rule 26(a)(2)(C).

## II.     The Court Should Preclude Archer's Experts from Offering Legal Opinions and Conclusions.

Closely related to Archer's use of Drs. Magee and Ikizler to recount its liability story to the jury is Archer's use of these experts to state opinions on the law and draw legal conclusions. "If an expert's statement offers no more than what a lawyer could offer in argument, it should be excluded." *Garcia v. Navasota Indep. Sch. Dist.*, No. H-09-3892, 2011 WL 335253, at *7 (S.D. Tex. Jan. 31, 2011); *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986). The Court should exclude Drs. Magee and Ikizler from offering these opinions and conclusions. *Snap-Drape Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996); *Alldread v. City of Grenada*, 988 F.2d 1425, 1436–37 (5th Cir. 1993); *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983); *In re Air Crash Disaster at New Orleans*, 795 F.2d at 1233; *Garcia*, 2011 WL 335253, at *7.

Drs. Magee and Ikizler repeatedly offer opinions and conclusions on antitrust law, even as they concede they are not lawyers and lack the qualifications to offer such opinions. *See* Am. Rpt. ¶¶ 146, 156 <span style="color:red">REDACTED</span>. For example, Drs. Magee and Ikizler purport to supplant the jury by concluding that <span style="color:red">REDACTED</span>

*Id.* ¶ 20. They also purport to supplant the Court, by defining what the law is. *Id.* ¶ 151 <span style="color:red">REDACTED</span>. And Drs. Magee & Ikizler decide for themselves that the law does not even require them to meet burdens of proof the law places squarely on Archer, for example by claiming <span style="color:red">REDACTED</span>

*Id.* ¶ 159. Expert economists can (indeed, as discussed

8

below, *see infra* Part IV, must) define the contours of the relevant antitrust market.  But that is

not what Drs. Magee and Ikizler are doing here; rather, they are declaring as a matter of law that

they do not need to do any market analysis at all.

These are just examples of the legal opinions and conclusions that pervade the Amended

Report.  *See* Am. Rpt. ¶¶ 146–156                                                  ¶¶ 197–

202                                     REDACTED

The Court should exclude Drs. Magee and Ikizler from offering legal opinions and conclusions.

**III.   Drs. Magee's and Ikizler's Economic Analysis Should Be Excluded as Unreliable and Unsupported.**

*Daubert* charges the Court to act as a gatekeeper against unreliable, speculative expert

opinions like those found in the Amended Report.  *Daubert v. Merrell Dow Pharms., Inc.*, 509

U.S. 579, 592–93 (1993); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243–44 (5th Cir. 2002).

Experts must rely on sufficient facts and data for their analysis to be reliable.  *Daubert*, 509 U.S.

at 592–93; *Ellipsis Inc. v. Color Works, Inc.*, 428 F. Supp. 2d 752, 754 (W.D. Tenn. 2006).  They

are not permitted to advance opinions based on *ipse dixit* unconnected to the existing data and

facts.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *In re Med Diversified, Inc.*, 334 B.R.

89, 102 (Bankr. E.D.N.Y. 2005).  They also cannot reach conclusions based on a selective

reading of the facts and assumptions that are counter to economic reality.  *Park v. El Paso Bd. of

Realtors*, 764 F.2d 1053, 1067 (5th Cir. 1985).  Every step of the expert's analysis must be

reliable, or, like a "house of cards," the entire opinion cannot stand.  *Ellipsis*, 428 F. Supp. 2d at

760–61 (alterations and internal quotation marks omitted); *In re Med Diversified*, 334 B.R. at 95.

These concerns take on heightened importance in the antitrust context, where speculative

damages are forbidden.  *Assoc. Gen. Contractors of Cal. Inc. v. Cal. State Council of

Carpenters*, 459 U.S. 519, 529 (1983).  This has long been established:  Antitrust law "does not

attribute remote consequences to a defendant [and] so it holds him liable if proximately the plaintiff has suffered a loss." *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533–34 (1918) (Holmes, J.).  Antitrust experts "cannot indulge in fantasy," *Park*, 764 F.2d at 1067 (internal quotation marks omitted), and they should not be permitted to present the jury "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it," *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 912 (2d Cir. 1975) (Friendly, J.).

Drs. Magee and Ikizler would have the jury believe that Archer, a small local distributor that made an average                           REDACTED

, Ex. 20,

These opinions lack factual support, are unconnected to economic reality, utilize unreliable assumptions and methods, and invite the jury to speculate.  Based on these endemic flaws, the Court should exclude all of their economic damages opinions as unreliable under *Daubert*.

*Damages for Consumables Sales.*                           REDACTED

t

10

REDACTED

REDACTED

---

REDACTED

REDACTED

. *See Concord Boat Corp. v.*

*Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (expert must account for market events that are not "not related to any anticompetitive conduct").

<center>REDACTED</center>

. *Assoc. Gen.*

*Contractors*, 459 U.S. at 544–46; *Herman Schwabe*, 297 F.2d at 911.

<center>REDACTED</center>

*See,*

*e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 147 (E.D. Pa. 2015) (plaintiffs could not recover damages from defendants "for purchases from non-conspirators"); *In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211, 220 (N.D. Ill. 1980) ("The defendants should not

<center>14</center>

REDACTED

REDACTED

REDACTED

<span style="color:red">REDACTED</span>

*See El Aguila*

*Food Prod., Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 (5th Cir. 2005) ("McCoin made no

effort to demonstrate the reasonable similarity of the plaintiffs' firms and the businesses whose

earnings data he relied on as a benchmark."); *Eleven Line, Inc. v. N. Texas State Soccer Ass'n,*

*Inc.*, 213 F.3d 198, 208–09 (5th Cir. 2000).

<span style="color:red">REDACTED</span>

REDACTED                                        . *In re Air Crash Disaster*, 795

F.2d at 1234–35 (excluding expert who used assumptions "abusive of the facts" and "removed

from any area of demonstrated expertise").

REDACTED

REDACTED

<div align="center" style="color:red">REDACTED</div>

<div align="center">* * * * * * * *</div>

Weighed down by these many flaws, the Amended Report cannot stand.  Without factual support, Drs. Magee and Ikizler ask the jury to award speculative damages resting on unreliable assumptions and unjustifiable economic theories.  These flaws render the Amended Report in its entirety unreliable and inadmissible under *Daubert*.  *El Aguila*, 131 F. App'x at 454 ("Because plaintiffs failed to offer substantial evidence on which a principled award of money damages could be based, the district court did not err in granting judgment in favor of Gruma on the claims for money damages.").

**IV.     The Court Should Exclude Dr. Magee's and Dr. Ikizler's Improper and Unsupported Market Definition Opinions.**

Drs. Magee and Ikizler never attempt to define the relevant antitrust market.  *See, e.g.*, Am. Rpt. ¶ 159                                <span style="color:red">REDACTED</span>

Archer has the burden of defining the relevant market, whether in a rule-of-reason case (which Archer and Drs. Magee and Ikizler disclaim, *see* Am. Rpt. ¶ 152) or in a *per se* case. *See, e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (for *per se* rule to apply, plaintiff must show that boycotting firms possess dominant position in relevant market); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123

F.3d 301, 312 (5th Cir. 1997).[7]  Failure to meet this burden is case-dispositive.  *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002); *Doctor's Hosp.*, 123 F.3d at 312; *Ky. Speedway*, 588 F.3d at 916.

The relevant market is defined as the market in which "commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce" affected by the alleged antitrust violation.  *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (internal quotation marks omitted).  Plaintiff must define the relevant market in terms of both (1) geography and (2) product.  *Ky. Speedway*, 588 F.3d at 916.  In other words, Drs. Magee and Ikizler must define a market in which anticompetitive activity would be felt, consisting of (1) the geographic area wherein dentists look to purchase the large capital equipment at issue in this case and (2) the subset of products that consumers regard as substitutes.  *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Drs. Magee and Ikizler fail to do either, which is fatal to Archer's case.

**A.      Drs. Magee and Ikizler Fail To Define the Relevant Product Market.**

<span style="color:red">REDACTED</span>

Am. Rpt. ¶¶ 76–97, 179–183.  But courts "have repeatedly rejected efforts to define markets by price variances or product quality variances."  *In re Fresh Del Monte Pineapples*, 2009 WL3241401, at *11 (collecting cases); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889

---

[7] *See also Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 (10th Cir. 2002); *Ky. Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908, 916 (6th Cir. 2009).

F.2d 524, 528 (4th Cir. 1989) ("The Discounters have not met their burden of establishing that 'better branded' furniture is not interchangeable with other furniture lines." (internal quotation marks omitted)).  This is because the product market is defined not by arbitrary lines, but rather by reference to reasonable interchangeability and cross-elasticity of demand, or, in other words, how and whether (1) substitute products can perform the same function and (2) consumers are sensitive to price levels such that they would elect a substitute for what Drs. Magee and Ikizler call the "Affected" premium brands.  *Lantec*, 306 F.3d at 1024; *Ky. Speedway*, 588 F.3d at 916, 918.  It is not enough for an expert to declare that consumers prefer the "affected" brands.  *In re Fresh Del Monte Pineapples*, 2009 WL3241401, at \*10.  Rather, courts mandate that antitrust experts use accepted methods to define the product market, most often in the form of the SSNIP ("Small but Significant Non-Transitory Increase in Price") test.  *Ky. Speedway*, 588 F.3d at 916, 918.

<p style="text-align:center; color:red;">REDACTED</p>

---

[8] The *Brown Shoe* factors derive from *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), and include: (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facility, (4) distinct customers, (5) distinct prices, (6) sensitivity to price change, and (7) specialized vendors.  *In re Fresh Del Monte Pineapples*, 2009 WL 3241401, at \*10.  Drs. Magee and Ikizler never list these factors, much less analyze them in any serious way.  In any event, the *Brown Shoe* factors "come into play only after the outer boundaries of a product market are determined by evaluating the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Ky. Speedway*, 588 F.3d at 918 (internal quotation marks omitted).

REDACTED

REDACTED

to narrow relevant market to "'A' rated hunter and jumper Recognized Horse Shows" because plaintiffs failed "to allege that 'A' rated hunter and jumper Recognized Horse Shows are unique or explain why 'A' rated hunter and jumper Recognized Horse Shows are not part of the larger market for horse competitions"). The Amended Report's conclusory attempt to define the product market as being limited to "premier" brands of dental equipment fails as a matter of law.

**B.      Drs. Magee and Ikizler Fail To Define the Relevant Geographic Market.**

The Amended Report's attempt to prove a geographic market in which Archer supposedly would have operated but for the conspiracy also fails.          REDACTED

These assertions are unsupported and contrary to the facts.  *Apani*, 300 F.3d at 628.

REDACTED

*Ky. Speedway*, 588 F.3d at 916, 918.   REDACTED

.  *See Lantec*, 306 F.3d at 1025–26 ("Dr. Beyer attempted to spin anecdotes from a handful of personal conversations with firms in a limited geographic area into evidence of a worldwide product market.  These conversations are not sufficient . . . .").

24

Drs. Magee and Ikizler also do not justify why the "national" market is appropriate in the first place.  "The geographic market consists of the area of effective competition," which is, "the *narrowest* market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market."  *Lantec*, 306 F.3d at 1026–27 (internal quotation marks omitted; emphasis added).  Factors to consider include "price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors."  *Id.* (internal quotation marks omitted).                     REDACTED

                    *See Lantec*, 306 F.3d at 1027 ("The geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." (alteration and internal quotation marks omitted)).

Finally, the idea that a "national" market must be the relevant market, as opposed to a regional market or the local market in which Archer has competed for its entire existence is

contradicted by Drs. Magee and Ikizler themselves.                    REDACTED

Am. Rpt. ¶¶ 173, 176, 177.

**C.     The Failure To Define the Relevant Market Reveals the Hollowness of Drs. Magee's and Ikizler's Analysis.**

The definition of a relevant market in which the Defendants have market power is not a mere academic exercise. It goes to the heart of demonstrating why Drs. Magee and Ikizler fail to show that Archer can advance a viable antitrust claim *at all* due to the fundamental concepts of both *inter*brand and *intra*brand competition that these experts ignore.

*Interbrand Competition.* Even if (counter to the actual facts) the Dental Company Defendants wanted to conspire with their distributors to diminish *intrabrand* competition (competition among dealers that sell the Dental Company Defendants' products) and raise margins, *interbrand* competition (competition between the Dental Company Defendants and other brands of dental equipment) would limit their ability to do so. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 725 (1988). In other words, consumers could simply turn to the many other dental equipment manufacturers in evidence, *see supra* at 23 and note 11, thereby depressing demand for the Dental Company Defendants' equipment and thwarting their ability to raise prices or margins. *See, e.g., Doctor's Hosp.*, 123 F.3d at 308–09 ("[I]nterbrand competition provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." (internal quotation marks omitted)); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 576 (1977). Drs. Magee and Ikizler never account for this or explain why the alleged conspiracy could have succeeded in the face of interbrand competition.

26

*Intrabrand Competition.*  But it is not just that *inter*brand competition undermines Drs. Magee's and Ikizler's economic theories; *intra*brand competition does, too.  If Schein, Benco, Patterson, and Burkhart (again, contrary to the evidence) all conspired to set supracompetitive margins after they supposedly eliminated Archer, dentists in Archer's market could turn to another local distributor that was Archer's direct competitor:   REDACTED   which had access to the Dental Company Defendants' products throughout the period of the alleged conspiracy and beyond.  Ex. 9 (Broncatti Tr. 61:8–21); Ex. 12 (Centala Tr. 37:1–9); Ex. 17 (Zambetti Tr. 140:22–25).  Drs. Magee and Ikizler do not cite any evidence that Midwest participated in the supposed conspiracy, and there is none.                    REDACTED


              t.  Ex. 17 (Zambetti Tr. 150:10–152:5); Ex. 21 (Zambetti Ex. 1); Ex. 23.  Again, Drs. Magee and Ikizler never provide any evidence that these distributors were part of the alleged conspiracy.

       Thus, even if Drs. Magee and Ikizler could find some fact or evidence demonstrating that Patterson, Schein, Burkhart, Benco, and the Dental Company Defendants all conspired to fix margins for the Dental Company Defendants' products.REDACTED would have checked such a conspiracy in Archer's local region (Texas) by undercutting those margins, thereby undermining the conspiracy at the outset through intrabrand competition.  And the same would have happened nationwide through various regional and local distributors who likewise would not have been constrained to sell at artificially inflated margins.  Again, Drs. Magee and Ikizler never come to terms with these fundamental economic realities.

       *Archer's Conspiracy Makes No Economic Sense.*  The other side of the market-power coin are the many pro-competitive justifications for a manufacturer to manage its dealer network

and the many market checks on their ability to harm competition while doing so.  As the

Supreme Court has explained, vertical management of a dealer network permits consumers *more*

choice, including between "low-price, low-service brands" and "high-price, high-service brands"

and "brands that fall in between."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S.

877, 890 (2007).  But without such distributor management, "the retail services that enhance

interbrand competition might be underprovided . . . because discounting retailers can free ride on

retailers who furnish services and then capture some of the increased demand those services

generate."  *Id.*; *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762–63 (1984) ("The

manufacturer often will want to ensure that its distributors earn sufficient profit to pay for

programs such as hiring and training additional salesman or demonstrating the technical features

of the product, and will want to see that 'free riders' do not interfere."); *Culberson, Inc. v.*

*Interstate Elec. Co.*, 821 F.2d 1092, 1094 n.3 (5th Cir. 1987).  This, in turn, causes "the high-

service retailer [to] lose sales to the discounter, forcing it to cut back its services to a level lower

than consumers would otherwise prefer."  *Leegin*, 551 U.S. at 891; *see also Doctor's Hosp.*, 123

F.3d at 310.

　　　　Here again, Drs. Magee and Ikizler's theories make no economic sense because the

Dental Company Defendants would be *dis*incentivized to fix margins, which is the core

allegation in the SAC.  SAC ¶ 1.  The Supreme Court has explained why: "A manufacturer has

no incentive to overcompensate retailers with unjustified margins.  The retailers, not the

manufacturer, gain from higher retail prices.  The manufacturer often loses; interbrand

competition reduces its competitiveness and market share because consumers will substitute a

different brand of the same product."  *Leegin*, 551 U.S. at 896 (internal quotation marks

omitted).  It is undisputed that in all three lines of equipment at issue (core equipment, imaging,

and handpieces), the Dental Company Defendants compete in a crowded marketplace.  *See supra* at 23 and note 11.  Joining an antitrust conspiracy to fix margins could only harm the Dental Company Defendants, because they would lose sales and market share to these other manufacturers who could capitalize on these inflated margins.

By failing to define a relevant product or geographic market within which any Defendant had market power, not confronting the procompetitive justifications for the Archer's termination, and failing to explain how the alleged conspiracy makes any economic sense, Drs. Magee and Ikizler failed to account for the countervailing market effects that would have destroyed the alleged conspiracy before it ever could have any effect.  Drs. Magee and Ikizler have shown no viable economic antitrust theory.  *See Leegin*, 551 U.S. at 906 ("The purpose of the antitrust laws . . . is 'the protection of competition, not competitors.'" (citation and emphases omitted)).  Their report should be excluded and Archer's claims should be dismissed.

**V.      The Court Should Exclude Dr. Abernathy from Offering Unsupported Economic Opinions That He Is Not Qualified To Give.**

Based solely on his experience as a dentist and a consultant who assists dentists in setting up practices, and without any review of the sales data produced here or any economic expertise in his own right, Dr. Abernathy purports to offer opinions well outside his expertise. First, Dr. Abernathy purports to opine on how price is set and resources are allocated in the market for dental equipment.                           REDACTED

REDACTED      Finally, based solely on personal experience and anecdote, Dr. Abernathy

claims to describe how dentists (as a supposed unitary group) select and purchase dental

equipment.  *Id.*  The Court should exclude these pricing, competition, and econometric opinions.

Dr. Abernathy is a dentist and a business consultant, not an economist or antitrust expert.

He never explained how his expertise or experience allows him to draw these conclusions.


REDACTED


*Id.* at REDACTED

168:11–22, 163:18–164:2, 171:2–22.  That is not permissible, and the Court should exclude Dr.

Abernathy from offering these opinions.  *See GWTP Invs., L.P. v. SES Americom, Inc.*, No. 3:04-

CV-1383-L, 2007 WL 7630459, at *14 (N.D. Tex. Aug. 3, 2007).[12]

## CONCLUSION

Dr. Abernathy should be precluded from testifying about the market for dental equipment

distribution.  The Amended Report of Drs. Magee and Ikizler should be excluded as unreliable,

and they should be excluded from testifying.  Absent admissible damages opinions, the Court

should dismiss Archer's Second Amended Complaint with prejudice and grant Defendants such

further relief that the Court deems justified and appropriate.

---

[12] To the extent Drs. Magee and Ikizler rely on these inadmissible opinions, their corresponding
opinions should be excluded, as well.

Dated:  December 4, 2017

Respectfully submitted,

/s/ Paul F. Schuster
Paul F. Schuster
Texas Bar No. 00784931
pschuster@lockelord.com
John P. McDonald
Texas Bar No. 13549090
jpmcdonald@lockelord.com
Matthew K. Hansen
Texas Bar No. 24065368
mkhansen@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone: (214) 740-8000
Facsimile: (713) 740-8800

Christopher Ondeck (*pro hac vice*)
condeck@proskauer.com
Adrian Fontecilla (*pro hac vice*)
afontecilla@proskauer.com
Stephen Chuk (*pro hac vice*)
schuk@proskauer.com

PROSKAUER ROSE LLP
1001 Pennsylvania Avenue NW
Washington, DC 20016
Telephone: (202) 416-5865
Facsimile: (202) 416-6899

Barack S. Echols
barack.echols@kirkland.com
Richard C. Godfrey
richard.godfrey@kirkland.com
J. Andrew Langan
andrew.langan@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle Street, Suite 2400
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile (312) 862-2200

*ATTORNEYS FOR DEFENDANT
HENRY SCHEIN, INC.*

/s/ Jay W. Schlosser
Clyde M. Siebman
Stephanie Barnes
SIEBMAN, BURG, PHILLIPS & SMITH
LLP
300 North Travis Street
Sherman, TX 75090
Tele: (903) 870-0070
Fax: (903) 870-0066
clydesiebman@siebman.com
stephaniebarnes@siebman.com

James J. Long (admitted *Pro Hac Vice*)
Mark G. Schroeder (admitted *Pro Hac Vice*)
Jay W. Schlosser (admitted *Pro Hac Vice*)
Scott M. Flaherty (admitted *Pro Hac Vice*)

BRIGGS AND MORGAN, P.A.

2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Tele: (612) 977-8400
Fax: (612) 977-8650
jlong@briggs.com
msehfoeder@briggs.com
iscliiosser@briggs.com
stlaherty@briggs.com

*ATTORNEYS FOR DEFENDANT
PATTERSON COMPANIES, INC.*

31

_/s/ Howard D. Scher_
T. John Ward
Claire Abernathy Henry
WARD, SMITH &HILL, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400
tjw@wsfirm.com
claire@wsfirm.com

Howard D. Scher (admitted _pro hac vice_)
Kenneth L. Racowski (admitted _pro hac vice_)
David A. Schumacher (admitted _pro hac vice_)
BUCHANAN INGERSOLL &ROONEY PC
Two Liberty Place, Suite 3200
50 South 16th Street
Philadelphia, PA 19102
(215) 665-8700
howard.scher@bipc.com
kenneth.racowski@bipc.com
david.schumacher@bipc.com

**_ATTORNEYS FOR DEFENDANT BENCO
DENTAL SUPPLY COMPANY_**

/s/ Brett C. Govett
Brett C. Govett (Bar No. 08235900)
Katherine P. Lett (Bar No. 24007548)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX  75201
Tel:  (214) 855-8118
Fax:  (214) 855-8200
Brett.Govett@nortonrosefulbright.com
Katherine.Lett@nortonrosefulbright.com

Layne E. Kruse (Bar No. 11742550)
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010
Tel:  (713) 651-5151
Fax:  (713) 651-5246
Layne.Kruse@nortonrosefulbright.com

Steven R. Kuney (*pro hac vice*)
Jonathan B. Pitt (*pro hac vice*)
Liam J. Montgomery (*pro hac vice*)
Matthew C. Monahan (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
skuney@wc.com
jpitt@wc.com
lmontgomery@wc.com
mmonahan@wc.com

*ATTORNEYS FOR DEFENDANTS DANAHER
CORPORATION, INSTRUMENTARIUM
DENTAL INC., DENTAL EQUIPMENT LLC,
KAVO DENTAL TECHNOLOGIES, LLC, AND
DENTAL IMAGING TECHNOLOGIES
CORPORATION*

## CERTIFICATE OF CONFERENCE

On November 28, 2017, in accordance with Local Rule CV-7, counsel for Defendants, Liam Montgomery, Paul Schuster, Scott Flaherty, and Ken Racowski conferred by telephone with counsel for Archer, Phillip Aurentz and Chelsea Priest, regarding the relief sought in this Motion.  The parties were unable to narrow their dispute and agreed that they had reached an impasse.

/s/ *Brett C. Govett*
Brett C. Govett

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by using the Court's electronic filing system and e-mail on December 4, 2017.

/s/ *Brett C. Govett*
Brett C. Govett