**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ARCHER AND WHITE SALES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 2:12-CV-00572-JRG-RSP |
| HENRY SCHEIN, INC., DANAHER | ) | |
| CORPORATION, INSTRUMENTARIUM | ) | **ORAL ARGUMENT REQUESTED** |
| DENTAL INC., DENTAL EQUIPMENT | ) | |
| LLC, KAVO DENTAL TECHNOLOGIES, | ) | **FILED UNDER SEAL** |
| LLC AND DENTAL IMAGING | ) | |
| TECHNOLOGIES CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**SEALED MOTION FOR SUMMARY JUDGMENT**
**BY DEFENDANTS DANAHER CORPORATION, INSTRUMENTARIUM DENTAL**
**INC., DENTAL EQUIPMENT LLC, KAVO DENTAL TECHNOLOGIES, LLC, AND**
**DENTAL IMAGING TECHNOLOGIES CORPORATION**

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

STATEMENT OF THE ISSUES.........................................................................................1

BACKGROUND ................................................................................................................3

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................8

      A.     Archer's Claims Related to Dynamic Dental.........................................................8

      B.     Archer's Claim Regarding Instrumentarium's April 2009 Territory
            Restriction. ..........................................................................................................10

      C.     Archer's Claim Regarding the 2014 Terminations. ..............................................11

      D.     Archer's Claims Regarding Other Manufacturers. ...............................................12

      E.     Archer's Evidence Regarding Unrelated Alleged Conspiracies............................13

      F.     Archer's Claims Against Danaher. .......................................................................14

ARGUMENT AND AUTHORITIES................................................................................15

I.     There Is No Evidence of a Conspiracy. ...........................................................................15

      A.     There Is No Evidence of a Horizontal Conspiracy Among Manufacturers...........17

      B.     There Is No Material Fact Demonstrating a Horizontal Conspiracy at the
            Distributor Level. .................................................................................................18

      C.     There Is No Material Fact Establishing a Vertical Conspiracy Between Any
            Manufacturer and Any Distributor........................................................................20

II.    As a Matter of Law, Any Claim, and Any Alleged Damages, that Derive from
      Dynamic Dental's Alleged Wrongful Termination Are Owned by Benco.......................23

III.   There Is No Material Issue of Disputed Fact as to Whether Danaher Corporation
      Participated in the Alleged Conspiracies—It Did Not, and It Cannot Be Liable for
      Its Subsidiaries' Alleged Acts...........................................................................................23

      A.     Archer Has Adduced No Evidence That Would Justify Piercing the
            Corporate Veil.....................................................................................................24

      B.     There Are No Material Facts Showing That Danaher Joined Any Alleged
            Antitrust Conspiracy. ..........................................................................................26

IV.   Archer Has Not Adduced Evidence Demonstrating That the Alleged Group Boycott Should Be Treated as *Per Se* Illegal. .................................................................................27

V.   Archer's Failure To Advance Admissible Expert Evidence in Support of Its Claims Is Fatal.................................................................................................................................30

CONCLUSION......................................................................................................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Am. Eagle Ins. v. United Techs. Corp.*,
   48 F.3d 142 (5th Cir. 1995) ......................................................................................25

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ....................................................................................30

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)..................................................................................................23

*Austin v. Granite Quarries, USA, Inc.*,
   No. 1:98-cv-455, 1999 WL 33798700 (M.D.N.C. Dec. 2, 1999)......................................25, 26

*Baker v. Raymond Int'l, Inc.*,
   656 F.2d 173 (5th Cir. 1981) ....................................................................................26

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................16

*Berger v. Columbia Broad. Sys., Inc.*,
   453 F.2d 991 (5th Cir. 1972) ....................................................................................25

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
   155 F.3d 331 (4th Cir. 1998) ................................................................................24, 25

*Burdett Sound, Inc. v. Altec Corp.*,
   515 F.2d 1245 (5th Cir. 1975) ..............................................................................16, 17

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988)..............................................................................................27, 28

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   780 F.2d 1212 (5th Cir. 1986) ..........................................................................21, 28, 29

*Century Oil Tool, Inc. v. Prod. Specialties, Inc.*,
   737 F.2d 1316 (5th Cir. 1984) ..................................................................................17

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)..................................................................................................17

*Culberson, Inc. v. Interstate Elec. Co.*,
   821 F.2d 1092 (5th Cir. 1987) ..........................................................................16, 20, 21

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*,
   123 F.3d 301 (5th Cir. 1997) ......................................................................16, 17, 27, 28

*El Aguila Food Prod., Inc. v. Gruma Corp.*,
   131 F. App'x 450 (5th Cir. 2005) ....................................................................30

*Fuller v. Eagle Constr. & Envtl. Servs., L.P.*,
   No. 6:08CV326, 2009 WL 10676788 (E.D. Tex. Nov. 23, 2009)...........................................21

*Golden Bridge Tech. Corp. v. Motorola, Inc.*,
   547 F.3d 266 (5th Cir. 2008) ....................................................................... passim

*Hassinger v. Tideland Elec. Membership Corp.*,
   622 F. Supp. 146 (E.D.N.C. 1985)..............................................................24, 25

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..........................................................................29

*In re Processed Egg Prod. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...........................................................26, 27

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d 51 (2d. Cir. 2012).............................................................................26

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959).......................................................................................28

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)...........................................................................22, 27, 28

*Lupia v. Stella D'Oro Biscuit Co.*,
   586 F.2d 1163 (7th Cir. 1978) .......................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).......................................................................16, 19, 20, 21

*Mendelovitz v. Adolph Coors Co.*,
   693 F.2d 570 (5th Cir. 1982) .................................................................17, 18, 27

*MM Steel, L.P. v. JSW Steel (USA), Inc.*,
   806 F.3d 835 (5th Cir. 2015) ...........................................................20, 27, 28, 29

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)......................................................................16, 17, 20, 21

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
   472 U.S. 284 (1985).................................................................................27, 29

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998)..................................................................................27, 28

iv

*O'Dell v. Gen. Motors Corp.*,
  122 F. Supp. 2d 721 (E.D. Tex. 2000) ................................................................16

*Park v. El Paso Bd. of Realtors*,
  764 F.2d 1053 (5th Cir. 1985) ............................................................................18

*Reisner v. Gen. Motors Corp.*,
  511 F. Supp. 1167 (S.D.N.Y. 1981) ..............................................................25, 29

*S. Volkswagen, Inc. v. Centrix Fin., LLC*,
  357 F. Supp. 2d 837 (D. Md. 2005) ....................................................................27

*Star Tobacco, Inc. v. Darilek*,
  298 F. Supp. 2d 436 (E.D. Tex. 2003) ..................................................................1

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
  830 F.2d 1374 (7th Cir. 1987) ............................................................................23

*Tunica Web Advert. v. Tunica Casino Operators Ass'n*,
  496 F.3d 403 (5th Cir. 2007) ..............................................................................27

*United States v. Bestfoods*,
  524 U.S. 51 (1998)..............................................................................................25

*United States v. Cornett*,
  195 F.3d 776 (5th Cir. 1999) ........................................................................18, 19

*Viazas v. Am. Ass'n of Orthodontists*,
  314 F.3d 758 (5th Cir. 2002) ..................................................................16, 20, 21

## STATE CASES

*B-W Acceptance Corp. v. Spencer*,
  149 S.E.2d 570 (N.C. 1966)..........................................................................24, 26

*Richardson v. Bank of Am., N.A.*,
  643 S.E.2d 410 (N.C. Ct. App. 2007)..................................................................24

## OTHER AUTHORITIES

Fed. R. Evid. 602 ....................................................................................................19

Fed. R. Evid. 801(d)(2)(E) .....................................................................................18

Tex. Bus. & Com. Code Ann. § 15.04 ......................................................................1

Archer alleges a wide-ranging conspiracy involving numerous distributors and manufacturers of dental equipment to boycott Archer.  But Archer either signed away these claims in 2009 or supports them with inadmissible and/or circumstantial evidence—competing dealer complaints and threats followed by termination—that the Supreme Court and the Fifth Circuit mandate to be inadequate to survive summary judgment.  In addition, the undisputed evidence establishes that Archer's claim cannot be evaluated under the *per se* rule of liability, which is fatal to Archer's claims because it has disavowed any alternative rule-of-reason claim.  Summary judgment should be granted in favor of Danaher Corporation and the Dental Company Defendants.[1]

## STATEMENT OF THE ISSUES[2]

1.      Section 1 of the Sherman Act requires Archer to prove a "contract, combination, or conspiracy" among the Defendants (as does its state-law analog, the Texas Free Enterprise and Antitrust Act).[3]  There are no material facts demonstrating a conspiracy at *any* level: (1) not at the horizontal level between the Dental Company Defendants and any other manufacturer; (2) not at the horizontal level among the Distributor Defendants (Schein, Benco, Patterson, and for the purposes of this Motion, non-defendant alleged conspirator, Burkhart); and (3) not at the vertical level between the Dental Company Defendants or any other manufacturer on the one

---

[1] "Dental Company Defendants" refers to Instrumentarium Dental Inc., Dental Equipment LLC, Kavo Dental Technologies, LLC, and Dental Imaging Technologies Corp.

[2] Danaher and the Dental Company Defendants incorporate by reference all arguments and evidence set forth in the summary judgment motions of the other defendants.

[3] "TFEAA § 15.05 is intended to be construed in accordance with the corresponding provisions of the federal antitrust statutes."  *Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436, 440–41 (E.D. Tex. 2003); *see* Tex. Bus. & Com. Code Ann. § 15.04 (West 2017) ("The provisions of this Act . . . shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes . . . .").  Thus, Archer's TFEAA claim rises and falls with its Sherman Act claim and this Motion, therefore, will focus on the Sherman Act.

hand and any Distributor Defendant on the other.  Having failed to create a genuine issue of material fact on this fundamental requirement for any Section 1 claim, Archer's claims fail.

2.     Archer claims to have partnered with Dynamic Dental to distribute dental equipment in Oklahoma and that it was harmed by Pelton & Crane's alleged wrongful termination of Dynamic Dental in February 2008.  In 2009, however, Benco purchased Dynamic's assets for less than REDACTED, including "all causes of action [or] rights of action . . . against third parties"—an agreement Jim Archer Sr. consented to in writing.  As a matter of law, Archer cannot premise its claims upon its partnership with Dynamic, because Benco owns any such claims and Archer lacks standing to raise them on Dynamic's behalf.

3.     To hold Danaher Corporation liable here, Archer must demonstrate that either (1) the corporate veils of the Dental Company Defendants should be pierced, or (2) Danaher itself consciously and directly participated in the specific antitrust conspiracies Archer alleges. Archer cannot make either showing.

4.     Archer cannot proceed on a *per se* theory of antitrust liability against the Dental Company Defendants, because Archer has failed to demonstrate a horizontal conspiracy at the distributor level, rendering any claim of a *per se* "group boycott" a dead letter.  But even if it could make such a showing, there is no material issue of disputed fact that the Dental Company Defendants' products are not necessary to compete.  Because Archer has declined to allege an alternative rule-of-reason claim, its failure to demonstrate that *per se* treatment is appropriate is fatal to its claims, and summary judgment should be granted.

5.     Finally, for the reasons set forth in Defendants' accompanying joint *Daubert* Motion, Archer lacks admissible expert testimony defining a relevant antitrust market or supporting its damages, which are fundamental elements of its Sherman Act claim.

## BACKGROUND[4]

Archer alleges that Danaher, the Dental Company Defendants, and the Distributor Defendants conspired among themselves and with other manufacturers (Midmark and Belmont) to exclude Archer from the market for three types of dental equipment: (1) so-called "core equipment," which includes such products as chairs, lights, and cabinets; (2) imaging equipment (various types of x-ray machines); and (3) dental handpieces (drills and other handheld mechanical tools).  Second Am. Compl. ("SAC") ¶¶ 1, 35–39.  Archer's allegations can be broken down into three specific allegedly wrongful acts.

*Dynamic Dental's 2008 Pelton & Crane Termination*.  First, Archer claims that Pelton & Crane wrongfully terminated its joint-venture partner Dynamic, in February 2008 from selling core equipment in Oklahoma and Northwest Arkansas.  The evidence demonstrates, however, that Pelton & Crane terminated Dynamic for its own independent business reasons, rather than pursuant to an alleged conspiracy.  Ex. 4 (Bump Tr. 169:20–24); Ex. 27 (Wilson Tr. 120:22–121:1); Ex. 32 (Foster Dec. ¶ 3).

Specifically, in 2007 and 2008, Pelton & Crane was effectuating two important changes:

REDACTED

Ex. 12 (Foster Tr. 135:8–18); Ex. 27 (Wilson Tr. 112:9–113:21, 115:14–22).  The former resulted in the termination of nearly REDACTED Pelton & Crane dealers across the country pursuant to an intensive review of each local market, including

REDACTED

---

[4] This evidence is presented for background purposes only.  A separate Statement of Undisputed Material Facts on which this Motion relies follows below.

<div align="center" style="color:red">REDACTED</div>

Ex. 4 (Bump Tr. 166:16–167:17, 168:12–21, 169:2–13); Ex. 12 (Foster Tr. 74:5–16, 74:23–75:14, 80:21–81:4); Ex. 32 (Foster Dec. ¶ 2).  The purpose was to arrive at the number of distributors that allowed Pelton & Crane to best serve dentists and to effectively compete against other manufacturers.   Ex. 12 (Foster Tr. 74:5–16).  The sales territory realignment eliminated overlap between Pelton & Crane and Marus salespeople in each territory by combining their sales forces and then assigning each salesperson to a smaller geographic territory.  Ex. 4 (Bump Tr. 164:5–18); Ex. 27 (Wilson Tr. 112:9–113:21).  Pursuant to both of these efforts, Pelton & Crane determined for its own independent business reasons that it did not want Dynamic to distribute either Pelton & Crane or Marus products in the Oklahoma region.  Ex. 4 (Bump Tr. 184:22–185:6); Ex. 12 (Foster Tr. 138:8–20); Ex. 27 (Wilson Tr. 120:22–121:1); Ex. 32 (Foster Dec. ¶ 3).

   *Instrumentarium's Restriction of Archer's Territory in 2009.*  Second, Archer argues that Instrumentarium wrongfully terminated its limited right to sell imaging equipment outside the state of Texas in April 2009.  The evidence shows that in 2007, Instrumentarium permitted Archer to distribute outside of its territory on a limited basis, pursuant to a pilot program meant to expand Instrumentarium's market share in regions either where it did not already have a local distributor, or where its existing distributors supported other manufacturers over Instrumentarium.  Ex. 13 (Franz Tr. 27:18–28:14, 169:17–171:5).  In order to ensure that the pilot program worked as intended, Instrumentarium required Archer to approach the local Instrumentarium sales representative in a particular area before initiating a sale in that area.  *Id.* This was because the Instrumentarium representative would be responsible for the ongoing service, training, support, and maintenance that a local, full service distributor would normally

<div align="center">4</div>

be required to provide.  *Id.*  It was Archer's job to convince the local Instrumentarium sales representative that this would be worth the extra expenditure of time and effort associated with supporting a dealer, Archer, that lacked the usual required local sales, service, and support.  *Id.*

Archer failed to convince the Instrumentarium sales representatives that the pilot program could work.  Ex. 13 (Franz Tr. 245:4–15).  The local Instrumentarium representatives did not want to invest the time and money necessary to support Archer over local dealers in their areas, who did have the required infrastructure to support a sale and with whom the Instrumentarium representatives were trying to build or maintain relationships.  Ex. 13 (Franz Tr. 170:13–171:5, 240:1–241:13).  In addition, Archer repeatedly failed to abide by the terms of the pilot program, often setting up or even closing a sale with a local doctor before ever approaching the local Instrumentarium representative.  Ex. 13 (Franz Tr. 238:17–25).  This caused Archer to be working with doctors who already had been approached by a local full-service dealer that had invested in the necessary infrastructure to support the doctor and resulted in these local dealers being understandably upset at Archer undercutting them on a sale without having been required to build and maintain that infrastructure.  Ex. 47 (Franz Dep. Ex. 1); Ex. 48 (Morgan Dep. Ex. 2).

Instrumentarium received numerous complaints from other distributors about the pilot program; often the complaints were vociferous.  For example, in December 2008, Schein employee Don Hobbs complained about the Archer program, and Instrumentarium General Manager John Franz responded by stating that he would    REDACTED    Ex. 40 (Dep. Ex. 812).  But Mr. Franz testified that he meant he would ensure that Archer would abide by the established pre-clearance arrangement described above, and that the April 2009 restriction— which did not occur until three and half months later—had nothing to do with this statement.  Ex. 13 (Franz Tr. 137:19–138:17).  Indeed, Mr. Franz was clear that the territory restriction had

nothing to do with complaints by any other distributor; it simply had to do with the pilot program not working as hoped.  Ex. 13 (Franz Tr. 245:4–246:2).

Emblematic of the troublesome nature of this arrangement was Archer's sale of an x-ray system to a doctor in Las Vegas.  Ex. 33 (AW0030630).  After Archer had the x-ray system installed, the doctor became upset and demanded his money back because he could not get the product to work properly.  *Id.*  Because it was Instrumentarium's name on the product, not Archer's, the doctor directed his ire at Instrumentarium, not Archer.  Ex. 13 (Franz Tr. 241:15–242:4).  This and other events like it persuaded Instrumentarium that the pilot program with Archer did not work.  Ex. 13 (Franz Tr. 244:16–245:15).

Archer was a problematic dealer for Instrumentarium in other ways.  For example, Archer sold an x-ray to a doctor in Ohio and provided *no* installation service.  Ex. 13 (Franz Tr. 268:1–269:10).  When the doctor installed the x-ray himself as a result, the building inspector refused to certify the installation, preventing the doctor from opening his office.  Ex. 13 (Franz Tr. 251:9–23).  Again, the doctor was upset with Instrumentarium, not Archer.  Ex. 13 (Franz Tr. 268:1–269:10).

Based on the failure of the pilot program and these other issues with Archer, in April 2009, Instrumentarium restricted Archer to selling its products only within the immediate area around Archer's showroom in Plano, Texas, where Archer *could* provide the required local sales, service, and support.  Ex. 13 (Franz Tr. 259:5–22); Ex. 48 (Morgan Dep. Ex. 2).[5]

*The 2014 Archer Termination*.  Finally, Archer also alleges that the Dental Company Defendants wrongfully terminated it from all of their lines effective May 2014.  As Pelton &

---

[5] Notably, Dynamic was an authorized dealer for Instrumentarium in Oklahoma at this time.  Ex. 13 (Franz Tr. 235:10–15).  Instrumentarium never terminated Dynamic.  Ex. 21 (Pettus Tr. 470:16–18).

Crane did in 2008, in 2013–2014, the Dental Company Defendants implemented a major rationalization of their dealer networks.  Ex. 12 (Foster Tr. 37:13–23); Ex. 28 (Zambetti Tr. 113:18–115:1); Ex. 32 (Foster Dec. ¶ 4).  In fact, such dealer rationalizations were part of the regular course of business for the Dental Company Defendants, who examined and streamlined their dealer networks virtually every year.  Ex. 3 (Broncatti Tr. 73:22–74:9); Ex. 9 (Dyer Tr. 111:18–112:14).                          REDACTED

                                                                        Ex. 28 (Zambetti Tr. 336:18–337:1).  The Dental Company Defendants independently derived objective criteria for which dealers it would keep and which it would eliminate.  Ex. 28 (Zambetti Tr. 112:17–113:5); Ex. 32 (Foster Dec. ¶ 5); Ex. 49 (Zambetti Dep. Ex. 1).

                                    REDACTED

                    Ex. 12 (Foster Tr. 158:20–24); Ex. 28 (Zambetti Tr. 335:22–336:10); Ex. 32 (Foster Dec. ¶¶ 2, 4).            REDACTED

                                        Ex. 3 (Broncatti Tr. 46:20–47:13, 250:15–251:21); Ex. 28 (Zambetti Tr. 151:24–152:5); Ex. 49 (Zambetti Dep. Ex. 1).  REDACTED

REDACTED

nt.  Ex. 37 (Dep. Ex. 353); Ex. 49 (Zambetti Dep. Ex. 1).  REDACTED

Ex. 3 (Broncatti Tr. 308:12–309:1); Ex. 28

(Zambetti Tr. 150:10–152:5).

REDACTED

Ex. 3

(Broncatti Tr. 250:15–251:21); Ex. 28 (Zambetti Tr. 140:1–141:4).  In February 2014, the Dental

Company Defendants terminated Archer from distributing their products, effective May 2014.

Ex. 34 (AW0001447).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.      Archer's Claims Related to Dynamic Dental.**

1.      On July 28, 2004, Archer entered into a "Joint Venture Agreement" with

Dynamic Dental                                   REDACTED

Ex. 44 (Dep. Ex. 1057).  The agreement granted REDACTED

*Id.*  In exchange,   REDACTED

*Id.*  These  REDACT

*Id.*

2.      Once the                              REDACTED

REDACTED         . Ex. 44 (Dep. Ex. 1057).  Although         REDACTED

Ex. 1 (Archer Tr. 132:24–

133:5).                    REDACTED                    Ex. 44 (Dep. Ex. 1057).  It

is undisputed that such a writing was never agreed to.

3.       There is no direct evidence that the Dental Company Defendants joined any

conspiracy regarding Dynamic Dental.  Instead, Archer supports its 2008 Dynamic Dental

allegations with three different categories of purported circumstantial evidence.

4.       First, Archer relies on hearsay statements allegedly made by Mark Lowery and

others at Schein and by Jack Powers of Burkhart, including statements on tapes Pettus and Phil

Salerno (a Dynamic salesman) secretly made of Lowery and Powers, and statements attributed to

Lowery and Powers by Pettus as supposedly having been made at the 2008 Oklahoma Dental

Association meeting.  SAC ¶¶ 55–73.              REDACTED

Ex. 21 (Pettus Tr. 471:16–472:11).  REDACTED

Ex. 19 (Lowery Tr. 159:20–160:1, 201:24–202:17); Ex. 22

(Powers Tr. 97:6–16); Ex. 6 (Cavaretta Tr. 121:7–122:4); Ex. 11 (Fernandez Tr. 228:14–229:17);

Ex. 16 (Hobbs Tr. 248:2–17); Ex. 18 (Kyle Tr. 200:5–201:2); Ex. 20 (McLemore Tr. 98:8–99:8);

Ex. 29 (Zimmerman Tr. 91:16–92:5); Ex. 30 (Zolfo Tr. 341:8–11, 18–23).

5.       Second, Archer likely will rely on testimony by a former Pelton & Crane

employee, Don Givens, that he assumed that Pelton & Crane terminated Dynamic because

Dynamic                    REDACTED                    Ex. 14

(Givens Tr. 241:11–25).              REDACTED

REDACTED                                          Ex. 14 (Givens Tr. 319:20–

320:5, 326:22–25).

6.       Finally, Archer will rely on complaints by Schein, Burkhart, and others about

Dynamic Dental prior to the termination.  *E.g.*, Ex. 27 (Wilson Tr. 28:8–21, 31:2–8).  REDACTED


Ex. 4 (Bump Tr. 184:12–21); Ex. 12

(Foster Tr. 113:4–12); Ex. 27 (Wilson Tr. 118:25–119:12).   REDACTED


Ex. 4 (Bump Tr. 169:20–24, 184:22–185:6); Ex. 27 (Wilson Tr. 119:24–120:2); Ex.

32 (Foster Dec. ¶ 3).

7.       On May 27, 2009, Benco purchased Dynamic's assets for REDACTED

Ex. 41, at 2 (Dep. Ex. 1015).  The Asset

Purchase Agreement included a "Unanimous Consent of Directors and Shareholders," also dated

May 27, 2009.  Ex. 42 (Dep. Ex. 1016).  This Unanimous Consent recited that Dynamic's Board

of Directors and shareholders            REDACTED                         .  *Id.* at 1.

REDACTED                     .  *Id.* at 2.  The Asset Purchase Agreement

recites the assets included in the sale.  Ex. 41, at 2–4 (Dep. Ex. 1015).  Included as transferred

assets were                         REDACTED

REDA *d.* at 4 (emphasis added).

**B.    Archer's Claim Regarding Instrumentarium's April 2009 Territory Restriction.**

8.       In late-2007, Instrumentarium granted Archer a limited right to distribute its

products outside of the area around Archer's showroom Plano, Texas.  Ex. 13 (Franz Tr. 27:18–

28:14, 169:17–171:5).  In April 2009, Instrumentarium ended this arrangement, but permitted

10

Archer to distribute its products in the state of Texas.  Ex. 48 (Morgan Dep. Ex. 2).[6]  There is no

direct evidence of a conspiracy between Instrumentarium, on the one hand, and any distributor or

other third party on the other, regarding this decision.  Instead, as with Dynamic Dental, Archer

relies on complaints Instrumentarium received about Archer.  *E.g.*, Ex. 40 (Dep. Ex. 812).  REDACTED

Ex. 13 (Franz Tr. 244:16–

246:2).

**C.    Archer's Claim Regarding the 2014 Terminations.**

9.    In February 2014, the Dental Company Defendants terminated Archer from

distributing their products, effective May 2014.  Ex. 34 (AW0001447).  There is no direct

evidence that the Dental Company Defendants made this decision as part of an alleged

conspiracy.    REDACTED

Ex. 28 (Zambetti Tr. 314:11–21, 321:12–323:20, 337:13–338:10); Ex. 31 (Broncatti Dec. ¶ 3);

Ex. 32 (Foster Dec. ¶ 5).

10.    REDACTED

Ex. 28 (Zambetti Tr. 336:18–337:12); Ex. 35 (excerpt of MFR-DEF-

ARCHER-000008813).    REDACTED

Ex. 3 (Broncatti Tr. 66:23–67:1);

Ex. 28 (Zambetti Tr. 140:1–141:4, 341:21–342:14); Ex. 36 (excerpt of MFR-DEF-ARCHER-

000008813).  Archer does not allege that *any* of these other distributors participated in any way

---

[6] Danaher did not acquire Instrumentarium until November 2009, Ex. 13 (Franz Tr. 233:19–23), after Instrumentarium had restricted Archer's sales territory to Texas in April 2009.  Archer does not allege that Instrumentarium conspired with Danaher or any other Dental Company Defendant during this period.

11

in its alleged antitrust conspiracies.

11.     During the years between 2008 and 2014, local sales representatives of various distributors would regularly complain about each other to the Dental Company Defendants about a host of issues regarding specific potential deals with particular doctors, including making sales outside of assigned geographic areas and pricing.  Ex. 4 (Bump Tr. 81:23–82:11); Ex. 28 (Zambetti Tr. 96:13–25).  Some of these complaints were about Archer.  Ex. 39 (Dep. Ex. 800). These complaints would often be vociferous.  *E.g.*, Ex. 45 (Dep. Ex. 1503).   REDACTED

Ex. 3 (Broncatti Tr. 45:20–46:6); Ex. 28 (Zambetti Tr. 314:11–21, 321:12–323:20, 337:13–338:10); Ex. 31 (Broncatti Dec. ¶ 3); Ex. 32 (Foster Dec. ¶ 5).

**D.     Archer's Claims Regarding Other Manufacturers.**

12.     There is no evidence of a horizontal conspiracy among any of the dental equipment manufacturers at issue in this case.

13.     Archer has adduced no evidence that Midmark ever conspired with any other manufacturer against Archer, including the Dental Company Defendants.   REDACTED

Ex. 15 (Hall Tr. 152:13–153:11, 154:10–155:3, 155:22–156:23).  Archer likewise has no evidence that Midmark ever conspired with any distributor against Archer.

REDACTED                          Ex. 15 (Hall Tr. 127:5–16, 136:17–24, 139:4–10, 145:15–22).

14.     Archer has adduced no evidence of a conspiracy as to Belmont.

15.     Archer remains in business today.  Ex. 2 (Blankenship Tr. 13:23–14:5).   REDACTED

Ex. 43 (Dep. Ex. 1053 & supporting materials).

12

16.     Numerous core equipment brands are not alleged to be part of Archer's alleged conspiracies, including Adec, DentalEZ, Engle (Archer distributes Engle today), Boyd, Forest, Sirona, Planmeca, Summit, Porter Royal, NCC, ILS, TPC, Beaverstate, certain Chinese manufacturers, and others.  Ex. 2 (Blankenship Tr. 16:14–18); Ex. 4 (Bump Tr. at 185:18–24); Ex. 8 (Cohen Tr. 336:23–337:5); Ex. 12 (Foster Tr. 41:24–42:8, 47:19–48:4); Ex. 15 (Hall Tr. 150:23–151:18); Ex. 17 (Killian Tr. at 164:2–166:17).  There also are many imaging equipment brands aside from Instrumentarium, Gendex, Midmark, or Belmont, that are not alleged to be part of the conspiracy Archer posits, such as Sirona, J. Morita, Planmeca, Carestream, Vatech, Air Techniques, and others.  Ex. 3 (Broncatti Tr. 284:14–18); Ex. 8 (Cohen Tr. 339:16–24); Ex. 12 (Foster Tr. 41:24–42:8, 68:10–19); Ex. 15 (Hall Tr. 153:25–154:9).  Finally, there are numerous handpiece manufacturers available to Archer that are not affected by any alleged conspiracy, such as Archer's own private-label brand of handpieces it markets, as well as such brands as NSK, Star, Dentsply, Adec, Midwest, Champion, and others.  Ex. 5 (Caillouet Tr. 28:24–30:1); Ex 8 (Cohen Tr. 343:7–18).  In fact, Archer sold some of these other brands, including Star and Midwest.  Ex. 5 (Caillouet Tr. 28:24–29:3).

**E.      Archer's Evidence Regarding Unrelated Alleged Conspiracies.**

17.     There is no direct evidence of a horizontal conspiracy among the Distributor Defendants or Burkhart.                         REDACTED

Ex. 6 (Cavaretta Tr. 121:7–123:20); Ex. 8 (Cohen Tr. 331:23–332:6, 332:24–334:20); Ex. 10 (Edens Tr. 68:19–69:24, 72:5–73:20, 74:14–76:1); Ex. 11 (Fernandez Tr. 228:14–230:17, 230:23–231:19, 232:5–233:3); Ex. 16 (Hobbs Tr. 247:19–248:17); Ex. 17 (Killian Tr. 243:5–245:6, 248:2–250:25, 251:11–252:8); Ex. 18 (Kyle Tr. 200:5–201:2, 201:13–205:6); Ex. 19 (Lowery Tr. 201:24–204:14); Ex. 20 (McLemore Tr. 98:22–102:5); Ex. 22 (Powers Tr. 97:6–

98:2, 99:5–100:17); Ex. 24 (Rogan Tr. 103:11–104:6, 104:15–108:24, 109:6–113:12); Ex. 29

(Zimmerman Tr. 92:20–96:20); Ex. 30 (Zolfo Tr. 341:8–343:21, 347:5–23).

18.      There is no evidence linking an alleged conspiracy among the Distributor

Defendants regarding Amazon.com or certain state dental associations to Archer, to Danaher, or

to any of the Dental Company Defendants.

19.      There is no admissible evidence linking Archer to complaints by dealers, or

statements by the Dental Company Defendants, regarding distributors other than Archer, such as

Pearson or Midco.  *E.g.*, Ex. 46 (Dep. Ex. 1509).

**F.      Archer's Claims Against Danaher.**

20.      There is no evidence that Danaher joined any of the alleged conspiracies

described above.

21.      There is no evidence that the Dental Company Defendants were inadequately

capitalized or that Danaher siphoned company funds from the Dental Company Defendants.

There is no evidence that the Dental Company Defendants functioned as a facade for Danaher

with no identity of their own or that they were excessively fragmented.  There is no evidence of

non-compliance with corporate formalities.  There is no evidence that Danaher used any of the

Dental Company Defendants to work a fraud or injustice upon Archer or anyone else, or that

Danaher had any role in any act alleged to have caused harm to Archer.

22.      Danaher does not manufacturer, market, or sell dental equipment or supplies.  Ex.

13 (Franz Tr. 234:16–19).  Rather, it is a holding company that owns numerous separately

incorporated subsidiaries across a wide range of industries, the dental industry being just one.

Ex. 12 (Foster Tr. 11:5–10).

23.      It is undisputed that Danaher does not take any regular, day-to-day role in the

operation of the Dental Company Defendants' operations; instead, the Dental Company

Defendants have their own executives that run the day-to-day business of the Dental Company Defendants.  Ex. 4 (Bump Tr. 161:18–20); Ex. 12 (Foster Tr. 10:8–9); Ex. 13 (Franz Tr. 234:20–22); Ex. 27 (Wilson Tr. 114:15–21); Ex. 28 (Zambetti Tr. 62:1–21).

24.     The operative distribution agreements at issue in this case, and the termination letters ending those agreements, all came from the Dental Company Defendants, not Danaher. Ex. 34 (AW0001447).  In addition, every relevant Dental Company Defendant witness who Archer alleges to have taken a wrongful act was employed by one of the Dental Company Defendants, not Danaher.  Ex. 3 (Broncatti Tr. 10:11–15); Ex. 4 (Bump Tr. 160:25–161:2, 161:15–17); Ex. 7 (Centala Tr. 7:25–8:3); Ex. 9 (Dyer Tr. 7:6–11); Ex. 12 (Foster Tr. 9:9–10:9); Ex. 13 (Franz Tr. 234:2–15); Ex. 14 (Givens Tr. 84:24–85:4, 320:10–20); Ex. 23 (Renfro Tr. 8:19–25); Ex. 25 (Skinner Tr. 6:21–7:2); Ex. 27 (Wilson Tr. 111:16–18, 114:15–17); Ex. 28 (Zambetti Tr. 8:17–9:9).

25.     To claim otherwise, Archer has relied on a single email chain between Danaher's CEO, Larry Culp, and Schein's CEO, Stanley Bergman.  *See* SAC ¶ 33.   REDACTED

Ex. 38

(Dep. Ex. 415).   REDACTED

Ex. 28 (Zambetti Tr. at 299:19–300:9).

## ARGUMENT AND AUTHORITIES

**I.     There Is No Evidence of a Conspiracy.**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Antitrust plaintiffs alleging a conspiracy must supply either direct evidence of the conspiracy or circumstantial evidence that "tends to exclude the possibility that the alleged conspirators acted independently." *Golden Bridge Tech. Corp. v. Motorola, Inc.*, 547 F.3d 266, 270–71 (5th Cir. 2008) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (internal

quotation marks omitted)); *Viazas v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 761–62 (5th Cir.

2002); *Culberson, Inc. v. Interstate Elec. Co.*, 821 F.2d 1092, 1093 (5th Cir. 1987); *O'Dell v.

Gen. Motors Corp.*, 122 F. Supp. 2d 721, 730 (E.D. Tex. 2000).   The concerted action

requirement requires proof of "'a conscious commitment to a common scheme designed to

achieve an unlawful objective.'"   *Golden Bridge*, 547 F.3d at 271 (quoting *Monsanto Co. v.

Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).   "Independent parallel conduct, or even

conduct among competitors that is consciously parallel, does not alone establish the contract,

combination, or conspiracy required by § 1."   *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

544 (2007)).

   Although summary judgment requires all reasonable inferences to be drawn in favor of

the nonmoving party, the Supreme Court has "limit[ed] the range of permissible inferences from

ambiguous evidence in a § 1 case," holding that "conduct as consistent with permissible

competition as with illegal conspiracy does not, standing alone, support an inference of antitrust

conspiracy," and therefore cannot defeat summary judgment.   *Matsushita*, 475 U.S. at 588.   "[I]n

other words, [plaintiffs] must show that the inference of conspiracy is reasonable in light of the

competing inferences of independent action . . . ."   *Id.*   Accordingly, "an antitrust plaintiff who is

unable to present direct evidence of a conspiracy must introduce circumstantial evidence that

'tends to exclude the possibility of independent action.'"   *Viazas*, 314 F.3d at 761–62 (quoting

*Monsanto*, 465 U.S. at 768).   Courts regularly grant summary judgment absent such evidence.[7]

---

[7] *See, e.g.*, *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975); *Doctor's
Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 312 (5th Cir. 1997); *Golden
Bridge*, 547 F.3d at 273; *Culberson*, 821 F.2d at 1093; *O'Dell*, 122 F. Supp. 2d at 738.

Absent proof of such an agreement, Archer faces the insurmountable reality that it is "settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself." *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1248 (5th Cir. 1975); *Monsanto*, 465 U.S. at 761 ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Mendelovitz v. Adolph Coors Co.*, 693 F.2d 570, 575 n.9 (5th Cir. 1982).  In fact, a "mere unilateral change of distributors is not an unusual business practice, nor is it a violation of the antitrust laws." *Burdett*, 515 F.2d at 1248.  This is true even "where the dealer substitution occurs at the insistence of the new dealer," *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997), "even when the new dealer and the manufacturer agree before the termination of the old dealer that the substitution will occur," *id.*, and "even if the effect of the new contract is to seriously damage the former distributor's business," *Burdett*, 515 F.2d at 1249.  Under the standards mandated by the Supreme Court and the Fifth Circuit, Archer cannot survive summary judgment.

### A.     There Is No Evidence of a Horizontal Conspiracy Among Manufacturers.

Archer has adduced *no* evidence—direct or circumstantial—of a conspiracy between or among any of the manufacturers it claims took action against it (the Dental Company Defendants, Midmark, or Belmont), or for that matter among *any* manufacturers at all. Statement of Undisputed Material Facts ("SUMF") ¶¶ 12, 13, 14.[8]

---

[8] To the extent Archer argues that Danaher conspired with the Dental Company Defendants or that the Dental Company Defendants conspired among themselves, such a claim fails as a matter of law, because entities within a corporate family cannot conspire with each other.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771–72 (1984); *Century Oil Tool, Inc. v. Prod. Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir. 1984).

**B.    There Is No Material Fact Demonstrating a Horizontal Conspiracy at the Distributor Level.**

Direct evidence of a conspiracy is evidence that "explicitly refers to an understanding between the alleged conspirators." *Golden Bridge*, 547 F.3d at 271.  A "common dislike" of a distributor by its competitors "is not the same as an explicit understanding to conspire." *Id.* at 272.   Archer has adduced no direct material evidence demonstrating a horizontal conspiracy among the Distributor Defendants.  SUMF ¶¶ 17–18.

Instead, the only evidence even approaching "direct" evidence of a conspiracy among the Distributor Defendants is the claim by Skip Pettus (relevant only to the 2008 Dynamic termination) that Jack Powers (Burkhart) and Mark Lowery (Schein) told him at the Oklahoma Dental Association meeting in 2008 that they had agreed to boycott Dynamic Dental (which both Powers and Lowery deny).  SUMF ¶ 4.  But this claim by Pettus—who admits that no one from the Dental Company Defendants participated in this conversation, *id.*—is inadmissible hearsay as to the Dental Company Defendants, who have never ratified or adopted any statement that supposedly was made at this meeting in 2008.

Although Archer likely will claim that this evidence should be admitted against the Dental Company Defendants as a statement of a co-conspirator under Rule 801(d)(2)(E), this would invert the analysis.  But Archer cannot rely solely on such hearsay; rather it must establish the existence of a conspiracy through substantial evidence before these alleged statements by Lowery or Powers could be admitted under Rule 801(d)(2)(E).  *Mendelovitz*, 693 F.2d at 579–80 & n.21; *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1064 (5th Cir. 1985).  And as a matter of law, Archer cannot base a conspiracy claim on alleged retrospective "chatter" about a *past* conspiratorial act, because such a statement would not be "in furtherance of" the conspiracy.  *United States v. Cornett*, 195 F.3d 776, 783 (5th Cir. 1999) (retrospective and "mere idle chatter"

18

between co-conspirators is not "in furtherance of" the conspiracy).  Archer cannot survive

summary judgment based on this hearsay evidence.

Archer also likely will rely on testimony by former Pelton & Crane employee, Don

Givens,                                    REDACTED

.  SUMF ¶ 5.  But here again, this

"evidence" is inadmissible, because Givens admitted at his deposition that he had no role in

making the decision regarding Dynamic and that he had no knowledge of why the decision was

made.  *Id.*; Fed. R. Evid. 602.  Givens's inadmissible speculation regarding the existence of a

supposed conspiracy also does not constitute direct evidence of a conspiracy.

As to a conspiracy among distributors, this leaves Archer to rely on evidence having no

connection to the specific antitrust conspiracies it alleges here.  For example, Archer goes to

great lengths to allege that the Distributor Defendants allegedly conspired with each other to

keep Amazon out of the consumables market, or that the Distributor Defendants conspired with

each other to boycott certain state dental association meetings.  SAC ¶¶ 144–149.[9]  As a matter

of law, however, evidence of unrelated conspiracies, even among some of the same actors at

issue in a particular case, is not probative of whether those actors engaged in the specific

antitrust conspiracy at issue.  *Matsushita*, 475 U.S. at 595–96 ("Evidence that petitioners

conspired to raise prices in Japan provides little, if any, support for respondents' claims

[regarding a conspiracy in the United States].").

To survive summary judgment, Archer must create a *genuine* issue of material fact, not

raise a mere metaphysical doubt that a dispute *may* exist.  *Id.* at 586–87.  In contrast to this

---

[9] There is no evidence that these alleged conspiracies in any way involved Archer, Danaher, or
the Dental Company Defendants.  SUMF ¶ 18.

inadmissible and legally insufficient evidence, *every* witness with personal knowledge provided

admissible testimony denying that there was *any* conspiracy between any distributor at issue in

this case.  SUMF ¶ 17.  Archer's allegations of a horizontal distributor conspiracy fail.

### C.   There Is No Material Fact Establishing a Vertical Conspiracy Between Any Manufacturer and Any Distributor.

Finally, there also is no direct evidence of conspiracy between any Distributor Defendant

on the one hand, and the Dental Company Defendants or any other manufacturer on the other.

SUMF ¶¶ 3, 8, 9, 12.  Archer is therefore left to rely solely on the type of circumstantial evidence

the Supreme Court long ago rejected as a basis to survive summary judgment: complaints by a

distributor followed by a manufacturer terminating a rival distributor.

Circumstantial evidence of a conspiracy "requires additional inferences in order to

support a conspiracy claim."  *Golden Bridge*, 547 F.3d at 271.  As noted above, however, the

range of permissible inferences in an antitrust case is limited.  *Matsushita*, 475 U.S. at 588.

Thus, "[d]ealer-initiated contact fails to establish that a manufacturer has imposed restrictions

collusively, not based on its independent business judgment," *Culberson*, 821 F.2d at 1094, and

"a manufacturer's action in the face of customer complaints is not a sufficient basis for a finding

of conspiracy," *Viazas*, 314 F.3d at 763.  In addition, termination when faced with a threat of

"nationwide boycott to coerce" the manufacturer also is insufficient to show conspiracy unless

the plaintiff can show that the termination "was inconsistent with [the manufacturer's]

independent self-interest."  *Id.*

This is because "complaints about price-cutters are natural and—from the manufacturer's

perspective—unavoidable reactions by distributors to the activities of their rivals."  *Monsanto*,

465 U.S. at 763; *MM Steel, L.P. v. JSW Steel (USA), Inc.*, 806 F.3d 835, 844, 847 (5th Cir. 2015)

(noting "this court's consistent enforcement of the rule that inference of a conspiracy is always

unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants." (internal quotation marks omitted)).  It is, therefore, perfectly legitimate for a manufacturer to terminate a distributor "to avoid losing the business of disgruntled dealers." *Viazas*, 314 F.3d at 764 & n.8 (internal quotation marks omitted); *see also Monsanto*, 465 U.S. at 764.[10]

Thus, Plaintiff can put forward as many vocal complaints and threats from Schein, Patterson, or Benco as it likes.  SUMF ¶¶ 6, 8, 11, 19.[11]  As a matter of law, complaints and threats followed by a termination or restriction are not adequate to avoid summary judgment.  *Id.* at 764–65; *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 780 F.2d 1212, 1217 (5th Cir. 1986), *aff'd*, 485 U.S. 717 (1988); *Culberson*, 821 F.2d at 1093–94.

This inadequate circumstantial evidence of vertical conspiracy becomes even less probative when considered against the economic theory behind Archer's allegations. *Matsushita*, 475 U.S. at 587 ("[I]f the claim is one that simply makes no economic sense[,] respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); *Golden Bridge*, 547 F.3d at 272–73 (the "existence of an independent financial motive" to remove a dealer undermines the inference of conspiracy); *Fuller v. Eagle Constr. & Envtl. Servs., L.P.*, No. 6:08CV326, 2009 WL 10676788, at *5 (E.D. Tex. Nov. 23,

---

[10] As the Seventh Circuit warned, "Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also . . . the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation." *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1166–67 (7th Cir. 1978); *see also Monsanto*, 465 U.S. at 764 (warning against "irrational dislocation" in market by subjecting manufacturer to treble damages liability for its exercise of independent business judgment).

[11] In fact, many of these are not about Archer at all, but rather concern complaints by distributors to manufacturers about dealers other than Archer,        REDACTED        SUMF ¶ 19.  As noted above, evidence of unrelated conspiracies is not sufficient to survive summary judgment. *Matsushita*, 475 U.S. at 595–96.

2009).  Archer alleges that the Dental Company Defendants and the Distributor Defendants eliminated Archer in order to fix the Dental Company Defendants' wholesale margins.  SAC ¶ 1. The Supreme Court has explained why such a theory makes no sense for a manufacturer:  "A manufacturer has no incentive to overcompensate retailers with unjustified margins.  The retailers, not the manufacturers, gain from higher retail prices.  The manufacturer often loses; interbrand competition reduces its competitiveness and market share because consumers will substitute a different brand of the same product."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 896 (2007) (internal quotation marks omitted).  It is undisputed that in all three lines of equipment at issue (core equipment, imaging, and hand pieces), the Dental Company Defendants compete in a crowded marketplace.  SUMF ¶ 16.  Joining an antitrust conspiracy to fix margins could only harm the Dental Company Defendants, because they would lose sales and market share to these other manufacturers who could capitalize on these artificially inflated margins.  Archer's already inadequate circumstantial evidence is rendered more so because its alleged margin-fixing conspiracy makes no sense.

<div align="center">* * * * * * * *</div>

Archer can come forward with no dispute of material fact regarding any level of conspiracy necessary as a threshold matter to its Section 1 claim.  There is no evidence of horizontal conspiracy at the manufacturer level at all.  There is no admissible, material evidence of horizontal conspiracy at the distributor level.  And the circumstantial evidence of complaints followed by termination that Archer will rely on to argue a vertical margin-fixing conspiracy is inadequate as a matter of law to survive summary judgment.  The Court should grant summary judgment and dismiss Archer's claims against Danaher and the Dental Company Defendants with prejudice.

<div align="center">22</div>

## II.    As a Matter of Law, Any Claim, and Any Alleged Damages, that Derive from Dynamic Dental's Alleged Wrongful Termination Are Owned by Benco.

Archer claims damages from its joint venture with Dynamic due to Pelton & Crane's termination of Archer in 2008.  However, Benco purchased Dynamic's assets in May 2009, including **REDACTED** "  SUMF ¶ 7. <sup>REDACTED</sup>

*Id.*

Because Benco owns any cause of action Dynamic might have had, Archer is estopped from bringing and lacks standing to bring a claim derived from any action taken against Dynamic, including in its capacity as a former shareholder of Dynamic with the right to 5% of Dynamic's revenues.  *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987).  Nor can Archer maintain any claim for damages based in part or in whole upon the alleged harm resulting to it from that termination, because that is just another way of attempting to stand in Dynamic's shoes on a claim Benco owns.  *See Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 543–46 (1983); *Sw. Suburban*, 830 F.2d at 1377–78.  Accordingly, the Court should grant partial summary judgment as to any claim that Archer was wrongfully excluded from selling equipment or consumables by virtue of Pelton & Crane's 2008 termination of Dynamic, and as to all damages purportedly flowing from that termination.

## III.    There Is No Material Issue of Disputed Fact as to Whether Danaher Corporation Participated in the Alleged Conspiracies—It Did Not, and It Cannot Be Liable for Its Subsidiaries' Alleged Acts.

There are only two bases on which Archer could attempt to hold Danaher liable for the antitrust conspiracies Archer alleges: (1) piercing the corporate veil or (2) Danaher's direct involvement in some antitrust conspiracy.  Archer has not created a genuine issue of material fact as to either.  Summary judgment should be granted.

23

### A.    Archer Has Adduced No Evidence That Would Justify Piercing the Corporate Veil.

In order to pierce the corporate veil and hold Danaher liable for the actions of its subsidiaries, Archer must come forward with evidence in support of three elements (1) control, in the sense of complete domination of finances, policy, and business practice so as to destroy any separate corporate identity, (2) that was used to commit fraud or other dishonest or unjust acts, and (3) that proximately caused the alleged injury. *B-W Acceptance Corp. v. Spencer*, 149 S.E.2d 570, 575–76 (N.C. 1966); *see also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 349 (4th Cir. 1998); *Hassinger v. Tideland Elec. Membership Corp.*, 622 F. Supp. 146, 150–52 (E.D.N.C. 1985).[12]  In applying this test, courts look to such factors as inadequate capitalization, non-compliance with corporate formalities, use of a subsidiary as a façade, and excessive fragmentation of the corporate structure. *Richardson v. Bank of Am., N.A.*, 643 S.E.2d 410, 420–21 (N.C. Ct. App. 2007).

Archer has adduced no evidence in support of any of the factors that would indicate "complete domination" by Danaher of its subsidiaries.  There is no evidence that the Dental Company Defendants were inadequately capitalized or that Danaher siphoned company funds from the Dental Company Defendants.  SUMF ¶ 21.   There is no evidence that the Dental Company Defendants functioned as a facade for Danaher with no identity of their own or that they were excessively fragmented. *Id.*  And there is no evidence of non-compliance with corporate formalities. *Id.*

Instead, Archer alleges that Danaher has a board of directors, while the Dental Company

---

[12] As noted in Danaher's Motion to Dismiss the SAC, Dkt. No. 280, at 11 n.5, there is no discernable difference between law of the states potentially at issue here, and so this Motion relies primarily on North Carolina law.  Danaher incorporates Docket No. 280 by reference.

Defendants do not.  SAC ¶ 26.  But the evidence shows that the line between the Danaher Board

and the Dental Company Defendants is clear.  The Dental Company Defendants have their own

officers and employees, separate from those of Danaher Corporation.  SUMF ¶ 23.   And even

were all of this not true, it would not be enough to allege that a parent and a subsidiary have

common officers or board members or that the parent exercises routine control through its board

or its officers.  *United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998); *Hassinger*, 622 F. Supp. at

150–52; *Berger v. Columbia Broad. Sys., Inc.*, 453 F.2d 991, 998 (5th Cir. 1972).

     In addition, there is no dispute that Danaher is a multi-industry holding company that

does not manufacturer, market, or sell dental equipment or supplies.  SUMF ¶ 22; *see Am. Eagle

Ins. v. United Techs. Corp.*, 48 F.3d 142, 147 (5th Cir. 1995) (evidence that parent "did not

design, manufacture, warrant, sell or otherwise place in the stream of commerce" product at

issue defeats attempt to hold parent liable).  It is undisputed that Danaher does *not* take any

regular, day-to-day role in the Dental Company Defendants' operations.  SUMF ¶ 23.

     Instead, the most Archer can come forward with is an allegation that Danaher met from

time to time with the Dental Company executives to "mentor" or "coach" them, to "hash out the

strategic vision of the companies together," and to discuss "policy deployment, action plans, root

cause countermeasures, product innovation, marketing, and brand awareness."  SAC ¶ 27.  Such

routine oversight provides no evidence at all that Danaher exercised such a degree of control

over its subsidiaries as to warrant the piercing of the corporate veil because parents and

subsidiaries can and do consult and deal with each other on a regular basis.  *Broussard*, 155 F.3d

at 350; *Reisner v. Gen. Motors Corp.*, 511 F. Supp. 1167, 1173–74 (S.D.N.Y. 1981).  It is to be

expected that a parent will assist its subsidiaries in maximizing their profit-making potential.

*Broussard*, 155 F.3d at 350; *Austin v. Granite Quarries, USA, Inc.*, No. 1:98-cv-455, 1999 WL

25

33798700, at *4 (M.D.N.C. Dec. 2, 1999).  In short, everything Archer has alleged, and *all* of the record evidence, demonstrate nothing more than a normal parent-subsidiary relationship between Danaher and the Dental Company Defendants.  *Austin*, 1999 WL 33798700, at *4; *see also Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 180–81 (5th Cir. 1981).

Finally, Archer also fails to allege any plausible facts—much less to adduce any evidence—necessary to satisfy the remaining elements of the veil piercing test.  Archer does not have a single piece of evidence demonstrating that (1) Danaher used its alleged "control" over the Dental Company Defendants to perpetrate a fraud or other wrongdoing or (2) that such control proximately caused its injury.  *B-W Acceptance Corp.*, 149 S.E.2d at 575–76; SUMF ¶ 21.  Archer cannot get to the jury on a theory that the Dental Company Defendants' corporate veils should be pierced to hold Danaher liable for their supposed conduct.

> **B.     There Are No Material Facts Showing That Danaher Joined Any Alleged Antitrust Conspiracy.**

Lacking any credible veil-piercing theory, Archer must create a genuine issue of material fact demonstrating that Danaher itself consciously participated in the three specific acts alleged to have caused harm to Archer in 2008, 2009, and 2014.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 69 (2d. Cir. 2012); *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 750 (E.D. Pa. 2011).  Archer has not done so; summary judgment should be granted.

There is no evidence that Danaher joined any of these alleged conspiracies.  SUMF ¶ 20. The termination letters and the operative distribution agreements at issue all came from the Dental Company Defendants, not Danaher.  SUMF ¶¶ 9, 24.  And there is no dispute that every relevant Dental Company Defendant witness who Archer alleges to have taken a wrongful act was employed by one of the Dental Company Defendants, not Danaher.  SUMF ¶ 24.

26

Archer may rely on an email chain between <span style="color:red">REDACTED</span>

SUMF ¶ 25.

<span style="color:red">REDACTED</span>

*Id.*  This email is not evidence connecting Danaher to any supposed conspiracy.

## IV.    Archer Has Not Adduced Evidence Demonstrating That the Alleged Group Boycott Should Be Treated as *Per Se* Illegal.

The vast majority of group boycotts are evaluated under the rule of reason, not the *per se* rule.  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 847 (D. Md. 2005).  This has been the law at least since the Supreme Court clarified its prior group boycott precedent in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).  The Fifth Circuit recognized this principle even before *Northwest Wholesale*.  *See, e.g.*, *Mendelovitz*, 693 F.2d at 575–77 & n.14.  And it has repeatedly reaffirmed it since.  *See, e.g.*, *MM Steel*, 806 F.3d at 844, 848 (applying two of the three *Northwest Wholesale* factors to find a group boycott *per se* illegal); *Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 414–15 (5th Cir. 2007); *Doctor's Hosp.*, 123 F.3d at 307 & n.12.

Thus, it is settled law that an alleged conspiracy between a manufacturer and a distributor to terminate a rival, price-cutting distributor must be evaluated under the rule of reason.  *Leegin*, 551 U.S. at 901–02 ("[T]he *per se* rule applie[s] only to specific agreements over price levels and not to an agreement between a manufacturer and a distributor to terminate a price-cutting distributor."); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726–27, 735–36 (1988).

27

The only potential exception to this general rule is where the plaintiff can prove a horizontal conspiracy at one level that was used to organize an antitrust conspiracy with actors in a vertical relationship with the plaintiff.  *MM Steel* is an example of this, where MM Steel's rival distributor organized a boycott among steel manufacturers, 806 F.3d at 844, 848, as is *Klor's*, which similarly involved a horizontal conspiracy, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13 (1959) (conspiracy organized by competing distributor and the major appliance manufacturers available to Klor's); *see also NYNEX*, 525 U.S. at 135 ("Although Klor's involved a threat made by a single powerful firm, *it also involved a horizontal agreement among those threatened, namely, the appliance suppliers*, to hurt a competitor of the retailer who made the threat." (emphasis added)); *Bus Elecs. Corp.*, 485 U.S. at 734 (noting that key to *per se* treatment in cases like *Klor's* was horizontal agreement at either manufacturer or distributor level (or both)).  Thus, the common thread among *per se* group boycott cases is a horizontal conspiracy at either the manufacturer or distributor level that harms a competitor by recruiting a vertical participant.

As noted above, there are no material facts demonstrating such a horizontal conspiracy at any level, whether at the manufacturer or the distributor level.  SUMF ¶¶ 3–6, 8, 9, 12, 17. Without such a horizontal conspiracy, Archer's case does not fall within the ambit of cases like *Klor's* or *MM Steel*.  At best, therefore, Archer must rely on a series of unconnected vertical conspiracies between a distributor and a manufacturer (and as demonstrated above, the evidence does not even support this).  But there is no such thing as a "two-firm boycott," and so the claim fails at the outset.  *NYNEX*, 525 U.S. at 133, 139; *Doctor's Hosp.*, 123 F.3d at 307.  And, regardless, purely vertical antitrust conspiracies must, as a matter of law, be evaluated under the rule of reason.  *Leegin*, 551 U.S. at 901–02; *Bus. Elecs.*, 485 U.S. at 726–27, 735–36.

And even accepting for the sake of argument that there is a dispute of material fact regarding a horizontal conspiracy, the boycott still would be required to deprive the plaintiff of something that is necessary to compete (as in both *MM Steel* and *Klor's*, for example, where the plaintiffs were driven out of business) in order to merit *per se* treatment.  But the undisputed material facts demonstrate that the Dental Company Defendants' products are *not* necessary for Archer to compete, given the multitude of brands Archer never alleges to be affected by a purported conspiracy, some of which Archer distributes today.  SUMF ¶ 16.  In addition, Archer remains in business today, even after enduring an alleged ten-year long conspiracy that concluded it in its termination from selling products manufactured by the Dental Company Defendants more than three years ago.  *Id.* ¶ 15.  In fact,                      REDACTED

, when the "conspiracy" was allegedly long established.  *Id.*  Under *Northwest Wholesale Stationers, MM Steel*, and cases like them, that is also fatal to Archer's alleged *per se* group boycott.

"While pleading exclusively per se violations," as Archer has done here, "can lighten a plaintiff's litigation burdens, it is not a riskless strategy.  If the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010); *see also MM Steel*, 806 F.3d at 847 n.6 (same).  Archer cannot show a horizontal conspiracy at any level that deprived it of something necessary to compete.  Instead, at best Archer has presented a tortious interference claim dressed up in antitrust garb in an attempt to gain trebling of damages and attorneys' fees.  *See Reisner*, 511 F. Supp. at 1178 n.25.  Its *per se* claim fails, and the SAC should be dismissed with prejudice.

V.    **Archer's Failure To Advance Admissible Expert Evidence in Support of Its Claims Is Fatal.**

For the reasons set forth in Defendants' jointly submitted *Daubert* Motion, filed contemporaneously with this Motion, Archer has failed to advance admissible expert testimony in support of a relevant antitrust market or its damages.  Because Archer lacks expert evidence in support of its damages and the antitrust market definition, summary judgment should be granted. *El Aguila Food Prod., Inc. v. Gruma Corp.*, 131 F. App'x 450, 454 (5th Cir. 2005); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

## CONCLUSION

For the reasons set forth above, Archer cannot prevail on its antitrust claims.  The Court should grant summary judgment in favor of the Dental Company Defendants.

30

Dated:  December 4, 2017

    Respectfully submitted,


/s/ *Brett C. Govett*
_____

Brett C. Govett (Bar No. 08235900)

Katherine Lett (Bar No. 24007548)

NORTON ROSE FULBRIGHT US LLP

2200 Ross Avenue, Suite 3600

Dallas, TX  75201

Tel:  (214) 855-8118

Fax:  (214) 855-8200

Brett.Govett@nortonrosefulbright.com

Katherine.Lett@nortonrosefulbright.com


Layne E. Kruse (Bar No. 11742550)

NORTON ROSE FULBRIGHT US LLP

1301 McKinney, Suite 5100

Houston, TX 77010

Tel:  (713) 651-5151

Fax:  (713) 651-5246

Layne.Kruse@nortonrosefulbright.com

Steven R. Kuney (*pro hac vice*)

Jonathan B. Pitt (*pro hac vice*)

Liam J. Montgomery (*pro hac vice*)

Matthew C. Monahan (*pro hac vice*)

WILLIAMS & CONNOLLY LLP

725 Twelfth Street, N.W.

Washington, DC  20005

Tel:  (202) 434-5000

Fax:  (202) 434-5029

skuney@wc.com

jpitt@wc.com

lmontgomery@wc.com

mmonahan@wc.com


*Counsel for Defendants Danaher Corporation, Instrumentarium Dental Inc., Dental Equipment LLC, Kavo Dental Technologies, LLC, and Dental Imaging Technologies Corporation*

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

The undersigned certifies that the foregoing document is authorized to be filed under seal

pursuant to the Protective Order entered in this case (Dkt. No. 116).

/s/ *Brett C. Govett*
Brett C. Govett


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been served upon all counsel

of record by using the Court's electronic filing system and e-mail on December 4, 2017.


/s/ *Brett C. Govett*
Brett C. Govett