**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **ARCHER AND WHITE SALES, INC.** | |
| Plaintiff, | Civil Action No. 2:12-CV-00572-JRG |
| v. | |
| **HENRY SCHEIN, INC., DANAHER CORPORATION, INSTRUMENTARIUM DENTAL, INC., DENTAL EQUIPMENT, LLC, KAVO DENTAL TECHNOLOGIES, LLC, DENTAL IMAGING TECHNOLOGIES CORPORATION, PATTERSON COMPANIES, INC., AND BENCO DENTAL SUPPLY CO.,** | **FILED UNDER SEAL** |
| Defendants. | |

**PLAINTIFF ARCHER AND WHITE SALES, INC.'S SUR-REPLY IN OPPOSITION TO DANAHER DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT (DKT. NOS. 279 & 280)**

# TABLE OF CONTENTS

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Plaintiff Archer and White Sales, Inc. ("Archer") is a Texas-based discount distributor of dental equipment. When Archer sought to expand its sales outside of Texas, Schein, Patterson, Benco, and Burkhart ("the Cartel Members") conspired to force their common suppliers, the Danaher Defendants, to restrict Archer's sales territory to Texas, and ultimately to cut off Archer altogether. The Second Amended Complaint explains in detail, with Defendants' admissions and other facts, how the purpose of the conspiracy to boycott Archer was to protect an unlawful agreement between the Cartel Members to protect their supracompetitive margins. The Defendants' conduct constitutes the type of group boycott that the Supreme Court and Fifth Circuit consistently recognize as per se illegal. In their Replies, the Danaher Defendants persist in ignoring the relevant case law, ignoring the Second Amended Complaint's factual allegations, and generally attempting to recast the Second Amended Complaint as something it is not. Their arguments should be rejected and their motions to dismiss denied.

## I.   *MM STEEL* INSTRUCTED THAT THE *NORTHWEST WHOLESALE* FACTORS HAVE "NO BEARING" ON THIS CASE

The Danaher Defendants' Reply is just their latest attempt to misinterpret or ignore *MM Steel*. In fact, *MM Steel* already rejected each and every one of the arguments that the Danaher Defendants make. They persist in their misleading characterization of *MM Steel*, claiming that it stands for the proposition that Archer must show that Danaher products are "necessary to compete" before *per se* treatment applies. But as explained in Archer's response, the Fifth Circuit explicitly held that "'market power or exclusive access to an element essential to effective competition' has ***no bearing on this case***." 806 F.3d at 848 n.7 (emphasis added) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 296 (1985)). In addition, the Fifth Circuit expressly rejected the argument that the *Tunica* factors— which the Danaher Defendants admit are equivalent to the standard they contend Archer must

satisfy, Reply Br. 2—do not apply in cases such as this. *MM Steel*, 806 F.3d at 850. The Fifth Circuit's rejection of the Danaher Defendants' position cannot get much clearer than that.

The Danaher Defendants are left with only pointing to descriptions of the facts of the case, suggesting that the Fifth Circuit somehow implicitly applied the *Northwest Wholesale* factors despite having unambiguously held that they had "no bearing" on the case.[1] Contrary to the Danaher Defendants' assertion, Archer is not arguing that *MM Steel* overruled *Northwest Wholesale*. Rather, Archer is pointing out that *MM Steel* distinguished *Northwest Wholesale* from cases such as this, not involving a cooperative or a professional organization, and specifically held that the *Northwest Wholesale* factors have "no bearing." 806 F.3d at 848 n.7 (citing *Nw. Wholesale*, 472 U.S. at 296). In fact, their Reply finally hints at the Danaher Defendants' true argument: that *MM Steel* was wrongly decided. The Danaher Defendants may disagree that *Northwest Wholesale* should be limited in such a way, but that does not permit this Court to ignore the Fifth Circuit's interpretation. In short, it is the Danaher Defendants, not Archer, asking the Court to ignore binding precedent.

Given the weakness of their *Northwest Wholesale* argument in light of *MM Steel*, the Danaher Defendants turn to pre-*Northwest Wholesale* Fifth Circuit cases. But that argument fares

---

[1] The Danaher Defendants over-read *MM Steel*'s description of the facts in any event. They claim that the plaintiff in *MM Steel* satisfied the requirement that the plaintiff be foreclosed from the market. *See* Reply 2. But one cannot draw the conclusion that the Danaher Defendants wish to draw. To conclude that MM Steel was cut off from all sources of supply, one would need information about the market position of the boycotting distributors and whether there were sources of supply available outside the boycott. Since the court was proceeding on a *per se* theory of liability, it did not examine those questions. More fundamentally, whether the boycotted firm was cut off from a supply necessary to enable it to compete does not mean that the victim has to be completely cut off from all potential sources of supply. Rather, it is sufficient that the boycott significantly impaired the victim's ability to compete. *See United States v. General Motors Corp.*, 384 U.S. 127, 140 (1966) (boycotted discount dealers cut off from only one automobile manufacturer); *MM Steel* Jury Instructions at 13 (asking only whether "one or more steel mills refused to sell steel plate to MM Steel").

2

no better. First, that argument fails to explain why the court in *MM Steel* did not engage in such an analysis of the relevant market or procompetitive justifications, as described above and in Archer's response. Second, Archer has satisfied the only proposition for which the Danaher Defendants cite these older cases, *i.e.*, that the Defendants' behavior must be purposefully exclusionary. *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee* summarized the law concerning *per se* boycotts, explaining that "the touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade,' and have fallen victim to the *per se* rule." 467 F.2d 178, 187 (5th Cir. 1972). Archer has alleged exclusionary *and* coercive conduct. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Compl. ¶ 106. The Second Amended Complaint also includes numerous allegations of threats (i.e., coercion). *See, e.g.*, *id.* ¶¶ 105-07, 114. The cases that the Danaher Defendants cite do not involve boycotts with the *intent* to drive the plaintiff out of business. Indeed, *Mendelovitz v. Adolph Coors Co.* explicitly distinguished cases on which Archer relies and in which the defendants, as in this case, had the exclusionary purpose of driving a discounter out of business. 693 F.2d 570, 578 n.14 (5th Cir. 1982) (distinguishing *United States v. General Motors Corp.*, 384 U.S. 127 (1965); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1958)).

At the end of the day, the Danaher Defendants are left with a citation to an out-of-circuit district court opinion. *See Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697 (D. Minn. 2011). Even were the Court to find that opinion instructive, it is not analogous to the facts of this case given the lack of a horizontal competitor's involvement in the conspiracy and

the attendant lack of an exclusionary purpose.[2] In any event, what matters in this Court is Fifth Circuit precedent, which is unambiguous. "[A] facially vertical restraint imposed by a manufacturer only because it has been coerced by a 'horizontal cartel' agreement among his distributors is in reality a horizontal restraint." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988). *Per se* analysis therefore applies. *MM Steel*, 806 F.3d at 848 ("[G]roup boycotts involving a horizontal conspiracy to foreclose a market participant are considered per se violations of § 1.").

## II. ARCHER HAS PLAUSIBLY ALLEGED THE *TUNICA* FACTORS, IF NECESSARY

Archer's position, as explained above, is that it is unnecessary to allege any of the *Northwest Wholesale*/*Tunica* factors. And even if it were necessary to satisfy *Northwest Wholesale*, Archer would not need to prove all three of the factors, contrary to the implication left by the Danaher Defendants. *See Nw. Wholesale*, 472 U.S. at 295 ("[A] concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment . . . ."). Nevertheless, were the Court to impose that burden, Archer has satisfied it, as explained in its response at 17-21.

First, Archer identified the dominant brands in the market making up 76% of sales in some cases; alleged that, because of brand loyalty, high switching costs, and other characteristics of the industry, having at least one of those brands is absolutely crucial to a distributor's success; and explained that Archer is unable to distribute any of these brands. Compl. ¶¶ 25, 30-31, 52. The Danaher Defendants' only retort remains that Archer has not been driven completely out of

---

[2] The point is not that the conspiracy *must* include a conspirator at the plaintiff's level of distribution; rather, the point is that an exclusionary (rather than procompetitive) purpose is much more likely to exist where the conspiracy involves one of the plaintiff's competitors.

business and points to other manufacturers in the marketplace. But Archer has explained that the boycott of Archer (and other low-margin distributors) has caused significant damage to both Archer and market competitiveness by eliminating low-cost options from the marketplace. The Defendants' continuing refusal to acknowledge Archer's losses does not change that fact. Moreover, the Danaher Defendants' argument ignores Archer's citation to *Rossi v. Standard Roofing*, in which the court held that "notwithstanding the large number of other manufacturers offering product in the area, GAF product was critical for a distributor to successfully compete." 156 F.3d 452, 460 (3d Cir. 1998).

Second, the Danaher Defendants' Reply says nothing about Archer's allegations that the Cartel Members dominate the market by controlling over 80% of the distribution of dental equipment and supplies in the United States. Compl. ¶ 18. Finally, the Danaher Defendants have no response to Archer's allegation that the Defendants' purported procompetitive justifications are pretextual, ███████████████████████████████████████████

███████████████████████████████. *Id.* ¶ 118. They simply assert that Archer has done "nothing to meet its burden," Reply 3 n.4, apparently ignoring that portion of Archer's response. Archer does not dispute that manufacturers are entitled to manage their dealer networks, but as Archer has said time and again, they must do so independently. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). That is not what happened here, and the *per se* rule should apply accordingly.

### III.     THE SECOND AMENDED COMPLAINT ALLEGES CLAIMS AGAINST DANAHER CORPORATION

In its moving brief, Danaher Corporation argued that the Second Amended Complaint should be dismissed as to it because the Second Amended Complaint fails to allege that it

engaged in any relevant conduct. In its response, Archer explained that the Second Amended Complaint alleged relevant conduct against Danaher Corporation in the form of its domination and control of its wholly owned subsidiaries.[3] In short, Danaher Corporation "treat[s] subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent." *Precision Assocs. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42, 2013 U.S. Dist. LEXIS 177023, at *62 (E.D.N.Y. Sept. 20, 2013).

Danaher Corporation's Reply fails to truly grapple with Archer's arguments by recasting all of them as veil-piercing arguments and attempting to hold Archer to that standard. But that is not what the cases on which Archer relies require. Crucially, Danaher Corporation admits that parent companies can be implicated in conspiracies "through a subsidiary representative." Danaher Corp. Reply 7. It attempts to distinguish the cases relied on by Archer by claiming that the complaints in those cases "were far more detailed." Not so. In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, the court relied on allegations that the parent corporation "dominated and controlled the finances, policies, and affairs" of its related entities. 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010). While the allegations of *how* the parent corporation did so might differ from that case to this one, Archer's Second Amended Complaint similarly describes the close relationship between Danaher Corporation and its wholly owned subsidiaries and how executives at the Danaher Corporation directed and controlled the dental platform companies. *See, e.g.*, Compl. ¶¶ 11-14, 26-29, 33. These allegations are analogous to the allegations found sufficient to state a claim in *Precision Assocs.*, where the parent corporation "coordinate[d] and manage[d]

---

[3] Contrary to Danaher Corporation's unsupported assertion, Reply Br. 3 n.2, domination and control are not solely relevant to veil-piercing claims. *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1020 (N.D. Cal. 2010) (citing allegation that parent company "dominated and controlled the finances, policies, and affairs" of its subsidiaries in support of holding that the complaint sufficiently stated a direct claim against parent company).

meetings between the managers from each of the different subsidiaries to facilitate an integrated enterprise." 2013 U.S. Dist. LEXIS 177023, at *62. If anything, Archer's allegations are even stronger because rather than appointing different managers for each of its subsidiaries and coordinating their meetings, Danaher Corporation appointed a single executive to control all of the dental subsidiaries under a single "dental platform" and then held regular meetings with high-level dental platform executives to discuss strategy. Compl. ¶ 33.[4]

Danaher Corporation's claim that Archer's Second Amended Complaint is self-defeating because it attributes relevant conduct to employees nominally employed by a subsidiary ignores the concession that subsidiary employees can participate in a conspiracy on behalf of a parent corporation. What is more, this argument fails to distinguish Archer's Second Amended Complaint from the cases that Archer cited. Danaher Corporation fails to point to any allegation in the complaints in those cases that pertained to a particular parent company employee. There, as here, allegations about subsidiary employees are sufficient.

Danaher Corporation also fails to grapple with the allegation that it treats its subsidiaries "as mere divisions of the corporate parent." *Precision Assocs.*, 2013 U.S. Dist. LEXIS 177023, at *62. It sidesteps the argument by claiming that Archer is simply trying to argue an intra-corporate conspiracy, Danaher Corp. Reply 6, but that is not the case. The cases that Danaher

---

[4] Danaher Corporation's objection that it is "wild speculation" to infer that the subsidiaries' purported "dealer rationalization" strategy would have been discussed with Danaher Corporation at their regular meetings is itself absurd. As the Second Amended Complaint explains, Danaher Corporation executives and subsidiary executives met regularly to discuss "strategic plans," "policy deployment," and "marketing." Compl. ¶¶ 28-29. Of course a massive dealer rationalization strategy would be part of that discussion. The inference is made more plausible by the fact that Danaher Corporation's CEO discussed Danaher Corporation's use of distributors with Schein's CEO, *id.* ¶ 33, indicated Danaher Corporation's involvement with distribution strategy. As for Danaher Corporation's protest that this specific inference is absent from Archer's Second Amended Complaint, a plaintiff need not connect all of the dots in its complaint; inferences are permitted. Indeed, the Court "must draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

Corporation cites hold that members of a corporate family cannot conspire with themselves, but they say nothing about multiple members of a corporate family conspiring with others, and that is what Archer alleges here. That Danaher Corporation and its subsidiaries held themselves out as a single monolith and the industry saw them that way is relevant to the assessments done in the cases cited in Archer's response, which considered whether the parent company treated the subsidiaries as "mere divisions," *Precision Assocs.*, 2013 U.S. Dist. LEXIS 177023, at \*62, whether people "often refer to a corporate family by a single name," and whether people "did not always know the corporate affiliation of their counterparts and did not distinguish between entities within a corporate family," *In re Cathode Ray Tube (CRT)*, 738 F. Supp. 2d at 1019. That critical subsidiary employees used @danaher.com email addresses, Compl. ¶ 33, and that industry participants referred to "Danaher" as a collective (especially in the context of a complaint about Archer), *id.* ¶ 112, certainly is relevant to those inquiries.

Finally, Danaher Corporation also completely avoids Archer's allegation that multiple different subsidiaries acted consistently with one another. Danaher Corporation responds only to the allegation that Pelton & Crane, Marus, and DCIE took action simultaneously and points out that all of those brands are owned by a single subsidiary. But Danaher Corporation ignores allegations about the other subsidiaries in the very next sentence of Archer's response (at 23). Other Danaher Corporation subsidiaries (including Gendex and KaVo) similarly participated in the boycott, and in fact *all* of the Danaher Corporation subsidiaries terminated their distribution agreements with Archer on the exact same day, in letters signed by the exact same person. Compl. ¶ 33. Taken as a whole, these allegations suggest Danaher Corporation's involvement in the group boycott conspiracy.

8

### IV. ARCHER IS ENTITLED TO INJUNCTIVE RELIEF

In their moving brief, the Danaher Defendants argued that Archer is not entitled to injunctive relief because Archer does not allege irreparable injury or that monetary damages would be inadequate because the Danaher Defendants completely cut off Archer as an authorized dealer. In its response, Archer explained that it is entitled to injunctive relief precisely because (1) Archer continues to be cut off by the Danaher Defendants; (2) Defendants' conspiracy is ongoing; and (3) injunctive relief would be in the public interest. Archer Br. 26-27. The Danaher Defendants' Reply does not contest that the continuing restraint on Archer's ability to compete is sufficient grounds for injunctive relief. Rather, it argues only that the Second Amended Complaint does not allege enough facts to support this claim. This argument fails for the same reason Defendants' other claims of insufficient facts fail. The Second Amended Complaint lays out in factual detail how (1) the Defendants conspired to boycott Archer; (2) the boycott curtailed Archer's sales to Texas before eventually cutting Archer off entirely; (3) the boycott conspiracy is ongoing; and (4) Defendants' concerted conduct harmed Archer. Archer Br. 4-10; *see, e.g.*, Compl. ¶¶ 35-40, 53-54, 74, 76, 87, 90, 96, 104, 108, 117, 122-123. This is more than sufficient show that Archer is entitled to injunctive relief.[5] *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (To invoke Section 16, a plaintiff "need only demonstrate a significant threat of injury from . . . a contemporary [antitrust] violation likely to continue to recur.").

---

[5] To the extent the Danaher Defendants still assert that the Second Amended Complaint must plead facts with respect to the balance of hardships and public interest, such pleadings are not required. *See First Impressions Salon, Inc. v. Nat'l Milk Prods. Fed'n*, No. 13-CV-454-NJR-SCW, 2016 WL 5816506, at *5 (S.D. Ill. Oct. 5, 2016) (factual allegations suggesting plaintiff may continue to suffer injury sufficient for injunctive relief).

The cases that the Danaher Defendants cite are not to the contrary. Those cases involved one-time events that were unlikely to recur.[6] Here, by contrast, given that Archer still distributes dental products, it remains at the mercy of dental product manufacturers who, Archer alleges, continue to be subject to threats by the Cartel Members. Though the Danaher Defendants terminated Archer, given their dominant position in the dental manufacturing industry, of course Archer will likely have interactions with the Danaher Defendants and endeavor to distribute Danaher Defendant products in the future. When it does so, neither Archer nor the Danaher Defendants should have to worry about threats from the Cartel Members. Courts have found irreparable harm and granted injunctive relief in other boycotting cases. *See, e.g.*, *WRMA Broad. Co. v. Hawthorne*, 365 F. Supp. 577, 582 (M.D. Ala. 1973). Given that it has alleged that the group boycott conspiracy is ongoing based on, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compl. ¶ 105, Archer adequately has alleged its entitlement to injunctive relief.

## CONCLUSION

The Danaher Defendants may not like *MM Steel*'s rejection of the *Northwest Wholesale* factors, but this Court is bound to follow it. Danaher Corporation may not like being held responsible for its actions, but it cannot hide behind its subsidiaries where it has wholly exercised domination and control.

For the foregoing reasons, the Danaher Defendants' motions to dismiss should be denied. In the alternative, should the Court find any deficiencies in the Second Amended Complaint, Archer should be granted leave to amend.

---

[6] Forfeiture of unvested contributions to a retirement plan upon leaving employment in *Hendricks v. UBS Fin. Servs., Inc.*, 546 F. App'x 514 (5th Cir. 2013) (per curiam), and a criminal indictment in *Humphreys v. City of Ganado*, 467 F. App'x 252 (5th Cir. 2012) (per curiam).

Dated: December 18, 2017.                             **MCKOOL SMITH, P.C.**

/s/ *Samuel F. Baxter*
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
**MCKOOL SMITH, P.C.**
104 E. Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Lewis T. LeClair
Texas State Bar No. 12072500
lleclair@mckoolsmith.com
Gary Cruciani
Texas State Bar No. 05177300
gcruciani@McKoolSmith.com
Phillip Aurentz
Texas State Bar No. 24059404
paurentz@McKoolSmith.com
Travis E. DeArman
Texas State Bar No. 24074117
tdearman@McKoolSmith.com
Chelsea A. Priest
Texas State Bar No. 24102375
cpriest@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Charles E. Fowler, Jr.
Texas State Bar No. 24083014
cfowler@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

***ATTORNEYS FOR PLAINTIFF,
ARCHER AND WHITE SALES, INC.***

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via email on December 18, 2017.

/s/ *Samuel F. Baxter*
Samuel F. Baxter

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

The undersigned certifies that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case (Dkt. No. 116).

/s/ *Samuel F. Baxter*
Samuel F. Baxter