# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| **ARCHER AND WHITE SALES, INC.** | |
| **Plaintiff,** | **Civil Action No. 2:12-CV-00572-JRG** |
| **v.** | |
| **HENRY SCHEIN, INC., DANAHER CORPORATION, INSTRUMENTARIUM DENTAL, INC., DENTAL EQUIPMENT, LLC, KAVO DENTAL TECHNOLOGIES, LLC, DENTAL IMAGING TECHNOLOGIES CORPORATION, PATTERSON COMPANIES, INC., AND BENCO DENTAL SUPPLY CO.** | **FILED UNDER SEAL** |
| **Defendants.** | |

**PLAINTIFF ARCHER AND WHITE SALES, INC.'S OPPOSITION TO
DEFENDANT HENRY SCHEIN, INC.'S MOTION
TO DISMISS THE SECOND AMENDED COMPLAINT (DKT. NO. 288)**

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

COUNTERSTATEMENT OF ISSUES ..........................................................................2

BACKGROUND ............................................................................................................3

ARGUMENT................................................................................................................11

I.  THE SECOND AMENDED COMPLAINT SUFFICIENTLY ALLEGES
    SCHEIN'S AGREEMENT TO PARTICIPATE IN AN ANTITRUST
    CONSPIRACY. ................................................................................................12

    A.  The Group Boycott and Price-Fixing Are Part of a Single
        Overarching Conspiracy to Eliminate Competition and Raise
        Prices Above Competitive Levels.........................................................13

    B.  The Second Amended Complaint Includes Sufficient Allegations
        That the Cartel Members Agreed to Boycott Archer............................17

CONCLUSION.............................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

Cᴀsᴇs

*American Airlines, Inc. v. Travelport Ltd.*,
No. 4:11-CV-244-Y, 2012 U.S. Dist. LEXIS 126934 (N.D. Tex. Aug. 7,
2012) ...................................................................................................................................11

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).........................................................................................12, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................................12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).............................................................................................................13

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962).............................................................................................................13

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013)..................................................................................................13

*F.T.C. v. Superior Court Trial Lawyers Ass'n*,
493 U.S. 411 (1990).............................................................................................................15

*MM Steel v. JSW Steel (USA) Inc.*,
806 F.3d 835 (5th Cir. 2015) ...............................................................................................15

*OLA, LLC v. Builder Homesite, Inc.*,
661 F. Supp. 2d 668 (E.D. Tex. 2009).................................................................................11

*Omni Healthcare, Inc. v. Health First, Inc.*,
No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806 (M.D. Fla. Jan. 22, 2015)......................14

*Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*,
604 F.3d 1291 (11th Cir. 2010) ...........................................................................................14

*Rossi v. Standard Roofing*,
156 F.3d 452 (3d Cir. 1998).................................................................................................15

*Tunica Web Adver. v. Tunica Casino Operators Ass'n*,
496 F.3d 403 (5th Cir. 2007) ...............................................................................................12

*United States v. General Motors Corp.*,
384 U.S. 127 (1966) ............................................................................................... 14, 15

*Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,
No. SA-15-CA-32-FB, 2015 U.S. Dist. LEXIS 154154 (W.D. Tex. Oct. 15,
2015) ........................................................................................................................ 13

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
648 F.3d 452 (6th Cir. 2011) .................................................................................. 13

**STATUTES**

Clayton Act § 4 ................................................................................................................ 13

TEX. BUS. & COM. CODE § 15.04 ................................................................................ 2, 11

**OTHER AUTHORITIES**

FED. R. CIV. P. 8(a)(2) ..................................................................................................... 11

FED. R. CIV. P. 12(b)(6) ................................................................................................... 11

Plaintiff Archer and White Sales, Inc. ("Archer") files this response in opposition to the motion to dismiss filed by Defendant Henry Schein, Inc. ("Schein") (Dkt. No. 288).

## INTRODUCTION

Archer is a Texas-based, family-owned, discount distributor of dental equipment. For years, Archer successfully sold dental equipment for the Danaher Defendants,[1] including the Gendex, KaVo, Pelton & Crane, Marus, DCI, and Instrumentarium lines. Danaher Corporation acquired these lines over time and they are now wholly owned and controlled by Danaher Corporation. When Archer sought to expand its sales outside of Texas in 2007, Schein and its fellow distributors Patterson Companies, Inc. ("Patterson"), Benco Dental Supply, Co. ("Benco"), and Burkhart Dental Supply ("Burkhart") (collectively, the "Cartel Members") conspired to force their common suppliers, including the Danaher Defendants, to restrict Archer's sales to Texas, and eventually to terminate Archer's distributorships altogether. As reflected by Defendants' numerous admissions detailed in the Second Amended Complaint, the purpose of the conspiracy to boycott Archer was to protect an unlawful attempt by the Cartel Members to restrict the competitive options available to customers in an attempt to fix, maintain, and stabilize the gross margins at which the dominant distributors sell dental equipment and supplies.

Schein asserts that Archer has failed to allege the necessary facts to plead causes of action under federal and state antitrust laws. But its arguments are misplaced, primarily because Schein follows the well-trodden path of its co-defendants in attempting to break the conspiracy into smaller parts and then to explain away each piece. In arguing that the Second Amended

---

[1] Danaher Corporation and its wholly owned subsidiaries, Instrumentarium Dental, Inc., Dental Equipment LLC, KaVo Dental Technologies, LLC, and Dental Imaging Technologies Corporation.

Complaint does not sufficiently allege an agreement to violate the antitrust laws, Schein ignores direct evidence of the Cartel Members' agreement to maintain supracompetitive margins and to protect that agreement via boycotts. It also ignores all of Archer's circumstantial evidence, including the suspect timing of Schein's supposedly independent complaints to manufacturers, agreements to boycott other low-margin competitors, and the pretextual nature of the Danaher Defendants' justifications for Archer's termination. Assessed in that context, the Second Amended Complaint contains sufficient allegations of Schein's involvement in an agreement to violate the antitrust laws. Schein also persists in arguing that Archer does not have standing to bring a price-fixing claim, but in doing so, it misreads Archer's claims; the Second Amended Complaint does not allege a standalone price-fixing conspiracy, but rather alleges a group boycott conspiracy that was motivated by and served as an enforcement mechanism for the Cartel Members' attempts to limit options to customers and to fix, maintain, and stabilize margins. Archer undoubtedly has standing to bring a suit stemming from its exclusion from the market, an obvious antitrust injury.

For the reasons stated above and explained in detail below, Schein's motion to dismiss should be denied. The arguments apply equally to Archer's claims under the Sherman Act and the Texas Free Enterprise and Antitrust Act. *See* TEX. BUS. & COM. CODE § 15.04 ("The provisions of this Act ... shall be construed in harmony with federal interpretations of comparable federal antitrust statutes....").

## COUNTERSTATEMENT OF ISSUES

1. Whether the Second Amended Complaint—which contains detailed allegations of concerted action and agreement among Schein, the other Cartel Members, and their common suppliers, the Danaher Defendants, to fix margins and protect their supracompetitive pricing by boycotting discounters—states a claim against Schein.

2. Whether the Second Amended Complaint, which alleges that the defendants conspired to boycott Archer, thus blocking Archer from competing, alleges antitrust injury sufficient to confer standing on Archer.

## BACKGROUND

As explained in the Second Amended Complaint, Archer was founded in 1983 by James Archer, Sr., and has earned a reputation among its customers—primarily dentists—for low prices and high-quality service. Compl. ¶¶ 24, 34. Archer was an authorized distributor for Defendants Dental Imaging Technologies (d/b/a Gendex), KaVo, Dental Equipment LLC (Pelton & Crane, Marus, and DCI equipment lines), and Instrumentarium. *Id.* ¶¶ 25, 76.

Beginning in 2004, Defendant Danaher Corporation embarked on a consolidation strategy whereby it acquired many of the dental equipment companies whose equipment Archer distributed. *Id.* ¶ 25. This consolidation strategy resulted in Danaher Corporation becoming the largest manufacturer of dental equipment in the industry. *Id.* Moreover, because Danaher Corporation gained control over a substantial portion of the dental equipment manufacturing industry, doing business with it became essential to the success of dental equipment distributors such as Archer. *Id.*

About the same time as Danaher Corporation began consolidating the dental equipment manufacturing industry, Archer sought to expand its business and increase its sales in Oklahoma and Northwest Arkansas by partnering with another independent distributor, Dynamic Dental Solutions, Inc. ("Dynamic"), as Archer's sales representative. *Id.* ¶ 43. Dynamic practiced the same high-quality service, low-price philosophy as Archer employed. *Id.* ¶ 46. As a result, Dynamic's sales grew significantly within only a few years, reaching almost a million dollars annually for the Pelton & Crane line alone. *Id.* Archer also sold a significant volume of equipment in Oklahoma and Northwest Arkansas independently of its relationship with Dynamic. *Id.* ¶ 43. In addition to its success in Oklahoma and Northwest Arkansas, Archer

3

started to grow nationally when Instrumentarium appointed Archer as its first hybrid, national distributor of dental imaging equipment in 2007. *Id.* ¶ 84. A hybrid distributor is one that sells nationally from a single location with no geographic restrictions. *Id.* Archer grew its sales of Instrumentarium equipment by 90 percent in each of the two years following its appointment as a national distributor.  *Id.* ¶ 85.

Archer's and Dynamic's success, along with their low prices, began to attract the attention of competing dental equipment distributors Schein, Patterson, Benco, and Burkhart. *Id.* ¶¶ 46, 86. Unbeknownst to Archer, while it was growing sales in Oklahoma and Northwest Arkansas, the Cartel Members—who make up over 80 percent of the distribution of dental equipment and supplies in the United States, *id.* ¶ 18—had already established a "trust" relationship by which they agreed that they would not compete on price for a customer known to already be in discussions with another Cartel Member. *Id.* ¶ 58. Rather than have Archer and Dynamic's low-price strategy upset that relationship—and the resulting high profit margins—the Cartel Members explained to Archer and Dynamic that they would be accepted into the industry only if they maintained the same high margins.  *Id.* ¶¶ 55, 71.

In meetings discussing the scope of the agreement, the Cartel Members explained to Dynamic's Skip Pettus that they want to be "on the same playing field" as their competitors. *Id.* ¶¶ 59-60. Schein's Mark Lowery explained that all of the Cartel Members "have the ability to drop our drawers," but that they "all want to make a living" so "we all ... all are going to sell it at a ... at a good price where we all get paid." *Id.* ¶ 61. As Lowery put it, the objective of the scheme is to ensure that dentists "get[] [dental products] for the same price no matter who they buy it from" so that "we all get paid." *Id.* ¶ 35. He further acknowledged that the conspiracy extended across the industry, explaining that "if [Dynamic] isn't selling it, [Burkhart's] Jack's

4

going to be selling it. If he isn't going to be selling it, Patterson is going to be selling it." *Id.* ¶ 67. Lowery admitted that the price-fixing conspiracy had been implemented "unanimously across the industry [for] as long as [he had] been in the dental business." *Id.* Lowery boasted that he could quote a price "with confidence" and tell the customer to go ahead and price check him with the competition because he secretly knows that his competitors will not offer a lower price. *Id.* ¶ 72.

Archer also learned that the Cartel Members enforce and protect their efforts to maintain high margins through dental product manufacturers. The Cartel Members procure the manufacturers' agreement to terminate or restrict the sales territories of competing, discount distributors by threatening to quit buying the manufacturers' products. *Id.* ¶ 70. Because the Cartel Members make up over 80 percent of the dental distribution market, *id.* ¶ 18, their collective refusal to buy from a manufacturer would devastate that manufacturer's sales and profits.

As detailed in the Second Amended Complaint, there is extensive evidence of the Defendants carrying out this plan and Schein specifically doing its part. For example, in January 2008, Schein manager Lowery threatened Pelton & Crane representative Don Givens, telling him that Schein would stop selling Pelton & Crane equipment unless Pelton & Crane stopped doing business with Archer and Dynamic. *Id.* ¶ 50. That same month, Burkhart's manager Powers made the same threat to Givens. *Id.* ¶ 51.

The Danaher Defendants responded to the threats by acceding to the Cartel Members' demands and joining the conspiracy, thereby cutting Archer off from the supply of dental equipment that it needed to compete effectively. In furtherance of the conspiracy, Dan Bump met with Schein and Burkhart in January 2008 and agreed that Dynamic would be banned from

selling not only Pelton & Crane equipment, but also Marus and DCI equipment. Furthermore, they agreed that Archer's territory would be restricted to Texas. *Id.* ¶ 53. In exchange, Schein and Burkhart promised to "make up" the sales that Danaher would lose as the result of its actions with respect to Archer and Dynamic. *Id.* Schein announced the news to its employees on February 25, 2008—over a week before Dynamic and Archer received the news from Danaher. *Id.* ¶ 54.

The territory restrictions quickly expanded to other manufacturers. For example, in December 2008, Instrumentarium prohibited Archer from selling equipment to a Wisconsin dentist because it was "Schein's backyard and Schein is raising hell about your current pricing." *Id.* ¶ 87. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████ *Id.* ¶ 90. Schein, Patterson, and Benco continued making similar complaints regarding other potential Archer sales. *See id.* ¶¶ 87, 90.

Eventually, Schein told Instrumentarium that it would not sell Instrumentarium equipment unless Instrumentarium terminated Archer's nationwide distribution rights, nor would Schein let Instrumentarium representatives step foot in a Schein showroom until that happened. *Id.* ¶¶ 86, 95. ████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 88. In April 2009, Instrumentarium revoked Archer's nationwide distributor status and limited Archer to sales only in Texas because of "the integrity of its end-user pricing." *Id.* ¶ 96. ████████████████

████████████████████████████████████████████

████████████████████████████████████ *Id.* ¶ 92.

████████████████████████████████████████████

███████████████████████████████████████████████████████████████ *Id.* ¶

94. Mike Null, the Instrumentarium representative who sent the letter restricting Archer's

territory, later told Archer that the pressure from Patterson, Schein, and others was so great that

he had been forced to email a copy of his restriction letter to them to prove that he had acted

upon their demands. *Id.* ¶ 96.

Similarly, KaVo refused to allow Archer nationwide distribution rights (which Archer

had held previously) because it "could not figure out a way to protect the margins demanded by

'other dealers.'"  *Id.*  ¶  100. And Gendex rejected Archer's multiple attempts to become a

distributor because, as Gendex told a Pelton & Crane representative, opening Archer would

cause him to lose all of his other business around town given the "pressure from other dealers."

*Id.* ¶¶ 101-03. Archer also previously distributed Danaher's Kerr line of consumables, but was

terminated from that line as well. *Id.* ¶ 32.

But the territory restrictions were not enough to satisfy the Cartel Members. █████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████     *Id.* ¶ 105. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[2] *Id.*  ¶  106. █

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[2]

███████████████████████████████████████ *Id.* ██████████████████████

██████████████████████████████████████████████████

████████████████████ *Id.*

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.* ¶

114. A Schein representative relayed the threat directly to Jim Archer Jr., stating that Archer "needed to 'get the price up on Nomads or it won't matter soon.'" *Id.* █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ *Id.* ¶¶ 110-11. ████████████

███████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶ 111.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ *Id.* ¶ 112.

███████████████████████████████████████ *Id.* ██

███████████████████████████████████████████████

████████ *Id.* ¶ 113.

As promised, in 2014, the Danaher Defendants terminated Archer's distributorship agreements—along with the agreements of a number of other independent, low-margin distributors. *Id.* ¶ 117. ██████████████████████



*Id.* ¶¶ 118-19.

*Id.* ¶ 118.

*Id.* ¶¶ 118-19.

*Id.* ¶ 118.

*Id.* ¶ 119.

The complaints extended to other manufacturers. When Archer asked for access to Midmark's entire equipment line in 2001 and regularly thereafter, Midmark refused because, as Midmark's Mike Hall explained, if he allowed Archer to sell Midmark's entire line, Schein, Patterson, and Island Dental (another distributor, later acquired by Schein) would "cut him off" (*i.e.*, stop selling Midmark products). *See id.* ¶ 126.

In or around 2005, Schein, Patterson, and Burkhart pressured SciCan (another manufacturer) to not open its equipment line to Dynamic Dental. These complaints led SciCan on several occasions to warn Archer to stop "stealing" Schein and Patterson customers and that Schein and Patterson had threatened to stop selling SciCan products if SciCan did not terminate Archer. *Id.* ¶ 135. In 2011, SciCan terminated Archer's distribution agreement. *Id.*

*Id.*

In December 2006, manufacturer Acteon terminated Archer's distribution agreement because Archer's pricing was "below the industry average in respect to gross margin." *Id.* ¶ 140. Acteon's representative explained to Archer that Schein and Patterson had complained to Acteon about losing sales to Archer. *Id.* In May 2008, manufacturer Vivadent terminated Archer's distribution agreement. A Vivadent representative later explained that Archer was terminated because it was taking too many orders from Schein and Patterson, who did not want to compete with Archer's prices. *Id.* ¶ 134.

Around 2009 or 2010, manufacturer Digi Doc refused to allow Archer to distribute its products because of too many complaints from Schein, Patterson, and Benco. *Id.* ¶ 141. In 2011, according to a former NSK employee, manufacturer NSK refused to re-authorize Archer's distribution agreement due to pressure from each of the Cartel Members, including Schein. *Id.* ¶ 138.

Schein's efforts, in conjunction with the other Cartel Members, to keep low-margin competitors out of the market extended to the consumables segment. ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████. *Id.* ¶ 144. ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* Additionally, when state dental associations partnered with low-price distributors to offer their members low prices, Schein joined with Patterson, Benco, and several manufacturers to boycott those state associations' annual meetings. *Id.* ¶ 148.

On August 31, 2012, Archer filed this lawsuit for damages and injunctive relief against Schein and the Danaher Defendants for violations of Section 1 of the Sherman Act and the Texas Free Enterprise and Antitrust Act. All Defendants then filed Motions to Compel Arbitration. Dkt. Nos. 10, 14. The Magistrate Judge granted the motions and stayed all proceedings in the case pending arbitration. Dkt. No. 44. Archer objected to the Magistrate's Order, but the stay remained in place for the next three-and-a-half years until December 7, 2016, when this Court denied the Motions to Compel Arbitration, lifted the stay, and ordered the parties to proceed with litigation. Dkt. No. 63. On August 1, 2017, Archer filed the Amended Complaint, adding Cartel Members Patterson and Benco as defendants. Dkt. No. 171. All defendants moved to dismiss, but those motions were mooted by Archer's filing of a Second Amended Complaint on October 30, 2017. Dkt. No. 261. Schein has now re-moved to dismiss the claim against it, asserting that the Second Amended Complaint insufficiently alleges an antitrust conspiracy and also suggesting that Archer lacks standing to bring its claims. Dkt. No. 288. The motion should be denied.

## ARGUMENT

"In the Fifth Circuit, motions to dismiss under Rule 12(b)(6) are viewed with disfavor and rarely granted." *OLA, LLC v. Builder Homesite, Inc.*, 661 F. Supp. 2d 668, 672 (E.D. Tex. 2009) (citing *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009)). A complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FED. R. CIV. P. 8(a)(2). On a 12(b)(6) motion, a court must accept all allegations in the complaint as true and construe the complaint liberally in the plaintiff's favor. *American Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 U.S. Dist. LEXIS 126934, at *9 (N.D. Tex. Aug. 7, 2012) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)). To survive a motion to dismiss, "a complaint must

contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation" of a right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## I. THE SECOND AMENDED COMPLAINT SUFFICIENTLY ALLEGES SCHEIN'S AGREEMENT TO PARTICIPATE IN AN ANTITRUST CONSPIRACY.

Schein argues that the Second Amended Complaint fails to allege facts necessary to establish an antitrust conspiracy among Defendants. According to Schein, the Second Amended Complaint alleges nothing more than a series of independent parallel complaints by the Cartel Members in response to Archer's "below-market pricing" followed by the Danaher Defendants' unilateral reaction to those complaints. Schein Br. 17-22. Schein's arguments ignore the Second Amended Complaint's conspiracy allegations, including admissions by conspiracy members, and distort the legal standard for pleading a conspiracy.

The existence of a conspiracy can be shown through either direct or circumstantial evidence. Where concerted action can be shown through direct evidence, such as statements or admissions by the conspiracy participants, "it is not required to provide circumstantial evidence . . . from which a concerted refusal to deal can be inferred." *Tunica*, 496 F.3d at 411. In the absence of direct evidence, conspiracies can be "proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (internal quotation marks and citation omitted). Allegations of parallel conduct accompanied by circumstantial evidence of a conspiracy are sufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 557 (Section 1 claim may be pled with allegations of

parallel conduct placed in a context suggesting an agreement); *see also Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013).

In considering whether Archer's allegations create an inference of conspiracy, the Second Amended Complaint is not to be deconstructed into its component parts, but must be viewed as a whole. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. SA-15-CA-32-FB, 2015 U.S. Dist. LEXIS 154154, at *15-16 (W.D. Tex. Oct. 15, 2015) (quoting *Continental Ore*). Moreover, at the pleading stage, "the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial." *Anderson*, 680 F.3d at 184 (citations omitted); *see also Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.").

### A.    The Group Boycott and Price-Fixing Are Part of a Single Overarching Conspiracy to Eliminate Competition and Raise Prices Above Competitive Levels

Schein opens its argument with several pages essentially arguing that Archer does not have standing to assert a margin-fixing claim, but in doing so, Schein—like Benco and Patterson before it—takes aim at a strawman that it admits is not part of the case. To be sure, to maintain a private antitrust claim under Clayton Act § 4, the plaintiff must allege "antitrust injury"—*i.e.*, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Archer's Second Amended Complaint does just that. The Second Amended Complaint contains a single Sherman Act Section 1 claim (and corresponding TFEAA claim)

against Defendants for engaging in a scheme to eliminate competition in the distribution of dental equipment and supplies by boycotting Archer and other discounters who threaten the Defendants' high margins.[3] The conspiracy injured Archer by blocking its access to dental equipment and supplies, thus preventing Archer from competing with the Cartel Members. Compl. ¶ 1. Courts consistently hold that firms that allege injury from conduct that inhibited them from competing, such as a group boycott, have antitrust standing. *See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010) (competitor had standing to challenge conduct that prevented it from competing as it had previously); *Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-cv-1509-Orl-37DAB, 2015 WL 275806, at *5, 10 (M.D. Fla. Jan. 22, 2015) (plaintiff had standing to challenge exclusionary conduct that included group boycott).

Schein's fundamental error is impermissibly breaking the alleged conspiracy into pieces. Archer does not allege an independent price-fixing conspiracy; rather, Archer's allegations of the Cartel Members' efforts to maintain elevated margins give its group-boycott claim relevant context.[4] Archer alleges that it was the margin-fixing agreement that motivated the Defendants to

---

[3] The boycott allegations distinguish this case from others in which plaintiffs lacked antitrust standing. *Rockbit Industries U.S.A. Inc. v. Baker Hughes, Inc.*, held that a competitor could not recover damages for a standalone price-fixing claim. *See* 802 F. Supp. 1544, 1548 (S.D. Tex. 1991). The complaint in *Dentsply International Inc. v. Dental Brands for Less LLC*, 2016 U.S. Dist. LEXIS 149139 (S.D.N.Y. Oct. 27, 2016), similarly lacked any boycotting allegations. Unlike the plaintiffs in those cases, Archer seeks damages flowing from its exclusion from the business of selling dental equipment as a result of Defendants' per se illegal group boycott.

[4] In truth, Archer could succeed on its boycotting claim even if it failed to prove a margin-fixing agreement. Though the Cartel Members' coordinated efforts to maintain supracompetitive margins provide a motive for the boycott, price evidence is relevant "solely for the purpose of showing the dealers' state of mind, rather than [to] prove the existence of actual price-cutting by the discounters." *United States v. General Motors Corp.*, 384 U.S. 127, 147 n.22 (1966). So long as the Cartel Members thought that low-margin distributors like Archer were a threat to their margins (fixed and supracompetitive or not), the same motive remains. The Supreme Court confronted a similar situation in *General Motors*, where the defendant was held liable for a group

exclude Archer as a competitor for the distribution of dental equipment and supplies. *See, e.g.*, Compl. ¶ 1 (alleging that Archer's "termination was an illegal boycott, the purpose of which was to allow the Cartel Members to maintain and perpetuate their margin-fixing conspiracy"). Courts have recognized that firms may engage in per-se illegal group boycott activity to protect agreed-upon, supracompetitive pricing. *See F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990) (explaining that a horizontal group boycott imposed to constrain supply and force a price increase "constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act" (internal quotation marks omitted)); *Rossi*, 156 F.3d at 472 (price fixers' knowledge of the plaintiff being a price-cutting competitor provided "strong evidence of the defendants' motive to conspire ... to prevent him from competing against them").

Schein is mistaken in claiming that the price-fixing allegations prove only a profit motive, and that a profit-motive proves little. The cases that it cites are irrelevant because in those cases the plaintiffs lacked direct evidence of a conspiracy and instead relied solely on circumstantial evidence that was found to be legally insufficient. *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995) ("When a plaintiff relies on circumstantial evidence, . . . he 'must show that the inference of conspiracy is reasonable in light of the competing inference[] of independent action.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999) (finding evidence of profit motive alone is insufficient to satisfy the "plus factor" requirement where there was no direct evidence of a conspiracy). It is understandable that in such cases, profit

---

boycott even though there was no allegation (much less proof) of price-fixing. *See id.* And in *MM Steel*, the Fifth Circuit made no explicit mention of a motive (much less a price-related one) in upholding the jury's verdict.

motive *alone* is not enough to carry the plaintiff's burden since every business has a profit morive.

But here, the Second Amended Complaint alleges much more than profit motive alone and in fact contains extensive direct evidence of an agreement between competitors by Schein's own admissions. The direct evidence includes:[5]

- On May 17, 2008, Schein's Lowery and Burkhart's Powers admitted to Dynamic's Skip Pettus at the Oklahoma Dental Association meeting that the Cartel Members were engaged in a margin-fixing agreement and invited him to join on behalf of Dynamic and Archer. Compl. ¶ 55.

- On May 27, 2008, Burkhart's Powers admitted to Pettus that the Cartel Members have a "trust" relationship pursuant to which they do not compete for each other's customers and that he wants to be "on the same playing field" with his competitors. *Id.* ¶¶ 57-59.

- On June 2, 2008, Schein's Lowery remarked to Pettus, that "when everyone plays on the same playing field, it makes things a whole lot easier," and that Burkhart's Powers is a "good competitor." *Id.* ¶ 60.

- At the same meeting, Lowery explained how the Cartel Members want to maintain a certain margin and do not compete against each other for customers. As a result, dentists get products "for the same price no matter who they buy it from." *Id.* ¶¶ 35, 61-63.

- The Cartel Members will call each other if they feel someone is charging too low a margin. For example, Lowery admitted that he has "no problem" calling Burkhart's Powers to ask what's going on with a low quote. *Id.* ¶ 69.

In any event, such allegations prove far more than just "motive." The boycotting allegations are an integral part of the Cartel Members' attempts to elevate margins because, as explained in the Second Amended Complaint, boycotts and threats to boycott are how the Cartel

---

[5] The above allegations are not mere "cherry-picked" quotations as Schein would have this Court believe. Schein Br. 14 n.4. The allegations describe in Schein's own words a conspiracy to fix margins for dental products. Such admissions by a defendant of the existence of the challenged conspiracy are more than sufficient to plead a Section 1 claim. *Tunica*, 496 F.3d at 411 (conspirators' statements acknowledging agreement deemed sufficient direct evidence of a conspiracy).

Members enforce the agreement. *Id.* ¶ 70. Accordingly, Schein cannot ignore any allegations about the Cartel Members' efforts to maintain supracompetitive margins, as all of the allegations form part of a single overarching anticompetitive agreement.

**B.  The Second Amended Complaint Includes Sufficient Allegations That the Cartel Members Agreed to Boycott Archer**

Having alleged that Schein participated in the horizontal conspiracy, it is unnecessary to allege that the Cartel Members *separately* agreed to threaten the Danaher Defendants to join the conspiracy. "All conspirators are jointly liable for the acts of their co-conspirators." *Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). "No express agreement . . . is necessary . . . . It is sufficient if persons, with knowledge that concerted action was contemplated and invited, 'give adherence to and then participate in a scheme.'" *Standard Oil Co. v. Moore*, 251 F.2d 188, 211-12 (9th Cir. 1957) (quoting *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 716 (1948)). Because the group boycott was undertaken with the express purpose of enforcing the margin-fixing agreement between the Cartel Members, Compl. ¶¶ 1, 70-71, it was part and parcel of the conspiracy in which Schein participated. Schein is therefore liable for the boycott, regardless of any independent agreement to engage in a group boycott.

Nevertheless, the Second Amended Complaint is replete with evidence of the Cartel Members' agreement to boycott Archer. The direct evidence includes, among other things, admissions by Schein's own employee of the agreement to maintain high margins and how Schein protected that agreement by enlisting the Danaher Defendants to boycott Archer. *See, e.g.*, Compl. ¶ 58 (Burkhart manager explaining the "trust" relationship between Schein and Burkhart), ¶ 70 (Schein manager admitting that the Cartel Members have an agreement with Danaher to restrict or terminate dealers who refuse to "sell at the same high prices at which" the

Cartel Members agree with each other to sell). These admissions are direct evidence of the boycotting agreement and are sufficient to meet Archer's pleading obligation.

Schein ignores this direct evidence of a conspiracy and then claims Archer has not alleged enough facts to infer an agreement. In doing so, Schein confuses the pleading standard. Circumstantial evidence is not required when there is direct evidence of a conspiracy. *Tunica*, 496 F.3d at 410 (defendants' own admission of an agreement sufficient to create a fact issue as to whether defendants engaged in concerted action); *Rossi*, 156 F.3d at 466 ("[T]he *Matsushita* standard [for inferring an agreement] only applies when the plaintiff has failed to put forth direct evidence of conspiracy."). Furthermore, Schein ignores the additional detailed evidence of a conspiracy, including:

- Schein's Tulsa Manager threatened to stop selling Pelton & Crane equipment unless Pelton & Crane stopped doing business with Archer and Dynamic. Compl. ¶ 50.

- Burkhart made the same threat to Pelton & Crane in the same month. *Id.* ¶ 51.

- Shortly thereafter, Dan Bump met with Schein and Burkhart to agree that the Danaher Defendants would no longer sell to Dynamic and restrict Archer's territory to Texas. *Id.* ¶ 53.

- Schein's Tulsa manager told Dynamic that it could begin selling again if it agreed to charge dentists the same prices as the Cartel Members. *Id.* ¶¶ 65-66.

- Burkhart's manager demanded that Dynamic's ADC (American Dental Cooperative) membership be revoked. *Id.* ¶ 48.

- In response to threats from the Cartel Members, Instrumentarium told Archer to "not quote" a dentist in Illinois, to "back off" from a sale to a dentist in Washington, and to "withdraw" a proposal to a dentist in California. *Id.* ¶ 87.

  ███████████████████████████████████████████████████████████. *Id.* ¶ 90.

- ████████████████████████████████████████████████████████████
  ███████████████████████ *Id.* ¶¶ 88-89, 92-93. ██████████████
  ████████████████████████ *Id.* ¶ 94.

18

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████

  *Id.* ¶ 118.

- The boycott was motivated by a desire to protect the Cartel Members' inflated margins. *Id.* ¶¶ 53, 70-71.

- The Cartel Members colluded to keep other low-margin dealers out of the market.
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████ *Id.* ¶ 144. Similarly, when state dental associations organized group purchasing organizations that offered lower prices to dentists, █████████
  ████████████████████████████████████████
  ████████████████████████████████ *Id.* ¶ 148.

Allegations like these, of multiple firms consistently applying pressure to the same manufacturers, around the same time, regarding the same threats are sufficient to infer an agreement. *MM Steel*, 806 F.3d at 845 (holding that "independent threats from two distributors" were sufficient to find a horizontal conspiracy existed where the threats were within several weeks of each other).

Schein nonetheless attempts to cast its conduct as little more than a fierce competitor complaining to manufacturers about a rival distributor's pricing. Schein Br. 18-19. But the conspiracy allegations are not based on price complaints alone. When rival distributors refuse to unlawfully "play on the same field," the Cartel Members do more than just complain to the manufacturers; they agree with each other and the manufacturers to cut off the non-compliant rival. Compl. ¶ 70. Such conduct cannot be explained away as "natural, parallel conduct" as Schein suggests, particularly given the extensive direct evidence of the Cartel Members'

agreement.[6] *See Rossi*, 156 F.3d at 464 ("[A]ll of this activity was done against the backdrop of [the defendants'] dissatisfaction with [plaintiff's] price-cutting proclivities, and thus an inference can be drawn that the conspiracy was at least partially conceived as a price restraint.").

Schein next tries to claim that this is just an example of a manufacturer regulating its distributor network, but it does so only broadly, without pointing to any facts specific to this case. Schein Br. 20-22. In truth, the facts show the exact opposite. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Compl. ¶ 118. Moreover, Schein ignores the horizontal component of the group boycott at issue in this case. *See* Schein Br. 20 (citing cases discussing vertical restrictions); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, *as long as it does so independently*." (emphasis added)). ████████ ████ ████ ██ ██ ██████ ████ ██ ██ ██████ ████ ████████████████████████████████████████████████████████████████ ██████████████████████████ Compl. ¶ 94.

The only independent business justifications that Schein alludes to are pretextual as applied here. After casting aspersions on Archer for allegedly failing to "employ personnel to

---

[6] The cases Schein cites do not help its argument because none of them involved detailed allegations (including direct evidence) of *any* horizontal agreement like those contained in Archer's Second Amended Complaint. *See In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 537 (N.D. Tex. 2014) (allegation that hotels controlled the online prices for rooms insufficient to infer a conspiracy among the hotels); *Corr Wireless Commc'ns, L.L.C. v. AT&T, Inc.*, 893 F. Supp. 2d 789, 802-06 (N.D. Miss. 2012) (no facts alleged to support conclusory assertion of agreement); *Am. Surgical Assistants, Inc. v. Great W. Healthcare of Tex., Inc.*, No. H-09-0646, 2010 U.S. Dist. LEXIS 13573, at *16 (S.D. Tex. Feb. 17, 2010) (allegation that insurance companies sourced data from a common supplier insufficient to show an agreement).

service equipment that it sells to customers," Schein Br. 8, Schein claims that it makes "perfect business sense" for a manufacturer to direct sales to "established full-service dealers" rather than "a price-cutting dealer" who sells "at a lower price and with no guarantee of follow-on service." *Id.* at 21. Contrary to Schein's allegations, Archer provides high-quality, nationwide service to its customers through a network of independent service technicians. Compl. ¶ 93. It is therefore untrue that Archer's sales come with "no guarantee of follow-on service." Moreover, Schein's criticism of Archer's business model is a pretext; Schein is a 45% owner of Darby Dental, an internet-based dental equipment distributor who uses a business model similar to Archer's, including independent service technicians. *Id.* While Defendants may argue that they had independent business reasons for terminating Archer, Archer has plausibly alleged that those reasons are pretextual. *See MM Steel*, 806 F.3d at 845; *Rossi*, 156 F.3d at 464 ("Importantly, all of this activity was done against the backdrop of [the conspirators'] dissatisfaction with [plaintiff's] price-cutting proclivities, and thus an inference can be drawn that the conspiracy was at least partially conceived as a price restraint.").

## CONCLUSION

For the foregoing reasons, Schein's Motion to Dismiss should be denied. In the alternative, should the Court find any deficiencies in the Second Amended Complaint, Archer should be granted leave to amend.[7]

---

[7] Schein has requested oral argument. Archer believes oral argument is not necessary but stands ready to present oral argument if the Court wishes.

Dated: December 15, 2017.

**MCKOOL SMITH, P.C.**

/s/ *Samuel F. Baxter*

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
**MCKOOL SMITH, P.C.**
104 E. Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Lewis T. LeClair
Texas State Bar No. 12072500
lleclair@mckoolsmith.com
Gary Cruciani
Texas State Bar No. 05177300
gcruciani@McKoolSmith.com
Phillip Aurentz
Texas State Bar No. 24059404
paurentz@McKoolSmith.com
Travis E. DeArman
Texas State Bar No. 24074117
tdearman@McKoolSmith.com
Chelsea A. Priest
Texas State Bar No. 24102375
cpriest@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Charles E. Fowler, Jr.
Texas State Bar No. 24083014
cfowler@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

*ATTORNEYS FOR PLAINTIFF,
ARCHER AND WHITE SALES, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via electronic mail on December 15, 2017.

/s/ *Samuel F. Baxter*
Samuel F. Baxter

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned certifies that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case (Dkt. No. 116).

/s/ *Samuel F. Baxter*
Samuel F. Baxter