# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| ARCHER AND WHITE SALES, INC., <br><br> Plaintiff, <br><br> v. <br><br> HENRY SCHEIN, INC., et al., <br><br> Defendants. | CIVIL ACTION NO.: <br> 2:12-CV-00572-JRG-RSP <br><br><br> **ORAL ARGUMENT REQUESTED** <br><br> **FILED UNDER SEAL** |

**SEALED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DANAHER CORPORATION, INSTRUMENTARIUM DENTAL INC., DENTAL EQUIPMENT LLC, KAVO DENTAL TECHNOLOGIES, LLC, AND DENTAL IMAGING TECHNOLOGIES CORPORATION**

To get to a jury on the sole theory alleged—a *per se* illegal group boycott—Archer must show a material dispute of fact supported by substantial probative evidence demonstrating (1) that Archer was deprived of something necessary to compete (even though Archer is still in business), as a result of (2) a horizontal distributor group boycott, aided by (3) a vertical conspiracy that Danaher and the Dental Company Defendants made a conscious commitment to join. Archer's Response fails on all three counts. Instead of meeting this burden, Archer advances a morass of inadmissible evidence to twist a lawsuit that for five years was about the termination of local Oklahoma dealer Dynamic Dental from one line of dental equipment (Pelton & Crane) and a purported restriction in Archer's territory for another line of equipment (Instrumentarium) into a vast, nationwide conspiracy. That alleged conspiracy involves not dental *equipment*, but dental *consumables* (which Archer did not sell), directed not at Archer, but at Amazon.com and the Texas and Arizona Dental Associations. It is no mystery why: ▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. The Court should not permit Archer to get to a jury on these inadmissible irrelevancies.

## I. The Court Should Grant Danaher Summary Judgment.

Relying principally on a Tenth Circuit case, Archer invokes the "single enterprise" doctrine to argue that Danaher should be liable for the alleged actions of its subsidiaries. Resp. at 2, 41–45. But that doctrine does not apply here. The case on which Archer relies, *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, held that it applies *only* to Sherman Act Section 2 claims. 847 F.3d 1221, 1231–34 (10th Cir. 2017). As to Section 1 claims like Archer's, *Lenox* noted, courts have long rejected the single enterprise doctrine. *Id.* at 1234. And even if it could apply to a Section 1 claim, *Lenox* also made clear that each corporate family member must have "independently participated in the enterprise's scheme," *id.* at 1237–38, the same thing Archer's

1

other cases require. *See, e.g.*, *Precision Assocs. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42, 2013 U.S. Dist. LEXIS 177023, at *64–66 (E.D.N.Y. Sept. 20, 2013).

Thus, whatever its legal theory, Archer must show Danaher itself made a "conscious commitment to a common scheme designed to achieve an unlawful objective" directed at Archer. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015). Archer has no such evidence. Instead, it dresses up veil-piercing allegations—a theory it again disclaims, Resp. at 43 n.6—as purported evidence of Danaher's liability. Archer claims Danaher operated the Dental Company Defendants as "mere divisions," allegedly by having one board of directors, appointing certain high-level officers, conducting meetings, and receiving occasional reports from subsidiaries. *Id.* at 44. It also claims that an email from Larry Culp of Danaher about ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *Id.* at 45. Finally, Archer claims the fact that it received termination letters from each of the Dental Company Defendants' brands on the same day somehow shows Danaher's direct involvement, *id.*, even as it does not dispute that the letters came from the Dental Company Defendants, not Danaher, as part of an effort to market these products under one brand, Kavo. These "facts" evidence normal parent oversight—not that Danaher joined a conspiracy. *See* Dkts. 280, 312. Danaher cannot be liable based on such evidence. The Court should grant it summary judgment.

II.   **Archer's Evidence of Conspiracy Is Inadequate To Survive Summary Judgment.**

*No Evidence of Horizontal Conspiracy*. To establish a horizontal conspiracy among the dealers, Archer first relies on retrospective chatter by two low-level salespeople for Schein (Lowery) and Burkhart (Powers), including at an Oklahoma Dental Association (ODA) meeting. This cannot establish the horizontal conspiracy necessary to survive summary judgment. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763 (5th Cir. 2002) (liability must be established through individuals having apparent authority to act); *United States v. Cornett*, 195 F.3d 776,

782–83 (5th Cir. 1999) (retrospective, "mere idle chatter" is not "in furtherance of" conspiracy).

Even supposing this evidence could be enough, however, it is inadmissible, particularly as to Danaher and the Dental Company Defendants. Archer's evidence about the ODA meeting is inadmissible hearsay by witnesses without personal knowledge. *See* Resp. at 17 (citing Ex. 47 ███████████████████████████████, Ex. 33 ███████████████████████████████, Ex. 38 ███████████████████████████████ ███████████; *see* Defs.' MiL Nos. 4–5 (Dkt. No. 351).[1] Archer also continues to persist in its false claim that ███████████████████████████████████████████████ Again, however, Archer relies on inadmissible, embedded double hearsay to make this false assertion: (1) a purported transcript of a secret recording made by Givens to aid Archer in this litigation, in which Givens himself purports to characterize what Powers told him about what Bump told Powers, Resp. at 6 & Ex. 7; (2) a purported transcript of another secret recording made by Givens in which neither Givens nor anyone else even discusses such a meeting, *id.* at 6, 11 & Ex. 8; and (3) a declaration, provided by Givens to aid Archer in opposing this Motion, ████████████████████████████████ *id.* at 6, 11 & Givens Decl.[2]

Setting aside its general inadequacy and inadmissibility, this evidence also does not establish Danaher's or the Dental Company Defendants' liability. Neither the alleged ODA meeting nor the secret tapes establish directly or circumstantially that Danaher or the Dental Company Defendants joined any supposed conspiracy. To the contrary, █████████████ ███████████████████████████████████████████████. Br. at 9. This evidence also has nothing to do with the 2009 Instrumentarium restriction or Archer's termination six

---

[1] Filed with this Reply is a chart of objections to Archer's summary judgment exhibits.

[2] Archer's use of Givens's statements as purported proof of a conspiracy is particularly questionable because ███████████████████████████████████████████████ ███████. Br. at 9–10; *see also* Ex. 51, Foster Decl. ¶ 2.

3

years later, in 2014. At best, then, the Lowery/Powers evidence constitutes a "mere scintilla" of circumstantial evidence about a purported "conspiracy" that does not include Danaher or the Dental Company Defendants. That is a far cry from the "strong" evidence tending to exclude the possibility of independent action that Archer must adduce to survive summary judgment in an antitrust case. *Tunica Web Advert. v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007).

Archer is then left to rely on sprawling descriptions of the Distributor Defendants' conduct ███████████████████, which has nothing to do with Archer or the Dental Company Defendants.[3] *See* Resp. at 8–9, 13–14, 24–30. Archer claims this evidence establishes a "larger" conspiracy to drive out low-margin competition. But the conspiracy cannot be so broadly defined: Unrelated antitrust conspiracies cannot be used to survive summary judgment as to the existence of a particular antitrust conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595–96 (1986); *see also* Defs.' MiL No. 2. That being the case, Archer resorts to analogizing to factually distinguishable cases regarding drug conspiracies or TV display technology. Resp. at 23–24 & n.2. But the sale of complex capital dental *equipment* (*e.g.*, treatment units, x-rays, and hand tools) by the Dental Company Defendants cannot be said to be part of a single conspiracy about the sale of dental *consumables* ███████ ███████. Instead, Archer has, at most, alleged a series of unconnected conspiracies with different goals and targets, involving products wholly unlike each other in nature and distribution model, none of which implicates Danaher or the Dental Company Defendants.

---

[3] Archer half-heartedly attempts to tie the Dental Company Defendants to ███████ Resp. at 14, 29. But the evidence Archer cites does not come close to suggesting the Dental Company Defendants participated in any alleged conspiracy to ███████████████ ████████████████████████████ *See* Ex. 51, Foster Decl. ¶ 3. And Archer points to no evidence whatsoever that would link the Dental Company Defendants ███████████████

To hold Danaher and the Dental Company Defendants liable for an alleged agreement reaching across multiple disparate products involving companies having nothing to do with them would be "merely to suggest . . . that 'if it happened here, it could have happened there.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51–52 (2d Cir. 2007). To borrow a cliché, Archer cannot argue that because there was a conspiracy in the California orange market at one time, there must have been one in the Texas apple market at another. *Id.*; *see also Matsushita*, 475 U.S. at 595–96; *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1315–17 (11th Cir. 2003); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 477 n.25 (S.D.N.Y. 2017) (conspiracy in one type of financial instrument not probative of alleged conspiracy in another); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975–76 (N.D. Iowa 2011).

Finally, Fifth Circuit case law prohibits exposing Danaher and the Dental Company Defendants to treble damages based on circumstantial evidence regarding *Distributor Defendant* meetings (Powers/Lowery) or ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ For example, the court in *MM Steel* dismissed Nucor because there was no evidence it knew about the alleged conspiratorial activity and therefore no basis to conclude Nucor made a conscious commitment to join it. *MM Steel*, 806 F.3d at 846 ("Without knowing that another distributor was threatening manufacturers, or that other manufacturers were refusing to deal with MM, Nucor could not consciously commit to a common scheme to foreclose MM from the market."). *Rossi*, one of Archer's favored cases, did the same. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 480–81 (3d Cir. 1998).

*No Evidence of Vertical Conspiracy*. Archer also provides no evidence of vertical conspiracy. For example, Archer cannot dispute that Foster and Zambetti advanced specific reasons for Dynamic's and Archer's terminations in 2008 and 2014. *See* Br. at 3–4. It merely

questions the credibility of these reasons, claiming they are "pretext." Resp. at 13. But Archer cannot survive summary judgment merely by "discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)). In the antitrust setting, this burden is significant: Faced with procompetitive business justifications and uniform denials of conspiracy, Archer must present "significant probative evidence" demonstrating the decisions were against the Dental Company Defendants' "economic self-interest so as not to amount to a good faith business judgment." *Aviation Specialties, Inc. v. United Techs. Corp.*, 568 F.2d 1186, 1191–92 (5th Cir. 1978). Archer lacks such evidence. Instead, regarding 2008 or 2014, it identifies three red herrings.

First, it is irrelevant whether the terminations were "for cause," Resp. at 13, 40, because there is no dispute that the relevant dealer agreements permitted termination at will. *See* Ex. 50 (dealer agreement § 11.3). Second, it is irrelevant that the Dental Company Defendants did not focus solely on sales numbers in those terminations, Resp. at 13, 40, because the record is clear



. *See* Br. at 3–4, 6–8; *Aviation Specialties*, 568 F.2d at 1192 n.10 (limiting distribution networks is commonplace, economically sound practice). Thus, it is unsurprising that the documents do not focus specifically on Archer, Resp. at 13, 40, because it is undisputed that                    . Br. at 3–4, 6–8. Finally, as with Dynamic or Amazon, Archer again relies on irrelevant emails about a different distributor, misleadingly arguing that documents and testimony from                    Resp. at 7–8, 39.

6

████████████████████████████████████████████████████████ Ex. 52, Dyer Tr. 44:1–5, ████████████████ ████████████████ *id.* at 66:11–18, ████████████████████████████ *supports* the conclusion that the 2014 terminations were made independent of any supposed conspiracy.

Archer also lacks the necessary affirmative evidence regarding the 2009 Instrumentarium restriction. Archer cannot dispute that the contemporaneous documents and Franz's testimony establish that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. *See* Br. at 5. Archer also does not dispute that the pilot program caused significant problems, including, among others, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ *Id.* at 6. Instead, Archer merely questions Franz's credibility, claiming that two isolated emails establish that these undisputed facts were mere pretext (which, as set forth above, is not enough). But these emails cannot bear the weight Archer places upon them.

The first, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Br. at 5. Second, Archer selectively quotes part of an email, Ex. 13, without noting that ████████████████ ████████████████████████████████████████████████████████ ████████████████," *id.* Thus, neither email evidences a conspiracy because neither shows a meeting of the minds. *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271–72 (5th Cir. 2008); *MM Steel*, 806 F.3d at 844. Instead, they constitute, at best, circumstantial evidence that full service dealers complained about Archer's free riding, *see Bus.*

7

*Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724–25 (1988), exactly as Franz described.

Finally, left standing on its own, Archer's circumstantial evidence of complaints, Resp. at 30–37, is irrelevant to whether a vertical agreement existed (especially because, again, Archer relies heavily on irrelevant communications with other manufacturers) and is not "strong" enough, *Tunica*, 496 F.3d at 409, to survive summary judgment as to a horizontal agreement. Archer relies on Third Circuit case law for such incorrect propositions as that "complaints from distributors to a manufacturer *is* evidence of a conspiracy." Resp. at 2. This is telling, because the Fifth Circuit is clear that evidence of complaints followed by termination is *insufficient* to survive summary judgment, even when the termination is done in part to keep the business of disgruntled dealers. *See, e.g.*, *Viazis*, 314 F.3d at 763–64 & n.8 ("One legitimate reason for terminating a relationship with a dealer is to avoid losing the business of disgruntled dealers." (internal brackets and quotation marks omitted)); *see also* Br. at 21–23 (collecting cases).

### III. Archer Cannot Recover for Harm to Dynamic.

Archer does not dispute that Benco owns Dynamic's causes of action. To avoid the statute of limitations, moreover, Archer admits that the Dynamic termination did not "directly" harm it. Resp. at 3, 51. Instead, according to Archer, the only directly relevant harm in 2008 was Pelton & Crane's decision to restrict Archer to Texas. Resp. at 3, 47. But nearly *every* piece of 2008 evidence Archer advances is about Dynamic, not Archer. Archer thus concedes that (1) any claim related to the 2008 Dynamic termination should be dismissed and (2) the evidence related to such claims should be excluded as irrelevant.

And the impact of these admissions reaches beyond 2008, to Archer's entire case. As explained in Defendants' *Daubert* submissions, Archer's damages model rises and falls on Dynamic Dental. For example, Archer rests its theory of nationwide expansion in equipment and consumables on its supposed plans to expand its relationship with Dynamic. *See, e.g.*, Resp. at

8

47 & n.10 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Its alleged growth rate ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ relies on sales growth attributable to Dynamic, and it applies its ▉▉▉ profit margin to all of its "but for" sales, including those it would have funneled through Dynamic. Thus, by admitting the irrelevancy of harm to Dynamic, Archer also admits that its damages model is built on a house of cards. For this reason, too, Archer cannot survive summary judgment. *See Daubert* Br. at 10–11, 15 (Dkt. 298); *Daubert* Reply at 3–4, 6–7 (Dkt. 350).

**IV. Archer's *Per Se* Group Boycott Theory Fails as a Matter of Law.**

Finally, Archer has again disclaimed the rule of reason, and so its failure to demonstrate that a *per se* theory applies also is fatal to its claims. First, Archer does not dispute that without a horizontal conspiracy, a putative boycott must be examined under the rule of reason. *See* Br. at 27–28. As explained above, Archer has not advanced sufficient evidence of such a conspiracy. Instead, at best Archer alleges a series of vertical conspiracies to terminate a cost-cutting rival, which must be examined under the rule of reason. *Bus. Elecs.*, 485 U.S. at 726–27, 735–36.

Archer also cannot dispute that although a horizontal conspiracy is a *necessary* condition of *per se* group boycott liability, it is not a *sufficient* one. This is clear from every case on which Archer relies, as well as some it ignores. For example, as *Tunica* holds, "That the casinos' alleged agreement was a horizontal one does not necessarily mean that the agreement is *per se* unlawful." *Tunica*, 496 F.3d at 414. Instead, *Tunica* held, a court must examine the *Northwest Wholesale* factors to determine if *per se* liability applies. In fact, the Fifth Circuit has mandated a similar inquiry for nearly half a century. *See, e.g.*, *E.A. McQuade Tours, Inc. v. Consol. Air Tour Manual Comm.*, 467 F.2d 178, 186–87 (5th Cir. 1972) (courts must examine "purpose and effect of the arrangement in question" before concluding *per se* treatment applies). Like *Tunica* and *McQuade*, *MM Steel* also carefully examined the nature of the boycott, acknowledged the

9

holding in *Northwest Wholesale* regarding "relationships the competitors *need* in the competitive struggle," and held that *per se* liability can apply only where "members of a horizontal conspiracy use vertical agreements anticompetitively *to foreclose a competitor from the market*." *MM Steel*, 806 F.3d at 848–49 (emphases added); *see also Rossi*, 156 F.3d at 462–64.[4]

Archer never tries to satisfy these factors. Instead, it invents a "premium" product market that has repeatedly been rejected as a matter of law, *see Daubert* Br. at 21–22, and then claims that the wealth of available alternative brands is irrelevant because it must have access to "at least one" of the so-called "premium" brands, Resp. at 14–15, 63–64. But there is no admissible evidence that *any* premium brand aside from the Dental Company Defendants' was unavailable to Archer as a result of the alleged conspiracy.[5] In fact, Archer's experts admit the contrary. *See Daubert* Reply at 8.[6] Lacking a viable *per se* theory, Archer's group boycott claim fails.

## CONCLUSION

For the reasons set forth above and in Danaher's and the Dental Company Defendants' opening brief, summary judgment should be granted.

---

[4] Archer makes much of footnote 7 to *MM Steel* regarding *Northwest Wholesale*. Resp. at 62. But the relevant passage in *Northwest Wholesale* focused on how the *Northwest Wholesale* factors applied to the *specific* co-op at issue in that case—which, as *MM Steel* acknowledged, was not relevant to *MM Steel* (or here). *See MM Steel*, 806 F.3d at 848 n.7 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 296 (1986)). That passage followed the *general* discussion of the factors applicable to *all* group boycott cases before *per se* liability can apply. *Nw. Wholesale*, 472 U.S. at 293–95. Archer's attempt to imply that this footnote somehow silently overruled both *Northwest Wholesale* and *Tunica* (which did not concern a sales co-op or a trade association) twists the footnote beyond anything it can bear.

[5] Archer tries to avoid this reality by pointing out that one defendant in *MM Steel* was found not liable. Resp. at 64 n.18. But this ignores the key fact that MM Steel went out of business because of the boycott in question, demonstrating that the products there were necessary to compete. The undisputed fact that Archer remains in business today takes it outside the cases on which Archer has attempted to rely, including *MM Steel, Rossi*, *Klor's*, and others.

[6] Whether a procompetitive justification is pretext is not, as Archer argues, an issue for the jury in a *per se* case, Resp. at 63—*Northwest Wholesale* foreclosed that argument. 472 U.S. at 296 n.7 ("[S]uch an argument is appropriately evaluated under the rule-of-reason analysis").

Dated: February 9, 2018

    Respectfully submitted,

/s/ *Brett C. Govett*

| | |
|---|---|
| Brett C. Govett (Bar No. 08235900) | Jonathan B. Pitt (*pro hac vice*) |
| Katherine Lett (Bar No. 24007548) | Liam J. Montgomery (*pro hac vice*) |
| NORTON ROSE FULBRIGHT US LLP | Matthew C. Monahan (*pro hac vice*) |
| 2200 Ross Avenue, Suite 3600 | WILLIAMS & CONNOLLY LLP |
| Dallas, TX 75201 | 725 Twelfth Street, N.W. |
| Tel: (214) 855-8118 | Washington, DC 20005 |
| Fax: (214) 855-8200 | Tel: (202) 434-5000 |
| Brett.Govett@nortonrosefulbright.com | Fax: (202) 434-5029 |
| Katherine.Lett@nortonrosefulbright.com | jpitt@wc.com |
| | lmontgomery@wc.com |
| Layne E. Kruse (Bar No. 11742550) | mmonahan@wc.com |
| NORTON ROSE FULBRIGHT US LLP | |
| 1301 McKinney, Suite 5100 | |
| Houston, TX 77010 | |
| Tel: (713) 651-5151 | |
| Fax: (713) 651-5246 | |
| Layne.Kruse@nortonrosefulbright.com | |

*Counsel For Defendants Danaher Corporation, Instrumentarium Dental Inc., Dental Equipment LLC, Kavo Dental Technologies, LLC, and Dental Imaging Technologies Corporation*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned certifies that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case (Dkt. No. 116).

/s/ *Brett C. Govett*
Brett C. Govett

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record by using e-mail and the Court's electronic filing system on February 9, 2018.

/s/ *Brett C. Govett*
Brett C. Govett