REDACTED BY ORDER OF THE COURT

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF TEXAS

3                    MARSHALL DIVISION

4   ARCHER AND WHITE SALES,      )(

5   INC.                          )(    CIVIL DOCKET NO.

6                                 )(    2:12-CV-572-JRG

7   VS.                           )(    MARSHALL, TEXAS

8                                 )(

9   HENRY SCHEIN, INC., ET AL.    )(    JULY 19, 2017

10                                )(    2:13 P.M.

11                    MOTIONS HEARING

12        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13               UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
17

18  FOR THE DEFENDANTS:(See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
19

20  COURT REPORTER:    Shelly Holmes, CSR-TCRR
                       Official Reporter
21                     United States District Court
                       Eastern District of Texas
22                     Marshall Division
                       100 E. Houston Street
23                     Marshall, Texas  75670
                       (903) 923-7464
24

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

1                         I N D E X

2

3   July 19, 2017

4                                           Page

5       Appearances                         1

6       Hearing                             3

7       Court Reporter's Certificate        128

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            COURT SECURITY OFFICER:  All rise.

2            THE COURT:  Be seated, please.

3            All right.  This is the time set for pending and

4    disputed motions before the Court in the Archer and White

5    Sales versus Henry Schein, et al., matter.  This is Civil

6    Action 2:12-CV-572.

7            Let me call for announcements.

8            What says the Plaintiff?

9            MR. DEARMAN:  Your Honor, Travis DeArman of McKool

10   Smith for the Plaintiff, Archer and White.  With me are my

11   colleagues, Lew LeClair, Gary Cruciani, Sam Baxter, and

12   Phillip Aurentz.  Thank you, Your Honor.

13           THE COURT:  You're ready to proceed?

14           MR. DEARMAN:  Yes, we are, Your Honor.

15           THE COURT:  Thank you.

16           What says the Defendants, in no particular order.

17           MR. SCHUSTER:  Paul Schuster for Henry Schein, and

18   with me today, Your Honor, is Eric Echols (sic).

19           MR. ECHOLS:  Good afternoon, Your Honor.

20           MR. SCHUSTER:  And we are ready to proceed.

21           THE COURT:  All right.  Other announcements from

22   Defendants?

23           MR. GOVETT:  Your Honor, good afternoon.  Brett

24   Govett for the Danaher Defendants, the manufacture

25   Defendants.  With me is Liam Montgomery and Jonathan Pitt.

1   We are ready to proceed.

2        THE COURT:  All right.  Thank you.

3        Do we have any other announcements?

4        All right.  Counsel, we've got a lot of ground to

5   cover this afternoon.  We're going to see how much we can

6   get done.

7        We're going to start with Plaintiff's emergency

8   motion to compel production of relevant documents.  This is

9   Docket No. 117.

10        And given that this is Plaintiff's motion, let me

11   hear from the Plaintiff on this first.

12        MR. DEARMAN:  Thank you, Your Honor.

13        THE COURT:  It appears that my invitation to come

14   an hour early and meet and confer didn't yield a whole lot.

15   We'll see.

16        MR. DEARMAN:  Your Honor, on this particular

17   motion, there have been some agreements with respect to the

18   documents at issue.  As Your Honor undoubtedly knows,

19   there's also an issue with respect to certain custodians

20   that Archer and White seeks discovery from.

21        With Your Honor's permission, I'll take up the

22   custodian issues first since it is in dispute without any

23   agreement.

24        THE COURT:  That's fine.  That's fine.  Go ahead,

25   Mr. DeArman.

1          MR. DEARMAN:  So, Your Honor, Archer and White

2    seeks discovery from three disputed custodians.  Those

3    custodians are Matt Zolfo, Z-o-l-f-o, Stanley Bergman,

4    B-e-r-g-m-a-n, and Greg Kuklinski, which is

5    K-u-k-l-i-n-s-k-i.  Clarity in the record.

6          These are three additional custodians that Archer

7    seeks discovery from in addition to the custodians that

8    Schein has previously searched its records for.  And -- and

9    it has previously searched its records for 36 custodians

10   that are involved in a related litigation in the Eastern

11   District of New York.

12         Archer approached Schein in order to obtain these

13   additional custodians because Archer believes it has good

14   cause to show that each of these three individuals has or is

15   very likely to have information that will be directly

16   relevant to Archer's claims in this case.  And these are the

17   only three disputed custodians that Archer seeks discovery

18   from in this case at this time.

19         I'd like to start with Matt Zolfo.  Matt Zolfo is a

20   Schein sales representative in Dallas, and we believe that

21   Matt Zolfo has information directly related to Archer's

22   claims that Schein engaged in a conspiracy with Danaher and

23   with Burkhart to boycott Archer's products.  And we believe

24   that because we have an email from Mr. Zolfo that was

25   produced by the Danaher Defendants.

1        I'm going to put that email on the ELMO.

2        I've highlighted several lines here.  The first is

3   the sender.  That's Matt Zolfo.  He's from Schein.  I've

4   also made a note of Danaher or Don Givens and for Kurt

5   Zambetti, who are both, as I understand it, employees of

6   some Danaher subsidiaries.

7        As you will see from the body of this email,

8   Mr. Zolfo writes at 1:22 a.m., the day after Archer files

9   the complaint in this case:  See attached yet another Archer

REDACTED BY ORDER OF THE COURT

10  and White example, Chair, ████████████████ ; Marus Unit, ████

11  █████████████.  This doesn't entice me to support Marus as

12  a value line brand moving forward.

13       For clarity, Marus is one of the lines carried by

14  the Danaher Defendants, and this is Mr. Zolfo, in Archer's

REDACTED BY ORDER OF THE COURT

15  view, ████████████████████████████████████████████

16  ████████████████████████  ██████████████████████

17  ████████████████████████  REDACTED BY ORDER OF THE COURT

18       We think this is direct evidence that ████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████.  Under MM Steel this is a threat, and it is relevant

22  to our claims.            REDACTED BY ORDER OF THE COURT

23            ██████████████████████████████████████████

24  ████████  ██████████████████████████████

25       Respectfully, even if Schein were correct, and ██

REDACTED BY ORDER OF THE COURT

1

2   complaints are still relevant, Your Honor.  And the Monsanto

3   case that they cite holds that.  Monsanto 465 US at Page

4   764, Note 8, the Court noted:  We do not suggest that

5   evidence of complaints has no probative value at all, but

6   only that the burden remains on the antitrust Plaintiff to

7   introduce additional evidence sufficient to support a

8   finding of an unlawful contract con -- combination or

9   conspiracy.

10          THE COURT:  Is this gentleman still employed by

11  Henry Schein?

12          MR. DEARMAN:  I believe so, Your Honor.

13          Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. DEARMAN:  We believe this -- this evidence on

16  its face shows that Mr. Zolfo will have relevant information

17  sufficient to come to hurdles at the discoverability stage.

18  And I believe this illustrates an issue that will pervade

19  the discovery disputes that we're going to address today,

20  which is admissibility is a question for the Court to

21  consider.  And, undoubtedly, the Plaintiffs and the

22  Defendants will have disputes about the relevance of

23  information and whether or not it is admissible before the

24  trier of fact.

25          But at discovery, evidence like this is conclusive

1    and shows that -- that the request from Archer is reasonable

2    and that this discovery should be compelled.

3            THE COURT:  All right.  Let me hear about the other

4    custodians.

5            MR. DEARMAN:  Yes, sir.

6            Moving on to Stanley Bergman, Mr. Bergman is the

7    president and CEO of -- of Schein.  He was the president and

8    CEO during the late 1990s and early 2000s at which time he

9    approached Archer to acquire the company or pro -- with a

10   proposal to acquire the company.  Once he was rebuffed,

11   Archer started to lose dental products.

12           More than that, Archer was informed that

13   Mr. Bergman's approaches were part of what was called a

14   Stan's Plan, which was a plan to consolidated the dental

15   supplier industry.

16           And following Archer's communications with

17   Mr. Bergman, they started to lose the lines, which are the

18   underlying facts supporting the group boycott allegations in

19   this case.

20           Moreover, the evidence presented to date, and the

21   evidence that will be presented at trial, will show that

22   this is a conspiracy between Schein and Burkhart joined by

23   the Danaher Defendants that we believe goes all the way to

24   the top.  And the fact that Mr. Bergman is the CEO of the

25   company does not insulate him from discovery.  In fact, it

1  is likely that he is directly involved.

2          The -- the next custodian is Greg Kuklinski.

3  Mr. Kuklinski was a National Equipment Manager from 2005 to

4  2014 during a bulk of the time period that's relevant in

5  this case.  His self-described job duties directly bear on

6  the issues in this case, including managing corporate

7  inventory buys to maximize competitive offerings and higher

8  profitability.

9          And based on his self-described job duties, Archer

10  believes that he will have relevant information to this case

11  and request that the Court compel production from this third

12  custodian.

13          And that's it for the contested custodians, Your

14  Honor.

15          THE COURT:  Let's do this.  Rather -- rather than

16  hear your argument on the entirety of the motion, because

17  it's got several components, let's break it down.

18          And let me hear from Defendants as regards these

19  custodian issues, and then we'll come back and pick up the

20  categories of information, the sales data information.

21          MR. DEARMAN:  Yes, sir.

22          MR. SCHUSTER:  Thank you, Your Honor.  Paul

23  Schuster.

24          I think this will probably come into bear a little

25  bit more later, but, obviously, the parties have a

1   significant disagreement about the scope of the facts

2   involved here.

3        The lawsuit itself discusses two broad categories

4   of claims, a 2008 restriction of a business partner of

5   Archer and White called Dynamic Dental in 2008 and a 2009

6   changing of Archer's sales territory for the Instrumentarium

7   entity from national to Texas only.

8        Coincidentally, Instrumentarium wasn't even bought

9   by Danaher, and I may not have the right word when I say

10  "bought" until later, November of 2009.  So Instrumentarium

11  wasn't even part of Danaher when that alleged change

12  happened.

13        So we have a very big difference of opinion, and

14  whatever Mr. Zolfo was doing in 2012 doesn't seem to have

15  any relevance to a restriction in 2008 or a restriction in

16  2009.

17        In addition to that on the custodian issue is a

18  more general thing.  We gave them access to 36 custodians

19  that we never would have done if it weren't part of an

20  overall deal of:  Hey, we're going to give you a lot more,

21  but this has got -- this has got to be pretty much it.  You

22  really got to come to us with a reason to add someone in.

23  And if you do, we'll absolutely listen to you.  And that's

24  exactly what happened.  They came to us and said:  Hey, we

25  think this guy named -- or this -- this woman named Melissa

1    Zimmerman, who was in Oklahoma in the 2008 period, is a

2    relevant custodian that you didn't include.  We said:  You

3    know what, you're right.  We'll add her.  We're doing it

4    right now.

5           THE COURT:  Let me ask you this, Mr. Schuster.  Is

6    this -- is part of the problem here the change in counsel,

7    and there were deals with prior counsel that now current

8    counsel doesn't necessarily feel bound to and existing

9    counsel feels like should be enforced?  Is that part of the

10   underlying problem?

11          MR. SCHUSTER:  I believe so.  To -- to give them

12   credit, believe me, the -- the -- the agreements with

13   counsel were stated in a way like, look, if you have good

14   cause, if you've got a reason to go ask us for something

15   else, we'll listen to you, we'll talk with you.  And we

16   agreed with them on Melissa Zimmerman.  They even asked for

17   two more, a guy name Ron Fernandez and a man by the name of

18   Heath Roberts.  And we said, we will look.  It just so

19   happened that those guys quit Schein back in 2009 and '10

20   before any of this came up in the 2012 lawsuit.  So we just

21   don't have their stuff anymore.  But we would have been

22   willing to go get them because they're related to those

23   issues in 2008 and 2009.

24          Let me turn very quickly to Matt Zolfo.  Matt Zolfo

25   is in Dallas.  And they're talking about an email in 2012.

1  That has nothing to do with that Oklahoma Dynamic Dental,

2  and it has nothing to do with the 2009 restriction to Texas.

3  So I'm at a little bit at a loss there as to how this

4  relates to this lawsuit.

5          I think that Archer's position is, well, but we got

6  terminated in 2014.  But they haven't made that part of the

7  lawsuit.  They got terminated in 2014.  Your Honor put this

8  case back on to the trial docket December of 2016.  They

9  haven't done anything to add that to the lawsuit.

10         So I'm not really sure what a 2 -- a September 2012

11 email from Mr. Zolfo has to do with a 2014 decision by

12 Danaher to restrict its overall distributor network where

13 there's no suggestion, even on their own email, that

14 Mr. Zolfo is agreeing with Burkhart.

15         What Mr. Zolfo is doing is he is telling Danaher,

16 like, look, I'm -- I'm out there working very hard for you,

17 and it's very difficult for me -- I don't know why I would

18 spend the time if every time I go put all of this work into

19 a sale and then someone comes in and just undercuts me,

20 that's normal business practice.  That's what distributors

21 do if they get undercut.  They say, look, I do a lot more

22 than the Archer guys.  I come in before and consult.  I get

23 the installation done.  I do the warranty work.  That's not

24 what Archer does.

25         Let me -- so I -- I think it's just totally

 1  different set of facts.  I don't think that there's any

 2  indication that Mr. Zolfo's complaining is anything other

 3  than what is a completely normal and legal as that Monsanto

 4  case says, and there's no indication that Danaher listened

 5  to them.  In fact, I looked -- I just looked very briefly at

 6  some of the -- the related documents.

 7          If I can throw this one down.  Is that right?  I've

 8  got to go this way, don't I?

 9          This was also produced -- I'll give you guys

10  copies.

11          I think it's -- if you can read that, this is,

12  again, Richard Centala is, I think, an Instrumentarium guy.

13  He's with the Danaher group of -- the manufacturer

14  companies.  Mike Null, as well.  And they're reacting

15  to a -- again, Mr. Zolfo is absolutely saying Archer is

16  doing things that are making my job very hard.  Why -- why

17  should I spend my time and effort trying to sell

18  Instrumentarium type of material when in response all my

19  effort's going to go to nothing.  I'm -- you know, I do a

20  lot of this stuff.

21          And the internal response by the -- the

                                    REDACTED BY ORDER OF THE COURT
22  Instrumentarium guys are:  ████████████  ████████████

23  █████████████████████

24          And that's reality.  Distributors complain.

25  Manufacturers tell distributors shut up.  They just don't --

1    that's just part of the world that exists.  And the fact

2    that they have an email that says Mr. Zolfo is essentially

3    trying to protect his own livelihood does not show a

4    conspiracy, and there's no suggestion that Mr. Zolfo is

5    working with Burkhart in any way, which is their whole

6    theory.  Their whole theory, if you remember, the only way

7    in their mind that they can have a per se Section 1 claim is

8    to have an agreement between Burkhart and Schein that

9    Danaher -- the manufacturer Defendants just don't.

10            Schein complaining to Danaher, that's not an

11   antitrust claim.  That's not a per se antitrust claim.  And

12   they're saying an email of Schein doing whatever Schein is

13   doing, a single sales person in Dallas, no relevance.

14            THE COURT:  Let me ask you this.  Part of what I

15   hear you arguing is that the discovery requested is not

16   supported by the allegations that Plaintiffs brought

17   forward.  In Plaintiff's response to your motion for

18   protective order, there's a footnote, if I'm not incorrect,

19   that says they, the Plaintiff, intends to amend the

20   complaint to bring in additional information and update the

21   state of the their pleadings given the amount of time that's

22   passed during the pendency of this action.

23            MR. SCHUSTER:  Uh-huh.

24            THE COURT:  Have you talked with Mr. DeArman or

25   other counsel at Plaintiff's table about those intended

 1   amendments, and are those intended amendments going to

 2   address some of the areas you say don't support the

 3   requested discovery?  Are we -- are we arguing about who

 4   comes first, the chicken or the egg here, or has that not

 5   even been discussed between the two sides?

 6          MR. SCHUSTER:  I don't think it's been

 7   significantly discussed.  In -- in our meeting with Judge --

 8   I'm sorry, the -- the information session with the mediator,

 9   McGovern -- I'm sorry, Professor McGovern, there was a

10   discussion that they plan to amend, didn't give us a time

11   table.

12          My personal view is they -- they may plan to amend,

13   but I don't -- they are trying to allege a very narrow type

14   of claim, which is not to fall into this per se category.

15   And -- and I'll let the -- the people that are arguing the

16   motion to dismiss explain all that.

17          But to try to fit into that category, it is not a

18   single distributor such as Schein complaining to a

19   manufacturer.  It has to be coordinated agreed conduct.

20          THE COURT:  Well, my point is a little simpler than

21   that.  You're telling me that this is not warranted, and

22   these custodians shouldn't be dealt with because the

23   complaints made by Plaintiff don't support it.  And yet

24   you're on notice from their filing that they intend to

25   amend.

1          My question is:  Have you asked them what their

2    amendments are going to cover so that maybe that addresses

3    your argument before you present it to me?  If they're going

4    to amend in a way that provides cover in their allegations

5    for the type of discovery that you're now saying aren't

6    supported by the pending and current allegations, that seems

7    like to me that's something that both sides ought to know.

8          MR. SCHUSTER:  I don't --

9          THE COURT:  I understand that's not the entire

10   answer.

11         MR. SCHUSTER:  Yes, sir.

12         THE COURT:  But I would think it's part of the

13   answer that ought to be explored.

14         MR. SCHUSTER:  As I understand the amendment, they

15   are considering -- and I don't know whether they will make

16   it, I have questions about whether they will make it -- is

17   exactly what Mr. DeArman said, which is there is a

18   conspiracy between Burkhart, Schein to draw and -- joined by

19   the manufacturer Defendants.

20         The -- the serious problem -- the reason I don't

21   think they can make that amendment is they settled their

22   disputes with Burkhart in 2011 or '12 and were done with

23   them.  So there -- there's no one else for Schein to

24   conspire with.

25          So I don't see how they can.  So even if they tried

```
 1    to amend it, I don't see how that's a valid claim, how they
 2    in good faith can bring that claim.
 3           And I will say this, one of the -- it's -- the
 4    declaration to the -- Mr. Archer's declaration to the -- in
 5    response to the motion to transfer venue, essentially says:
 6    Hey, I understand Mark McLemore, who is our Dallas guy, is
 7    saying all this stuff.  Dallas office doesn't have anything
 8    to do with this case.  And he gives that declaration in 2 --
 9    February of 2017, almost three years after they were
10    terminated from that distributorship.
11           So I don't know how they make that type -- I
12    understand they're suggesting that they are going to make
13    that amendment, and I think I understand what they may try
14    to do, but I don't know that they can actually make that
15    amendment.
16           THE COURT:  All right.  Do you have further
17    argument, Mr. Schuster, on any of these three custodians?
18           MR. SCHUSTER:  Yes, absolutely, Your Honor.
19           THE COURT:  Let's get to that.
20           MR. SCHUSTER:  I will be very quick.
21           THE COURT:  Let's get to that.
22           MR. SCHUSTER:  Okay.  Quickly, Stanley Bergman, the
23    only way they're trying to rope him in is by saying that he
24    had a conversation with the Archers in the late 1990s.
25    Again, Archer didn't even get into the Oklahoma relationship
```

1   with Dynamic Dental until 2004.  The termination here that

2   is at issue was in 2008, and the restriction by

3   Instrumentarium is 2009.  It -- it doesn't make any sense

4   that a conversation -- the fact that he had a conversation

5   about potentially acquiring them in the late '90s has

6   anything to do with an -- a conspiracy a decade later to cut

7   them off from anything.  There's just -- that's --

8           THE COURT:  Okay.

9           MR. SCHUSTER:  -- that's way too long.

10          The other thing I would say there is we have

11  already produced custodians from Jim Breslawski, the

12  president of Henry Schein; Tim Sullivan, the president of

13  Henry Schein Dental, Dave Steck, the general manager of

14  Henry Schein Dental; Hal Muller, the president of the

15  special markets division; Mark Mlotek, the executive vice

16  president and chief strategy officer; Steve Kess, vice

17  president of global relations --

18          THE COURT:  Slow down a little bit.

19          MR. SCHUSTER:  Okay.  Paul Hinsch, vice president

20  merchandise marketing, dental; Don Hobbs, vice president,

21  equipment sales; Joe Cavaretta, vice president of sales,

22  western area; and Jake Meadows, vice president of sales,

23  eastern area.

24          THE COURT:  Well, in light of the number of

25  custodians that have already been dealt with, and I think

1  that's 36 I'm hearing, is three more really that burdensome?

2      MR. SCHUSTER:  It is, Your Honor, because you not

3  only have to process those people, because they've got email

4  files, but then you have to have attorneys go through and

5  look at the materials that -- these are -- especially the

6  CEO of the entire company.  I mean, that's -- that's highly

7  sensitive stuff, and it's very easy for -- for things that

8  are of a very critical nature to get mixed in that have

9  nothing to do with the lawsuit.  So it -- you know, I just

10  can't imagine producing the CEO --

11      THE COURT:  That process -- that process takes

12  place with every custodian.

13      MR. SCHUSTER:  Absolutely.

14      THE COURT:  All right.

15      MR. SCHUSTER:  It's just we get in a lot more

16  trouble with the CEO of the entire company if -- if we screw

17  it up.

18      THE COURT:  I understand.  Thank you.

19      MR. SCHUSTER:  Last person, Greg Kuklinski, the

20  only thing I've got to say that -- the only thing -- the

21  only basis upon which they are seeking him as a custodian is

22  his LinkedIn profile.  Mr. Archer, or the people working

23  with him, taped something like 30 or 31 -- secretly taped 30

24  or 31 conversations.  Greg Kuklinski's never -- name never

25  shows up anywhere.  There's -- quite frankly, when they gave

1    him the name, I was like who?  I don't think he has anything

2    to do with this lawsuit.

3         And, again, sort of like with Mr. Bergman, there

4    are lots of other equipment people that are in the custodian

5    file.

6         That's all I have, Your Honor.

7         THE COURT:  All right.  Mr. DeArman, do you have a

8    brief rebuttal on these custodians?

9         MR. DEARMAN:  Yes, Your Honor.  Thank you.

10        THE COURT:  Then we'll move on.  Basically,

11   Mr. Schuster tells me that you failed to connect the dots,

12   that these people and what they might know don't line up

13   with what's alleged and when it's supposed to have happened.

14        What's -- what's your response to the -- that

15   argument?

16        MR. DEARMAN:  Yes, Your Honor.  If -- if I can,

17   I'll go back to Mr. Zolfo to begin with.

18        Your Honor, our theory of the case, as currently

19   pled, is a conspiracy between Schein and Burkhart, which the

20   Danaher Defendants joined.  That is -- it isn't that we need

21   to amend to allege that.  That is what is currently the

22   theory of the case as pleaded.

23        As noted in the briefing before the Court and is

24   discussed with opposing counsel, we do intend to further

25   amend the complaint in order to bring things current.  The

1    exact scope of that amendment will be forthcoming, but at

2    the very least, it will include the 2014 termination by the

3    Danaher Defendants of Archer and White which we allege is

4    part of an ongoing conspiracy and boycott to prevent Archer

5    and White from competing in the market.  It isn't that it

6    was a discreet act in 2008 and discreet act in 2009 and a

7    discreet act in 2014.  It's that these are all discreet acts

8    in furtherance of an ongoing conspiracy and boycott.

REDACTED BY ORDER OF THE COURT

9         And on its face, ███████████  ███████████████

10   ████████████████████████████████████████████████████

11   ██████████████████████████████████████████

12   █████████████.

13        Subsequent to this email, Archer and White is, in

14   fact, terminated by the Danaher Defendants.  The first line

REDACTED BY ORDER OF THE COURT

15   of this email says: ███████████████████████

16   ████████████████████████████████████████████████████

17   ███████████████████████████████████████

18   I'll -- and, again, I'll also note the timing, 1:22 in the

19   morning, the day after the filing of the complaint in this

20   action.

21        THE COURT:  Talk to me about Kuklinski.  Opposing

22   counsel says that your only hook here is a LinkedIn profile.

23        MR. DEARMAN:  Your Honor, the -- the description of

24   his job duties in the LinkedIn profile is why we believe he

25   has relevant information in this case, because his

1   self-described job duties involve competitive

2   decision-making and other areas that we believe will

3   fundamentally inform our allegations about anticompetitive

4   behavior.

5          It is true that we do not have any visibility into

6   the Danaher Defendants' private descriptions of their

7   employees or -- or any other way to gain additional

8   information.

9          THE COURT:  Of course, nobody on their LinkedIn

10  profile overstates their importance or tries to make

11  themselves sound more important than they are, do they?

12         MR. DEARMAN:  Well, Your -- You Honor, I'm certain

13  the Danaher Defendant employees would -- would -- excuse me,

14  that Schein's employees would not do such a thing.

15         THE COURT:  But that's -- that's a --

16         MR. DEARMAN:  It is true, where -- where we have

17  found this information is from a LinkedIn profile, yes, sir.

18         THE COURT:  That's your sole reason to pursue this

19  gentleman?

20         MR. DEARMAN:  Yes, sir.

21         THE COURT:  All right.  Anything else on Bergman?

22         MR. DEARMAN:  Your Honor, I would just at a -- at a

23  high level, Mr. Schuster suggested that, again, this is a

24  very small case.  It's very limited, and he referred to very

25  discreet events.  We think that is an incorrect statement of

1    the issues in the case.

2           The termination of Dynamic Dental is part of this

3    case, and the termination of their territory in Oklahoma and

4    Texas.  It's also the prevention of Archer and White from

5    selling in their contractually allowed territory in Oklahoma

6    and Texas, Arkansas, and Louisiana, I believe.

7           All of -- it's also the determination of the

8    Instrumentarium line which was a nationwide distributorship.

9    In other words, the Plaintiffs and the Defendants have very

10   different ideas about the scope and value of this case, as

11   I'm sure will continue to come up throughout these motions.

12          Nothing else, Your Honor.

13          THE COURT:  All right.  Thank you.

14          Let's -- let's move on to the nine different

15   categories of information where I'm told there may be some

16   limited agreement between the parties.

17          Plaintiff, let me hear what's agreed to and what's

18   not agreed to here.

19          MR. DEARMAN:  Yes, Your Honor.

20          THE COURT:  Danaher's agreed to the first four; is

21   that correct?

22          MR. DEARMAN:  So I will -- I will recite what I

23   believe the agreements to be, subject to opposing counsel

24   correcting me if I get anything wrong.

25          Beginning with Danaher, I believe we are in

1    agreement with respect to Categories 1 through 4.

2    Categories 5 through 9 are still in dispute.

3            With respect to Schein, Schein has produced, as we

4    understand it, documents corresponding to Categories 1

5    through 3, up to approximately November or December of 2016.

6            So the dispute with respect to Categories 1 through

7    3 is limited to Archer requests that that the Court compel

8    Schein to supplement its production of financial documents

9    corresponding to Categories 1 through 3 at some reasonably

10   agreed to pre-trial date, so that those documents are

11   brought current from end of 2016 through trial in this

12   matter.

13           THE COURT:  But there's a dispute with Schein as to

14   Categories 4 through 9?

15           MR. DEARMAN:  Yes, Your Honor.

16           THE COURT:  Okay.  Well, let's -- let's start with

17   the ones where there's no agreement.  Why don't -- why do

18   you -- why don't you tell me what's the necessity of

19   Categories 5 through 9 --

20           MR. DEARMAN:  Yes, Your Honor.

21           THE COURT:  -- from your standpoint?

22           MR. DEARMAN:  Yes, Your Honor.

23           So I'll set aside Category 4, which is --

24           THE COURT:  We'll come back to that.

25           MR. DEARMAN:  Yes, Your Honor.

1                 So taking Categories 5, 6, and 7 to start with, if

2      I could, Categories 5, 6, and 7 relate to financial

3      projections, market share forecasts, market reports, and

4      competitive intelligence documents, broadly speaking.

5                 We believe that such documents will show, for

6      example, if the Defendants are broadcasting or forecasting,

7      excuse me, increased market share based on, for example, its

8      ability to eliminate independent distributors, and

9      potentially Archer and White in particular, from markets, be

10     it in Texas or Oklahoma or nationwide, such information, to

11     the extent it exists, we believe is indisputably relevant to

12     the claims in this case, which, again, is a conspiracy and

13     boycott to prevent Archer and White from entering into the

14     market.

15                If, for example, Schein has other documents showing

16     its competitive arrangements with its major competitors,

17     like Burkhart, all of that information is part of the

18     circumstantial evidence that would tend to support claims of

19     conspiracy.

20                And as Your Honor knows, in antitrust claims

21     involving conspiracy and boycott, there is very rarely, you

22     know, a smoking gun direct email that is going to say come

23     and join with me in a group boycott to freeze out this

24     particular competitor.

25                In virtually every conspiracy and boycott antitrust

1   case, circumstantial evidence must be compiled from many

2   sources, all of which goes to show a conspiracy, whether or

3   not it's joined by particular manufacturers, who the -- who

4   the full scope of conspirators are.  All of these documents

5   are part of that circumstantial evidence.

6            THE COURT:  All right.  What about 8 and 9?

7            MR. DEARMAN:  So 8 and 9 is -- is a subset of

8   documents.  It is presentations to investors, that's 8, or

9   presentations to the board of directors of the Defendant

10  companies, again, discussing the same -- it is limited to --

11  to -- well, limited to presentations from investors or

12  presentations of board of directors discussing the

13  Defendants', you know, competitive strategies, efforts to,

14  you know, eliminate competition from the market,

15  specifically mentioning Archer and White.

16            It is not every board presentation that has ever

17  been presented by Danaher's board or by Schein's board, but

18  it is those documents that bear directly on Archer and White

19  in particular and the competitive landscape that is at issue

20  in this case.

21            THE COURT:  Of course, you're aware that the

22  discovery rules have not too long ago been amended, and

23  there's an express requirement for proportionality.  Tell me

24  why in light of the totality of what's at issue here you

25  think that proportionality requirement is met by your

1    request.

2           MR. DEARMAN:  Yes, Your Honor.

3           And I'll note the -- the proportionality

4    requirement, as we've approached it, has always existed in

5    the rules.  The amendment merely moved it --

6           THE COURT:  That's why I said -- that's why I said

7    is expressly stated now.

8           MR. DEARMAN:  Yes, Your Honor.

9           And -- and Archer, in propounding its discovery

10   requests, has considered this proportionality requirement.

11          Taking as a first issue this -- this idea of 36

12   custodians that have already been searched for and evidence

13   has already been produced, and, therefore, from Schein's

14   perspective, additional searches are unnecessary, the

15   custodians at issue were identified and the information

16   collected in connection with another suit.  In other words,

17   that burden that has been taken on by Schein was taken on by

18   Schein absolutely independently of any -- any discovery

19   requests propounded based on the facts of this case.  It

20   would have been undertaken had this case never been filed.

21          In other context, for instance, in resisting

22   Archer's attempts to discover the deposition transcripts at

23   issue in the Eastern District of New York case, Schein has

24   taken a very different position, which is you shouldn't be

25   able to look behind the curtain in that case, and -- and

1  that case is irrelevant to the discovery issues.

2          THE COURT:  We'll get to the subpoena issue later.

3          MR. DEARMAN:  Yes, sir.

4          And the point being that we think this is a --

5  again, the -- the burden of additional discovery that we are

6  seeking in this case is very narrow.  It's a certain number

7  of additional custodians, as well as a narrowly tailored set

8  of document requests, none of which are -- were necessarily

9  addressed by discovery in the other matter.

10         More broadly, we have heard no articulation of

11 burden from either of the Defendants, for example, with

12 respect to Categories 8 and 9.

13         With respect to -- to the board present -- the

14 materials of board presentations or investor presentations,

15 I am not aware if the Defendants have even reviewed those

16 materials to see if they contain relevant information, or

17 the scope of what those materials would be.

18         I imagine that there are not 10,000 board of

19 directors minutes that refer in any way to Archer and White

20 or competition in the -- the dental distributing field.  But

21 I -- but I do not know that because that -- there's no --

22 been no articulation of burden other than a kind of general

23 this is burdensome discovery, we should not be compelled to

24 produce it.

25         With respect -- the same goes with respect to --

1    excuse me, industry and market reports, competitive

2    intelligence, past, present, future forecasts, and that's

3    Categories 5, 6, and 7.  Again, we've heard no specific

4    allegation that these documents voluminous or -- and

5    otherwise impose an undue burden.

6           THE COURT:  Let me ask you this.  You mentioned

7    with regard to Categories 8 and 9 that you would be looking

8    in those categories for information that mentions Archer and

9    White.  Is that same kind of limitation applicable to the

10   other categories, or is there not such a limitation

11   applicable elsewhere?

12          MR. DEARMAN:  I -- I wouldn't -- I wouldn't say a

13   strict limitation that if the word Archer and White or

14   Archer does not appear the document is, therefore,

15   irrelevant.  So, no, I wouldn't -- to the extent that's the

16   Court's question, I would not impose that limitation.

17          I would suggest that the competitive intelligence

18   and analysis reports we're seeking, you know, are relating

19   to dental supplies and equipment products, the products at

20   issue in this case.

21          THE COURT:  Well, it can't be everything in these

22   categories without any relation to what's at issue here, but

23   yet I understand it may not be unreasonable or it may be --

24   it may be unreasonable to limit it to specific words or

25   combinations of words.  We're trying to get -- I think we're

1  trying to get to a result rather than be tied to a specific

2  label, but by the same token, there's got to be some

3  guidance here.

4          MR. DEARMAN:  Yes, Your Honor.

5          I -- with respect to some of the disputed

6  categories of documents, for example, taking Category 6, I

7  think the category itself is limited to a relevant matter of

8  inquiry, which is competitive intelligence and analysis.

9          With respect to Categories 8 and 9, as Your Honor

10 mentioned, that is a -- a broader category of documents.

11 There are any number of -- of methods, I assume, Defendants

12 would use to search within that category using electronic

13 search terms or otherwise to narrow the -- the field from

14 board of directors' presentations at large to board of

15 directors' presentations, for example, relating to Archer

16 and White competition with Burkhart, the relationship with

17 the Danaher Defendants as it relates to competing with

18 dental distributors, those types of clearly relevant issues,

19 Your Honor.

20         THE COURT:  All right.  Let's move to Category 4

21 with regard to Schein.

22         MR. DEARMAN:  So, Your Honor, to the extent -- in

23 Archer's mind, Category 4 is somewhat related to Categories

24 1, 2, and 3, in that what it is seeking is financial

25 information.  In this case, projections, as opposed to

1   actual statements of past numbers that reflect, you know,

2   the -- for example, future prices, revenues, volumes of the

3   relevant products -- the Pelton & Crane line, for example,

4   over the time period which, you know, the Plaintiffs have

5   made their allegations, you know, 2008 and continuing.

6        Your Honor, we believe this information will tend

7   to show that -- the effects of the anticompetitive boycott

8   that Schein has engaged in with Burkhart and which the

9   Danaher Defendants have joined in the same way that actual

10   financial numbers in Categories 1 through 3 will.

11        THE COURT:  Are these -- are these financial

12   projections that were made as projections in the past in the

13   period over which they were projected has now come and gone,

14   or are these projections for the future covering periods

15   that haven't transpired yet, or both?

16        MR. DEARMAN:  Your Honor, I don't have any -- any

17   visibility into how these projections are created, whether

18   it's annually for the next year or annually for the next

19   decade.

20        THE COURT:  Well, you know what you're asking for.

21   So tell me what you're asking for.

22        MR. DEARMAN:  Well, Your Honor, we would be asking

23   for projections that cover the period from -- and I don't

24   want to give a date that's wrong, but I believe it's 2008

25   and -- through -- through the present.

1           MR. AURENTZ:  Projected 2017 through 2020.

2           MR. DEARMAN:  And -- and if they projected in -- if

3   they have a current projection from yesterday that projects

4   into, say, 2020.

5           THE COURT:  So a prior projection that's already

6   come and gone as well as a future projection?

7           MR. DEARMAN:  Yes, sir.

8           THE COURT:  All right.

9           What else on these that we haven't already covered,

10  Mr. DeArman?

11          MR. DEARMAN:  Nothing further, subject to

12  responding, Your Honor.

13          THE COURT:  All right.  Let me hear from Schein and

14  Danaher, and I don't particularly care which order.  Whoever

15  would like to go first.

16          MR. MONTGOMERY:  Thank you, Your Honor.  Liam

17  Montgomery for the manufacturer Defendants.

18          There's a few points that I want to make, Your

19  Honor, just to sort of clarify precisely what it is at issue

20  here.

21          As you mentioned a little while ago, sir, the --

22  there is a date agreement that has been in place since early

23  April between the manufacturer Defendants and Archer that

24  would set the limits on document productions to May 27th,

25  2014.

1          What's at issue here and how it was portrayed to us

2   is a request for a narrow set of documents having solely to

3   do with damages and whether we would be willing to extend

4   the date range we had already agreed upon that stood for

5   nearly two months before we heard anything about this data

6   extension idea as to documents that go to damages.

7          And so that's why at this point for the

8   manufacturer Defendants, Your Honor, as to these damages

9   documents on Categories 1 through 4, we are willing to agree

10  with Archer that we would produce those through the first

11  quarter of 2017 with an agreement that we would make a

12  reasonable supplementation at some specified date closer to

13  trial.

14          Where we depart with the -- with Archer on this is

15  on Categories 5 through 9.  And what I think you heard from

16  Mr. DeArman, Your Honor, is a description of documents that

17  go to liability, not to damages.  He talked about these --

18  he's describing circumstantial evidence of a conspiracy

19  between the manufacturer Defendants and their distributors.

20  And he said that -- that, quote, that these would support a

21  claim of conspiracy.

22          So if --

23          THE COURT:  So these fall in that category where

24  you had an agreement with prior counsel, current counsel

25  doesn't necessarily feel bound by it, but yet you feel

1    entitled to enforce it?

2          MR. MONTGOMERY:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. MONTGOMERY:  And, again, our -- our attempt all

5    along here has been to be reasonable about it.  So we

6    listened to their arguments about why damages documents

7    should be extended beyond the agreed date range, and -- and

8    I think we made a reasonable proposal that Categories 1

9    through 4 should be extended, and we're willing to do that.

10          So as to 5 through 7 and 8 and 9, I think what you

11   heard was a description of liability documents, Your Honor,

12   not damages documents.

13          In particular on Categories 8 and 9, I just want to

14   point out, Your Honor, that what they're asking for is

15   communications, so presentations to investors or to a board

16   of directors.  And the manufacturer -- the actual dental

17   company manufacturing companies here, Pelton & Crane, Marus,

18   DCI, Instrumentarium, those companies do not have investors

19   and do not have a board of directors.

20          So what they're asking for here is presentations to

21   the investors of Danaher, the corporate parent, which is

22   just a holding company.  It doesn't manufacture dental

23   equipment.  It doesn't market dental equipment.  It doesn't

24   sell dental equipment.  Only the dental companies that are

25   wholly owned subsidiaries of it do that.

1      So they're asking -- and -- and in their complaint

2  there's no allegations that would support veil piercing,

3  such that there's some kind of notion that Danaher was using

4  these corporate forms in an effort to commit a fraud or to

5  somehow justify piercing the veil to Danaher.  And there's

6  no -- there's no facts in their complaint which will be

7  argued further in the motion to dismiss that would support

8  any independent action taken by the holding company parent,

9  Danaher itself.

10      And Archer really has never explained, Your Honor,

11  how statements to investors or statements to the board of

12  directors of the parent holding company could have anything

13  to do with their damages, whether in their initial motion

14  where they had a single sentence justifying this additional

15  discovery or in their reply where they made certain

16  statements along the lines of what Mr. DeArman said going

17  more to liability and not to damages.

18      And so for that reason, Your Honor, we think it's a

19  reasonable proposal that we would produce Categories 1

20  through 4, as we reached an agreement with them, and we feel

21  that their request for Categories 5 through 9 should be

22  denied.

23      THE COURT:  All right.  Thank you, counsel.

24      Does Schein have anything different to add?

25      MR. SCHUSTER:  Just a couple of points, Your Honor.

```
 1            You've asked about proportionality, and I think
 2   it's important to remember --
 3            THE COURT:  I was sure you were going to bring it
 4   up, so I went ahead and asked about it first.
 5            MR. SCHUSTER:  So the whole -- even the proposed
 6   amendment is discussing a conspiracy between Schein and
 7   Burkhart that Danaher, the manufacturer Defendants, then
 8   joined, this supposed bad thing that Archer settled with
 9   Burkhart in 2012 ███████████████.
10            THE COURT:  I'm aware of that.
11            MR. SCHUSTER:  So I -- that's one of the three main
12   players in their view of the world, and so when they're
13   asking us to go do all of this stuff and go into the future
14   based upon a conspiracy with a person who they took out of
15   the conspiracy that they even claim in 2012 doesn't make any
16   sense.
17            Further, Mr. Archer and his dec -- draft
18   declaration that he submitted in a class action, he even
19   put -- I don't know whether it's gross sales, profit,
20   whatever, but losses at 1.3 million, and there's that
21   serious consideration that the fact that the restriction in
22   the Oklahoma area is that Dynamic Dental was sold to Benco
23   and sold its causes of action to another company.  So I
24   don't understand how Archer has the ability to even claim
25   damages associated with Dynamic Dental's inability to sell.
```

 1             One thing I will add on the supplementation issue,

 2    apparently, it is very difficult to pull all of this

 3    information together.  We have produced 461 gigabytes of

 4    data, which I understand to be hundreds and hundreds --

 5    hundreds and hundreds of millions of rows of data.

 6             And so to go supplement that is not an easy thing,

 7    and it would be difficult for us to do.

 8             That's all I have, Your Honor.

 9             THE COURT:  All right.  Thank you.

10             Do you have something further, Mr. DeArman?

11             MR. DEARMAN:  I'm sorry, Your Honor, if -- if you'd

12    permit me just a brief response.

13             THE COURT:  Let's make it brief.  Go ahead.

14             MR. DEARMAN:  Yes, sir.

15             Your Honor, there -- there was just one overarching

16    issue that I wanted to address, and it's the issue of

17    agreements with opposing counsel in both the current dispute

18    and the other agreements that have been raised.  Those

19    agreements were subject to Archer's ability to for good

20    cause shown seek additional discovery.  It wasn't that there

21    was an agreement to foreclose all discovery for all time.

22    And it isn't that current counsel has completely disregarded

23    former counsel's agreements.  It's that we believe there's

24    good cause to show limited additional discovery.

25             That's all I have to say about that.

```
 1          And then the last matter that I want to touch on
 2  because I think it will pervade this case is the idea that,
 3  for example, the Burkhart settlement should inform the scope
 4  of discovery.
 5          As Your Honor well knows, you know, Rule of
 6  evidence 408 would prevent settlement from being imposed to
 7  show liability or damages at trial.  I believe using it to
 8  curtail discovery that would show liability and damages is
 9  equally incorrect.
10          THE COURT:  You don't think it has any bearing on
11  proportionality?
12          MR. DEARMAN:  Well --
13          THE COURT:  I mean, if they've settled out for
14  [REDACTED] and we're talking about
15  discovery here that [REDACTED]
16  [REDACTED] --
17          MR. DEARMAN:  Your Honor --
18          THE COURT:  -- determining whether this is a
19  proportional request or not?
20          MR. DEARMAN:  I think the relevance, if any, should
21  be -- should be small because of the considerations that go
22  into dispute resolution.  It may have -- you know, any
23  number of considerations aren't before the Court and can't
24  be before the Court.
25          With respect to -- there's a number that was cited
```

REDACTED BY ORDER OF THE COURT

1   from a previous Archer declaration, and I believe the number

2   in the filings is actually 1.3 million.  I think it's

3   important to note that that was a discussion had with a

4   representative of Benco, another dental distributor.

5          In advance of the filing of this suit in which

6   Benco had approached Archer to essentially offer to

7   prophylactically settle a suit against its competitor, and a

8   1.3-million-dollar number was mentioned in connection with

9   one facet of what is now this litigation.  It was never a

10  universal agreement that damages in this case were somehow

11  limited to 1.3 million as it has been presented in the

12  papers.  And I think the actual declaration itself will show

13  that.

14         That's all I have, Your Honor.

15         THE COURT:  All right.  Thank you.

16         Let's do this, counsel, let's -- let's move to

17  the -- the search term disputes.  Let's take up Plaintiff's

18  emergency motion to compel Danaher to produce documents

19  generated from search terms.  That's Docket 120.

20         The first motion, 117, that we just argued, that's

21  under submission.  Let's move on to 120.

22         Let me hear from Plaintiff on this motion.

23         MR. DEARMAN:  Excuse me, Your Honor.

24         THE COURT:  Whenever you're ready.  We have seven

25  motions.  That just took an hour, so by my calculations, we

1    should finish about 9:00 or 10:00 o'clock tonight.

2         MR. DEARMAN:  Thank you, Your Honor.  I'll -- I'll

3    attempt to be as brief as possible with respect to this

4    motion.

5         As Your Honor knows, this dispute centers around a

6    list of proposed search terms that Archer proposed to the

7    Danaher Defendants to run against their identified

8    custodians.

9         The original proposed list of terms from Archer

10   generated what is apparently 212,000 or so hits, and that

11   includes the documents that actually hit on a search term

12   and attachments.  So, for example, if a document is one

13   email that hits on a search term and five attachments, that

14   is six hits.

15        Since the filing of the motion, the parties have

16   both met and conferred and exchanged revisions to that -- to

17   those lists.  As of today -- or, I'm sorry, as of last

18   night, Archer has proposed a modified list of terms that

19   reduced the hit count to 197,000.

20        The Danaher Defendants have, in fairness, given us

21   a counter proposal, but it was today, and it's not reflected

22   in the argument prepared for the Court.

23        But let me address kind of the threshold issues

24   with respect to burden in this case.  Again, Your Honor, in

25   an antitrust case like this, the monetary considerations of

1  burden are one of the burdens to consider.  The rule -- the

2  comments to the rule and the case law applying the rule,

3  that being Rule 26, also refer to, for example, the public

4  interest.  And in an antitrust case like this, the public

5  interest is a powerful countervailing fact to a monetary

6  burden that may be imposed on any Defendant subject to

7  discovery requests.

8      THE COURT:  The problem, Mr. -- Mr. DeArman, is

9  you're -- you're probably right.  Bad actors, whether these

10 Defendants are or not remains to be seen.  But bad actors

11 usually are not dumb actors, and they are careful in what

12 they do.  And it takes a lot of discovery to find it, and

13 it's usually not direct evidence, it's usually

14 circumstantial.

15     But there's also an obligation not to put

16 Defendants such as these Defendants to a greater burden than

17 is reasonable.  And just because these kind of cases are

18 complicated doesn't mean that they're not reasonable limits

19 that need to be imposed on the discovery that the Plaintiff

20 seeks.

21     And what I'm trying to do is -- is find some

22 equitable balance here, and it's not -- it's not a black and

23 white situation.  And you can -- you can argue, as you have,

24 persuasively that these kind of cases are complex, and it

25 does take a lot of discovery.  And the Defendants can get up

```
1    and argue they shouldn't be put to an inordinate burden just
2    because of the complexity of the case.  And there's probably
3    truth on both sides of this.  But at the end of the day,
4    we're going to have to find an approach that is reasonable
5    given the competing interests of Plaintiff and Defendants.
6             Tell me, again, where we are.  There have been --
7    there have been lists exchanged, and you haven't had a
8    chance to review the last overture from them to you; is that
9    right?
10            MR. DEARMAN:  That is true, Your Honor.  As of the
11   last count that I'm familiar with proposed by Archer, we're
12   now down to 197,000 hits.
13            In light of Your -- Your Honor's comments regarding
14   proportionality and reasonable measures to be taken to
15   mitigate the burden on the Defendants, what I would raise,
16   as we have previously raised with the Defendants in our
17   papers, is that we have suggested a number of available cost
18   saving measures because the burden that the Danaher
19   Defendants have identified based on a declaration submitted
20   by their attorney regarding the cost of having attorneys
21   review documents for confidentiality, for responsiveness,
22   and for privilege, is -- is the burden that is currently at
23   issue.
24            We have proposed, among other cost saving measures,
25   that the Danaher Defendants may produce to us the document
```

1   set -- generated from the search terms.  So what currently

2   stands at 197,000 documents without further review for

3   responsiveness.  And if the Plaintiffs would accept that

4   burden and otherwise -- in other words, if there is a

5   banquet email, to use an example from the pleadings, that is

6   wrapped up in these search terms, the Plaintiffs will accept

7   the burden of reviewing these documents one at a time to

8   eliminate those kinds of documents.

9        What that does is it removes one peg of the review

10  that must be conducted by the producing Defendants.

11       Now, the producing -- oh, I'm sorry, Your Honor --

12       THE COURT:  How does -- how does that avoid the

13  risk that Plaintiff's going to become privy to information

14  that has, A, no relevance, and, B, might be confidential,

15  sensitive, or proprietary from the Defendants if they're

16  just going to give you all these documents and let you take

17  on the burden of reviewing them?

18       MR. DEARMAN:  So, Your Honor, taking the -- the

19  sensitive and confidential nature of these documents, what

20  we have also -- we have also suggested is that Plaintiffs

21  would take on another burden, which is that we would agree

22  to accept the corpus of documents under any confidentiality

23  designation that Defendants think is sufficient to ensure

24  that no such documents are disclosed.  And then we would

25  account for, for example, the public's interest and access

1  and the Court's interest and access.  Because in the course

2  of the Plaintiffs conducting the response in this review, to

3  the extent there is responsive information on an individual

4  basis that we felt is improperly designated, for example, is

5  confidential attorney's eyes only, outside counsel, and so

6  could not be shared with anyone outside of the Court staff

7  or the attorneys sitting in the room, that we would take on

8  the burden of identifying those documents, conferring with

9  the other side such that any confidentiality concern for the

10  Defendants that's covered and nevertheless it is not a

11  blanket designation such that no one is ever allowed to

12  access these documents.

13        THE COURT:  Let me ask you this.  Have you ever

14  done that in reverse and given unfiltered copies of your

15  client's documents to some other law firm to review?

16        MR. DEARMAN:  Again, Your Honor -- no, Your Honor,

17  not completely unfiltered.  But let me add, we're not

18  suggesting a completely unfiltered --

19        THE COURT:  Largely unfilterered.

20        MR. DEARMAN:  Your Honor, I have used mechanisms

21  like this.  The -- the core and the most expensive element

22  of any document review, in -- in my experience and our

23  firm's experience, is the privilege review.  What these

24  provisions allow for is the elimination of the other sources

25  of cost, which although not as expensive as privilege

1  review, are still major drivers.

2          And I'll point out, Your Honor, that the Defendants

3  have alleged that this -- this -- these kinds of provisions

4  are not recognized by the law, but, in fact, I am -- we have

5  used them.

6          The case that is cited by the -- the Defendants in

7  their brief is a -- is a Chen-Oster v. Goldman Sachs case,

8  and the citation on that is 2014 Westlaw 716521.  In fact,

9  the Chen-Oster case was not a burden analysis.  What -- the

10  Court in that case dealt with production in response to RFPs

11  that came to a head in 2011.  Three years later, the

12  Plaintiffs in that case said that production is

13  insufficient, and we need you to produce, without any

14  additional checks, the hits on our search terms.

15          And the Court denied the motion, but the Court

16  denied the motion because -- because it said, look, three

17  years is too long to wait.  What it said about the

18  procedures that we propose is the following:  In light of

19  the availability of technologically assisted review, another

20  model is possible.  The parties can simply agree on the

21  search methodology, for example, by stipulating to search

22  terms with the understanding that all documents, except

23  those containing privileged information, shall be produced.

24  This approach essentially allies the search process with the

25  substantive determination of relevance and has the advantage

1  of saving resources for the producing party which need not

2  conduct further review for responsiveness.

3       That Court cited by the Defendants recognizes

4  exactly the procedure that we have proposed.  Even with

5  respect to privilege review, automated search assists are

6  frequently used to take a subset of responsive documents

7  that hit on search terms and narrow the number that must

8  actually be reviewed for privilege.

9       And that process has actually been recognized by

10  this Court in an opinion by Judge Folsom, which is Stambler

11  v. Amazon.com, and that is 2011 Westlaw 10538668.

12       So far from being prohibited under the law, these

13  are -- these are procedure that we believe are reasonable

14  checks on costs that can be employed by the Defendants and

15  have been recognized by Courts.

16       We are also further willing to stipulate, although

17  it is a provision of Your Honor's protective order so I

18  don't -- I don't think our stipulation affects that, that

19  any information that was, for instance, inadvertently

20  produced because it's privileged is absolutely not a waiver

21  of privilege and would be destroyed and returned pursuant to

22  the provisions of Your Honor's order.

23       Defendants may elect not to engage in these cost

24  saving measures.  That is -- that is their prerogative.  But

25  they are available to them, and they are widely used and

1   they are recognized.  And if they elect not to avail

2   themselves, then that is not a burden associated with

3   production.  It's a burden associated with Defendants'

4   preferred method.

5        THE COURT:  Are they widely used by the opposing

6   side in a case, or are they widely used by the side that's

7   having to produce the discovery?  I mean, I understand

8   they're probably widely used.  I'm not as readily persuaded

9   that they're widely used by the opposing side, and the

10   implementation of those cost saving measures is carried out

11   by their opponents in the case subject to whatever agreement

12   might be ancillary to that.

13        MR. DEARMAN:  You know, Your Honor, my

14   understanding, again, from -- for example, the procedure

15   recognized in the Chen-Oster case and -- and my experience

16   is that taking the responsiveness review as an example, that

17   is done in response to some requests for production from

18   opposing counsel and some either agreed upon or disputed

19   list of terms.  And then the -- the actual review is

20   undertaken by the receiving side.  So it would be the

21   opposing party in this -- in this case, Archer and White,

22   the Plaintiff.

23        THE COURT:  Well, let's -- let's talk about this,

24   counsel.

25        What -- what I'm hearing so far is we want what we

1   want, but we're willing to help the other side, and it won't

2   be as burdensome to get us what we want.

3          What -- what are you proposing or willing to

4   propose with regard to focusing or narrowing the actual

5   terms of the request to streamline this regardless of who

6   bears the burden of doing the actual production or review?

7          MR. DEARMAN:  Yes.  So, Your Honor, what we have to

8   date offered are -- are unilateral eliminations or

9   modifications to terms in an attempt to have, you know --

10   to -- to eliminate the chaff so to speak and reduce the

11   number of hits.

12          What we would be willing to consider and think

13   is -- is a probably more effective option is that if the

14   Defendants were willing to sample the most responsive hits,

15   which generate, I think -- I think the top two most

16   responsive hits generate 30,000 hits each -- excuse me, the

17   top two responsive terms generate 30,000 hits each.  And if

18   I could, very quickly grab a document, I could show you what

19   those terms are.

20          THE COURT:  Certainly.

21          MR. DEARMAN:  And, Your Honor, this -- this is

22   the -- this is the hit report based on the most recent

23   proposal from Archer and White to the Danaher Defendants.

24   And as you'll see, the -- the first Boolean search term is

25   Schein with a connector and then price or margin or

1   competition -- it's shortened -- or discount or refused.

2   Your Honor, we would submit that these -- these are terms

3   that go to quintessentially the issues in this case, as do

4   the terms that are outlined in the -- you know, next four

5   searches, all of which have been arranged in a Boolean

6   fashion in an effort to narrow.

7           THE COURT:  Tell me specifically what you're

8   suggesting be done with these top three, top five, whatever

9   they are.

10          MR. DEARMAN:  Is that Defendants, for example,

11  sample a thousand of these 28,995 hits.  And based on that

12  sample, tell us are 90 percent of these relevant, are

13  10 percent of these relevant.  If -- if it's the latter,

14  what do they think is generating the excessive hits?  And

15  then we can consider modifying the term to address, you

16  know, the -- the bulk of the burden is on the Plaintiff as

17  Your Honor can see in the first half a dozen or so terms.

18          We would also submit the -- the hits on only the

19  keyword, the third column on the right-hand side, that

20  indicates the unique hits on each of these.  The column on

21  the left indicates that while the -- for example, Schein and

22  price and margin, et cetera, term hit on 28,995 documents,

23  that number also reflects hits on other search terms further

24  down the list.

25          So we think that if -- if we were to address these

1   top two terms, we could get to the real number, which is

2   more or less the right-hand column.

3           THE COURT:  And you've proposed this to opposing

4   counsel?

5           MR. DEARMAN:  Your Honor, we -- this -- this

6   proposal is -- no, we --

7           THE COURT:  This is new?

8           MR. DEARMAN:  This is new.

9           THE COURT:  All right.  What else do you have for

10  me on this?

11          MR. DEARMAN:  Forgive me, Your Honor, if I could

12  just consult my notes.  I jumped around a little bit.

13          Your Honor, the only other issue is the -- is the

14  concept that 197,000 hits representing some smaller number

15  of -- of discreet documents plus attachments is irrelevant

16  in a case like this which we contend is -- is, you know, a

17  case involving damages in the millions and up to tens of

18  millions of dollars and the public interest.  We would say

19  that even as it stands today, we're seeking reasonable

20  discovery.

21          THE COURT:  All right.

22          MR. DEARMAN:  That's the only thing I'd add.

23          THE COURT:  Let me hear a response from Danaher.

24          MR. MONTGOMERY:  Thank you, Your Honor.

25          There was a lot there, but I want to just sort of

1   cut right to the key issues here.

2          The first is, Your Honor, that we are aware of

3   Local Rule 26 and the obligations that it imposes.  So we've

4   done everything required under that rule up to this point

5   and are continuing to do so.  Specifically to date, without

6   any agreement on search terms, only an agreement on

7   custodians, which we didn't reach until June 8th, so June

8   8th is the first date we had an agreement with -- on

9   custodians with Archer.

10          We produced four different productions numbering

11   more than 40,000 pages of documents, and we're continuing to

12   go through that process.  So what we're talking about here,

13   Your Honor, is essentially an additional burden on top of

14   what we've already undertaken without any agreement on

15   search terms with the Plaintiffs.

16          We did tell Archer we would be willing to talk

17   about more, but what we received was this proposal that

18   would result in either 197,000 or 212,000.  We think those

19   are both unreasonable on their own.  And as we set forth in

20   our papers, Your Honor, that would be -- we estimate

21   approximately 3.1 million pages of documents that would have

22   to be reviewed for responsiveness, privilege, and

23   confidentiality.  It would take thousands of hours and would

24   cost upwards of 900,000 to a million dollars.

25          THE COURT:  What's your -- what's your response to

1  the idea of doing a preliminary check on the results and

2  seeing what really -- whether -- whether you're getting 90

3  percent relevant return or 10 percent or somewhere in the

4  middle, and then letting that dictate to some degree where

5  you go from there as opposed to taking on the full

6  obligation to review everything ab initio?

7       MR. MONTGOMERY:  Well, I -- my response is twofold,

8  Your Honor.  First of all, the reason that I don't think

9  that that's workable at this point is because we haven't

10 gotten to a set of search terms that we think is anything

11 close to reasonable.  And I think that reasonable and

12 proportional has to two aspects in this -- in this respect.

13      One is the cost and burden, just the time, money,

14 manpower hours, and things like that, but also how narrowly

15 tailored are the terms that we're talking about.

16      So to take Mr. DeArman's first example, the first

17 search term that he had on his list, it was Schein with the

18 word "and" in a document, so Schein -- the word "Schein"

19 anywhere in the document with very, very common business

20 terms like price, margin, all sorts of -- whole additional

21 list of terms that are extremely common -- common business

22 terms.  I think the idea of doing a sampling review is

23 appropriate if the parties can be close to what they think

24 might be reasonable, but there is some disagreement as to a

25 couple of terms that might separate them on that.

1          My second response, Your Honor, has to do with the

2     fact that there's a lot of indicia of the -- the proposal

3     that we have made to Archer that demonstrates what we're

4     proposing to do is reasonable and proportionate in this

5     case.

6          If I could approach, Your Honor, I have a -- a

7     diagram that illustrates what we've proposed to Archer, and

8     I'd like to explain it to you if that's okay.

9          THE COURT:  You're welcome to approach or you're

10    welcome to put it on the document camera so I can see it.

11         MR. MONTGOMERY:  It's a -- it's a multi-page, Your

12    Honor.

13         THE COURT:  All right.  Then just approach with it.

14         MR. MONTGOMERY:  Thank you.

15         So what I've handed to Your Honor is our proposal

16    of -- as compared to Archer's proposal.  So this is their

17    original proposal of 212,000 documents.

18         Our proposal would hit on 37,000 documents that

19    need to be reviewed for responsiveness, confidentiality, and

20    privilege.  And in this, there are four different categories

21    of search terms.  The green search terms are 81 search terms

22    that we've accepted from Archer verbatim without changing

23    them.  So we've agreed that we would run these, and we have

24    run them and tested them.  And it provides the search term

25    hits on that.  So that's 81 of their terms.

1          If you flip to the third page, Your Honor, there

2     are eight terms that Archer proposed using with an "and"

3     connector that we proposed modifying to a within 25 words

4     connector.  So I'm sure you're familiar with this, I think,

5     Your Honor, but the idea would be instead of any document --

6          THE COURT:  I understand this.

7          MR. MONTGOMERY:  Okay.  So there are -- the -- the

8     dark -- the brighter yellow is Archer's "and" proposal.  The

9     lighter yellow or kind of orangish color is the within 25

10    that we've proposed.  So that's 81 terms we proposed

11    keeping, eight that we proposed a slight modification to.

12         We then added 61 terms starting on Page 4.

13         THE COURT:   These are the blue ones?

14         MR. MONTGOMERY:  These are the blue ones, yes, Your

15    Honor, that we think get to the same things that their

16    search terms do but in a more constrained way.  So as you'll

17    see, anything having to do with a competitive threat in the

18    same document or near in the vicinity of the word "Archer"

19    or dynamic, anything having to do with margin increase in

20    the same -- in the same vicinity as a whole host of

21    distributors that Archer claims are potentially at issue in

22    this case, price raises having to do with those

23    distributors, termination of a dealer having to do with

24    those same distributors, and on and on to other specific

25    search terms like variations on the word "monopoly,"

55

1  variations on the word "collude" or "conspire," so these are

2  all terms that we considered and added to their list either

3  to get at the same ideas as their search terms or to get at

4  the claims and defenses of the case -- in the case in a more

5  constrained and reasonable way.

6          THE COURT:  Tell me about the red ones.

7          MR. DEARMAN:  So the red ones, Your Honor, are the

8  terms that we proposed to Archer that we would not use.  So

9  this includes what we believe to be either their most

10 overbroad terms, the things that hit on tens of thousands of

11 documents.  And I'll point out, Your Honor, if a term here

12 hits on, for example, 26,000 documents, that doesn't account

13 for the family members it would bring with it.  So it's more

14 than 26,000.  Or things -- terms that we think are blue

15 terms get to in a more constrained way.

16         So --

17         THE COURT:  Now, is this the proposal that's

18 recently been given to Plaintiff and Plaintiff hasn't

19 reacted to yet?

20         MR. MONTGOMERY:  No, Your Honor.  So this proposal

21 was given to Plaintiff on June 30th.

22         THE COURT:  Okay.

23         MR. MONTGOMERY:  We just received their response to

24 it this past Friday -- Thursday or Friday.  I'm sorry, I

25 can't remember the precise date.  That's the 197,000

1    proposal.  And what we said to Plaintiff this morning during

2    the meet and confer, Your Honor -- and, again, it was -- it

3    was at the last moment -- was that if there are individual

4    red terms that they think should be included -- so I gave an

5    example in the red terms of AW or A and W, I think those are

6    both in there, we would be willing to include individual

7    terms like that on a term-by-term basis.

8            But some of these other terms, Your Honor, like

9    cheap, cheaper, competition, competitive, forecast,

10   financial -- and, again, even the terms that have the word

11   "Schein" in them have such common business terms that we

12   just don't think it makes sense to do a sampling review or

13   anything like that, unless we can get closer to an

14   agreement.

15           So, Your Honor, we think that Archer's proposals

16   turn Rule 26(b) and Local Rule 26 on their head.  We're

17   required to produce responsive and non-privileged documents,

18   so this review protocol that they have proposed, we don't

19   think -- the best practices or the law.

20           As you noted, if we were to simply dump all of the

21   documents out that have -- that hit on any search terms that

22   Archer has asked us to run without regard to responsiveness,

23   we are exposing some of our most sensitive business

24   information in this case.  We're already doing that.  And we

25   shouldn't have to do that as to things that are irrelevant.

1          As to privileged review, we note in our papers that

2     the standard set of privilege search terms that we run would

3     return 68,000 hits that we would have to review for

4     privilege, and that -- that's still, Your Honor, we do not

5     think would fulfill our obligation to ensure that there

6     aren't privileged documents among the other 130,000

7     documents or so that would be going out the door

8     potentially.

9          And then, finally, as to confidentiality, if we

10    were to designate every one of these hundreds of thousands

11    of documents as outside counsel eyes only, I don't think

12    that serves anyone.  It doesn't serve the Court.  It doesn't

13    serve the parties who would be hamstrung in their ability to

14    work with their clients.

15         THE COURT:  Tell me again, counsel, what's happened

16    to this proposal since you sent it out June the 30th.

17         MR. MONTGOMERY:  So June the 30th, we sent this

18    proposal, Your Honor.  On Thursday or Friday of last week,

19    we received Archer's counter proposal, which is what

20    resulted in 197,000 documents.  So it went from 212 to 197.

21         And then this morning, what we offered was that if

22    there are individual red terms that they think should be

23    included like AW or A and W, we would be willing to do that.

24    Or if there are others they want to discuss, we'd be willing

25    to discuss that, but we think that's the extent of what is

 1   reasonable in this case.

 2          THE COURT:  And you haven't heard back from

 3   Plaintiff since -- since that last communication?

 4          MR. MONTGOMERY:  And -- and in fairness, Your

 5   Honor, that was about five minutes before you took --

 6          THE COURT:  I understand.

 7          MR. MONTGOMERY:  And so I just want to wrap up by

 8   saying, Your Honor, our proposal, we would estimate still

 9   would cost a considerable amount, but -- but we would be

10   willing to undertake it.  We could complete our production

11   of documents under the 37,000 proposal within the next six

12   weeks or less, and so it would fit within the schedule that

13   the Court has set -- or, excuse me, the -- the proposed

14   revised schedule that we have proposed, and would be

15   reasonable and proportional to the issues in this case, and

16   we're asking that you accept our proposal, Your Honor.

17          THE COURT:  All right.  Thank you, counsel.

18          MR. MONTGOMERY:  Thank you.

19          THE COURT:  Any follow-up, very briefly,

20   Mr. DeArman?

21          MR. DEARMAN:  Your Honor, if I could just clarify

22   one thing.  I -- I made a mistake on the record.  My

23   colleague, Mr. Aurentz, informed me that, in fact, sampling

24   had been discussed in the past.  It was not a -- a new

25   proposal.  Just to clarify, that was my mistake.

1           THE COURT:  Okay.  Thank you.

2           Counsel, I'm going to carry this.  It's under

3    submission.

4           I want the parties to continue to work together on

5    this.  It's -- it's a little bit disconcerting that if this

6    original proposal came from Danaher to Plaintiff on the last

7    day of June, here we are two-thirds of the way through July

8    and we are where we are.

9           I'm -- I'm persuaded there is ground that both

10   sides can move off of and move toward some point of common

11   meeting.  And if they can't get there all the way, I'm

12   prepared to step in, but I think there needs to be continued

13   work from both sides on negotiating a compromise with regard

14   to these search terms before I declare an impasse and say

15   here's what the answer is, which I'm sure none of you are

16   going to like.  And I want to give you the opportunity to do

17   that.

18          But for the record and where we stand now, I've

19   heard your arguments, and it's under submission.  I'm going

20   to afford you some time, and I'm going to direct you to work

21   harder toward a resolution on this one.  If you can't, I

22   will -- I will resolve it and settle it by an order of the

23   Court.  But I'm persuaded, as I say, that there's probably

24   fair movement yet to be made by both sides that if you can't

25   resolve it completely, you can certainly get closer together

1    than you are today.

2          All right.  That matter is, as I mentioned, under

3    submission.

4          Before we move to the next disputed motion, which

5    has to do with the subpoena issue, we're going to take a

6    short recess.  We'll take up Document -- Docket No. 138,

7    Defendant Schein's motion to modify or quash the subpoena

8    when we come back.

9          The Court stands in recess.

10         COURT SECURITY OFFICER:  All rise.

11         (Recess.)

12         COURT SECURITY OFFICER:  All rise.

13         THE COURT:  Be seated, please.

14         With regard to the matter that we just completed

15   argument on, Docket 120, and Plaintiff's motion -- emergency

16   motion to compel Danaher, I indicated I wanted counsel to

17   continue to work together on this.  I'm going to be a little

18   more precise.

19         I want counsel to take the June 30th proposal from

20   Danaher with the color-coated search terms.  I want you to

21   use that as a basis to embark on further discussions and

22   negotiations with regard to these disputes.  If there are

23   excluded terms from the red category on this proposal that

24   Plaintiffs feel properly should be added back in, I want to

25   hear about that.

1          And I'm not going to tie Plaintiff's hands that

2     only items from the excluded list marked in red can be

3     reurged, but I think this gives a useful framework for

4     further discussions, and I want those discussions to be

5     ongoing, and if not continuous, close to continuous.

6          I'd like a joint notice from both Danaher and

7     Plaintiff as to any adjustments, changes, or improvements in

8     their posture on these items filed by the end of the day on

9     Friday of this week.

10          And we'll see where you are then.  And the Court

11     will determine then whether I need to order further efforts

12     on your parts -- your part or whether I just need to look at

13     what you have at that point and tell you what the result's

14     going to be so that you can live with it and get on.  But

15     that's more precise guidance than I gave you when we broke

16     for the recess.

17          Now, let's next take up Docket Item 138, Defendant

18     Schein's motion to modify or quash a subpoena.  This has to

19     do with the production in the class action pending in the

20     Eastern District of New York.

21          Let me hear from the movant first.  Go ahead,

22     Mr. Schuster.

23          MR. SCHUSTER:  Thank you very much, Your Honor.

24          I think the first issue is a procedural one, and

25     it's a little bit of a conundrum.  They issued the subpoena

1    out of the Eastern District of Texas but sued the Plaintiffs

2    in the New York case.

3          So I was -- that's why I moved for a protective

4    order here.

5          THE COURT:  Let me -- let me ask you this.  There's

6    a miscellaneous action filed in the Eastern District of New

7    York?

8          MR. SCHUSTER:  Yes.

9          THE COURT:  But somehow it's not assigned to the

10   same Judge that has the class action?

11         MR. SCHUSTER:  Yes.  As I understand it, counsel

12   for Archer and counsel for all the Defendants have agreed to

13   move that over to the magistrate handling it, Judge Brown.

14   I think that's right, isn't it?  I'm not --

15         THE COURT:  I see heads moving up and down on the

16   Plaintiff's side.  Is that correct?

17         MR. AURENTZ:  Yes, Your Honor.  We -- we filed it

18   originally expecting to transfer it to the judge, but the

19   Defendants sent us a letter and said we'd like to send a

20   letter to our judge and -- and make it clear that this is

21   coming over, so we immediately agreed to that.  So there's

22   no dispute about it.  It should be heard by the same judge

23   in New York where the class action is pending.

24         THE COURT:  Okay.  I'm not sure I follow all that,

25   and I'm not sure whose judge is their judge, but nonetheless

```
 1    you all have agreed that the magistrate there is going to

 2    hear this?

 3            MR. AURENTZ:  Yes, Your Honor.

 4            THE COURT:  Okay.

 5            MR. SCHUSTER:  Yes.  So -- so part of my conundrum

 6    was I've -- I've got a subpoena that says it was returnable

 7    July 5 or something, and that's why I filed a motion to

 8    quash here.  I would have expected them to subpoena the

 9    class or really expected them to subpoena the individual

10    Defendants up there and -- or wherever those Defendants may

11    be, but that -- that just was a little bit why this is in

12    front of you right now.

13            So that was a little bit confusing to me, but we

14    are where we are.  And part of the question is, okay, so

15    there's these depositions that are covered by a protective

16    order issued out of the Eastern District of New York.  And

17    that judge has to do something.

18            THE COURT:  Do you have any idea when Magistrate

19    Judge Brown, if that's who everybody's agreed to, is going

20    to handle the EDNY portion of this?  Do you have any idea

21    when he and his chambers are going to focus on this?

22            MR. SCHUSTER:  I know that briefing was completed

23    yesterday.

24            If I'm right on that, Phillip?  We submitted our

25    response to your motion to compel.
```

1        MR. AURENTZ:  That is correct.  However, we believe

2   new issues were raised, and so we are going to seek the

3   ability to reply to what was raised in those papers.  So I

4   wouldn't say briefing is completed, but Defendants have been

5   heard in response.

6        THE COURT:  Okay.  Subject to a request for

7   additional briefing, the first round of briefing is

8   complete?

9        MR. AURENTZ:  Yes.

10        THE COURT:  Okay.

11        MR. SCHUSTER:  All of that sort of leads into what

12   is supposed to happen when this type of thing happens.

13   There are a lot of words flying around in -- in that case

14   about clone discovery and how things work.

15        The best I can make out, the -- the Eastern

16   District of New York, since they control the protective

17   order, have -- that Court has to make its call on whether

18   the protective order will be modified.  I can tell you our

19   position in the Eastern District of New York is the same as

20   it is here with one slight tweak.  It is we're happy giving

21   you those depositions that talk about Archer or Dynamic.

22   The -- the slight tweak -- there's two slight tweaks on

23   that.

24        One, because we're up there and we don't own the

25   depositions given by all of the other Defendants, we can't

1  produce the other Defendants' depositions.  They're not --

2  not ours to -- to claim confidentiality or agree to.

3        The other thing is we said we want to produce this

4  group of Defendants of Schein -- of Schein depositions, and

5  one of the other Defendants objected, and said, no, you

6  can't.  So we -- we're sort of -- so we're trying to get to

7  this same position where Archer gets the depositions from

8  the class action that talk about Archer and Dynamic, but we

9  don't control all of those pieces.  But that is our

10  position.

11        And I can then -- so how this Court deals with that

12  before the Eastern District rules on it, I don't really know

13  what the right way is.  It's sort of a chicken and egg

14  thing, who makes the call first.  I would -- I believe the

15  class Plaintiffs have said when I read y'all's motion to

16  compel -- Archer's was the class Plaintiffs say they're not

17  willing to risk a sanctions finding by that Eastern District

18  of New York until the Eastern District of New York says

19  okay.  So --

20        THE COURT:  Let me ask you this, Mr. Schuster.

21  Your -- your motion seems to rely on Federal Rule of Civil

22  Procedure 45(d)(3)(A), subpart 4, which talks about

23  subjecting a person to an undue burden.  It seems to me what

24  you've argued in your briefing is undue burden at the end of

25  the day is the reason why you're opposing the subpoena.

```
 1            The rule clearly directs that if I find it is
 2   unduly burdensome or if I find it requires disclosure of
 3   privileged or other protective material, unless there's an
 4   exception or waiver, as well as two other grounds, then I
 5   must quash or modify the subpoena.
 6            Nobody seems to have argued the third prong, which
 7   is requires disclosure of privileged or protected material,
 8   and that really is what I'm the most concerned about.
 9   I'm -- I'm concerned about being asked to make a ruling one
10   way or the other that is directly impacted by another
11   Court's protective order when it's not my protective order.
12            And I'm -- I'm interested in whether it's Judge
13   Brown or the presiding district judge there in the Eastern
14   District of New York.  I'm interested in them giving this
15   Court some guidance as to the application of their
16   protective order as a prerequisite to me ordering this to be
17   produced or this to be quashed.
18            That's why I'm asking you questions about when do
19   you think that judge there is going to be in a position to
20   take a position.
21            MR. SCHUSTER:  One, I totally agree with you.
22            Two, I think so.  I'm assuming that Archer plans on
23   seeking leave to file something fairly quickly.  But I --
24   I've got all of the same questions in my head, Your Honor.
25   I don't -- and -- and I agree that that procedural issue is
```

1    sort of creating a problem of how we get to where we need to

2    get to.

3            THE COURT:  Okay.

4            MR. SCHUSTER:  I think we've made the position

5    clear, but I don't know if you want argument about why we

6    think the class action deals with a whole bunch of stuff

7    that has no bearing here, like on the no poaching or Source

8    One and dental associations.  I don't know if you want me to

9    go through the reasons we have suggested the limitations

10   that we have, but in short, it's sort of laid out in the

11   papers that Source One is -- is really focused on other

12   stuff.

13           THE COURT:  I've seen that.

14           MR. SCHUSTER:  Yeah.  The -- the only thing I think

15   I probably would add, Your Honor, is from what I saw that

16   was filed with the Eastern District of New York yesterday,

17   the number of depositions is now over 80.  The majority of

18   them are employees or former employees of non-Defendants in

19   this case.  There's something like 23,000 pages of

20   deposition testimony and almost 2,000 exhibits.

21           THE COURT:  All right.  Let me hear from Plaintiff

22   on this.

23           MR. DEARMAN:  Your Honor -- excuse me, Your Honor,

24   I'll be very brief.

25           With respect to how we've reached the place where

1  we are, the Plaintiffs issued a subpoena under Rule 45 out

2  of this Court pursuant to the Court's nationwide subpoena

3  power to the Plaintiffs in the class action case who do not

4  object to the production of the material at issue.

5       The Defendants in that action, including Schein,

6  have expressed objections, primarily an objection to the

7  production of information that is subject to the protective

8  order issued by the Eastern District of New York.

9       For that reason, we also subpoenaed individual --

10  the individual Defendants who might have the same

11  information.  And the reason for that is, it's one thing to

12  interpose an objection saying I have received the material

13  under a protective order and cannot produce it to you

14  because it is subject to a protective order.  It is a very

15  different thing to say, I am in possession of my own

16  relevant information, e.g., testimony or documents, and I

17  will not produce them to you because I have previously

18  produced that information in another case.  That is -- that

19  is not a tenable position under the law.

20       But in any case, we -- where we -- what we did to

21  resolve the protective order is file a miscellaneous action

22  in the Eastern District of New York in -- in order to get

23  the question in front of Magistrate Judge Brown.  The

24  intention was always to address the protective order-based

25  objection in front of the judge that issued the protective

1    order.

2          We also approached the Defendants who had

3    interposed objections to production with the stipulation

4    that any documents that be produced, be produced subject to

5    the protections of this Court's protective order, which we

6    believe have the same, if not greater, protections for

7    confidentiality, as the Eastern District of New York's

8    protective order, which allows for the parties to agree to

9    production without further inter -- intervention by the

10   Court in New York.

11         Those overtures were unsuccessful, hence the

12   currently pending miscellaneous action.

13         THE COURT:  All right.

14         MR. DEARMAN:  With -- I'm sorry, Your Honor.

15         THE COURT:  Go ahead.

16         MR. DEARMAN:  With respect to the burden, Your

17   Honor, these documents are in Schein's possession.

18   They're -- the transcripts and the -- the exhibits.  They're

19   in the possession of the Plaintiffs in the class case.

20         The -- the actual expense burden of producing

21   consists of putting them on a -- a drive and sending them to

22   Archer.

23         THE COURT:  What about the argument that they don't

24   have or own or control some of these depositions?  I just

25   heard they're not our depositions to --

1          MR. DEARMAN:  As I understand, that's the

2     protective order issue that is -- is -- is currently being

3     resolved that's part of the miscellaneous action in the

4     EDNY.

5          THE COURT:  Okay.

6          MR. DEARMAN:  Those -- whatever the bucket of

7     depositions are, they'll fall into two categories.  They'll

8     either be irrelevant, or they'll be relevant.  23,000 pages

9     or otherwise, if -- if they are irrelevant, Archer will

10    accept the burden of reviewing irrelevant documents.

11    They'll have no impact on this case.

12         If they are, however, relevant, and there's no

13    dispute that at least some of them are relevant, then among

14    other things, it will allow Archer to tailor the discovery

15    that it propounds in this case.

16         We are -- in other words, Your Honor, part of the

17    reason we're seeking this information is in order to, in the

18    most economic way possible, get the information we need to

19    prosecute our case here.

20         THE COURT:  All right.

21         MR. DEARMAN:  Thank you, Your Honor.

22         THE COURT:  Well, counsel, here's -- here's where

23    this Court is.

24         I'm not going to order the production under the

25    subpoena or I'm not going to deny the motion to quash it or

1   modify it without getting Magistrate Judge Brown or the

2   district judge who has the class action in New York to take

3   a position with regard to that Court's protective order.

4   I'm not going to circumvent that Court's right to exercise

5   the application of its own protective order.  I would not

6   expect that Court to do the same thing if the roles were

7   reversed.

8          I'm going to direct both of you to proceed as

9   promptly as you can with the miscellaneous action in New

10  York to get a judgment by Magistrate Brown with regard to

11  the protection order issues, the confidentiality issues

12  emanating from this subpoena.

13         And whether those can be adequately dealt with by

14  subjecting what's produced under the subpoena to this

15  Court's protective order, that may satisfy Judge Brown and

16  he may have no problems, but I want him to -- I want him to

17  act on this first.

18         Now, once that's done, then we get back to whether

19  the -- on a more routine basis, whether I should quash this

20  subpoena or not.  And at this point, I'm not inclined to

21  quash it.  These are materials that already exist.  The cost

22  and the burden to produce them, subject to the protective

23  order in this case, is not excessive as far as I can see.

24  But I'm not going to order anything until I know what the

25  Court in New York -- how it wants to apply and implement its

1  protective order.

2      Under Rule 45(d)(3)(A), this Court has the latitude

3  to either quash or modify the subpoena.  I understand the

4  subpoena has a return date that's coming up promptly, and

5  that's why the movant here is understandably concerned, and

6  they -- and the right thing was to bring this motion as it's

7  been brought.

8      I'm going to modify the subpoena that it is

9  performable not on the July 5th return date, but it's

10  performable five days after the ruling by the magistrate

11  judge in New York, and it's applicable to whatever the

12  magistrate judge in New York allows to be produced under

13  their protective order as covered by the original scope of

14  this subpoena.

15      So we're going to do this in that manner.  The New

16  York Court is going to interpret and apply its protective

17  order, and it's going to determine what it believes can

18  properly be released, whether that's subject to this Court's

19  protective order or other protective measures that that

20  Court wishes to impose.

21      But whatever it ends up with saying this is the

22  universe of what's available for production in our view

23  under our protective order, then the opinion -- then the

24  subpoena is going to apply, and it's going to be produceable

25  and deliverable under that subpoena five days thereafter.

1          So I'm in effect denying the substantive motion to

2     quash the subpoena.  But I'm recognizing the need to allow

3     that Court to police its own protective order and to take a

4     position on the protection of any confidential, privileged,

5     or other protected matters, rather than me try to apply

6     their protective order.

7          So on -- the one hand, the Plaintiff has some

8     relief that's not produce -- the subpoena is not performable

9     on July the 5th -- not July the 5th, whatever the day -- is

10    that the right date?  So we're already past the date.  Okay.

11    Well, you're already out of the trap of being late to

12    produce under the subpoena, and you've got five days after

13    the New York court rules.

14         But as to your substantive objection to the

15    production and the scope of it, that's overruled.

16         Does everybody understand where we are?

17         MR. SCHUSTER:  Yes, Your Honor.

18         THE COURT:  Okay.  All right.  That's Item --

19    Docket No. 137.

20         Next we've got the manufacturer Defendants motions

21    to amend the docket control order.  I'm happy to take this

22    up, but my understanding is this, to some extent, perhaps to

23    a large extent, is dependent upon the substantive rulings

24    the Court's going to have on these discovery disputes that

25    we've already gone through.

1        The first one I've taken under submission.  The

2    second one I've given you instructions to meet and confer

3    further in an attempt to narrow and resolve it.

4        Is this ripe given the state of where we are with

5    those discovery disputes?  I'm happy to take it up if we can

6    do some good, but can we do some good where we are now?

7        What's the parties' view on that?

8        MR. GOVETT:  Your Honor, Brett Govett for the

9    record.

10       I think that the parties have agreed that it would

11   be at least what was requested in terms of the dates, the

12   adjustment of the dates, and so I wanted to make that clear

13   to the Court and -- so that we're all on the same page in

14   terms of there's -- there -- the parties have agreed to

15   request the Court that there -- that there needed to be some

16   adjustment.

17       The question is whether there is a greater

18   adjustment than what's in the manufacturer Defendants'

19   request to adjust those dates, if -- if I'm making myself

20   clear.  So, in other words, is more time needed?

21       And so -- but my understanding, based on

22   conversations with the other side, and we've had a number of

23   them, is that it's -- it's at least that.  What we have put

24   forth in the amended docket control order, it's Document

25   134-1, we'll need at least that.  And then the question

1    is -- is, you know, based on rulings and so forth, is more

2    time than that needed?

3              THE COURT:  Well, does Plaintiff agree with that?

4              MR. CRUCIANI:  Your Honor, Gary Cruciani for

5    Plaintiff.

6              In part, we actually had a productive discussion in

7    the hour before this hearing talking about this very issue.

8    And we do agree with Your Honor that there's obviously a

9    direct correlation between certain of these discovery issues

10   presented today, as well as issues that the Court has not

11   yet heard, such as how many depositions are going to be

12   allowed, and that will certainly inform the schedule.

13             We do believe, however, that while both sides agree

14   the current schedule is not workable and while Defendants

15   have proposed in their -- in their motion to keep the

16   current trial setting and move certain of the internal

17   deadlines, basically between 30 or 45 days, we agree that at

18   a minimum, that needs to happen, but we think it's clear

19   that that is not going to be satisfactory.

20             For example, let me just give you two key dates --

21             THE COURT:  Let me just stop you, counsel.

22             MR. CRUCIANI:  Yes, sir.

23             THE COURT:  If that's the case, then why as an

24   interim step would it not make sense to amend the docket

25   control order with the dates that have been proposed that

1  both sides agree are a minimum, and then if they turn out

2  not to be adequate, you can come back to me with a further

3  attempt to amend the docket control order as those

4  circumstances may present themselves?

5       MR. CRUCIANI:  Sure.  That -- that was perfectly

6  acceptable.

7       THE COURT:  That seems to me it might get this

8  issue off the table, at least for today.

9       MR. CRUCIANI:  And that's fine, Your Honor.  I

10 guess the only point I'd like to make is we -- we don't need

11 to wait, we don't believe, for additional circumstances to

12 know that those internal deadlines -- the 30 to 45 days, we

13 know right now those are not going to be sufficient.

14      What we talk -- for example, if I may, under the

15 current proposal, two key dates are Plaintiff's expert

16 disclosure was moved from August 11th until September 29th.

17 Where we are right now and given, for example, the

18 representation that it's going to take six weeks to get

19 Danaher documents at a minimum, that's going to put us up

20 until, you know, the beginning of September before we even

21 have the documents.

22      Another key date -- second key date is the

23 September 1 fact discovery being moved to October 13.  So --

24 so we're happy to have those moved internally, Your Honor,

25 but we know right now those are not sufficient.

1           What we did discuss with defense counsel prior to

2    this hearing was -- and I think subject to the Court's

3    agreement, of course, we would propose, knowing that these

4    dates aren't workable right now, and while as Plaintiffs, we

5    want to get to trial as quickly as we can -- as reasonably

6    practical, we believe a 60 to 90-day extension of the trial

7    deadline and corresponding deadlines -- pre-trial deadlines,

8    we would respectfully ask the Court to consider that.

9           We did discuss that, and I don't want to speak for

10   defense counsel about that in principle, and I think they

11   are in agreement in principle to that.  Mr. Schuster had a

12   conflict in -- in early April that I think was a -- or

13   mid-April was a problem.  But we're happy to do this in

14   steps, Your Honor, if that's your preference.

15          But, again, I don't want to suggest that we think,

16   gee, you know, their -- this may be workable because we

17   don't think it's workable under any circumstances, and the

18   60 to 90 days would be what we envision.

19          THE COURT:  I understand your position, but it is

20   the Court's inclination to at least do this incrementally.

21   I'm going to enter the amended docket control order as

22   proposed and attach to Defendants' motion.  I'm not -- I'm

23   not asking you to concede on the record that you won't have

24   additional requests for an extension at a later date.  But

25   that at least gives us an interim adjustment.  It gives us a

1    little bit of an adjusted set of deadlines.  And if and when

2    you're back to me for changes in the future, you'll know

3    then more than you know today.  And I think the Court will

4    benefit by that additional information at that later date.

5    So I'm going to enter the amended DCO as suggested, and then

6    we'll see where it takes us.

7              MR. CRUCIANI:  Thank you, Your Honor.

8              THE COURT:  All right.

9              Do you have something else, Mr. Govett?

10             MR. GOVETT:  Your Honor, while Mr. Cruciani was up

11   here, I just want to -- there's my pen -- I just -- I

12   couldn't find my pen.

13             THE COURT:  So you came back to find your pen?

14   We'll get you another pen, Mr. Govett.

15             MR. GOVETT:  I pulled another one out of my bag

16   because I couldn't find this one.

17             But on the --

18             THE COURT:  Pulled it out of where?

19             MR. GOVETT:  My bag.

20             THE COURT:  Oh, okay.

21             MR. GOVETT:  I got it.

22             On the -- on the -- I know it's not on the -- on

23   the docket, Your Honor.  I just wanted to ask if we could

24   raise one thing on the discovery order.  And -- and that is

25   everything is -- is pretty much in agreement, except on the

1  deposition hours.  I just wanted to raise that, if the Court

2  had any questions on that.

3      We did -- the Plaintiff, during our meet and

4  confer, went to 150 hours total for the Plaintiff.  And then

5  we went to 60 hours.  60 hours was what was the result of

6  the discussion some time ago of Mr. Beane and Ms. Brumbaugh

7  and that's what they requested the Court to be.  So it's --

8  it's -- that should be the only thing in terms of the

9  discovery order that's still up in the air for the Court to

10  decide.  Is it 150 hours?  Is it 60 hours per side in terms

11  of depositions?  Or is it obviously something in between?

12      THE COURT:  Well, let me make sure I'm following

13  you.  Are you telling me then that the discovery order isn't

14  premature until these other discovery motions I've taken up

15  today are ruled on?

16      MR. GOVETT:  It probably is -- it probably needs --

17  it may be premature, yes.

18      THE COURT:  But are you -- are you telling me

19  there's an immediate need to get some resolution on the

20  deposition hours?  Is that why you bring it up?

21      MR. GOVETT:  No.  I just bring it up for -- because

22  the question was asked before we had the hearing where we

23  are in terms of agreements and so forth, and I want to make

24  sure that was understood because I scribbled on this sheet

25  of paper right here, and I handed it to Ms. Oliver, and I

1   passed it up -- and I wanted -- it's just if there was any

2   questions.  That's the only reason.

3           THE COURT:  Okay.

4           MR. GOVETT:  That's it.

5           THE COURT:  All right.

6           MR. GOVETT:  Okay.  Thank you.

7           THE COURT:  Duly -- duly noted.

8           MR. GOVETT:  Thank you.

9           THE COURT:  Okay.  I'll enter the docket control

10  order as I've announced.

11          Okay.  Let's next take up the manufacturers' -- the

12  manufacturer Defendants' motion to dismiss, Docket Item 79.

13          Let me hear from the manufacturer Defendants on

14  their motion.

15          MR. PITT:  Thank you, Your Honor.  Jonathan Pitt

16  representing the manufacturer Defendants.

17          As Your Honor is aware, the two Defendant groups in

18  this case have briefed some overlapping antitrust issues.

19  And given the lateness of the hour and our assumption that

20  you would not like to hear from multiple lawyers on the same

21  topics, what we've endeavored to do is to separate them out

22  as between counsel for the manufacturer Defendants and

23  counsel for Schein.

24          And so what I would propose, Your Honor, is there

25  are just a couple of issues that I'd like to raise with

1 respect to some of the arguments in our papers from the

2 manufacturer Defendants' perspective, and then I believe

3 that counsel for Schein, Mr. Echols, is planning to address

4 the antitrust issues that are in large measure common to all

5 Defendants.

6          THE COURT:  That's fine.  And so what we're

7 consequently doing is taking up the manufacturer Defendants'

8 motion and Defendant Schein's motion concurrently?

9          MR. PITT:  That would be -- if that's acceptable to

10 Your Honor.

11          THE COURT:  That's acceptable.

12          MR. PITT:  Terrific.

13          So the first issue that I wanted to address, Your

14 Honor, is -- is the issue as to whether all entities -- all

15 of the manufacturer Defendant entities have been properly

16 sued in this case.  It's out position that the Plaintiff has

17 not, in fact, alleged a cause of action against three of the

18 five manufacturer Defendants.

19          I'm going to, with Your Honor's permission, put

20 something up on the ELMO just to demonstrate who the

21 Defendants are.

22          THE COURT:  That's fine.

23          MR. PITT:  So as Your Honor no doubt recalls,

24 Danaher Corporation is a holding company, and it owns the

25 other four manufacturer Defendants, which are, in fact, the

1  companies that actually manufacture and sell dental

2  equipment.  Those Defendants are listed here on this

3  diagram, and I'd be glad to hand up a copy afterwards if

4  you'd like it.  But -- but for these purposes, as you can

5  see, Dental Equipment LLC does business as and manufactures

6  the lines of Pelton & Crane, Marus, and DCI.

7  Instrumentarium Dental Inc. manufactures the line

8  Instrumentarium, and then there are two others, KaVo Dental

9  Technologies, which is referred to as KaVo, and Dental

10 Imaging Technologies Corp., which does business as Gendex

11 and is generally referred to as Gendex.

12          THE COURT:  These are the two you're saying are not

13 properly before the Court?

14          MR. PITT:  Those two, as well as the holding

15 company, Danaher Corporation, that is correct, Your Honor.

16          So I -- I won't go over the -- the allegations in

17 the complaint.  They've been discussed.  But as we discussed

18 in our papers, the -- the complaint addresses actions that

19 were allegedly taken by Dental Equipment LLC and

20 Instrumentarium, however, not by the parent corporation and

21 by these other two subsidiaries.

22          I'd like to address Danaher first.  The holding

23 company is alleged, first of all, to -- to be the owner of

24 the other four manufacturing entities which is the case.

25 However, as was discussed briefly by Mr. Montgomery, there

1   are no veil piercing allegations in the complaint.  There --

2   there is no basis in the complaint, hasn't been suggested

3   that there would be any basis to hold Danaher Corporation

4   liable for the -- the alleged conduct of Dental Equipment

5   LLC and Instrumentarium.

6          So what Archer has said in its papers is first of

7   all, they say that the actions of Dan Bump, a company named

8   Dan Bump should be attributed to Danaher because one

9   paragraph of the complaint describes Mr. Bump as a, quote,

10  Danaher regional sales manager, and that's Paragraph No. 32.

11  That's inconsistent with the rest of the complaint which

12  discusses Mr. Bump's conduct or alleged conduct in

13  connection with the brands Pelton & Crane, Marus, and DCI,

14  all of which are alleged in the complaint to be brands of

15  Dental Equipment LLC, not brands of Danaher Corporation.

16         Danaher Corporation is a holding company that does

17  not manufacture itself these three brands.  It does not, in

18  fact, employ anyone with the title regional sales manager.

19         THE COURT:  Counsel, if you'll take a breath and if

20  you'll push the microphone a little away -- a little bit

21  away from you, it won't be quite so blaring, and I'll follow

22  you better.

23         MR. PITT:  My apologies, Your Honor.

24         THE COURT:  That's better.  Please continue.

25         MR. PITT:  Okay.  So as discussed, Danaher doesn't,

1   in fact, employ regional sales managers, and the use of the

2   word "Danaher" in the complaint is frankly a shorthand for

3   the -- the company Dental Equipment LLC.

4          THE COURT:  Let me interrupt and ask you a

5   question.

6          MR. PITT:  Certainly.

7          THE COURT:  Why is this not plain old ordinary

8   respondeat superior?  Why is this some kind of a corporate

9   veil that must be pierced?

10         MR. PITT:  Well, because if they're only alleging

11  conduct on behalf of one of the subsidiaries, then in order

12  to hold the parent corporation liable for alleged acts of

13  the subsidiaries, they do need to -- to pierce the corporate

14  veil.  I don't think respondeat superior would reach the

15  holding company.  Respondeat superior might reach a

16  particular company with any of its own employees, but it

17  doesn't allow the Plaintiff to take conduct on the part

18  of -- or alleged conduct on the part of Dental Equipment LLC

19  and simply attribute it to the parent company.

20         THE COURT:  Is it correct that these subsidiary

21  entities don't have a functioning board of directors, the

22  only board of directors, which we've talked about in the

23  discovery disputes, is with the parent?

24         MR. PITT:  I believe it is correct that the only

25  entity that has a board is the parent, but in order to

1    pierce the veil, they would have had to obviously include

2    very detailed allegations which they did not and which we

3    don't think that they could.  There is no evidence that

4    these subsidiaries have somehow been used to perpetrate a

5    fraud or as an alter ego or anything along those lines, any

6    of the standard reasons why a Court might permit a Plaintiff

7    to go forward with a veil piercing theory.  None of that is

8    alleged in the complaint, and respectfully, I don't think it

9    could be in good faith.

10          The -- the companies are separately incorporated,

11   and the Plaintiffs don't provide any reason for the Court to

12   disregard those corporate forms.

13          Second, I would -- I would discuss Gendex and KaVo,

14   the two on the right which are in gray here.  The reasons

15   that Archer gives for naming them as Defendants are first

16   that they're -- that they're subsidiaries of Danaher, again,

17   without -- without actually raising any veil piercing

18   allegations.

19          And, second, that they say that at present, Archer

20   is not an authorized dealer for those two companies.  They

21   say that in their sur-reply.  Other than that, those two

22   companies aren't even mentioned in the complaint, other than

23   identifying them as subsidiaries of Danaher Corporation.

24          So we don't think that there's any basis to hold

25   either of those two companies liable in this complaint given

1  that there frankly are no allegations -- no substantive

2  allegations about them.

3         Now, with respect to the -- what they -- what they

4  say in their papers about, well, we're not currently an

5  authorized dealer, obviously, that hasn't been alleged.

6  There are a variety of reasons why we don't think that it

7  would be appropriate to allege that these acts undertaken

8  in 2014, some six years after the other conduct that's

9  alleged in the complaint, were somehow part of a conspiracy.

10        Beyond that, and we don't obviously need to get

11 into facts that aren't in the complaint because our -- our

12 whole point is that there is nothing in the complaint about

13 these two -- in fact, the termination was as a part of a

14 nationwide dealer rationalization program.  It affected

15 scores of other dealers around the country.  It was done for

16 a variety of procompetitive reasons that had, you know,

17 objective criteria that were associated with them.

18        And so we don't think that -- you know, obviously,

19 we'll see what they maybe do, but we don't think that

20 there's any basis for alleging the involvement of these

21 other two companies or their brands in -- in what they've

22 alleged in their complaint.

23        So the -- the one other issue, Your Honor, that I'd

24 just like to touch upon before, as I understand it

25 Mr. Echols deals with the other antitrust issues, is I

1    wanted to just talk about the MM Steel case for a moment

2    because very obviously, that -- that case is really in some

3    senses at the center of the debate that's going on here

4    between the -- the Plaintiff and the Defendants.

5          As we explain in our paper, given that we're in

6    a -- a vertical relationship -- that the manufacturer

7    Defendants are in a vertical relationship with the Plaintiff

8    here, the -- we don't think that there's any basis for the

9    Court to treat these terminations as per se illegal.  And

10   we've -- we've cited that -- that case law in our papers.

11         But what Archer has, of course, attempted to do is

12   to invoke a line of cases that says that certain group

13   boycotts, it's a very narrow category, can qualify for the

14   per se rule.

15         What Archer says is that so-called classic group

16   boycotts automatically qualify for the per se rule because

17   they have long been considered to be per se illegal.  But

18   even if you were to accept that formulation, and, obviously,

19   in our papers, it's not a formulation that we agree with,

20   but for present purposes, if we dispense with those

21   arguments and simply accept the notion that this classic

22   group boycott concept would be a way for the Court to apply

23   the per se rule to conduct that's alleged, our view is that

24   that argument actually even fails on its own terms.

25         So in MM Steel, MM Steel did not, in fact, actually

```
 1   hold that any time competing dealers persuade a single
 2   manufacturer to withhold product, it is per se illegal.
 3   Rather what they held was -- and this is a quote from the
 4   case -- quote, the crux of the group boycotts at issue in
 5   the cases in which per se liability has always applied is
 6   that members of a horizontal conspiracy use vertical
 7   agreements anticompetitively to foreclose a competitor from
 8   the market.
 9        And the reason for that requirement, Your Honor,
10   which by the way is one of the Northwest Wholesale
11   Stationers criteria that we also mentioned, but the reason
12   for that requirement in MM Steel is that the focus of
13   antitrust law is supposed to be not whether competitors
14   like Archer are harmed, but rather whether consumers -- in
15   this case it would be the dentists who purchase these
16   products -- whether consumers are harmed.
17        And the law recognizes that if a dealer like Archer
18   is cut off from a single brand or a set of brands that are
19   produced by the same company, then consumers will not
20   necessarily be harmed because they can turn to other brands
21   if they don't want to buy the good from the dealers that are
22   still selling the brand in question.
23        And that's why that requirement exists.  Even in
24   the cases that Archer cites, even in the -- the so-called
25   classic group boycott cases, that whatever it is that the
```

1  Plaintiff is deprived of allegedly through this boycott, it

2  must be something that was actually necessary in order for

3  them to compete in order to be judged under the per se rule.

4  Otherwise, the case law is clear, it must be the rule of

5  reason that applies.

6          So when looking at their complaint to try to find,

7  well, why is it that one entity's brands, given that they're

8  already alleging elsewhere in the complaint that they sell

9  the equipment made by many other manufacturers, many other

10  brands, why is it that one brand that these -- these

11  manufacturer Defendants' brands are somehow so special, so

12  extraordinary that they're absolutely necessary to compete,

13  they don't explain that in their complaint.

14          And, in fact, in the MM Steel case, it was very

15  clear that -- that they had -- they did allege it in their

16  complaint, but also that at trial, what they were claiming

17  and what they were adducing proof of was that they had been

18  deprived of any ability to sell the kind of steel that they

19  existed to sell, and as a result, they went out of business.

20  They went out of business almost immediately.

21          And -- and those were the circumstances under which

22  the Court said -- the Fifth Circuit said, well, when you

23  have this kind of classic group boycott, meaning when a

24  bunch of entities have joined together to deprive a -- the

25  Plaintiff of what it needs to compete in this market,

1 thereby foreclosing that Plaintiff from the market, those

2 are the circumstances under which the Court said it may be

3 appropriate to use the per se rule, not where a Plaintiff is

4 simply deprived of a single brand.

5        And -- and with that, Your Honor, I -- I would like

6 to -- unless, of course, Your Honor has questions, I'd like

7 to allow counsel for Schein to address the other general

8 antitrust arguments.

9        THE COURT:  That's fine.  I'll hear from Mr. Echols

10 now.

11       MR. PITT:  Thank you very much, Your Honor.

12       THE COURT:  Good afternoon, counsel.

13       MR. ECHOLS:  Good afternoon, Your Honor.  Barack

14 Echols on behalf of Henry Schein, Inc.

15       Let me pick up, if I can, where Danaher -- sorry,

16 the manufacturer Defendants' counsel left off.

17       What I'm going to address here, Judge, is the

18 standard Rule 12(b)(6) standards as applied to an antitrust

19 boycott claim like Archer and White brings here.  And when

20 you apply those rules -- not asking the Court to do anything

21 extraordinary -- but when you apply those rules as they've

22 been articulated most recently by the Supreme Court in the

23 Twombly case and then affirmed in the Iqbal case and all of

24 the decisions following those, this claim cannot stand and

25 should be dismissed.

1          To boil down in simple terms, Judge, the way the

2    Supreme Court says you should approach an antitrust

3    complaint like this is you take a couple of steps.  Same way

4    I'm sure Your Honor addresses just about every motion to

5    dismiss that's presented to you.  If you look to the

6    complaint and first say what allegations in this complaint

7    are not conclusory allegations?  Just legal conclusions and

8    the like.

9          Then, second, what -- or do those non-conclusory

10   allegations support entitlement to the relief that the

11   Plaintiff is seeking.

12         Then the question after that is do the allegations

13   as a whole push the claim across the line from the

14   conceivable -- something that can be imagined or surmised to

15   something that is a plausible claim that ought to go forward

16   in discovery and cause the Defendants and the parties to

17   spend hours and millions of dollars and thousands and

18   hundreds of pages of thousands of -- hundreds of thousands

19   of pages of documents.

20         And one overall aspect here, Judge, that is very

21   important, I think particularly in this case, is the

22   application of common sense given the factual context,

23   and -- that's even brought out in Twombly and Iqbal because

24   you can put a lot of things in a complaint and you can make

25   a lot of assertions, but when you use common sense and

1    understanding of markets and businesses and the way they

2    work, a lot of times the complaint doesn't stand up, and

3    that's precisely what's happening here.

4           Before I get to the legal framework specifically, I

5    thought it might be helpful just to boil down the factual

6    buckets at issue.  And I understand that to the extent that

7    you allow them after addressing this motion to re-plead,

8    that they -- that may have some additional facts.  I

9    think -- I don't believe my argument will change, based on

10   what I've heard today of what they plan to add, if you allow

11   them to add any of these additional facts.

12          THE COURT:  Let me ask you this, Mr. Echols.

13          MR. ECHOLS:  Yes, sir.

14          THE COURT:  To what extent, if any, should this

15   Court be guided by Judge Cogan's decision to deny a similar

16   12(b)(6) motion in the class action case given that there

17   are at least to some extent overlapping facts and

18   allegations?

19          MR. ECHOLS:  Basically not at all, Your Honor.

20   That -- that conspiracy alleged there -- well, first off,

21   one of the first points -- you know, and then I'll -- I'll

22   explain in greater detail -- is that's a claim of price

23   fixing among your different parties, Schein included, yes,

24   and Burkhart included, yes, price fixing to raise the price

25   of products to the dentists that bought them.  That's not a

1    claim that Archer and White can even bring.

2          The law is well settled, and we cite these in Page

3    7 of our motion that a competitor distributor, like Archer

4    is to Schein and to Burkhart, cannot sue for price fixing --

5    and I'll get into the boycott part -- but cannot sue for

6    price fixing as a matter of law because it doesn't

7    experience antitrust injury.  You know, you have to be

8    injured by something that is -- was the anticompetitive

9    conduct.

10          Ironically, Archer and White is better off if

11   Schein and Burkhart conspire to raise prices because they've

12   got more options.  They can -- one, they can sell their

13   products at higher prices if they want to, or they can

14   charge lower prices and undercut if they want to.

15          The other thing is, you know, the -- the customer

16   allocation idea that's in the complaint, as well, they're

17   better off with that, too.  So say Schein and Burkhart

18   allocate customers, you know, one versus another, Archer

19   should be happy to have that because if they want to go

20   after one of those customers, they've got one fewer

21   distributor to compete against.  You know, rather than duke

22   it out with both Burkhart and Schein, they've just got one

23   person that they have to be better than in order to win that

24   customer.

25          And that's why in case after case after case, you

1  know, from the Supreme Court, Matsushita, a competitor can't

2  recover damages for a conspiracy to charge higher than

3  competitive prices, the Stewart Glass case because they

4  stand to gain from a conspiracy to raise prices, they can't

5  sue for that.

6           Now, I know -- you know, I'm sure -- I don't want

7  the Court to think that I'm setting up a -- a strawman here

8  because they will get up, as they have in their papers, and

9  say we're not trying to recover for the higher prices.

10  We're trying to recover for the boycott claim.

11           And, you know, and that, in essence, you know,

12  answers from your perspective, you know, Judge, the question

13  you just asked.  You know, it's different.  They say that

14  this is different.  The complaint doesn't read that way.  It

15  reads like a price fixing complaint.

16           And what I will address, you know, as I said

17  before, is what is left -- outside of these price fixing

18  allegations that they cannot sue and they cannot recover

19  for, what's left that is a boycott claim?  And there's

20  almost no there there.  And what is in the complaint is

21  patently insufficient as a matter of law to allow this claim

22  to go forward.

23           THE COURT:  All right.  Continue.

24           MR. ECHOLS:  Okay.  Just to back off from the legal

25  framework, and as I said understanding that, you know, that

1   Archer plans to -- to suggest that it intends to add

2   additional facts, I think it's helpful to think in three

3   basic buckets of what does this complaint say when it comes

4   to the boycott claim, just in plain English basic terms.

5          So you have Archer, a distributor that was

6   authorized to sell the manufacturer Defendants' products.

7   You know, and I'll try to use -- you know, we've got these

8   different entities up here, and I don't know if this is

9   helpful to leave this up or take it down, you know, but --

10  so we've got products like Pelton & Crane and Marus and --

11  and such.

12         They took on this business to part -- partner

13  Dynamic Dental in 2004.  This is, you know, basically brand

14  new company, never been a distributor before, two or

15  three-man operation, and they're selling into Oklahoma and

16  Northwest Arkansas.

17         This equipment, Judge, as the manufacturer

18  Defendant said, this is not selling staplers and papers or

19  even modems and such.  This is big capital equipment.

20         So the Pelton & Crane, for instance, these are

21  sterilizers that cost 2,000, 4,000, $5,000.00.

22         This Marus company, they make the dental chairs

23  that we all love to go sit in and lean back and have our

24  mouths poked in.  Those are 8,000, $10,000 things.

25         Instrumentarium, when I get to those allegations,

1  that -- the Instrumentarium, they have these 2D and 3D

2  pantomograph things.  These things can run as much as

3  $50,000.00, these pieces of equipment.  And why that's

4  important is that the distributors -- national distributors

5  like Henry Schein, you know, and Burkhart, not -- not quite

6  as big, but when you sell a piece of equipment like that,

7  you take on the responsibility.  We take on the

8  responsibility for all the follow-up on that piece of

9  equipment.  You know, we have to make -- we are the ones

10  that have to satisfy the warranty.  We are the ones that get

11  called if there's any problem with it.  And these

12  warranties, obviously, because it's a big piece of

13  equipment, you know, it's important for a dental practice --

14  could be like 5 or 10 years.

15         Now, Dynamic Dental, a two or three-man operation

16  that's never ever even been in this industry, they don't do

17  that.  They don't do that.  You know, we have 2,500 sales

18  people.  We've got 1,200 equipment repair people.  I might

19  have those numbers a little bit off, but we have to be able

20  on a dime turn around and get to that dentist office and fix

21  something.  And so we're different than Dynamic Dental.

22         And we were and are also authorized distributors

23  for these products.  So you've got Dynamic Dental, shows up

24  out of nowhere, and is selling equipment from this brand --

25  Pelton & Crane, for instance -- at low prices, and we,

1    yes -- you know, Schein and Burkhart apparently complained

2    to Pelton & Crane and said what -- what is going on here?

3           The -- Pelton & Crane, the dental equipment entity

4    here, terminated Dynamic, and said you can't -- you can't

5    sell this anymore, you're not authorized.  And it told

6    Archer and White:  Look, you know, stay in the Texas

7    territory where you started out.  You know, that's your

8    territory.  That's the way they rationalized, you know,

9    their distribution network.  These are the facts in the

10   complaint.  And this was all January-February 2008.  You

11   know, I think these times are important, too, when we're

12   talking about the overall picture of discovery and just how

13   plausible some of these allegations are.  So that was Bucket

14   1.

15          Bucket 2 is this Instrumentarium part, and it's --

16   it's totally separate.  There's five paragraphs total in the

17   complaint.  It's 46 to 51.  You know, this is a big 20,000,

18   30,000, $50,000 piece of equipment.

19          Now, this Instrumentarium allegations -- you know,

20   as Mr. Schuster explained, Instrumentarium wasn't even a

21   part of this Danaher group of the manufacturer Defendants'

22   group.  It wasn't acquired until November 2009.

23          So everything that's alleged in the complaint, you

24   know, is before Instrumentarium was even part of the

25   Defendants here.  So -- but the only substantive allegations

1   applicable to Schein and Burkhart who was not even here, who

2   settled out, are on two different occasions -- let's see, it

3   has nothing to do with Texas.  In October of 2008 in the

4   state of Washington, Instrumentarium told Archer:  You know,

5   Burkhart is already talking to this dentist to sell him a

6   piece of equipment, so, you know, you don't do that.

7          Then in March 2009, Instrumentarium told Archer:

8   Look, Schein is not happy with the low prices that you are

9   selling out there.  They're talking to this dentist already,

10  so let Schein do that.

11         And then in April 2009, Instrumentarium told

12  Archer:  Why don't you stick to Texas?  And that's it.

13  That's the factual allegations in the complaint related to

14  this whole Instrumentarium issue.

15         Last bucket quickly -- it's already been covered.

16  You know, as far as the injury -- the claimed injury here,

17  it's not alleged that Archer and White, you known, this

18  authorized distributor, was cut off entirely at any point

19  during this period relevant to the complaint from selling

20  the manufacturer Defendants' products.  It wasn't.  You

21  know, its territory was just limited.  You know, distributor

22  territories get changed all the time.  They didn't go out of

23  business.  They're still here.  They didn't go away like MM

24  Steel did.  Nothing prohibited them from selling any

25  competing products and quit then.  They still can now.

1          And then the same thing with Dynamic Dental who's

2    not a Plaintiff here, they're not suing.  They were never

3    prohibited from selling any competing products.  And they --

4    they sold themselves to another distributor in May 2009.

5          So that is the summary of the facts that are

6    alleged when you're talking about the boycott claim.

7          So on the legal standards, and some of this we

8    already addressed in response to your question.  I can

9    streamline it.  I'm going to touch just very briefly then on

10   the antitrust standing issue as far as related to price

11   fixing allegations.

12         The main thing here, of course, is that the

13   allegations that are made with respect to this boycott --

14   purported boycott, I want to explain why under the

15   well-settled law are flatly insufficient, and then probably

16   as was already addressed by the manufacturer Defendants, 90

17   seconds to point out a rule of reason per se issue.

18         Antitrust standing, I don't need to address it

19   again.  The -- the fact that the claims are price fixing

20   when you go through it and go through the complaint, the

21   reason we're raising it is because when you take all of

22   those price fixing allegations out, there is not that much

23   left and not enough to make a boycott claim.

24         For purposes of my argument for our motion to

25   dismiss, Judge, you can assume price fixing if you want.

1  Assume that those allegations are well pled.  Archer could

2  attach a video to their complaint, and you can have Schein

3  and Burkhart in a smoke-filled room shaking hands and saying

4  here's what our deal is, and that's not going to change my

5  argument at all.  You know, that's -- doesn't get them past

6  first base to be able to recover on their claim.

7       Now, they said in their papers, well, this shows

8  motive.  Well, sure, the motive to earn money, to sell at

9  higher prices.  You know, the antitrust cases recognize,

10 yes, you do need motive, but as far as motive being a

11 driving and important factor determining if a complaint

12 survives a motion to dismiss, you know, allegations of -- of

13 a motive to make money, you know, welcome to capitalism.

14 You know, motive allegations and $3.00 will get you a small

15 coffee at Starbucks.  You know, it doesn't get you past a

16 motion to dismiss.

17      And the -- again, general obvious context here is

18 these companies are supposed to make money for their

19 shareholders or their owners.  Archer and White, no

20 different.  Salesmen are supposed to sell products in the

21 market.  They're supposed to get the best price they can

22 get.  They live on commissions.  That's how they feed their

23 families.  That's how they send their kids to college.

24 There is nothing unusual about that.  So motive gets you

25 nowhere as far as adding all these -- this price fixing

1    detail.

2         So let's go to the claim that's supposed to have --

3    the claim they are bringing here, this boycott claim.  They

4    say in their opposition at 13 -- Defendants' boycott is a

5    core -- a horizontal agreement.  When you take all this

6    price fixing -- the allegations away to ask what are the

7    remaining well pled factual allegations, it's hard to find

8    many.  And I'm going to talk about what few there are, but

9    first off, just a couple of things about what's missing

10   there, you know, based on the cases that they cite, the MM

11   Steel case, in particular, that they put so much emphasis

12   on.

13        So remember on this Dynamic bucket, Dynamic Dental

14   terminated as a distributor at the end of February 2008.

15   Archer's territory cut back to Texas.

16        So in the complaint, you know, what do we have?

17   You'd expect we have some allegation that Schein and

18   Burkhart met before this termination, you know, to implement

19   this boycott.  There's no such allegation.

20        Some -- some allegation that they communicated with

21   one another about Archer and Dynamic and having them

22   terminated.  No allegation of that either.  Some -- some --

23   maybe they would have talked to Archer or Dynamic, you'd

24   have something in that respect before they were terminated.

25   None whatsoever.

1          On the vertical side, when you're looking at the

2     manufacturer Defendants, the Pelton & Crane, you know, the

3     Danaher Group, no -- no well pled allegations that Schein

4     will told the manufacturer Defendants it had some deal with

5     Burkhart, you've got to get rid of Dynamic Dental.  No

6     allegation that -- that the manufacturer Defendants had any

7     knowledge of such agreement.  No allegation that Schein knew

8     that Burkhart was talking to the manufacturer Defendants.

9     These are the all the kind of things that you would expect

10    to see to have alleged like in their favorite case, the MM

11    Steel case.

12          So -- so look what you have in the MM Steel case.

13    You know, both -- more detailed allegations in the

14    complaint, as well as, you know, what the Fifth Circuit

15    talks about.  So you've got on this horizontal level, same

16    as Schein and Burkhart, you've got direct statements by one

17    Defendant distributor that it should do all we can to help

18    this other competitor get rid of MM Steel.

19          So you've got the statements from the other

20    distributor saying we're going to take all available courses

21    of action, legal or otherwise, to get rid of this guy.

22    You've got emails between the two distributors expressing

23    the hope they'd be successful at shutting this distributor

24    down.  Absolutely nothing like that alleged here.

25          On the vertical side, you know, the manufacturer

1   Defendants, Pelton & Crane or what is -- if you don't mind,

2   I'm just going to take this thing off so I don't keep

3   looking at it.

4           We also do not have any allegation similar to what

5   was the situation in MM Steel.  MM steel, it was clear there

6   already was a horizontal conspiracy that then the one

7   manufacturer, JSW, was found to have joined.  The

8   distributors explicitly coordinated among themselves, you

9   know, these threats, you know, said, okay, I'm going to send

10  my email to them today.  No, you a week later are going to

11  send this one threatening, you do business with us, are you

12  not?  You know, and so -- I hope this goes well for you.

13          Then you had a whole separate issue that the

14  manufacturer there, the steel manufacturer -- this was a

15  total change of course.  This is not just a rationalization

16  of distribution of territories.  They had just signed a

17  one-year long -- one-year long agreement with the Plaintiff,

18  MM Steel, saying you are going to be our distributor.  We're

19  going to give you a 750 grand line of credit and -- you

20  know, and go forward and help us out.  And then all of that

21  changed after the conduct that was alleged here.  You got

22  absolutely nothing like this here.

23          And you'll see, if you look at the other cases that

24  Plaintiffs cite, there's this Rossi case.  You've got direct

25  pleadings or evidence of threats.

104

1          You look at the Bucket 2 on the Instrumentarium
2    allegations, that's even less well pleaded.  So -- so you
3    have Archer and White, you know, good Texas distributor.
4    It's -- it's dipping its toe into a couple other markets,
5    you know, with Instrumentarium.  You got October 2008.  You
6    know, it's trying to sell to a dentist in Washington.
7    Instrumentarium says:  You know, let Burkhart complete the
8    sale.  They're already talking to them.
9          So what does that have to do with Schein?  So
10   there's not a single allegation that Schein was involved in
11   this, knew of, communicated, you know, with Burkhart or with
12   Instrumentarium about any of this, nothing, nothing in the
13   complaint.
14         So how is that part of a boycott conspiracy?  And
15   you have this other allegation, March 2009, Instrumentarium
16   says:  Hey, Archer, Schein is complaining about you selling
17   to this fellow in California or selling at low prices.  Let
18   them finish their sale to this guy in California, this big
19   capital piece of equipment.  Where's the allegation that
20   Burkhart has anything to do with this?  How is this an
21   agreement, a coordination of a conspiracy?
22         So one way to think of it is, you know, you've
23   got -- you know, in narcotics cases and others, you've got
24   like the hub and spoke.  So you might have -- you have an
25   Instrumentarium, and it's having a communication with

1    Burkhart here.  Instrumentarium is having a communication

2    with Schein there.  But there's no rim on this wheel.  There

3    is nothing to tie Schein and Burkhart together as being part

4    of a conspiracy.

5          And certainly there's nothing at all to take, you

6    know, a thousand miles away in California and in -- this is

7    in Oregon -- or, no, state of Washington, you know, a year

8    later.  What does this have to do with Pelton & Crane

9    terminating Dynamic Dental in February 2008?  Taking the

10   Instrumentarium part by itself, it would be easy to see that

11   this would be subject to dismissal because there's just

12   nothing there.

13         So now I'm going to get to what do they plead

14   because I -- I'll admit, you know, sure, there are some well

15   pled allegations in the complaint, very few, but there are

16   some, but they're not sufficient.

17         The boycott claim.  What do you have?  You've got

18   parallel conduct.  You've got parallel complaints by

19   distributors to the same manufacturer about another

20   distributor selling at low prices in their territories.

21         The complaint says:  Burkhart complained to Pelton

22   & Crane about Dynamic.  Schein complained to Pelton & Crane

23   about Dynamic.  The -- Pelton & Crane terminated Dynamic,

24   limited Archer's territory to Texas where it started off,

25   and that's -- that's it.

106

```
 1          You can go to the complaint.  You got Paragraph 26
 2   on the Schein complaint, Burkhart complaints.  Paragraph 29,
 3   Schein complaint to Pelton & Crane.  Paragraph 30, Burkhart
 4   did the same thing.
 5          Then you get into the wholly conclusory types of
 6   assertions that the Supreme Court, you know, in all of the
 7   cases after Twombly and Iqbal say you don't credit in
 8   deciding if a motion to dismiss should be granted.  You've
 9   got statements that, you know, by the time Paragraph 31 --
10   by the time they began their coordinated boycotting
11   activities, you know, from -- from where?  What is that?
12   That they conspired and agreed to do this.
13          Now, there's one paragraph, Judge, that I think I
14   do need to address specifically.  It was a little bit long,
15   so it's probably not as useful to put up, but I'll -- I'll
16   refer to it specifically for you.
17          This Paragraph 32 in their complaint.  It is
18   basically -- you know, on this Dynamic issue, the last
19   substantive allegation in the complaint of any purported
20   agreement to -- to boycott Dynamic.  And this paragraph
21   says:  In response to the threats from Schein and Company X,
22   Burkhart, in January 2008, Danaher regional sales manager,
23   Dan Bump -- you just heard about -- met with Lowery of
24   Schein and the general manager of Company X to discuss
25   Archer Dental's and Dynamic's prices and what to do about
```

1  them.  And Bump also met with Schein's Little Rock,

2  Arkansas, branch, as well.

3       Next sentence -- you know, and this is the

4  important part here because it's worded very, very

5  carefully.  At the meetings, Danaher, Schein, and Burkhart

6  collectively agreed that Dynamic and Archer would be cut

7  off.  It says:  At the meetings.  It does not allege,

8  because it can't, that Schein and Burkhart and, you know,

9  the Danaher all were in the same meeting discussing Dynamic

10  and discussing its prices and having it cut off.  They

11  weren't.

12       Of course, you know, you can't put things in a

13  complaint when there's no good faith basis to claim it.

14  And, you know, just -- Your Honor, if they -- if they had,

15  if they could say that, you know for certain they would put

16  that in the complaint.  It would make my job a heck of a lot

17  harder to come up here and say you should dismiss it.  There

18  was not a meeting with these three folks in the same room

19  talking about Dynamic and talking about having it cut off.

20       So what I believe -- you know, fairly read -- I --

21  I can concede, and it doesn't affect my argument.  So let's

22  say there were these meetings.  You had Schein's Tulsa

23  manager had a meeting with its manufacturer rep from -- from

24  Danaher, Pelton & Crane.  Fine, okay?  Schein's Little Rock

25  manager had a meeting, you know.  And maybe even at these

1   meetings, they talked about Archer and White or Dynamic.

2   That's fine.

3         Burkhart had a meeting.  Distributors -- dealers

4   talk to their manufacturers that they're out there selling

5   their products about all the time.  There's nothing wrong

6   with that.  You know, that's just ordinary business every

7   day in -- in America.  It's -- that's the factual

8   allegation.

9         These additional assertions that at these meetings

10  there was discussion and formation of an unlawful agreement

11  among the distributors and the manufacturer, you know, now

12  we're back in the world of conclusory allegations,

13  unwarranted deductions, legal conclusions that the Fifth

14  Circuit in Hall, following up from Twombly and Iqbal say

15  that should not be credited for purposes of a motion to

16  dismiss.

17        Now -- so what we have here is parallel complaints,

18  you know, granting them.  We have allegation of parallel

19  complaints by us and by Burkhart to a common manufacturer.

20  And, you know, luckily, you know, to our benefit, you know,

21  we've got recent cases, Supreme Court and otherwise,

22  addressing this issue and saying that's not enough.  That is

23  not enough to get this complaint -- to allow this complaint

24  to survive.

25        Twombly, facts that are legally consistent with but

109

```
 1  not suggesting a illegal agreement don't state a conspiracy
 2  claim.  The American Surgical Assistants, you know, natural
 3  parallel conduct does not -- does not make a plausible
 4  conspiracy.  It doesn't get passed this line of possible
 5  conceivable to plausible.
 6          You know, and it -- it may be -- you may have in
 7  the back of your mind, Your Honor, I've got all these price
 8  fixing allegations and such thereto, yes, we're -- we're
 9  going to address and disprove those in the Eastern District
10  of New York.  But I'm saying for purposes of this, because
11  they can't recover for any of that, it's not tied to any of
12  their injury, we have to see what did they allege that shows
13  any kind of boycott here.
14          And the other thing is, in this particular context,
15  we've got a manufacturer and dealers, distributors.  The
16  Supreme Court has been even more explicit about what is not
17  sufficient.
18          So you've got in that Monsanto case, complaints --
19  I guess Justice Powell, complaints about price cutters are
20  natural and from a manufacturer's perspective, unavoidable
21  reactions by distributors to the activities of their rivals.
22  The kinds of grievances the complaint alleges provides in
23  the normal course of business and do not indicate illegal
24  concerted action.
25          Of course, distributors complain about their
```

 1   rivals.  Of course, if they think their rival is getting a

 2   better deal somehow because they're out there able to sell

 3   it cheaper, they want to make sure they're on a level

 4   playing field.  And they have every right to complain to

 5   their manufacturer and say, hey, I'm out there selling your

 6   product and marketing and doing a good job for you, what is

 7   going on with this upstart over here who's somehow, and I

 8   don't know how, able to sell at such lower prices?  They're

 9   supposed to do that.  That's their job.

10          And the Supreme Court in Monsanto also looks at it

11   from the manufacturer's side down.  You know, and it says --

12   and this is at 764 of that case -- to permit the inference

13   of concerted action on the basis of a manufacturer receiving

14   complaints and acting on them would both inhibit

15   management's exercise of independent business judgment and

16   emasculate the Sherman Act.

17          THE COURT:  Let's see if we can't bring this

18   argument to a conclusion.

19          MR. ECHOLS:  Absolutely.

20          MM Steel says the same thing.  If you -- parallel

21   conduct, if that's the basis of your conspiracy, it's always

22   unreasonable.  They're citing Southway in the Fifth Circuit.

23          You know, Danaher, the manufacturer Defendants

24   here, basically the same situation as Nucor, the -- the

25   manufacturer that was let out in MM Steel with the jury

1    verdict reversed.

2         So any -- anyway, Judge, the -- the basic thing is,

3    you know, using -- you know, common sense that any of us who

4    have held a job working for any kind of company, this is the

5    time of obvious alternative explanation that Iqbal says, you

6    know, trumps a conspiracy allegation and is not sufficient

7    to get a complaint past the conceivable line into plausible.

8         Instrumentarium briefly, why shouldn't

9    Instrumentarium want to have the distributor it's been

10   working with for a long time make the sale to the dentist?

11   You know, that's -- of course it should.  Why should it have

12   somebody else come in and -- and interfere with the customer

13   relationship and sell at a lower price that doesn't elevate

14   its brand?

15        So for that reason, this complaint shouldn't --

16   shouldn't go forward, shouldn't stand.

17        90 seconds, if that, the per se rule of reason

18   distinction.  You know, as counsel said, they didn't go out

19   of business.  They weren't foreclosed from the market.

20   Archer says in its opposition it's not relying on rule of

21   reason.  It didn't plead it.  And they don't attempt to

22   plead it.

23        You know, MM Steel -- and I don't know why they had

24   to put it all the way down in a footnote, in Note 6, says,

25   that's fine, because in that case when they let Nucor, this

1  other manufacturer out and said this doesn't support a

2  conspiracy, they said it's okay if you want to proceed

3  only on a per se basis.  We, the Fifth Circuit, we're not

4  going to, you know, have to take on the burden of looking

5  at this under rule of reason to say should it survive or

6  not.

7          So -- but the way you do that in this Note 6 where

8  they cite this brokerage antitrust case say, that's okay,

9  Plaintiff, but that's not without risk.  If you plead

10 something that the Court -- when they look at these

11 allegations, say, you know, this isn't per se.  You know,

12 this is probably more rule of reason than the result here is

13 the claims will be dismissed.

14         You know, it's not, oh, okay, you can re-plead, do

15 the rule of reason case.  You know, you made your bed, you

16 lie in it.  You're going per se.  This is not per se.  It's

17 dismissed.

18         So in sum, Your Honor, it's the well pled factual

19 allegations that count and not the conclusions, not

20 repeatedly saying coordinated con -- conspiracy agreed.  You

21 know, you can assume, you know, that the price fixing

22 allegations are well pled.  Doesn't change my argument.  You

23 know, it doesn't get them past first base, and well-settled

24 antitrust law says that using common sense when you're

25 looking at parallel -- parallel behavior by distributors

1    complaining about a rival, that -- that happens all the

2    time, and as a result, it doesn't state a claim, and we

3    would respectfully request that Your Honor dismiss the

4    complaint.

5              THE COURT:  All right.  Thank you, Mr. Echols.

6              Let me hear a response from Plaintiff.

7              MR. LECLAIR:  Good afternoon, Your Honor.  Lew

8    LeClair on behalf of Archer and White.

9              THE COURT:  Proceed.

10             MR. LECLAIR:  Let me start with the MM Steel case,

11   and I want to quote two lines from that if I could.

12             First, quote, the type of conspiracy that MM

13   alleged and that the jury found Nucor and JSW to have joined

14   is a group boycott, here, and often, a concerted agreement

15   among competitors to refuse to deal with a manufacturer

16   unless the manufacturer refuses to deal with an additional

17   competitor.

18             Second line:  Although evidence of mere complaints

19   from a distributor to a manufacturer would not be sufficient

20   evidence to establish a conspiracy or that a manufacturer

21   joined a conspiracy, evidence that a manufacturer responded

22   to a distributor's actual threat can show concerted action

23   that is not independent conduct.

24             I think all of the questions in the motion to

25   dismiss are answered by that very language.

```
1            Let me turn to the facts.  And, Your Honor, I'm

2  going to move -- in view of the lateness of the hour, I'm

3  going to move very quickly through this.  If Your Honor has

4  a question or feels that I've not addressed something,

5  please --

6            THE COURT:  I'll let you know.

7            MR. LECLAIR:  Thank you.  I'm sure you will.

8            THE COURT:  Why don't -- why don't we stop here and

9  let me ask this question.

10            Do you believe that you've alleged one conspiracy,

11  a group boycott involving Schein and Burkhart and the

12  other -- and the manufacturing Defendants, or do you believe

13  you've alleged two conspiracies being a boycott plus a

14  separate stand-alone price fixing claim?

15            MR. LECLAIR:  I believe it is one conspiracy, Your

16  Honor.  It is a conspiracy where the distributors are trying

17  to protect their margins and control prices.  And in

18  furtherance of that conspiracy, they engage in threats of

19  the manufacturer to avoid the competition from a competitor,

20  Archer and White, who threatens the effectiveness of their

21  conspiracy.  So I believe it is one single conspiracy that

22  we have alleged.

23            THE COURT:  And you think that's supported by your

24  pleadings?

25            MR. LECLAIR:  I believe it is.
```

```
 1              THE COURT:  Okay.  Go ahead with the rest of your

 2    argument.

 3              MR. LECLAIR:  Factually, what we have in Paragraph

 4    30 of our complaint, we set forth the threat from Schein and

 5    Burkhart to stop buying from Danaher if they don't stop

 6    selling to Archer and White.  So you have the threat very

 7    specifically alleged in Paragraph 30.

 8              Then you have the action in Paragraph 32, which

 9    specifically in Paragraph 32 says that it was agreed that

10    Danaher would cut off Archer and White in Oklahoma and

11    Northwest Arkansas.  And further discussion about making up

12    business by Schein and Burkhart.

13              So you have exactly what MM Steel says is required,

14    threats and action in response to the threats.

15              THE COURT:  What's your response to Mr. Echols'

16    argument on Paragraph 32 where he makes a big emphasis on

17    meetings as opposed to meeting?

18              MR. LECLAIR:  I think it's wholly irrelevant, Your

19    Honor.  It is -- the -- the allegation, which is what we're

20    talking about here, of course, allegations, evidence and

21    proof will come.  But this is testing the allegation.  The

22    allegation is that there was a concerted agreement among

23    Bump for Danaher, Burkhart's representative, Schein's

24    representative, an agreement that Archer and White would be

25    cut off.
```

```
 1            So the allegation is expressly -- whether that --
 2   whether that agreement was reached in one, two, three, or
 3   four meetings, I don't believe is relevant to the question
 4   of whether a conspiracy is properly alleged.
 5            THE COURT:  Is it possible that each distributor --
 6   each distributor just happened to make the same threat to
 7   the manufacturer rather than the distributors actually
 8   conspiring together?
 9            MR. LECLAIR:  It is -- it is -- the question I
10   think Your Honor is asking is, is a conspiracy plausibly
11   properly alleged and shown?  And when you -- if you take the
12   evidence alleged in our complaint, you can't -- you can't,
13   of course, take one little piece, one little piece, one
14   little piece.  You've got to take it all.  If I just run
15   through this, I think it will be become clear why there's
16   sufficient evidence of conspiracy.
17            THE COURT:  Go ahead.
18            MR. LECLAIR:  February of 2008, as to the -- as to
19   the conspiracy allegation, concerted action, Schein
20   announces that we're going to be cut off before Archer and
21   White knows they're going to be cut off.  So there is
22   evidence that the conspirators actually are telling each
23   other what's going to happen before the announcement
24   actually goes out to Archer and White that they're going to
25   be cut off.  Evidence of conspiracy.
```

117

```
 1            Then -- then we get to May of 2008, June of 2008,

 2   where you have Skip Pettus, the Archer representative who

 3   is talking to the Schein and Burkhart representatives in

 4   some amazing conversations that clearly evidence the nature

 5   of the conspiracy and talk about trust relationship between

 6   the two purported competitors, talk about the -- the

 7   agreement in effect not to poach on each other's customers,

 8   talk about such things in -- this in Paragraphs 34, 37,

 9   Paragraph 40, talking about in June, the discussion about

10   maintaining gross profits and how if -- if -- if Schein is

11   bidding on a customer and the -- and the customer wants to

12   go to the other, well, they'll step out.

13            So you -- you have a clear evidence sufficient to

14   support an allegation of conspiracy with respect to the

15   actions taken here.  It's not -- look, that would have been

16   a fine opening statement that I just heard.  They're

17   entitled --

18            THE COURT:  It would have been too long.

19            MR. LECLAIR:  But that's what it was.  It was an

20   opening statement arguing the inferences of the evidence in

21   their favor, which is the exact opposite of where we are

22   today.  The inferences have to be taken in our favor.

23            And Instrumentarium is exactly the same.  What we

24   have on Instrumentarium in Paragraph 49, the threat, no sale

25   of Instrumentarium products, if it continued to sell to
```

1    Archer and White.

2         And then Instrumentarium responds to the threat in

3    Paragraph 50 and 51.  And I highly recommend Paragraph 51

4    could not be -- I was -- I was amazed listening because I

5    thought that doesn't sound like my complaint at all.  And

6    it's not my complaint because we inherited it, but it's our

7    complaint.

8         Paragraph 51:  Ultimately, Schein and Company X

9    informed Instrumentarium representatives that they could not

10   even set foot in Schein and Company X's showrooms and Schein

11   and Company X threatened that they would not sell

12   Instrumentarium equipment until Instrumentarium terminated

13   Archer Dental's ability to distribute Instrumentarium

14   equipment on a national basis.

15        That is as about as specific a statement of the

16   conspiracy agreement threat, and the response was exactly

17   what was requested, which is they were cut off from being a

18   national distributor on a very important product that their

19   sales were skyrocketing on.  And this is all going to be

20   proof.

21        So I think, Your Honor -- and, again, I -- I could

22   go on and on about this, but the point being there is way

23   more than sufficient evidence.  And what we were being

24   compared to was interesting on MM Steel.  Those were quotes

25   and comments from a 30,000-page trial record after complete

1   discovery.  We're fortunate here that we have specific

2   evidence available to us from tape recordings to support our

3   allegations of conspiracy, and they are way more than

4   sufficient under the case law to establish necessity of

5   pleading.  And they're -- in fact, in my judgment, if we

6   were standing here arguing summary judgment, we would be

7   successful on summary judgment with these -- with these

8   allegations standing alone because they are sufficient to

9   raise the evidence of conspiracy, sufficient concerted

10  action, and the -- the damage to Archer.  I --

11          THE COURT:  Give me -- give me some argument on

12  these parties that movant claims are not properly before the

13  Court, the Danaher parent corporation, Gendex, and KaVo, or

14  KaVo, whatever it is.

15          MR. LECLAIR:  Fair enough.  And -- and here --

16  here's where we are with that, Your Honor.

17          It's -- they're basically saying, oh, well, these

18  actions were taken by these two parts of the Danaher family

19  but not these others.  What we have alleged in the complaint

20  is that there was a Danaher -- joinder in a Danaher

21  companywide -- joinder in a conspiracy to cut off Archer and

22  White and -- and limit their ability to sell and compete in

23  response to threats from the distributor Defendants.

24          And they -- at the end of the day, we, of course --

25  they say that they're a holding company, they don't have any

120

1   operations.  Of course, Your Honor, we -- we don't know

2   that.  We have alleged that this was a companywide top down

3   decision and agreement.

4          And, in fact, it appears to have been effective

5   across all of the dental lines.  In other words, nobody

6   is selling to Archer and White today and haven't since

7   2014.

8          So I agree with them that eventually, we are going

9   to have to prove that.  But what we've done is allege it,

10  and we've alleged it on a good faith basis, which is that

11  this -- these people that we dealt with acted and talked

12  about Danaher.  They didn't talk about, oh, this is going to

13  be Dental Equipment LLC.  That's not the way people talked

14  and acted.  It was Danaher.

15         So the question is will we be able to show or prove

16  at the end of the day the top down conspiracy?  I believe we

17  will.  But all that Your Honor's faced with today is have we

18  made an allegation of that, and we have.  And at the end of

19  the day, if we can't prove it, then we won't be successful

20  against those entities.  But we -- we can't be cut off when

21  we have alleged in good faith that it is a companywide

22  conspiracy on a group that's led with a single board of

23  directors, as they freely admit.

24         THE COURT:  Tell me something, and I'm a little

25  confused about this.  How can Dan Bump be a regional sales

1  manager for Danaher if Danaher doesn't sell products?

2        MR. LECLAIR:  I -- I think -- I will -- again, it

3  wasn't our complaint.  So I'll excuse us to that extent.

4        I think the reason for that is that the client

5  understood from his dealings with Dan Bump that Dan Bump

6  worked for Danaher.

7        Now, of course, the client doesn't -- doesn't know

8  internal Danaher organizational arrangements, and so they

9  may well be right.  I don't -- I don't disagree.  Dan Bump

10 probably gets his paycheck from something other than the

11 holding company.  And so we don't have any basis to know

12 that at this point in time.

13       What we -- what we know is that our client dealt

14 with a guy who said he worked for Danaher.  That's what we

15 know.  And that's all that we know.  And at the end of the

16 day, the proof will be what it will be.

17       THE COURT:  All right.  What else, counsel?

18       MR. LECLAIR:  That's all I have, Your Honor.

19       THE COURT:  All right.  Mr. Echols, would you like

20 a brief rebuttal?  Or other co-counsel?

21       MR. ECHOLS:  Judge --

22       THE COURT:  It's going to need to be brief.

23       MR. ECHOLS:  Judge, only if you have any questions

24 for me.  I'm happy to respond to this.  I don't -- anything

25 that was raised by counsel for Archer and White is not

122

1   inconsistent with parallel complaints.

2          You know, one thing I guess I would say is that,

3   yes, as he explained, you know, after Dynamic was

4   terminated, they sent this fellow around recording everybody

5   he talked to to try to say, oh, you know, what was going on,

6   can I -- is there some deal, some way can I join this?  You

7   would think having done that that he would -- they would

8   have some actual quotes to support the boycott allegation,

9   and there's none, none at all.  We only have the summaries

10  there.

11         They -- as I said, I'm not arguing that they have

12  pleaded the price fixing part.  But that's not a claim that

13  they can bring.

14         But only if you have any questions for me,

15  otherwise, Your Honor --

16         THE COURT:  No.  All right.  Thank you.

17         Okay.  The motions under Rule 12(b)(6) by the

18  manufacturers Defendants and by Defendant Schein are under

19  submission.

20         Thank you for your argument on that, counsel.

21         That leaves us on the long list of things to be

22  covered today Schein's motion to transfer intradistrict to

23  the Sherman Division.

24         As is no surprise to those of you in the room, this

25  Court is very familiar with transfer motions.  I'm really --

1  I really only have one question I want some clarification

2  on.

3      MR. SCHUSTER:  Sure.

4      THE COURT:  And, otherwise, I'm satisfied that the

5  Court can reach a proper decision based on the briefing and

6  the papers.

7      Part of the argument that's presented is that the

8  Court should take into account in the Defendants' motion to

9  transfer the fact that the Plaintiff resides in the proposed

10  transferee division.  Tell me why I should do that.  Why is

11  the Plaintiff not entitled to file their suit wherever they

12  want to file their suit, and how can -- how do you have

13  standing to take advantage of a fact particular to the

14  Plaintiff and not particular to the Defendant?  How does

15  that impact the Defendants' convenience if the Plaintiff

16  chooses to go somewhere away from home?

17      MR. SCHUSTER:  I would say -- I think probably the

18  bigger issue on that is that I don't know, but Plaintiff may

19  have former employees -- disgruntled former employees near

20  its place of business that we would want the ability to

21  compel attendance for.  And that's why their location in

22  such a close inside the district place is there.

23      Does the fact that they're willing to come all the

24  way out here -- it's part of the overall picture, but I

25  understand what you're saying, Your Honor.

1          THE COURT:  Well, you know, maybe, should have,

2    possibly, that's not what these kind of decisions are based

3    on.  You have an obligation to come forward to support your

4    motion with evidence that, in fact, there are Employees A,

5    B, and C, and they do live in Sherman, and it would be more

6    convenient for you as the Defendant to get their testimony

7    in Sherman as opposed to Marshall, but I don't see that

8    you've done that.

9          MR. SCHUSTER:  Your Honor, the -- we have not

10   identified any --

11         THE COURT:  What you've identified is pure

12   speculation.

13         MR. SCHUSTER:  Yes.

14         THE COURT:  Okay.

15         MR. SCHUSTER:  The only thing I was going to add on

16   this when I raised it with opposing counsel awhile back and

17   earlier today is they make some arguments about delay

18   associated with any transfer.  And after talking with --

19         THE COURT:  Because of the criminal docket in the

20   Sherman Division?

21         MR. SCHUSTER:  No, because it would be a new judge.

22   And my -- my suggestion, if -- if you'd be willing to

23   entertain it, is that you keep --

24         THE COURT:  You want me to go to Sherman?

25         MR. SCHUSTER:  Plano may be even easier --

```
 1              THE COURT:  Well --

 2              MR. SCHUSTER:  -- just because that's -- then no

 3   one has to stay in a hotel of all the -- the local people.

 4   But that's obviously impinging on your schedule, Your Honor.

 5   So that -- that was the only thing I really wanted to

 6   address.  Otherwise, I think the papers cover it.

 7              THE COURT:  All right.  Well, you've answered the

 8   question I had.

 9              MR. SCHUSTER:  Thank you.

10              THE COURT:  Anything from the Plaintiff before we

11   complete argument on the transfer issue?

12              MR. DEARMAN:  Only if there was something you

13   wanted to hear from us, Your Honor.

14              THE COURT:  My understanding is Plaintiff has

15   identified four will call references from either Marshall or

16   Arkansas or Texarkana or somewhere east of Sherman and

17   closer to this division than to the Sherman Division?

18              MR. DEARMAN:  Yes, Your Honor.  I believe one of

19   those individuals in -- is in Louisiana and is a -- is an

20   independent contractor that did work for Archer.

21              THE COURT:  Closer to -- closer to Marshall than to

22   Sherman or Plano?

23              MR. SCHUSTER:  And three dentists, as well, yes,

24   Your Honor.

25              THE COURT:  Unless you've got some argument on this
```

```
 1   for me, Mr. DeArman, I think I -- I think I had the

 2   questions I had on the transfer issue answered.

 3          MR. DEARMAN:  Thank you, Your Honor.  We're happy

 4   to stand on the papers.

 5          THE COURT:  All right.  I'll take that up with

 6   regard to briefing, in addition to what you've told me.

 7          Counsel, that's all I have on my list for today.  I

 8   appreciate your attendance and your argument.  I will turn

 9   my attention as promptly as I can to those matters that are

10   under submission.

11          I'll look for the follow-up report from counsel

12   jointly on what I've directed with regard to the discovery

13   dispute where I've directed further efforts to meet and

14   confer.  And I will -- I've given you pretty much a ruling

15   on the motion to quash issue.  I intend to reduce that to a

16   written order.  And then I will take under advisement and

17   get you, when I can, decisions on the 12(b)(6) motions and

18   the transfer motion.

19          Is there anything that anybody is aware of that we

20   have not covered today that was noted for today?  I know

21   there are other issues out there, some of which haven't been

22   briefed fully yet, but as to what was noticed for today, is

23   anybody aware of anything we've not covered?  I take it by

24   your silence, that you're not.

25          That will complete the hearing for today, counsel.
```

1    Thank you for your attendance, and you're excused.

2            COURT SECURITY OFFICER:  All rise.

3            (Hearing concluded.)

1                                CERTIFICATION

2

3            I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    7/21/17
     SHELLY HOLMES, CSR-TCRR               Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/18

12

13

14

15

16

17

18

19

20

21

22

23

24

25