**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **ARCHER AND WHITE SALES, INC.**<br><br>    **Plaintiff,**<br><br>   **v.**<br><br>**HENRY SCHEIN, INC., DANAHER CORPORATION, INSTRUMENTARIUM DENTAL, INC., DENTAL EQUIPMENT, LLC, KAVO DENTAL TECHNOLOGIES, LLC, DENTAL IMAGING TECHNOLOGIES CORPORATION, PATTERSON COMPANIES, INC., AND BENCO DENTAL SUPPLY CO.,**<br><br>    **Defendants.** | **Civil Action No. 2:12-CV-00572-JRG**<br><br><br>**FILED UNDER SEAL** |

**PLAINTIFF ARCHER AND WHITE SALES, INC.'S SURREPLY TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     The Cartel Members Engaged in a Horizontal Conspiracy to Eliminate Low-Margin Competition............................................................................................................. 1

II.    The Danaher Defendants Joined the Horizontal Conspiracy ................................. 11

III.   Danaher Corporation Is Liable as a Coconspirator ............................................ 14

IV.    Archer's Claims Are Not Barred By the Statute of Limitations ..................................... 16

   A.   Archer's Claims Accrued in May 2008 ................................................... 16

   B.   The Defendants Are Involved in a Continuing Conspiracy ............................... 18

   C.   Patterson and Benco Are Jointly and Severally Liable for All Damages ...................... 19

   D.   The Defendants Fraudulently Concealed the Conspiracy ............................... 21

V.     Archer Is Not Claiming Dynamic's Damages ...................................................... 22

VI.    Defendants' Group Boycott is *Per Se* Illegal ................................................. 23

CERTIFICATE OF SERVICE ................................................................................. 27

CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL ........................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Benco Dental Supply Co.*,
  No. 9379 (F.T.C. Feb. 12, 2018) .......................................................................................5

*Bray v. All Saints Camp & Conf. Ctr., Inc.*,
  2012 U.S. Dist. LEXIS 76997 (E.D. Tex. June 1, 2012) .........................................................2

*Cargill, Inc. v. Boag Cold Storage Warehouse*,
  71 F.3d 545 (6th Cir. 1995) .............................................................................................2

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ......................................................................................................1

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ..................................................................................................14, 15

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984) ...........................................................................................21

*Imperial Point Colonnades Condo., Inc. v. Mangurian*,
  549 F.2d 1029 (5th Cir. 1977) ....................................................................................18, 20

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430, 477 ................................................................................................6

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
  768 F. Supp. 2d 961 (N.D. Iowa 2011) ............................................................................6, 7

*Kleen Products LLC v. International Paper Co.*,
  831 F.3d 919 (7th Cir. 2016) .....................................................................................19, 20

*Lorraine v. Markel Am. Ins. Co.*,
  241 F.R.D.534 (D. Md. 2007) ........................................................................................19

*Mitchael v. Intercorp, Inc.*,
  179 F.3d 847 (10th Cir. 1999) ........................................................................................15

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) ..................................................................................... *passim*

*Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004) ..............................................................................15

*In re Packaged Seafood Prod. Antitrust Litig.*,
   242 F. Supp. 3d 1033, 1059 (S.D. Cal. 2017) ........................................................16

*Precision Assocs. v. Panalpina World Transp. (Holding) Ltd.*,
   No. CV-08-42, 2013 WL6481195, at *17 (E.D.N.Y. Sept. 20, 2013) ....................16

*Serfecz v. Jewel Food Stores*,
   67 F.3d 591 (7th Cir. 1995) ......................................................................................3

*Smith v. United States*,
   568 U.S. 106 (2013)................................................................................................18

*Sterkel v. Fruehauf Corp.*,
   975 F.2d 528 (8th Cir. 1992) ..................................................................................12

*Texas v. Allan Constr. Co.*,
   851 F.2d 1526 (5th Cir. 1988) ................................................................................21

*Toys "R" Us v. FTC*,
   221 F.3d 928 (7th Cir. 2000) ....................................................................................4

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*,
   502 F.3d 47 (2d Cir. 2007)........................................................................................6

*United States v. Ayala*,
   601 F.3d 256 (4th Cir. 2010) ..................................................................................19

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)..................................................................................................3

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003) ................................................................................6

**Other Authorities**

Fed. R. Evid. 801(d)(2)(A)-(E) ........................................................................................4, 19

Fed. R. Evid. 803(1).................................................................................................................2

Fed. R. Evid. 803(5).................................................................................................................4

Fed. R. Evid. 902(7)...............................................................................................................19

Archer is entitled to a jury trial. Through multiple rounds of briefing, Defendants have stubbornly repeated arguments that ignore the fundamental impact of Archer's evidence. Defendants break the alleged conspiracy down into separate pieces, ignore or write off unfavorable evidence as irrelevant, and generally misconstrue Archer's claims. This is not what the law allows. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Taken as a whole, Archer has presented evidence sufficient to show a genuine issue of material fact regarding the existence of and Defendants' participation in a *per se* illegal group boycott.

## I.     The Cartel Members Engaged in a Horizontal Conspiracy to Eliminate Low-Margin Competition

### 1.  Oklahoma Evidence

Archer presented evidence that Schein and Burkhart admitted to Dynamic's Pettus at the 2008 Oklahoma Dental Association (ODA) meeting that they kept margins above 30% and that Dynamic needed to raise its margins to do the same. *See* Dkt. No. 353 at 17-18. Schein argues that this evidence is irrelevant because it establishes only a price-fixing conspiracy, and Archer, as a competitor, cannot be injured by such a conspiracy. *See* Dkt. No. 368 at 3. But Schein mistakenly conflates evidence of *injury* with evidence of *conspiracy*.[1] While Archer may recover damages for only the injuries it sustained, that does not make evidence of other aspects of the conspiracy—including its motive—irrelevant. Indeed, each case that Schein cites discusses the plaintiff's injury, but says nothing about what evidence is admissible to prove the conspiracy once the plaintiff has established that it was injured by that conspiracy. *See id.* And there is no question that Archer can prove that it was injured by the conspiracy given that its distribution

---

[1] Schein applies this same argument to the evidence of Pettus's recorded meetings with Lowery and Powers and the evidence of the coconspirators targeting other low-margin threats, such as Amazon and state dental associations, discussed below. It fails for the same reasons.

1

rights were restricted or terminated by the manufacturers in an effort by the Cartel Members to drive out low-margin competition.

Danaher then claims that this evidence is inadmissible hearsay.[2] Dkt. No. 371 at 3. Not so. Pettus's notes reflecting the ODA events (Ex. 47) were recorded immediately after the events recorded, Ex. 134, ████ Depo. at 150:4-19, and therefore are present sense impressions. Fed. R. Evid. 803(1); *Cargill, Inc. v. Boag Cold Storage Warehouse*, 71 F.3d 545, 555 (6th Cir. 1995) (holding that notes taken during investigation were admissible as present sense impressions). The notes reflect what Pettus was told by Lowery, Powers, and Fernandez, all of whom worked for Schein or Burkhart, making them statements of a party-opponent or a co-conspirator, and therefore not hearsay. Danaher mischaracterizes the ODA admissions as "retrospective, mere idle chatter" by "low-level salespeople." Dkt. No. 371 at 2-3. However, Lowery and Powers are not mere "low-level salespeople"; they were the managers of Schein's and Burkhart's Oklahoma branches. What is more, their discussion with Pettus was neither retrospective nor idle; rather, they informed Pettus that they all "need[ed] to ensure that the people that can afford the product (equipment) are being charged good margins for it," that margins should be at least 30-31%, and that Dynamic could "sell at higher margins" and did not "need to give it away." Dkt. No. 353 at 17-18; Exs. 33, 47. In other words, Schein and Burkhart told Dynamic how to act in the future so as to not run afoul of the conspirators.

Danaher's argument that the ODA evidence does not establish Danaher's liability because no Danaher representative participated in the conversations is a red herring. That

---

[2] It is difficult to discern exactly what evidence Danaher objects to given the lack of specificity in the objection. The Court should decline to consider the objections for that reason alone. *See, e.g.*, *Bray v. All Saints Camp & Conf. Ctr., Inc.*, 2012 U.S. Dist. LEXIS 76997, at *2 (E.D. Tex. June 1, 2012) ("Without some specificity, the court declines to consider the Defendant's objections."). Archer responds as best it can, however, given the generality of the objections.

evidence shows the existence of a horizontal conspiracy among distributors that Danaher joined. While the ODA evidence does not show Danaher's participation in that conspiracy, it is nonetheless admissible against Danaher because the actions of one conspirator are attributable to all other co-conspirators. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253-54 (1940). Archer separately lays out its evidence that Danaher joined the conspiracy. *See* Dkt. No. 353 at 39-40; *infra* Section II.

Archer also offered evidence of Pettus's meetings with Lowery and Powers in which Lowery and Powers admitted that they would leave Dynamic alone only if it was "on the same playing field"—i.e., charged the same high prices as the Cartel Members. Dkt. No. 353 at 18-23. Lowery even admitted that he had threatened to stop selling for manufacturers who worked with low-margin distributors. *Id.* at 22. Defendants' only response is to claim that their attempts to maintain high margins are irrelevant because "profit motive is insufficient to avoid summary judgment." Dkt. No. 368 at 4. But Archer has shown more than just profit motive—it has presented evidence of Schein and Burkhart collectively telling Dynamic to raise its margins, and then in later meetings, telling Dynamic that it needs to get "on the same playing field." Moreover, while profit motive *alone* is insufficient to avoid summary judgment, that does not make it irrelevant. Indeed, even the case that Schein cites acknowledges that "the mere confluence of economic interests between the parties does not establish, *standing alone*, the existence of a conspiracy." *See Serfecz v. Jewel Food Stores*, 67 F.3d 591, 601 (7th Cir. 1995) (emphasis added).

Archer's final piece of Oklahoma evidence is that Pelton & Crane agreed to cut off Dynamic only after Schein and Burkhart collectively agreed to make up the lost sales. Schein emphasizes that Pelton & Crane's Bump met with Schein and Burkhart separately, but whether

the conspiracy was implemented through joint meetings or separate meetings is immaterial. *See Toys "R" Us v. FTC*, 221 F.3d 928, 932 (7th Cir. 2000) (holding Toys "R" Us liable for antitrust conspiracy even though it "was careful to meet *individually* with each of its suppliers") (emphasis added). The content of those meetings—which Schein ignores—is what is important. At those meetings, Bump informed Schein and Burkhart that he could cut Dynamic off only "if *everybody* would agree to make up the business." Ex. 8, at 14:19-22 (emphasis added); *see* ▮▮▮▮ Decl. ¶¶ 7-11. Burkhart's Powers would accept that deal only if "Schein's got to make up some too" because Burkhart could not do it alone. Ex. 8, at 14:22-25; *see also* Ex. 440, at 9:19-24 (when Bump asked Burkhart to "step up to the plate and make up some of the difference," Powers responded, "Schein's going to do the same thing"). In the end, "everybody agreed to it. [Schein's] Mark [Lowery] agreed, [Burkhart's] Jack [Powers] agreed." *Id.* at 30:15-25.

Danaher's objections to the admissibility of Givens' recordings evidencing the agreement fail.[3] Dkt. No. 371 at 3. The participants in those conversations were Givens, Skinner, and Fernandez, and they reference statements made by Bump and Powers. Givens, Skinner, and Bump were employees of Pelton & Crane at the time, making their statements not hearsay because they were made by the employees of a party-opponent. Fed. R. Evid. 801(d)(2)(A)-(E). Fernandez was employed by Schein at the time, so his statements are likewise admissible as those of a party-opponent. *Id.* Powers was employed by Burkhart, an unnamed coconspirator, making his statements admissible as those of a coconspirator. *Id.* Even if any portion of these recordings is hearsay, however, they are admissible as recorded recollections to the extent that any participant in the conversation cannot remember the conversation or the statements made therein. Fed. R. Evid. 803(5). That one of the recordings does not discuss a meeting taking place

---

[3] Again, Danaher's objections lack specificity and should be disregarded on that ground alone, but Archer responds to the best of its ability. *See supra* note 2.

is irrelevant. Bump already admitted that he had (separate) meetings with Schein and Burkhart in that timeframe. Ex. 136, ██████ Depo. 112:20-113:24. The *content* of those meetings—as described above—is what matters, and Danaher makes no challenge to Archer's evidence on that issue.

### 2.  Other Low-Margin Competitors

Archer presented significant evidence of other aspects of the conspiracy to drive out low-margin competition, including that Schein, Patterson, and Benco coordinated their efforts to eliminate potential threats from Amazon and state dental association buying groups. *See* Dkt. No. 353 at 23-30. Executives at the highest levels coordinated the distributors' responses to these threats. Dkt. No. 353 at 26-27 (████████████████████████████████████████ ████████████████████████████████████████████████████)[4]; *id.* at 28 (████████████████████████████████████████████████████ ████████████████████). What is most significant is that the evidence shows that the conspirators implemented their conspiracy against all low-margin competition *in the same way*—boycott and denial of access to critical suppliers. Defendants do not substantively respond to that evidence, but instead try to write it off as entirely "unrelated" to Archer's termination. By limiting their replies to evidence "regarding Archer," Dkt. No. 365 at 2, Defendants evade the crux of the case. Archer has not alleged a conspiracy solely confined to Archer, but rather has identified a broader conspiracy to drive out any low-margin competitor who threatens the status quo of the Cartel Members. Archer is entitled to use evidence of that larger conspiracy of which it was only one victim to prove its case. *See* Dkt. No. 378 at 1-5.

---

[4] In fact, these allegations form the basis of a suit recently filed against the defendant distributors by the FTC. *See* Complaint, *In re Benco Dental Supply Co.*, No. 9379 (F.T.C. Feb. 12, 2018).

Defendants' bald assertions that their actions directed at Archer are unrelated to their actions directed at other low-margin competitors do not make it so. They flatly assert that the cases Archer cited, Dkt. No. 353 at 23-24 & n.2, are "factually distinguishable," but they do not explain how. *See also* Dkt. No. 378 at 1-5. They claim that the sale of dental equipment is different than the sale of dental consumables, even though both are part of the larger market for dental products, as evidenced by every major dental distributor selling both equipment and consumables, with equipment sales often accompanying consumables sales and vice versa. Accordingly, distributors have an incentive to bar low-margin competition from both segments of the market. This case is on all fours with *Sharp Elecs. Corp. v. Hitachi Ltd. (In re Cathode Ray Tube (CRT) Antitrust Litig.)*, where the plaintiff alleged a conspiracy to fix the price of CRTs and the court permitted evidence related to both CPTs and CDTs—subtypes of CRTs. 2016 U.S. Dist. LEXIS 140647, at *198-200 (N.D. Cal. Oct. 7, 2016). Here, "dental products" is the equivalent of CRTs, and equipment and consumables are the equivalents of CPTs and CDTs, respectively.

Defendants cite cases that are distinguishable because the alleged conspiracies were entirely unconnected. *See Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*, 502 F.3d 47, 51-52 (2d Cir. 2007) (plaintiffs failed to show any link between European conspiracy and American conspiracy); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1315-17 (11th Cir. 2003) (two conspiracies had different objects—suppressing price competition versus health competition—and were 40 years apart); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 477 n.24 (S.D.N.Y. 2017) (claims involved in the two conspiracies were "materially different"); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975-76 (N.D. Iowa 2011) (no allegation that the defendants competed with one another in any

geographical area). By contrast, Archer has provided significant evidence of the linkages between the various aspects of the conspiracy, including that Defendants refer to low-margin competitors as "trunk slammers" and ████████████████████████ to them. *See* Dkt. No. 353 at 24; Exs. 51-53, 108; Dkt. No. 378 at 3-5. Defendants may disagree, but whether the allegations are part of a single conspiracy or separate ones is a fact question for the jury. *See Sharp Elecs.*, 2016 U.S. Dist. LEXIS 140647, at *198-200.

Here, there is extensive evidence that Archer was a target of the larger conspiracy to protect supracompetitive margins by driving out low-margin competitors and that Archer is not simply trying to "glom-on" to other cases. The Supreme Court confronted a similar question in *Monsanto Co. v. Spray-Rite Services Corp.* when, having found an agreement to maintain prices, the Court asked "whether the termination of [the distributor] Spray-Rite was part of or pursuant to that agreement." 465 U.S. 752, 767 (1984). The Court determined that the answer was yes given that (1) the first thing the manufacturer mentioned at a meeting following the termination was the plaintiff distributor's prices, (2) the manufacturer had never before discussed with the distributor the purported criteria that were the alleged basis for the termination, (3) the manufacturer had informed the distributor of complaints from other distributors about its prices on several occasions, and (4) the manufacturer had made explicit threats to terminate the distributor if it did not raise its prices. *Id.* Similar evidence exists here. For example, Instrumentarium manager John Franz justified restricting Archer to a geographic location by pointing to "████████████████████████████████████ ████████████████████████████." Ex. 13. Instrumentarium had also admitted to Archer that it had prohibited Archer from making sales because other dealers had complained about Archer's prices. *See* Dkt. No. 353 at 32; Exs. 77, 113, 114. The concerns supposedly leading to Archer's

termination were never relayed to Archer before the termination. *See* Ex. 90, ███ Depo., at 121:10-123:2, 124:1-7, 124:19-25, 147:20-150:9; Ex. 137, ███ Depo. at 137:12-141:19; Ex. 133. And one of the purported reasons—low or declining sales—makes no sense, as Archer's sales were higher and increasing faster than the sales of numerous dealers who were not terminated. Ex. 39, ███ Depo. 280:14-286:22; Ex. 90, ███ Depo. 147:20-150:9; Ex. 133.

Finally, Schein argues that Archer could only have benefitted from the Defendants' anticompetitive acts in driving out low-margin competition, *see* Dkt. No. 368 at 4, but Schein ignores that Archer was one of the harmed competitors. Under Schein's theory, no plaintiff could ever bring a boycott claim so long as the boycott targeted more than one competitor because the plaintiff would always see some "benefit" from having fewer competitors. It cannot be and is not the law that the more victims of the conspiracy, the harder it is for any one victim to hold the conspirators accountable.

### 3.  Simultaneous Complaints and Responses

Archer's evidence of complaints by the distributors and the manufacturers' responses to those complaints is not Archer's *only* evidence of a conspiracy. Defendants are correct that complaints alone are not sufficient to prove a conspiracy, but they also cannot ignore the complaints when presented within a mosaic of other evidence of conspiracy. Defendants' insistence on ignoring the evidence of complaints is even more egregious given that the complaints were often near simultaneous and prompted identical reactions by manufacturers. Accordingly, Defendants have shown no basis to disregard evidence of complaints.

Patterson asserts that there is "no evidence of collaboration or joint effort by Patterson and the other distributor Defendants in complaining to manufacturers regarding Archer." Dkt. No. 365 at 2. But Patterson ignores the evidence that Archer presented from which an inference

of coordinated action can be drawn, such as near-simultaneous complaints to manufacturers. The existence of threats from different distributors within weeks of one another is evidence of a conspiracy. Dkt. No. 353 at 33 (quoting *MM Steel*, 806 F.3d 835, 845 (5th Cir. 2015)). The Fifth Circuit in *MM Steel* held that such evidence was sufficient to support a verdict against a manufacturer because it proved the manufacturer's knowledge of and conscious commitment to join the conspiracy. Evidence of threats on the very same day or in close succession on multiple occasions—as is the case here—permits the inference that the distributors making the threats were involved in a conspiracy.

Patterson attempts to distinguish *MM Steel* by arguing that the evidence of near-simultaneous complaints was used against a manufacturer rather than a distributor. *See* Dkt. No. 365 at 4. But that factual distinction is of no import. The manufacturer could have been liable for joining the conspiracy only if it knew the conspiracy existed. But its *only* knowledge of the horizontal conspiracy was that it had received near-simultaneous threats from two different distributors. The Fifth Circuit held that such knowledge "was sufficient evidence for a reasonable juror to conclude that JSW was aware of the horizontal conspiracy to exclude MM from the market." 806 F.3d at 845. In effect, the court held that such evidence permitted the jury to find that JSW knew of the existence of the horizontal conspiracy (even though JSW was unaware of any of the other evidence that proved the conspiracy's existence). The same logic is applicable here because it merely removes the second step—the manufacturer's knowledge—allowing the jury to find the existence of a horizontal conspiracy directly.

Patterson and Benco also fail in their attempts to explain away specific pieces of evidence. Benco claims that evidence of Patterson and Benco preventing Archer from making sales to doctors in Pennsylvania and Maryland actually shows that Archer could market outside

of its "designated territory" only with pre-approval. Dkt. No. 370 at 7-8. Archer contests that characterization. Instrumentarium imposed the preapproval restriction only after the Cartel Members began complaining about Archer's prices. Prior to the restriction, Archer was allowed to distribute nationwide without any restrictions. *See* Ex. 4, at 332:19-334:24. Benco also claims that Archer mischaracterizes a document, Dkt. No. 370 at 9 n.4, but Benco's own quotation shows that both Schein and Benco were threatening Gendex's ability to make sales because of Gendex's relationship with low-margin distributor Pearson. *See* Ex. 117 (████████████████ ████████████████████████████████████████████ ████████████████████ (emphasis added)). That parallel action is circumstantial evidence of a conspiracy.

Patterson's admissibility objections are confined to an exhibit, Dkt. No. 365 at 7 & n.7, Ex. 1, and Archer responds in its combined response to Defendants' objections. The crux of Patterson's objections, however, is that Archer cannot invoke the coconspirator exception because it has not proven a conspiracy. As shown by the evidence throughout this section— which is not confined solely to evidence admissible only through the coconspirator exception— Archer has satisfied that standard.

### 4. Benco's Offer to Settle Claims on Behalf of Schein and Burkhart

Finally, Archer submitted evidence of Benco's offer to pay to settle Archer's claims against Schein and Burkhart. No rational competitor would do that absent some ulterior motive. Here, that motive was to prevent the coconspirators' anticompetitive conduct from coming to light. Benco's attempt to explain Cohen's phone call to Archer raises at most a jury question. Contrary to Benco's assertion that "[t]here is no suggestion that Benco's alleged offer would 'settle' any claims that Archer itself had against Schein or anyone else," Dkt. No. 370 at 10,

Cohen specifically asked during the call, "is there some sort of reasonable sum of money that we could settle this thing out for and all walk away feel like – feeling like we are okay about it, *without going to court with Schein and Burkhart*?" Exs. 31, 32 (emphasis added). That is an explicit offer to settle claims against Schein and Burkhart.

The most that the Benco can do is offer alternative explanations that make no sense. First, Benco claims that Cohen was offering to settle a debt that Pettus owed Archer. But Archer has never claimed that Pettus owed any debt or attempted to collect one, Ex. 4, ███ Depo. at 136:21-138:3, and Pettus never asked Cohen to settle any alleged debts on his behalf, Ex. 138, ███ Depo. 48:12-16; Ex. 33, ███ Depo. at 209:21-25, 211:8-15. What is more, if the alleged debt was between Pettus and Archer, that would not explain why Cohen asked what sum of money was necessary to avoid "going to court with Schein and Burkhart." Second, Benco claims that Cohen simply was trying to "extricate" Pettus and Salerno from a "sensitive" lawsuit. But because ███████████████████████, all Benco had to do, as it did, was ████ ███████████████████. In any event, all inferences must be drawn in Archer's favor on summary judgment, and it will be for the jury to determine which interpretation to adopt.

## II. The Danaher Defendants Joined the Horizontal Conspiracy

Danaher claims that Archer has not produced any affirmative evidence that it joined the conspiracy but rather has merely "discredit[ed] the credibility of the movant's evidence." Dkt. No. 371 at 5-6. Not so. Archer has put forward affirmative evidence, including that Danaher terminated Archer notwithstanding that its sales were higher and increasing faster than many other distributors who were not terminated. Ex. 39, ███ Depo. 280:14-286:22; Ex. 90, ███ Depo. 147:20-150:9. Such a termination is contrary to Danaher's own business interests. Danaher defends itself by claiming that sales were not the only reason for terminations, but Danaher's corporate representative admitted that of all the purported reasons he gave at his

11

deposition for Archer's termination, he had not communicated a single alleged concern or reason to Archer, either before or at the time of its termination. Ex. 90, ████ Depo., at 121:10-123:2, 124:1-7, 124:19-25, 147:20-150:9; Ex. 137, ████ Depo. at 137:12-141:19; Ex. 133. Just as in *Monsanto*, the manufacturer never mentioned these purported issues to the plaintiff distributor until after the termination, which permitted the inference that those post hoc reasons were pretextual and the distributor had been terminated as a result of the boycott. 465 U.S. at 767.

What is more, Archer cited an Instrumentarium email specifically conceding that ████████████████████████████████████████████████ ████████████████.[5] Ex 13. That email also mentions ████████████ ██████████████████████████████████████████. Importantly, the complaints from other dealers were about Archer's "████████████," not about its ████████████████████████████. In any event, interpretation of the email statements is a jury question. Moreover, this email does more than question Franz's credibility—it provides an alternative explanation for the restrictions that would be sufficient to show Instrumentarium's participation in the conspiracy.  The email is substantive evidence that rebuts Franz's testimony, not mere impeachment. *See Sterkel v. Fruehauf Corp.*, 975 F.2d 528, 532 (8th

---

[5] Archer in fact does dispute that what Danaher describes as a "pilot program" was a pilot at all, much less that it required Archer to convince the local Instrumentarium sales representatives to work with it. *See* Dkt. No. 371 at 7. As Mr. Archer described it, ████████████████████████ ████████████████████████████████████████████████████ ████████████" Ex. 4, ████ Depo. at 333:16-334:13. ████████████████████" *Id.* at 334:15-335:7. It was complaints and threats from other distributors—not the failure of this "pilot program"—that resulted in Archer's restriction and termination.

Cir. 1992) ("Impeachment is an attack on the credibility of a witness, whereas rebuttal testimony is offered to explain, repel, counteract, or disprove evidence of the adverse party.").

The ████ email admitting that "████████████████████████████ also is relevant, Ex. 23, as it was discussing the 2014 terminations of low-margin dealers in general, not just a specific distributor. The email confirms that fact, as it specifically lists several dealers ████████████████ *Id.*

Finally, Danaher attempts to use *MM Steel* as a defense, comparing itself to manufacturer Nucor, which was not liable because it had not consciously joined the conspiracy. *See* Dkt. No. 371 at 5. Danaher ignores the significant factual differences between itself and Nucor, however, including that Nucor (1) refused to deal with the plaintiff before the horizontal conspiracy even existed; (2) had a longstanding "incumbency practice" to remain loyal to established customers; and (3) had been approached by only one distributor. 806 F.3d at 845-47. None of those facts hold true for Danaher. Nucor had never done business with the plaintiff whereas Danaher had done business with Archer for many years before Archer's growing success threatened traditional distributors' margins and prompted complaints and threats to Danaher from *multiple* distributors. While Danaher claims an independent business reason for Archer's termination—its purported "dealer rationalization"—that reason is pretextual as the after-the-fact excuses offered by Danaher in deposition testimony for Archer's termination were never contemporaneously documented by Danaher and were never communicated to Archer. That makes Danaher's situation much more akin to that of manufacturer JSW in *MM Steel*, which was held liable because "[a] reasonable juror could have concluded that JSW's explanation for its supposedly independent refusal to deal was pretextual." *Id.* at 845.

### III.    Danaher Corporation Is Liable as a Coconspirator

Initially, Danaher Corporation's reply is notable in that it makes the subtle—yet critical—concession that Danaher Corporation need not have directly participated in the specific accused *acts* provided that the evidence sufficiently links it to the alleged *conspiracy*. Apparently acknowledging the settled rule that one who becomes enmeshed in an antitrust conspiracy "is legally liable for all the acts of its co-conspirators in furtherance of" the conspiracy, *see MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) (internal quotation marks omitted), Danaher Corporation now says only that "Archer must show Danaher [Corporation] itself made a conscious commitment *to a common scheme*," *see* Dkt. No. 371 at 2 (emphasis added and internal quotation marks omitted).

Although this concession is a step in the right direction, Danaher Corporation incorrectly insists that the record does not sufficiently link it to the alleged conspiracy under the applicable standard. First, Danaher Corporation says that the single-enterprise theory is applicable only to Sherman Act § 2 claims but has been rejected in the § 1 context, citing *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* But *Lenox* says no such thing. *See* 847 F.3d 1221, 1234 (10th Cir. 2017). That proposition makes no sense, however, as the Supreme Court originally announced the single-enterprise doctrine *in a § 1 case. See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise *for purposes of § 1 of the Sherman Act*." (emphasis added)). Thus, *Lenox*, itself, required an extension of *Copperweld*'s rationale (from the § 1 context to the § 2 context); Archer's claim against Danaher Corp. does not.

In the *Lenox* passage cited by Danaher Corporation, the Tenth Circuit did discuss an earlier decision in which it had held that liability for a § 1 conspiracy cannot be imputed between sibling corporations "where there is no evidence that both were involved in the challenged

14

conduct." *See* 847 F.3d at 1234 (quoting *Mitchael v. Intercorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)) (cleaned up). That was true, said the court, because *Copperweld* addressed only *coordinated* activity among related companies. *See Mitchael*, 179 F.3d at 857. Far from "rejecting" the single-enterprise doctrine in the § 1 context, however, *Mitchael* implicitly recognized that under § 1, related companies are treated as a single coconspirator whose conduct is viewed collectively when there *is* evidence of coordinated activity among them, as there is here.

The question, then, is what degree of coordination Archer must show to establish that Danaher Corporation was part of a single economic enterprise along with its subsidiaries. That question is answered by cases like *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048 (D. Colo. 2004), which are discussed at length in Archer's response brief, *see* Dkt. No. 353 at 43-44, but left wholly unaddressed by Danaher Corp. In *Clear Channel*, the court explained that under the single-enterprise doctrine, "a parent may be directly liable for anticompetitive conduct at the subsidiary level when the parent sufficiently controls the subsidiary," as "[w]hen the parent controls, directs, or encourages the subsidiary's anticompetitive conduct." 311 F. Supp. 2d at 1070 (citing *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 324 (S.D.N.Y. 2003)). As Archer has previously explained, *see* Dkt. No. 353 at 44-45, the record easily creates a fact issue under this standard. In dismissing the facts cited by Archer as "dresse[d] up veil-piercing allegations," Danaher Corporation ignores that Archer relies on *precisely* the same kinds of facts as the *Clear Channel* plaintiffs relied on to defeat summary judgment. *See* 311 F. Supp. 2d at 1070-72.[6]

---

[6] Additionally, as Archer has already explained, the evidence of Danaher Corp.'s pervasive control over its subsidiaries and its involvement in the anticompetitive conduct in issue also establishes its independent participation in the conspiracy—and thus its liability for its

## IV.     Archer's Claims Are Not Barred By the Statute of Limitations

Defendants' statute of limitations arguments boil down to the claim that Archer should have brought suit solely on its knowledge of complaints that Defendants now claim are insufficient evidence of a conspiracy. But Defendants cannot ask Archer to have psychically foretold all that was to occur and the evidence that Archer would uncover during discovery in this case. At most, Defendants have presented an argument that should be heard and decided by the jury.

### A.  Archer's Claims Accrued in May 2008

Schein argues that Archer's claims accrued in February 2008, but that is a genuine issue of material fact for the jury to resolve. Archer was not informed of its own geographic restriction and therefore was not directly harmed until May 2008. *See* Dkt. No. 353 at 51. Schein endeavors to distract from that fact by focusing on the ADC's exclusion of Dynamic in February 2008, but Archer's consumables damages do not turn on that event. The consumables damages essentially are lost follow-on sales that would have accompanied sales of equipment that Archer lost due to the equipment boycott. Because all of Archer's direct damages for lost equipment sales are within the statute of limitations, so too are the follow-on consumables sales.

Schein's focus on the ADC is further attenuated because while Archer identified the ADC as one avenue through which it could have obtained consumables, Archer does not have to prove that its inability to distribute consumables was directly related to the ADC. Rather, it is enough that the evidence shows that consumables sales typically accompany equipment sales,

coconspirators' conduct—irrespective of whether it is viewed as part of a single enterprise with its subsidiaries. *See* Dkt. No. 353 at 45-47; *MM Steel*, 806 F.3d at 844; *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1059 (S.D. Cal. 2017); *Precision Assocs. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42, 2013 WL6481195, at *17 (E.D.N.Y. Sept. 20, 2013). Contrary to Danaher Corporation's unsupported characterization, the facts described in Archer's response brief do not prove only "normal parent oversight" that allows Danaher Corporation to escape liability.

and thus Archer's lost equipment sales caused lost consumables sales. The plaintiff in *Greene v. General Foods Corp.* did not have to prove that all of his damages came from lost sales of products from manufacturers engaged in anticompetitive behavior. Instead, the Fifth Circuit permitted him to recover the profits from sales that he lost due to losing the "door opener" effect. 517 F.2d 635, 663-64 (5th Cir. 1975); *see also* Dkt. No. 322 at 19-20. Similarly here, Archer need not prove that all of its lost sales came from affected brands, because it also lost sales of attached equipment and consumables due to its inability to distribute the affected brands. Archer has identified multiple avenues by which it could have obtained consumables to make those sales, including through Dynamic's ADC membership, its own ADC membership, or as a benefit of its larger size had its growth not been hampered by the conspiracy.

Second, Schein dismisses Archer's argument that it could have continued selling into Oklahoma as it had for years as "inconsistent" and "illogical," Dkt. No. 367 at 4-5, but in doing so it completely fails to address Archer's evidence. Most specifically, in a May 2008 phone call, Pelton & Crane's Dan Bump told Archer that he was still considering whether Archer would be permitted to make sales in Oklahoma and Arkansas. Dkt. No. 353 at 12; Exs. 4, 9. If it was obvious in March 2008 that this would not be permitted, Bump would not still have been considering the issue two months later. At the very least, that Schein and Archer have engaged in such a spirited dispute as to exactly when Archer knew that it would no longer be permitted to sell outside of Texas demonstrates that this is a factual dispute for the jury.

Finally, Schein argues that Archer's claims must have accrued by March 2008 because it consulted counsel and began recording conversations that month. But Archer took those actions as a shareholder of Dynamic in an attempt to protect *Dynamic's* interests. While Archer may have been on notice of illegal conduct directed at Dynamic, it was not on notice that Archer itself

was also a target of that illegal conduct until it was told in May that its own distribution rights were restricted. Even if it consulted with attorneys about its *own* rights, however, its claims could not have accrued until it was actually damaged through its own restriction in May 2008.

### B.  The Defendants Are Involved in a Continuing Conspiracy

Patterson misunderstands the continuing conspiracy doctrine in claiming that Archer must prove Patterson participated in the conspiracy using *only* within-limitations evidence. In fact, the continuing conspiracy doctrine allows a plaintiff to rely upon evidence outside of the limitations period to prove a conspiracy and damages within the limitations period. *See Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1031 (5th Cir. 1977) (plaintiffs would have to point to lease entered outside of limitations period to prove unlawful tying agreement). Admittedly, the conspiracy must have continued into the limitations period, but there is overwhelming evidence of such continuance here, including, most prominently, Danaher's termination of Archer in 2014. *See* Dkt. No. 353 at 56-58 (arguing that the acts of one conspirator are attributable to the acts of all coconspirators).[7] Once Archer proved the existence of the conspiracy and Patterson's participation in it, *see supra*, it became Patterson's burden to prove termination of or withdrawal from the conspiracy outside of the limitations period. *Smith v. United States*, 568 U.S. 106, 113-14 (2013).

While it is unnecessary for Archer to identify acts specific to Patterson within the limitations period, Archer has nonetheless done so. *See* Dkt. No. 353 at 54. In its reply, Patterson

---

[7] Patterson attempts to distinguish these cases by arguing that they are criminal cases and/or concern "fraudulent concealment," not "defeating the application of the statute of limitations." Dkt. No. 365 at 9 & n.10. First, while there is no reason to think that the statute of limitations applies differently in criminal versus civil cases, Archer has cited more than just criminal cases. *See* Dkt. No. 353 at 56 (citing *Cty. of El Paso v. Jones*, 2009 U.S. Dist. LEXIS 133413, at *35-36 (W.D. Tex. 2009) (collecting cases)). Second, fraudulent concealment *is* an avenue to "defeat[] the application of the statute of limitations," so those cases are precisely on point. Moreover, Patterson has provided no reason why the general rule that coconspirators' actions are attributable to one another should not apply in this specific context.

ignores Archer's arguments. First, with regard to the Midmark email, Patterson merely repeats admissibility objections to which Archer has fully responded. As Archer explained in its response, the Midmark email is self-authenticating. *See* Dkt. No. 357 Ex. A. Each of the declarants is a coconspirator, thus the statements are by definition not hearsay. Fed. R. Evid. 801(d)(2)(E). Indeed, one of the declarants is a Patterson representative, making those statements admissible as the admission of a party-opponent. Fed. R. Evid. 801(d)(2)(A), (D). It is of no moment that the Patterson representative is not identified by name. *See United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010). The email itself is self-authenticating given its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," and under Rule 902(7) given that it includes "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control." *See Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D.534, 554-55 (D. Md. 2007). Second, with respect to the Danaher meeting, Patterson ignores Archer's evidence that Patterson ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████. *See* Dkt. No. 353 at 54; Exs. 98, 99.

### C.  Patterson and Benco Are Jointly and Severally Liable for All Damages

While this is admittedly an unusual case in which the plaintiff brings suit against coconspirators at different times resulting in different applicable limitations periods, that does not mean that the later-joined conspirators can escape joint and several liability. The logic of *Kleen Products LLC v. International Paper Co.*, 831 F.3d 919 (7th Cir. 2016), is instructive, and Benco's attempts to distinguish that case fail. Just as in this case, the defendant used a procedural maneuver in an attempt to escape liability; in that case, bankruptcy discharge, here, the statute of limitations. But the court rejected that argument, reasoning that because the defendant had

19

rejoined the conspiracy after the bankruptcy discharge, it was liable not only for its post-discharge conduct, but also "jointly and severally liable for actions undertaken by its co-conspirators before the discharge," *i.e.*, damages for which it would not otherwise be liable due to the bankruptcy discharge. *Id.* at 930. Similarly here, because Benco and Patterson continued their participation in the conspiracy within the limitations period, they are jointly and severally liable for damages for which their coconspirators are liable.

Contrary to Benco's assertion, this approach does not conflict with the statute of limitations. Bankruptcy discharge and statutes of limitation are both important, but that does not mean that any exception necessarily conflicts with their purposes; applying joint and several liability would not do so here. The Fifth Circuit has explained that "defendants hardly are in a position to argue for the protection of the statute of limitations on the traditional ground that 'evidence has been lost, memories have faded, and witnesses have disappeared,' when it was the defendants' own recent conduct that results in a finding of a newly accruing cause of action." *Imperial Point*, 549 F.2d at 1041 (5th Cir. 1977) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 544 (1974)). That same analysis applies here. Nor does Archer's approach discourage "the vigorous enforcement of antitrust laws" by allowing a plaintiff to "sit on his rights, allowing damages to accumulate"—the reason that the continuing conspiracy doctrine does not permit damages outside of the limitations period. *Id.* at 1044. Archer can collect pre-2013 damages because it *did* attempt to assert its rights and enforce the antitrust laws by bringing suit against Schein and Danaher in 2012. Archer's claims against Patterson and Benco were delayed only because the case was stayed and Archer was unable to obtain discovery from Defendants revealing Patterson's and Benco's misconduct for over three years. In these circumstances,

holding Patterson and Benco jointly and severally liable for all of the damages caused by the conspiracy does not conflict with the purposes of the statute of limitations.

### D. The Defendants Fraudulently Concealed the Conspiracy

Benco and Patterson ignore all of Archer's evidence of concealment, including Lowery's insistence that the conspirators keep their agreement "invisible," lest they "make it look like we are . . . having a conspiracy going on," Ex. 6, at 212:1-9, and the conspirators' repeated attempts to avoid creating a paper trail evidencing their anticompetitive conduct, Exs. 15, 82, 83. These are not merely allegations that Defendants did not affirmatively disclose the conspiracy, but rather that they took affirmative steps to conceal it. Neither Benco nor Patterson addresses this evidence, but rather wrongly suggest that Archer is obligated to claim that it reasonably relied upon an affirmative denial of wrongdoing. *See* Dkt. No. 370 at 4. That is not the law. While reasonable reliance on a defendant's denial of wrongdoing is *one way* to prove fraudulent concealment, it is far from the only way. *See Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1532-34 (5th Cir. 1988). Nor does Archer's suspicion of *some* conspiracy prove that it had sufficient knowledge of each of the coconspirators' participation at that time. *See Hobson v. Wilson*, 737 F.2d 1, 36 (D.C. Cir. 1984) ("[S]imply because a person knows he has been injured by one person cannot reasonably mean he should be held to know of every other participant.").

Benco misstates Archer's position and evidence in claiming that Archer's theory is inherently contradictory. Dkt. No. 370 at 4-5. While near-simultaneous complaints is *some* evidence of participation in the conspiracy, it is not sufficient on its own to establish liability. Patterson's "19 bullet points" argument, Dkt. No. 365 at 10, fails for the same reason. Accordingly, Patterson and Benco cannot point to Archer's knowledge of such complaints to show that Archer was on notice of their role in the conspiracy. As Archer collected evidence, the

scope of the conspiracy became clear and Archer established sufficient grounds on which join Patterson and Benco.

**V.      Archer Is Not Claiming Dynamic's Damages**

As explained above, Dynamic's ADC membership is not the sole method by which Archer could have obtained consumables. Accordingly, Archer's claim for lost consumables does not belong to Dynamic; rather, they are follow-on sales from Archer's *own* equipment sales. Nor is Archer claiming profits attributable to Dynamic's lost equipment sales. Archer's sales to Dynamic are properly included in a model of the but-for world. Before the partnership with Dynamic, Archer made sales into Oklahoma and Northwest Arkansas on its own for more than twenty years. *See* Ex. 9, at 18:24-19:17. After entering into the joint venture, ███████████

████████████████████████████████████████████████████████████

███████████████████████████. *See id.* Archer merely chose to exchange one type of sales (direct to the customer) for another (through Dynamic). Those sales thus reduced Archer's overall profitability, but that reality is reflected in the damage model's incremental profit margin, as it was calculated with data showing that ████████████████.[8] As Dr. Ikizler explained at this deposition, Archer's sales through Dynamic are merely illustrative of Archer's ability to find an outlet for sales. Ex. 97, at 279:12-23. [9]

---

[8] Danaher again attacks the experts' incremental profit margin and growth rate. That issue has been thoroughly aired in the *Daubert* briefing, and Archer will not repeat here its explanation that its experts' opinions on those matters is entirely reasonable and based on significant data.

[9] Contrary to Defendants' assertions, Dkt. No. 367 at 3 n.3, Belmont is not implicated in this issue. Dynamic had its own distribution agreement with Belmont, so Dynamic did not need to buy through Archer. Belmont's termination of Dynamic, however, is still relevant to proving the existence of a conspiracy. *See* Dkt. No. 378 at 1-5.

Danaher wrongly claims that Archer's nationwide expansion was premised on expanding the Dynamic relationship. Dkt. No. 371 at 8. While Archer intended to establish additional branch locations, that was not necessarily predicated upon Dynamic's involvement.

That Archer is not claiming Dynamic's damages does not make evidence about Dynamic irrelevant. Rather, the distributor threats that caused Dynamic's termination also caused Archer's restriction to Texas. Schein implicitly concedes as much by claiming that it is "illogical" for Archer to have believed that it would be permitted to continue distributing in Oklahoma after Dynamic was terminated. Dkt. No. 367 at 4-5. The link is further reinforced by Archer's conversation with Pelton & Crane's Bump, in which they discussed what Dynamic's termination would mean for Archer's ability to make sales outside of Texas. *See* Ex. 9.

## VI.     Defendants' Group Boycott is *Per Se* Illegal

While it is not a *per se* violation for a manufacturer to agree with *one* distributor to limit or terminate a competing dealer, *see* Dkt. No. 368 at 9, that is not what Archer alleges here. Because Archer has sufficient evidence that *multiple* distributors conspired among themselves and then brought manufacturers into that conspiracy, making it a horizontal restriction, *per se* analysis is appropriate. *See MM Steel*, 806 F.3d at 849. Danaher cannot dispute that *MM Steel* held that whether the defendants possessed "'market power or exclusive access to an element essential to effective competition' has no bearing" on cases that do not involve a cooperative or a professional organization. *Id.* at 848 n.7. Danaher also cannot dispute that the Fifth Circuit held that the district court did not err in refusing to apply the exact *Tunica* factors that Danaher asks this Court to apply here. *Id.* at 850. Nevertheless, Danaher asks this Court to ignore that very clear guidance from the Fifth Circuit because the court supposedly engaged in a "*general* discussion" of the factors applicable to group boycott cases, Dkt. No. 371 at 10 n.4—apparently the same factors that the court explicitly held were not applicable. *Compare id.* at 10 (claiming that Archer must show that it lost relationships that it "*need[s]* in the competitive struggle"), *with MM Steel*, 806 F.3d at 848 n.7 (holding that whether the defendants possessed "exclusive access

to an element essential to effective competition" was irrelevant to the case). That argument makes no sense.[10]

Danaher also absurdly claims that Archer "never tries to satisfy these factors." Dkt. No. 371 at 10. On the contrary, Archer devoted two full pages of its response to arguing that it had satisfied these factors were it necessary to do so. Dkt. No. 353 at 62-64. Danaher is also wrong that there is no evidence that other premium brand manufacturers joined the conspiracy. For example, manufacturer Midmark geographically restricted Archer's sales after price complaints from Schein and Patterson. *Id.* at 32-33; Exs. 4, 79-82. And manufacturer Belmont demonstrated its ▮▮▮▮ to Benco by cutting off Archer. Ex. 120. While some brands were not involved in the conspiracy, such as Adec, that does not mean that Archer's *per se* claim fails, just as MM Steel's *per se* claim did not fail just because one steel mill did not join the boycott.

Danaher attempts to distinguish *MM Steel* by returning to its argument that this case is different because the Defendants have succeeded only in crippling Archer rather than entirely driving it out of business. Dkt. No. 371 at 10 n.5. But its attempts fail. Because one of the steel mills in *MM Steel* did not participate in the boycott, *the boycott* did not deny the plaintiff all of the supplies it needed to compete. While steel in general is necessary to compete, *the conspirators'* steel specifically was not necessary to compete. That did not stop the Fifth Circuit from holding that those conspirators were *per se* liable. Similarly here, while other sources of supply were available to Archer, what matters is that Archer could have effectively competed with access to Danaher's products, but the Defendants' anticompetitive conduct prevented it from doing so. Accordingly, *per se* analysis applies here just as it did in *MM Steel*.

---

[10] Danaher wrongly claims that *Tunica* did not involve a trade association. But the first defendant in the case caption is "Tunica Casino Operators Association, Inc.," which the court described as "a trade association formed by the Tunica casinos." 496 F.3d 403, 407 (5th Cir. 2007).

**CONCLUSION**

For the reasons set forth above and in Archer's response to Defendants' motions for summary judgment, Defendants' motions should be denied.

Dated: February 26, 2018.

**McKool Smith, P.C.**

/s/ *Samuel F. Baxter*

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
**McKool Smith, P.C.**
104 E. Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Lewis T. LeClair
Texas State Bar No. 12072500
lleclair@mckoolsmith.com
Gary Cruciani
Texas State Bar No. 05177300
gcruciani@McKoolSmith.com
Phillip Aurentz
Texas State Bar No. 24059404
paurentz@McKoolSmith.com
Travis E. DeArman
Texas State Bar No. 24074117
tdearman@McKoolSmith.com
Chelsea A. Priest
Texas State Bar No. 24102375
cpriest@McKoolSmith.com
**McKool Smith, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Charles E. Fowler, Jr.
Texas State Bar No. 24083014
cfowler@McKoolSmith.com
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

***ATTORNEYS FOR PLAINTIFF, ARCHER AND WHITE SALES, INC.***

26

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has

been served on all counsel of record via email on February 26, 2018.

/s/ *Samuel F. Baxter*
Samuel F. Baxter

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned certifies that the foregoing document is authorized to be filed under seal

pursuant to the Protective Order entered in this case (Dkt. No. 116).

/s/ *Samuel F. Baxter*
Samuel F. Baxter
