# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| **ARCHER AND WHITE SALES, INC.**<br><br>        **Plaintiff,**<br><br>  v.<br><br>**HENRY SCHEIN, INC., DANAHER CORPORATION, INSTRUMENTARIUM DENTAL, INC., DENTAL EQUIPMENT, LLC, KAVO DENTAL TECHNOLOGIES, LLC, DENTAL IMAGING TECHNOLOGIES CORPORATION, PATTERSON COMPANIES, INC., AND BENCO DENTAL SUPPLY CO.,**<br><br>        **Defendants.** | Civil Action No. 2:12-CV-00572-JRG<br><br>**FILED UNDER SEAL** |

**PLAINTIFF ARCHER AND WHITE SALES, INC.'S**
**SUPPLEMENTAL *DAUBERT* OPPOSITION BRIEF**

Archer is not pursuing claims owned by or damages suffered by Dynamic Dental. Rather, all of the damages that Archer seeks in its damage model are damages suffered by Archer. Defendants spend pages of their supplemental brief arguing about a shareholder's rights to assert claims on behalf of a corporation. But, to be clear, this argument is pointless. Archer does not dispute that it cannot pursue claims for damages to Dynamic and is not doing so.

**ARCHER'S DAMAGE CLAIM**

Having clarified what it is not (a claim for Dynamic Dental), what is important is what Archer *is* claiming. Archer's damage claim is entirely built on Archer's profitability from Archer sales in the but-for world where Archer was not suffering from the wrongful conduct and conspiracy of the dominant distributor defendants, including sales of both consumables and Pelton & Crane equipment. With respect to consumables, Dynamic Dental is relevant only as a likely source of supply for Archer in the but-for world, and as some evidence supporting Archer's ability to make consumable sales with equipment sales. But all of the projected consumable sales are Archer sales, not Dynamic Dental sales.

The same is true of projected Pelton & Crane equipment sales. All are projected sales *by Archer*. As explained below, some sales in the base year were sales to Dynamic Dental. But these were actual Archer sales and used as a benchmark not because they were sales specifically to Dynamic Dental but because they reflected Archer's ability to make sales in the but-for world not contaminated by the defendants' wrongful conduct.

A. **Consumables**

Defendants' attack on Archer's consumables damages is fundamentally a factual dispute about whether Archer would have successfully obtained access to and sold consumables but for Defendants' anticompetitive conduct. This is a jury question, not a proper *Daubert* challenge. So

1

long as Magee and Ikizler's assumptions about the but-for world do not "lapse into 'pure speculation,'" (they do not), the testimony is admissible. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 2010 U.S. Dist. LEXIS 144244, at *11-12 (E.D. Tex. Dec. 13, 2010) (denying motion to exclude expert testimony alleged based on incorrect assumptions about the but-for world, because the court did not find the assumptions "lapse into 'pure speculation'"); *Gil Ramirez Grp. v. Hous. Indep. Sch. Dist.*, 2016 U.S. Dist. LEXIS 123809, at *11 (S.D. Tex. Sept. 13, 2016) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact. ... When the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." (citation omitted)); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 70 (D.D.C. 2017) (rejecting *Daubert* challenge to expert opinion that allegedly was "inconsistent with the factual record," because "those arguments do not challenge the reliability of [the expert's] methods but go to the weight to afford [the expert's] opinion").

Archer's theory is that it would have obtained access to and sold consumables in the absence of Defendants' anticompetitive conduct. One of the ways in which it could have done so (though not necessarily the only way) was through its relationship with Dynamic.[1] One of the

---

[1] Archer previously had its own distribution agreements with consumables manufacturers, but the distributors terminated those agreements in the early 2000s. So contrary to Defendants' assertion that Archer "never record[ed] a single line of revenue from consumable sales," Archer had significant experience selling consumables. But the consumables manufacturers, including Kerr, terminated Archer by the end of 2003, after they "received complaints" from other distributors. *See* AW0001298 (Ex. 692). In any event, that has no bearing on Archer's current damages. The relevant question is whether Archer could have sold consumables in 2008 and onward but for Defendants' anticompetitive conduct. Defendants might be able to argue to the jury that Archer's limited consumables sales from 2003-08 is reason to disbelieve that Archer would have sold consumables in the future. But it is not a reason to exclude the testimony or the projected damages.

2

goals of the joint venture was to "███████████████████████████" Ex. 1, ███ Dep. 58:9-59:10, 116:2-18; *see also* Ex. 2, ███ Dep. 52:22-53:7. To do that, Dynamic pursued membership in the American Dental Cooperative ("ADC"), which would have provided access to manufacturers, including consumables (also known as merchandise). *See* Ex. 2, ███ Dep. 52:4-53:7. Had that application been successful—and not denied after "input received" from Burkhart, one of the co-conspirators—*Archer* would have obtained access to consumables. Just as Dynamic received access to Pelton & Crane equipment by virtue of Archer's dealer agreement (until terminated), Archer would have received access to ADC-affiliated manufacturers by virtue of Dynamic's membership. *See* Ex. 3, Archer Dep. 678:22-680:2 (testifying that Dynamic's ADC membership would have benefitted Archer). This evidence could support a jury finding that Archer would have had access to consumables but for the Defendants' bad conduct.[2]

Archer would have then sold those consumables and earned a profit on them. *Those* are the damages Archer is claiming. Archer's model assumes that Archer would have sold some consumables along with equipment (rising over time from 15% to 50% of sales, based on Archer's previous experience selling consumables). Because the model includes only Archer's equipment sales, it also includes only Archer's consumables sales.

### B. Equipment

Archer's damages model includes only those sales *Archer* would have made in the but-for world in which it was not artificially restricted to Texas in 2008 by Pelton & Crane. This issue is about the "sales base" on which to grow Archer's but-for damages. Magee & Ikizler

---

[2] Additionally, in the but-for world, Archer is entitled to assume, based on the evidence, that Dynamic would not have sold itself to Benco. ████████████████████████████████████████████████████████████████████████████████████████████████████████

3

calculated the amount of equipment Archer purchased from each manufacturer immediately prior to Defendants' bad conduct (restriction or cut off) ("manufacturer purchases"), then calculated how much revenue and profit Archer received from those sales, which they used to create variables to apply to the "but-for world" model. Some of the Pelton & Crane equipment included in the "manufacturer purchases" calculation was sold to Dynamic.[3]

Defendants claim that this model means Archer is somehow claiming Dynamic's damages. Not so. Pelton & Crane's cut-off of Dynamic damaged Dynamic, but Pelton & Crane's restriction of Archer's territory to only Texas damaged Archer. In the but-for world in which Archer was not improperly restricted to Texas, Archer would have made all of the Pelton & Crane sales on which it is claiming damages in Oklahoma or elsewhere.

Archer had long had the right to sell equipment in Texas, Oklahoma, Louisiana, and northwest Arkansas. It had been doing so for years, pursuant to its contractual right to sell to dentists within a 250-mile radius of its physical location in Plano. *See, e.g.*, Ex. 3, Archer Dep. 501:5-16, 505:18-24, 508:13-509:3. After entering the joint venture agreement with Dynamic, Archer agreed with Dynamic to limit its sales into Oklahoma and Arkansas (and Dynamic to limit its sales into Texas) so that they were serving different customer bases. *See id.* at 423:15-424:19.

After Dynamic's termination, however, Mr. Archer testified that Archer was "███████████████████████████████████████████████████████████████████████████████

---

[3] ███████████████████████████████████████████████████████████████████████████████ This also explains why Defendants are wrong that the Dynamic issue affects Archer's "but-for projected margin." Supp. Br. at 3 n.5. If there is any effect, it is in Defendants' favor, because Archer's profit margin was calculated based on only Archer's profit and loss statements. The ███████████████████████████████████████████████████████████████████████████████

4



██████ Ex. 3, Archer Dep. 500:6-19; *see also id.* at 504:8-9 ("██████ ██████."), 508:21-25 ("██████ ██████ ██████."), 510:15-17 ("██████ ██████") So after Dynamic's termination, the sales that Dynamic would have made in 2008 would have then been sales that Archer made in its own name in 2008 and beyond. Defendants' anticompetitive conduct, however, prevented Archer from making those sales. In May 2008, notwithstanding Archer's contractual right to sell into Oklahoma, Pelton & Crane's ██████ told Archer that it could not sell outside of Texas at all. *See id.* at 505:9-16. It therefore is appropriate for the damage model to include sales Archer could have made into Oklahoma, but did not because of Defendants' anticompetitive conduct.[4]

C. Conclusion

The Court should deny Defendants' *Daubert* motion in whole and as it relates to Dynamic Dental.

Dated: January 11, 2020. McKool Smith, P.C.

---

[4] Out of an abundance of caution, Magee and Ikizler offered an alternative model benchmark in their January 8 Supplemental Report (Defendants' Supplemental Brief Exhibit A). That is only in the unlikely event the Court rejects Archer's position. The Supplemental Report substitutes a benchmark sales year preceding the Dynamic agreement. Defendants complain that the alternative model does not remove "Dynamic's sales of brands other than Pelton & Crane." Supp. Br. at 5. This concern is marginal, at best. ██████ ██████ ██████ ██████ ██████

5

/s/ *Samuel F. Baxter*
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
**McKool Smith, P.C.**
104 E. Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Lewis T. LeClair
Texas State Bar No. 12072500
lleclair@mckoolsmith.com
Gary Cruciani
Texas State Bar No. 05177300
gcruciani@McKoolSmith.com
Phillip Aurentz
Texas State Bar No. 24059404
paurentz@McKoolSmith.com
Travis E. DeArman
Texas State Bar No. 24074117
tdearman@McKoolSmith.com
Chelsea A. Priest
Texas State Bar No. 24102375
cpriest@McKoolSmith.com
**McKool Smith, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Charles E. Fowler, Jr.
Texas State Bar No. 24083014
cfowler@McKoolSmith.com
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

***ATTORNEYS FOR PLAINTIFF***
***ARCHER AND WHITE SALES, INC.***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via electronic mail on January 11, 2020.

>/s/ *Chelsea A. Priest*
>Chelsea A. Priest

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned certifies that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case (Dkt. No. 116).

>/s/ *Chelsea A. Priest*
>Chelsea A. Priest