**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **ARCHER AND WHITE SALES, INC.** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **HENRY SCHEIN, INC., DANAHER CORPORATION, INSTRUMENTARIUM DENTAL, INC., DENTAL EQUIPMENT, LLC, KAVO DENTAL TECHNOLOGIES, LLC, DENTAL IMAGING TECHNOLOGIES CORPORATION, PATTERSON COMPANIES, INC., AND BENCO DENTAL SUPPLY COMPANY,** <br><br> **Defendants.** | **Civil Action No. 2:12-CV-00572-JRG** |

**JOINT PROPOSED JURY INSTRUCTIONS AND FORM OF THE VERDICT
(REVISED VERSION FILED 1-17-2020)**

The parties respectfully submit the attached proposed jury instructions and verdict form in accordance with the Court's directions as an amended version of what the parties filed on December 30, 2019.  Agreed instruction language appears without any highlighting as does any footnote material indicating the source for the agreed instruction.

Instruction language proposed by Plaintiff to which Defendants object appears in yellow, as does any footnote support supplied by Plaintiffs for that language.  Defendants' objections to that language appear in blue in the footnotes.  Correspondingly, instruction language proposed by Defendants to which Plaintiff objects appears in blue, as does any footnote support supplied by Defendants for that language.  Plaintiff's reasons for objecting will be in yellow.  Fundamentally,

when Plaintiff is speaking it will be in yellow; when Defendants are speaking it will be in blue. The parties object to all of the other side's highlighted language unless otherwise indicated.

Defendants submit their proposed jury instructions subject to their pending motions to dismiss, for summary judgment, and if necessary, their motions for judgment as a matter of law. Defendants reassert their position that none of Plaintiff's claims are viable, that this Court does not have jurisdiction over Plaintiff's claims, that this case should be referred to arbitration, and that Plaintiff does not have standing to pursue its claims.  Defendants do not acquiesce in the submission of any jury questions.

Archer submits these amended proposed jury instructions in light of the Court's recent *Daubert* ruling, but does not waive any later objection to or appeal of that ruling. Specifically, by removing instructions and questions on consumables from the previously proposed jury instructions and verdict form in light of the Court's guidance, Archer does not waive any rights.

## I.     Jury Instruction:  Instructions for Beginning of Trial

Good morning, ladies and gentlemen. Thank you for being here. My name is Rodney Gilstrap, and I am the Chief United States District Judge for the United States District Court for the Eastern District of Texas.

I want you to know that I have lived and practiced in this district since 1981. I was involved for about 30 years in the active practice of law. I've been on the bench as a United States District Judge since 2011. And I will make an early confession to you, ladies and gentlemen, I was not born in Texas, but I got here as fast as I could. I arrived at the ripe old age of 18 to attend college and then stayed for law school at Baylor University in Waco.

I am married. I have two grown children, and my wife owns and operates a retail floral business in Marshall.

Now, I tell you all these things because in a few moments, I'm going to ask each of you to tell me the same kind of information about each of you, and I think you're entitled to know as much about me as I'm about to find out regarding each of you.

We are about to engage in the selection of a jury in a civil case involving allegations of antitrust violations. However, before we go any further, I'd like to briefly review with the panel how we came to have a jury trial system for civil disputes such as this.

If you go back in ancient history and if you begin with the first five books of the Old Testament, the Pentateuch, you'll find that the ancient Jewish nation empaneled juries to decide issues of property ownership and property value.  The ancient Greeks began using a jury system about 1500 BC. The Romans, as they did most things, copied the jury system from the ancient Greeks. And it was the Romans that brought the jury system to what we now know to be Great Britain when they conquered that island in the 4th Century AD.

And after they brought the jury system to England in the 4th Century AD, it was established and flourished for 800 years until in the 12th Century AD, a tyrannical king came to the throne of Great Britain. He was known as King John. And King John attempted to limit or stop the citizens' rights to a trial by jury in Great Britain.  That and other disputes led to a confrontation between King John and his nobles that threatened an outright civil war. That civil war was avoided by an agreement reached between the king and his nobles at a place in England called Runnymede.  And the document that memorialized their agreement, that resolved their disputes and reestablished the right to trial by jury in England is known as the Magna Carta.

In fact, ladies and gentlemen, 28 of our 50 United States have adopted from the Magna Carta the exact language therein referring to and establishing the right to trial by jury.

So you can see that when English colonists came to this continent, they came with the understanding and practice of the jury system deeply engrained in them. And the jury system flourished in America for over a hundred years after it was colonized by the British until another tyrannical king came to the throne of Great Britain. This time the king's name was King George, III.  And King George, III also attempted to deny the right to trial by jury to his citizens. That and other disputes between his colonists, his citizens here in America led to what we all know to be the American Revolution.

And it was Thomas Jefferson, in writing the Declaration of Independence that if you read the document, you will see it lists and spells out in detail the disputes between the king and his colonists in America that led those colonists to believe and to be compelled to seek separation and independence from Great Britain.  And in the Declaration of Independence, Thomas Jefferson specifically calls out the king's efforts to deny the right to trial by jury as one of the reasons mandating separation of this country from Great Britain.

The right to trial by jury was later expressly adopted in what we know to be the Bill of Rights as the first 10 amendments to our United States Constitution. It's specifically the Seventh Amendment within those first 10 that guarantees the right to trial by jury to American citizens. And the Seventh Amendment to the Constitution was ratified in 1791. So for well over 200 years, every American citizen has had a constitutional right to submit their disputes in civil matters to resolution by a jury of their peers.

So by being here, ladies and gentlemen of the panel, in a very real and tangible way, you are doing your part as citizens today to preserve, protect, and defend our constitutional rights, including the right to trial by jury.  I always tell prospective jurors that appear for jury duty, as you have this morning, that in my personal opinion, jury service is the second highest form of public service that any American citizen can render.  In my personal opinion, the highest form of public service are those young men and women who wear the uniform of our armed services.

But I want you to understand, all of you are doing very real and important public service by being present today and reporting as summonsed for jury service in this case.

Now, ladies and gentlemen, when the lawyers address you in a few moments, they're going to be asking you various questions. And I want you to understand they will not be seeking to pry into your personal affairs unduly. They're not attempting to be nosy. They are asking questions for a specific purpose, and that purpose is to ensure that the jury selected in this case is fair and impartial and will hear the evidence on a fair and impartial basis.

I don't know if it will happen today, it rarely does, but I want you to understand, those of you on the panel, that if you are asked any question by the lawyers that you personally view as so personal and so private that you're not comfortable answering it in front of the rest of the panel, you have the option to simply say, I'd like to discuss that with Judge Gilstrap.  And if that's your

response, I'll provide an opportunity for you to discuss it with me outside the presence of everyone else on the panel. Again, that doesn't come up often, but I want you to know that option is available.

The important thing, ladies and gentlemen, when you're questioned by counsel in the case, is that you give, full, complete, and truthful answers to the questions that are asked. Remember, there are no wrong answers to the questions, as long as the answers you give are full, complete, and truthful.[1]

---

[1] *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 6:18-cv-00243-JRG (E.D. Tex. Feb. 21, 2019).

## II.     Jury Instruction:  Preliminary Instructions After Voir Dire

Ladies and Gentlemen of the Jury, you have now been sworn as the jury in this case. As the jury, you will decide the disputed questions of fact. As the Judge, I will decide the questions of law and procedure. And from time to time during the trial and at the end of the trial, I will instruct you on the rules of law that you must follow in making your decisions.

The party who brings the lawsuit is called the Plaintiff. The Plaintiff in this case is Archer & White Sales, Inc., who I will refer to simply as the Plaintiff or Archer. The party against whom the suit is brought is called the Defendant. In this action, the Defendants are Henry Schein, Inc., who I will refer to as Schein; Instrumentarium Dental, Inc., Dental Equipment LLC, Kavo Dental Technologies, LLC, and Dental Imaging Technologies Corporation, who I will refer to as the Dental Manufacturers; Danaher Corporation, who I will refer to as Danaher; Patterson Companies, Inc., who I will refer to as Patterson; and Benco Dental Supply Company, who I will refer to as Benco.

Soon, the lawyers for each side will make what is called an opening statement. Opening statements are intended to assist you in understanding the evidence. However, what the lawyers say during opening statements is not evidence. It is only what they expect the evidence will show. What you should base your decision on is the evidence that you will hear, which comes from the sworn testimony from the witness stand, from depositions that are shown to you, and from exhibits that I admit into evidence. This is the evidence that you should rely on in making your decisions as to the verdict in this case.

After opening statements, the Plaintiff will call witnesses and present its evidence. Then the Defendants will have an opportunity to call witnesses and present their evidence. After the

parties' case-in-chief has been presented, then the Plaintiff may be permitted to call additional witnesses for what we call a rebuttal case or rebuttal evidence.

Then after all the evidence is in, I will instruct you upon the applicable law to apply in this case. I will give you detailed instructions both orally, as I am doing now, and after I give you your final instructions, after all the evidence is in, then you will hear closing arguments from the attorneys. And after you have heard their closing arguments, then and only then will I instruct you to retire to the jury room and to discuss the case among yourselves in an attempt to reach a verdict. Only when you retire to the jury room after all the evidence is in, are you permitted to discuss the case among yourselves; but at that time, you are required to discuss the case among yourselves.

During the presentation of the evidence and throughout the case, I want you to keep an open mind. Do not decide any fact until you heard all the evidence, then until you have heard the closing arguments, and finally after you have heard my final instructions to you. Pay close attention to the evidence and the testimony from the witnesses. If you elect to take notes during the trial, you may do so. We have some juror notebooks that I am going to ask the Court Security Officer to pass out at this time. There is one juror notebook for each member of the jury. (Pause in proceedings.)

Now that you have your notebooks, if you will open those up, you will find a legal pad in there, together with a pen, which you can use to make additional notes, if you choose to. You will have lots of time to look through that notebook as the trial goes on, so if you will close those now and let me complete my instructions to you. If you decide to take notes in this case, be careful not to get so involved in your note-taking that you become distracted and miss part of the testimony. You do not need to write down everything that happens, but take such notes as you

feel are appropriate and will be helpful to you. Your notes are to be used as an aid to your memories only, and if your memory should differ from your notes, then you should rely on your memory and not your notes. Do not be unduly influenced by the notes of another juror. A juror's notes are not entitled to any greater weight than the recollection of each juror concerning the testimony and evidence. For example, just because someone has written something down does not necessarily mean that they heard it right or they wrote it down correctly. The fact that it is written into the notes does not mean that it is to be given any greater weight than just what your memory would be. It is there to help you and for no other purpose.

As I mentioned to you this morning, it is very important that, until the trial is over and I have released you from your service as jurors, you are not to discuss this case with anyone, and do not permit anyone to discuss the case with you in your presence, including family or friends. When you take recesses during the trial, when you are on lunch during the trial as you come and go, those are times you might overhear something about the case. Be mindful not to listen. Be mindful not to pay attention. Do not engage in hearing about anything, as well as talking about anything. Again, it is critical that your decision-making process be limited solely and only to the evidence that comes in under oath from the witness stand and the exhibits that are produced and admitted by the Court during the trial. That is part of why you each have a badge that says "juror" on it, so that when people are talking about this trial and they see you coming, they will know that they are supposed to stop talking so you do not overhear what they say. Be sure that you keep that juror badge clearly visible on the outside of your clothing throughout your trial process. You are to hold yourself apart from the rest of the people here in the courthouse and elsewhere as you discharge your duties as jurors.

I mentioned to you before lunch, and I will say it again, you are not to do any research regarding this case from any source whatsoever. You are not to attempt to communicate through social media by posting anything on the Internet or any type of communication whatsoever. During the trial, it may be necessary from time to time for the Court to confer with the lawyers here at the bench and outside of your hearing. I will handle those matters as quickly and as conveniently and briefly as I can, but you should remember that may be necessary during part of the trial. You are not to speculate about what the Court may discuss with the lawyers outside of your hearing. There may be times that I address the lawyers when you are not in the courtroom, and that also is outside your hearing. You should not attempt to speculate or guess about any communications that the Court might have with counsel outside of your hearing, either when you are out of the courtroom or when I call them to the bench.

I am first going to give you a summary of each side's contentions in the case.[2]   And then I will tell you what each side must prove to win on these issues.  As I told you this morning during voir dire, this is an antitrust case involving dental products. Archer, Schein, Patterson, and Benco are all dental distributors.  The Dental Manufacturers make certain dental products that dental distributors sell to dentists.    Danaher is a holding company that owned the Dental Manufacturers.  Danaher does not directly manufacture or distribute products.[3]

---

[2] The need to instruct the jury on the parties' contentions is generally supported by the following: Dkt. No. 161, Jury Instructions at 6-7, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS (E.D. Tex. Apr. 26, 2017 (Schroeder, J.); Dkt. No. 384, Final Jury Instructions at 4, *In re Tableware Antitrust Litig.*, Dkt. No. 384, No. 3:04-cv-3514-VRW (N.D. Cal. June 29, 2007).

[3] Plaintiff objects to this sentence as unnecessary and improperly previewing and emphasizing Danaher's theory of the case. The previous sentence adequately describes Danaher's role.

Archer claims that the defendants agreed to drive price-cutting[4] competitors out of business by reducing the areas in which they could sell products and eventually eliminating the competitors' access to manufacturers' dental products altogether. Archer contends that the distributor defendants (Schein, Patterson, and Benco) and another dental distributor called Burkhart Dental Supply convinced the Dental Manufacturers (such as Danaher and its subsidiaries) to cut off low-price competitors Archer.[5] Archer alleges that the manufacturers

---

[4] This is the first of a series of statements Plaintiff makes in its statement of contentions wherein Plaintiff is attempting to use evidence of alleged wrongs in other contexts to show that, in this case, the defendants supposedly committed those alleged wrongs here. The evidence and allegations in this case should focus on Archer's complaints, not on other perceived wrongs supposedly committed by the Defendants against parties not present in this lawsuit. Federal Rule of Evidence 404(b)(1) prohibits the use of evidence for that purpose, as does the United States Supreme Court. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 595–96 (1986) (evidence of a conspiracy in one market "does not tend to show a conspiracy … in another"); *see also* Federal Rule of Evidence 403; *Lewis v. City of Chicago*, 590 F.3d 427, 442 (7th Cir. 2009) (affirming exclusion of evidence of prior investigations related to the same facts because of "the substantial risk that the jury would adopt the earlier conclusions") *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1015 (9th Cir. 1999) (finding a risk of unfair prejudice "because a jury might find it difficult to evaluate independently evidence … after being informed of the investigating agency's final results"); *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.* 783 F.2d 159, 165 (10th Cir. 1986) (upholding exclusion of evidence of FTC investigation as irrelevant, prejudicial, and risked confusing and misleading the jury); *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982) ("[T]he evidence of multiplicitous schemes worked a prejudice to the substantial rights of the defendants because, even if there had been sufficient evidence to convict any one of the defendants on a single scheme, the volume and manner of presentation of the evidence created the likelihood of spillover: *i.e.*, that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another."); *Sugar Ass'n v. McNeil-PPC, Inc.*, 2008 WL 4755611 (C.D. Cal. Jan. 7, 2008) (excluding foreign judgments under Rule 403 because the "dangers of unfair prejudice or confusing or misleading the jury substantially outweigh any probative value"). Defendants assert the sentence should say: "Archer claims that the defendants agreed to drive **it** out of business. . . ." Plaintiff contends that this language is appropriate because the effort to drive Archer out of business was only one part of a larger conspiracy, as explained in more detail in Archer's response to Defendants' Motions in Limine. *See* Dkt. No. 378, at 1-5. Additionally, the mention of price-cutting is necessary to explain the Defendants' motive for targeting Archer.

[5] Defendants suggest the blue language in lieu of the yellow language for the same reasons identified above in footnote 4. Plaintiff is attempting to use evidence of alleged wrongs in other contexts to show that, in this case, Defendants supposedly committed those alleged wrongs here. Plaintiff's efforts to prove its case in this way contravenes Federal Rule of Evidence 404(b)(1)

joined the conspiracy to ensure Schein, Patterson, Benco, and Burkhart would continue selling and promoting the manufacturers' products. Archer claims that it was only one target of the defendants' overarching conspiracy to eliminate competition that might endanger the distributors' high margins; other targets include other price-cutting distributors, buying groups, TDA Perks/SourceOne, and Amazon. Archer claims that these territory reductions and terminations are an illegal boycott, the purpose of which was to allow the defendants to illegally protect their high prices.[6]

The Defendants deny Archer's allegations. The Dental Manufacturers state that they imposed the same rules on Archer they imposed on every other distributor, and that they imposed the territory restrictions and terminations Archer complains of for legitimate business reasons: Archer did not comply with its contract with the Dental Manufacturers, was not able to adequately serve the Dental Manufacturers' customers, and did not meet the standards the Dental Manufacturers require of their distributors. The Distributor Defendants state they compete vigorously with each other and with Archer, and that Archer's territory restrictions and terminations were the result of the manufacturers' business decisions. The Distributor Defendants deny they conspired with each other to induce any manufacturer to boycott Archer.[7]

---

and *Matsushita*, as well as the other cases cited above.  Plaintiff's response is the same as the earlier instruction. Additionally, Defendants' proposed language improperly limits the allegation to only the "Dental Manufacturers," when Archer also has brought suit against Danaher Corp. and pleaded in its operative complaint that other manufacturers (such as Midmark and Belmont) are unnamed co-conspirators.

[6] This is a continuation of the same problem identified in the previous footnote.  Plaintiff is attempting to use evidence of alleged wrongs in other contexts to show that, in this case, Defendants supposedly committed those alleged wrongs here.  Plaintiff's approach contravenes Federal Rule of Evidence 404(b)(1), *Matsushita*, and other cited authorities.

[7] Plaintiff objects to this language on several grounds.  First, the paragraph is repetitive and thus unduly emphasizes the defendants' alleged justifications for their actions (for example – though not the only examples - both the second and fourth sentences refer to "business reasons" or "business decisions"; the penultimate and ultimate sentences both deny the existence of a

All Defendants deny the existence of a conspiracy, and deny that any action taken as to Archer harmed competition.

I will now give you some information about the issues that will be presented to you at this trial, as well as a short overview of the applicable law. At the close of the case, I will give you more specific instructions that you must follow in reaching your verdict. You will also be given a verdict form and questions that you must answer in providing your verdict. That will all happen at the end of the case.

Let me first provide you with some instructions to follow in deciding the case. First, I am going to discuss the burdens of proof required in the case. In any legal action, facts must be proved by a required standard of evidence known as the burden of proof. We talked about this before. You may have heard about this in a criminal case, proof beyond a reasonable doubt. The standard beyond a reasonable doubt that is used in criminal cases does not apply in a civil case such as this one. In an antitrust case like this one, the burden of proof that will be applied is what is called the preponderance of the evidence standard.  Archer must prove every essential part of its claims by a preponderance of the evidence.  Defendants do not bear the burden of proof on any of Archer's claims.  However, the Defendants do bear the burden of proving their affirmative

conspiracy). The deletions are an attempt to remove some of the repetition so as not to unduly emphasize defendants' arguments. Second, some of it is factually wrong (for example, it implies there is one contract with the "Dental Manufacturers," when there are separate contracts; it says "Dental Manufacturers' customers," when they are actually "Archer's customers"). Third, the defendants are elaborating in detail on their alleged motive for their actions, while objecting to Archer's contentions regarding the defendants' motives (cutting off low-price competition). If the defendants get to describe their alleged motives, Archer should get to describe its theory of the defendants' motive. That is not to say Archer would withdraw its objections if defendants withdrew their objections – the descriptions should receive approximately equal time/space, and defendants' proposal unduly emphasizes their alleged motives, as described above – but it highlights the inequity of defendants' objection to Archer's submission in the context of defendants' own submission. Finally, the contention that Archer did not comply with its contract is an unpleaded counterclaim on which the defendants would bear the burden of proof, and therefore should be excluded.

defenses by a preponderance of the evidence. When a party has the burden of proof by a preponderance of the evidence, it means that you must be persuaded that what the party seeks to prove is more probably true than not true.

At the end of the trial, you will get a written charge that will have all of these instructions in it in much more detail than what I am giving to you now. And you will also have the verdict form that will have some questions.

Let me finally visit with you regarding what your duties as jurors are. You have two duties as jurors. Your first duty is to decide the facts from the evidence in the case. That is your job and your job alone. Your second duty is to apply the law that I will give you at the conclusion of the case to the facts of the case as you find them. You must follow those instructions even if you disagree with them. Each of the instructions is important, and you must follow all of them. You should perform these duties fairly and impartially. You should not allow your sympathy, your prejudice, any fear or public opinion to influence you. Nothing I say now and nothing that I say or do during the course of the trial is meant to indicate any opinion on my part one way or the other about what the facts are or what your verdict should be. Again, you, the jury, will be the sole judges of the facts in this case.[8]

---

[8] *Smartflash LLC, et al. v. Apple Inc.*, No. 6:13-cv-447 (E.D. Tex. Feb. 16, 2015) (Gilstrap, J.); Dkt. No. 161, Jury Instructions at 2, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS (E.D. Tex. Apr. 26, 2017) (Schroeder, J.).

**<u>Jury Instruction:  General Post-Evidence Charge</u>**

Members of the jury:

You have heard the evidence in this case and I will now instruct you on the law that you must apply. Each of you are going to have your own printed copy of these final jury instructions that I'm giving you now, so there's really no need for you to take notes unless you just particularly want to.  I'd prefer you listen and pay direct attention to the instructions I'm going to give you orally at this time.

It is your duty to follow the law as I give it to you. On the other hand, you the jury are the sole judges of the facts. Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of the case.

You're about to hear closing arguments from the attorneys.  Statements and arguments of the attorneys, I remind you, are not evidence, and they are not instructions on the law.  They're intended only to assist the jury in understanding the evidence and the parties' contentions.

A verdict form has been prepared for you. You will take this verdict form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in the blanks in the verdict form, date it, sign it, and notify the Court Security Officer.

Answer each question on the verdict form from the facts as you find them to be. Do not decide who you think should win and then answer the questions to reach that result. Again, your answers and your verdict must be unanimous.

A corporation and all other persons are equal before the law and must be treated as equals in a court of justice. With respect to each question asked, your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits that were admitted and received into evidence, regardless of who may have produced or introduced them, as well as any stipulations or agreements the parties may have reached in this case.  You, the jurors, as the sole judges of the credibility of each and every witness and the weight and effect to be given to the evidence in this case.[9]

---

[9] Dkt. 284, Final Jury Instructions at 2, *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (E.D. Tex. Aug. 25, 2018); Dkt. 341, Official Transcript of Proceedings Held On Feb. 8, 2019 at 6, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-577-JRG (E.D. Tex. Feb. 21, 2019); Dkt. 161, Jury Instructions 2-3, *Red Lion Medical Safety, Inc., et al. v. General Electric Co., et al.*, No. 2:15-cv-308 (E.D. Tex. April 26, 2017) (Schroeder, J.).

## Jury Instruction:  Considering Witness Testimony

As I've told you previously, the attorneys in this case are acting as advocates for their competing parties and their competing claims, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court.  In that case, when the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if permitted to answer the question.  If, on the other hand, the objection was overruled, then you're to treat the answer to the question and the question itself just as if no objection had been made; that is, like any other question and answer.

Now, at times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We met because often during a trial something comes up that does not involve the jury. You should not speculate about what was said during such discussions that took place outside of your presence.

There are two types of evidence that you may consider in properly finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect or circumstantial evidence; that is, the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.  As a general rule, you should know that the law makes no distinction between direct and circumstantial evidence, but simply requires that you, the jury find the facts based on the evidence presented, both direct and circumstantial. However, you may not consider evidence of a crime, wrong, or other act on one occasion to prove a person's or corporation's character in order to show that on a different occasion the

person or corporation acted in accordance with that character.[10]   Also, evidence that an act was done at one time or on one occasion is not any evidence or proof whatsoever that the act was done in this case.[11]

---

[10] Defendants are requesting this instruction because the evidence and allegations in this case should focus on Archer's complaints, not on other perceived wrongs supposedly committed by Defendants against parties not present in this lawsuit.  Federal Rule of Evidence 404(b)(1) prohibits the use of evidence for that purpose, as does the United States Supreme Court. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 595–96 (1986) (evidence of a conspiracy in one market "does not tend to show a conspiracy … in another"); ; *see also* Federal Rule of Evidence 403; *Lewis v. City of Chicago*, 590 F.3d 427, 442 (7th Cir. 2009) (affirming exclusion of evidence of prior investigations related to the same facts because of "the substantial risk that the jury would adopt the earlier conclusions") *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1015 (9th Cir. 1999) (finding a risk of unfair prejudice "because a jury might find it difficult to evaluate independently evidence … after being informed of the investigating agency's final results"); *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.* 783 F.2d 159, 165 (10th Cir. 1986) (upholding exclusion of evidence of FTC investigation as irrelevant, prejudicial, and risked confusing and misleading the jury); *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982) ("[T]he evidence of multiplicitous schemes worked a prejudice to the substantial rights of the defendants because, even if there had been sufficient evidence to convict any one of the defendants on a single scheme, the volume and manner of presentation of the evidence created the likelihood of spillover: *i.e.*, that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another."); *Sugar Ass'n v. McNeil-PPC, Inc.*, 2008 WL 4755611 (C.D. Cal. Jan. 7, 2008) (excluding foreign judgments under Rule 403 because the "dangers of unfair prejudice or confusing or misleading the jury substantially outweigh any probative value"). Plaintiff objects to this instruction as unnecessary. Evidence about other parts of a single conspiracy is admissible, as explained in Archer's response to Defendants' Motions in Limine. *See* Dkt. No. 378, at 1-5. None of the cited cases gave an instruction like this to the jury.  Additionally, this sentence is repetitive of the following sentence. If any instruction is given, it should be the Fifth Circuit Pattern Jury Instruction 2.10, in full.

[11] Fifth Circuit Pattern Jury Instructions (Civil) §2.10 (2014 ed.).  The Fifth Circuit pattern instruction also lists a number of exceptions, which defendants assert do not apply in this case. Plaintiff objects to this instruction as unnecessary. The Court can deal with this type of evidence when and if it arises rather than putting it in the instructions and unduly drawing attention to the issue. Additionally, it is repetitive of the preceding sentence. If the Court decides to give some version of this instruction, however, it should give the entirety of the Pattern instruction, as Plaintiff alleges that other acts in support of the overarching conspiracy are relevant to show motive (maintaining elevated margins); opportunity, intent, and knowledge (threats to manufacturers effective against other low-margin threats); and plan (Plaintiff alleges boycotts of all low-margin competitors was part of an overarching conspiracy to maintain elevated margins).

The parties have stipulated or agreed to some facts in the case.  A list of stipulations has been included in your juror notebooks.  When the lawyers for both sides stipulate as to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence and regard the fact as proven. [12]

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine the questions of credibility or truthfulness regarding the witnesses.  In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances.  Has a witness been contradicted by other credible evidence? Has he or she made statements at other times or in other places contrary to those made on the witness stand?  You must give the testimony of each witness the credibility that you think it deserves.

---

[12] Dkt. 284, Final Jury Instructions at 3, *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (E.D. Tex. Aug. 25, 2018); Dkt. 341, Official Transcript of Proceedings Held On Feb. 8, 2019 at 8, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-577-JRG (E.D. Tex. Feb. 21, 2019); Dkt. No. 161, Jury Instructions at 8, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS (E.D. Tex. Apr. 26, 2017) (Schroeder, J.).

### Jury Instruction:  How To Examine The Evidence

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked of a witness in advance of trial. If a witness cannot be present to testify in person, the witness's testimony may be presented under oath in the form of a deposition.  Before the trial, the attorneys representing the parties in this case questioned these deposition witnesses under oath.  At that time, a court reporter was present and recorded their sworn testimony.  Deposition testimony is entitled to the same consideration by you, the jury, as testimony given by a witness in person from the witness stand in open court. Accordingly, you should judge the credibility and importance of the deposition testimony to the best of your ability, just as if the witness had testified before you in open court.

As I explained to you during the course of the trial, many of these depositions were taken remotely, by lawyers located far away from the witnesses.  For that reason, you may have noticed some witnesses looking down at a computer screen while they testified.  The reason for that is that the witness was looking at the lawyer asking the questions.  You are to draw no inference at all from the fact that some attorneys took depositions in that manner, while others were in the same room as the witness, nor should you draw any inference from the fact that some witnesses were looking down at a computer screen in order to see the lawyer asking the questions.[13]

---

[13] Defendants suggest this instruction because some depositions were taken remotely and the witnesses were looking down at computer screens while testifying. This instruction simply informs the jury why these witnesses appear differently than witnesses who were deposed with the attorneys in the room.  The following authorities support such an instruction: Pattern Jury Instructions, Civil Cases, U.S. Fifth Circuit, District Judges Association, 2014 Edition, 2.13 Deposition Testimony (video deposition testimony should be considered as if witness was present from stand); Kevin F. O'Malley, Jay E. Grenig, & Hon. William C. Lee, Fed. Jury Practice & Instructions 105.02 (6th ed. 2008) (same); *In re Urethane Antitrust Lit.*, No. 2:08-5169, 2016 WL 475339, *3 (D.N.J. Feb. 8, 2016) (noting court may use jury instruction to cure

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.   However, you should not base your decision on any evidence not presented by the parties in open court during the trial of this case, including your own personal experiences.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.[14]

potential confusion caused by use of certain names in video deposition testimony); *Ellis v. Country Club Hills*, No. 06-c-1895, 2011 WL 6001148, *4 n.3 (N.D. Ill. Dec. 1, 2011) (the court will craft instructions to introduce jury to notions relating to video testimony not presented live in the courtroom).   Plaintiff objects to this instruction as unnecessary. Plaintiff is not aware of any other case in which the Court has given this instruction. Moreover, this instruction unnecessarily emphasizes remote depositions. It also would be unnecessary and inappropriate for the Court to instruct the jury that "the witness was looking at the lawyer asking the questions" when there is no way for the Court (or anyone else) to tell for sure what the witness was looking at.  However, Plaintiff will not object if some short version of this instruction is given during the trial by the attorney introducing the deposition clip before the remote deposition is played to the jury.

[14] Dkt. 284, Final Jury Instructions at 4, *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (E.D. Tex. Aug. 25, 2018); Dkt. 341, Official Transcript of Proceedings Held On Feb. 8, 2019 at 10-11, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-577-JRG (E.D. Tex. Feb. 21, 2019); Dkt. No. 161, Jury Instructions at 5, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS (E.D. Tex. Apr. 26, 2017) (Schroeder, J.).

### Jury Instruction:  Expert Witnesses

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field - called an expert witness - is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.[15]

---

[15] Dkt. 284, Final Jury Instructions at 4, *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (E.D. Tex. Aug. 25, 2018); Dkt. 341, Official Transcript of Proceedings Held On Feb. 8, 2019 at 11, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-577-JRG (E.D. Tex. Feb. 21, 2019); Dkt. No. 161, Jury Instructions at 6, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS (E.D. Tex. Apr. 26, 2017) (Schroeder, J.).

**Jury Instruction:  Demonstrative Exhibits**

Certain exhibits have been shown to you during the trial that were illustrations. We call these types of exhibits "demonstrative exhibits" or demonstratives for short.  Demonstrative exhibits are a party's description, picture, or model to describe something involved in this trial. If your recollection of the evidence differs from the demonstrative, rely on your recollection. Demonstrative exhibits are sometimes called jury aids.  The demonstrative is not itself evidence, but the witness's testimony during which they use the demonstrative is evidence.[16]

---

[16] Dkt. 284, Final Jury Instructions at 4, *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (E.D. Tex. Aug. 25, 2018); Dkt. 341, Official Transcript of Proceedings Held On Feb. 8, 2019 at 12, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, No. 2:17-cv-577-JRG (E.D. Tex. Feb. 21, 2019); Dkt. No. 161, Jury Instructions at 6, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS (E.D. Tex. Apr. 26, 2017) (Schroeder, J.).

**<u>Jury Instruction:  Burden of Proof</u>**

In any legal action, facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on Plaintiff for some issues, and it is on Defendants for other issues.   The burden of proof that applies in this case is called the "preponderance of the evidence."  Preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.[17]

---

[17] Dkt. 284, Final Jury Instructions at 5, *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (E.D. Tex. Aug. 25, 2018).

## III.   ANTITRUST INSTRUCTIONS

### A.   Purpose of the Sherman Act

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.[18]   The law therefore protects competition, not competitors.  An act becomes unlawful only when it constitutes an unreasonable restraint of trade.[19]

---

[18] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 1-A (2016 ed.).

[19] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *accord, Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877, 905 (2007).  A similar instruction was given the jury in *Retractable Technologies, Inc. v. Becton, Dickinson & Company,* Dkt. 567, p. 16, Charge of The Court, No. 2:08-cv-16 (E.D. Tex. Sept. 18, 2013) ("Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.") and in *MM Steel*, Dkt. No. 518, Instructions to the Jury at 6, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014) ("In general, the law protects competition, not competitors.  Hence, an act is unlawful when it constitutes an unreasonable restraint on interstate commerce.").

### B.   Elements of a Violation of Section One of the Sherman Act

Archer challenges the conduct of Defendants under Section 1 of the Sherman Act.  Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade.   Archer claims that the Distributor Defendants (Schein, Benco, and Patterson) agreed and conspired with each other to bar Archer from having access to separate and distinct products that Archer alleges were necessary for Archer  to compete:  (1) core dental equipment; and (2) dental imaging equipment.  Archer claims that the Distributor Defendants did this by agreeing and conspiring with the Dental Manufacturers.

Archer claims that the Distributor Defendants (Schein, Benco, and Patterson) agreed and conspired with each other and Burkhart to bar Archer from having access to dental products that were necessary for Archer to compete effectively. Archer claims that the Distributor Defendants and Burkhart did this by agreeing and conspiring with the Dental Manufacturers, Danaher, and other manufacturers of dental products.[20]

To prevail on this claim that a particular defendant violated the Sherman Act by conspiring to refuse to deal with Archer, Archer must prove, as to that defendant, each of the following elements by a preponderance of the evidence:

1)  The defendant and one or more businesses refused to sell Archer (1) core dental equipment; and (2) dental imaging equipment other businesses refused to deal with Archer by preventing Archer from buying dental products;[21]

---

[20] Defendants' proposed instruction needlessly splits core dental equipment from dental imaging equipment. It also ignores the roles that Burkhart, Danaher, and other dental manufacturers played in the conspiracy.

[21] Plaintiff's suggested language generally comes from American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-C-5 (2016 ed.), with additions based on this case. Defendants' proposed replacement language also unnecessarily splits dental products between core equipment and imaging equipment. Defendants' proposed replacement language also comes

2)   The refusal to deal was not an independent decision but instead was[22] pursuant to an agreement between at least two dental distributors on the one hand and either Danaher or at least one of the Manufacturer Defendants on the other hand in which that particular defendant was a participant conspiracy between that defendant and one or more other persons or businesses;[23]

---

from the same model instruction, but added this language to tailor the instruction to the facts of this case and to better reflect Archer's allegations.

[22] This instruction is based on authorities holding that independent parallel action will not support the finding of an antitrust conspiracy. *Bell Atl. v. Twombly*, 550 U.S. 544 (2007) (parallel conduct insufficient to demonstrate antitrust conspiracy); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (must be evidence tending to exclude possibility of independent action); *Monsanto Co. v. Spray-Rite Services Corp.*, 465 U.S. 752 (1984) (same). Defendants assert that Plaintiff's evidence does not pertain to a conspiracy but actually pertains to independent parallel conduct that Plaintiff is attempting to pass off as a conspiracy. Plaintiff objects to Defendants' proposal because the instruction already makes clear that the refusal to deal has to be "pursuant to" the conspiracy/agreement. The instruction on Group Boycott in subsection C also makes clear that an independent decision to refuse to deal is not illegal. Defendants' proposal unnecessarily and improperly emphasizes the element and is inconsistent with the ABA's Model Jury Instructions and the instructions to the jury in *MM Steel*, Dkt. No. 518, Instructions to the Jury at 6-7, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[23] Plaintiff's suggested language is from American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-C-5 (2016 ed.). Defendants' suggested language more directly ties the instruction to the facts of this case and deals with the fact that Plaintiff's cause of action requires a horizontal conspiracy between dental distributors and participation in that horizontal conspiracy by at least one Manufacturer Defendant and Danaher. *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848-49 (5th Cir. 2015) (requiring showing of both a horizontal conspiracy between distributors and a vertical conspiracy with manufacturers). Plaintiff's proposed instruction does not make the requirements of the conspiracy sufficiently clear to the jury. Defendants also adjusted the instruction to change "conspiracy" to "agreement" because the term "conspiracy" has not yet been defined, but will be defined in subsequent instructions. Defendants' proposal is unnecessary in light of subsection (3) of this instruction, which already makes clear that the cause of action requires a horizontal conspiracy. That proposal is also inconsistent with the ABA's Model Jury Instructions and the instructions to the jury in *MM Steel*, Dkt. No. 518, Instructions to the Jury at 6-7, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014)

3) At least two of the parties to the agreement are direct competitors with each other and with Archer;[24]

4) The refusal to deal denied Archer access to a supply of (1) core dental equipment; and (2) dental imaging equipment disadvantaged Archer by denying Archer access to a supply of dental products necessary that were necessary for Archer to compete effectively;[25] and

5) Archer was injured in its business or property because of the refusal to deal.[26]

---

[24] Based on American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-C-5 (2016 ed.).

[25] Plaintiff's suggested language is from American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-C-5 (2016 ed.), with Archer's name added.  Defendants' suggested language more directly ties the instruction to Archer's allegations and the facts of this case. As with other instructions, Defendants' proposal unnecessarily divides core equipment and imaging equipment, increasing the risk of jury confusion.

[26] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-C-5 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 6-7, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

### C.   Group Boycott

A business has the right to deal, or refuse to deal, with whomever it likes, as long as it makes that decision on its own.  The Sherman Act, however, prohibits two or more competitors—here, the distributors—from agreeing with one another under the circumstances defined in the previous instructions to deprive their competitor of products necessary to compete effectively by agreeing with a manufacturer to withhold products that are necessary to compete[27] to deprive another business of the ability to purchase products, like dental products.[28] This situation is sometimes referred to as a "group boycott."[29]

A business may be found to have participated in a conspiracy to refuse to deal with Archer even if the business did so in response to what it believed was wrongful conduct of Archer, its owners, or its employees.[30]

---

[27] Defendant proposes the language in blue in substitution for Plaintiff's proposed language in yellow (which follows) because Defendants' description of the alleged agreement is what is required to prove a horizontal boycott in this case.  The agreement has to be between two distributors and then with a manufacturer, and the manufacturer must agree to withhold products. *See MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848-49 (5th Cir. 2015) (requiring showing of both a horizontal conspiracy between distributors and a vertical conspiracy with manufacturers).  Plaintiff's description of the agreement fails to accurately reflect what the agreement must be and inaccurately assumes the distributors are selling dental products to Archer.

[28] Plaintiff proposes this language to describe the boycott that must occur in this case. Defendants' proposal is unnecessarily wordy and confusing.

[29] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-C-5 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 7-8, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[30] Plaintiff bases this instruction on the following:  *United States v. General Motors Corp.*, 384 U.S. 127, 146 (1966); Dkt. No. 518, Instructions to the Jury at 8, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).  Defendants object to this instruction because it suggests that a competing distributor's breach of a manufacturer-imposed policy is irrelevant to whether the termination was pursuant to a conspiracy. That is not the law. *See, e.g.*, *Monsanto*, 465 U.S. at 762-63 (juries must not be permitted to mistake complaints regarding breaches of costly manufacturer-imposed policies for evidence of conspiracy). Moreover, although Plaintiff bases its proposed instruction in part upon the jury instructions in *MM Steel*, Plaintiff's version of the instruction modifies the language used by the *MM Steel* court in significant ways. The actual language used in *MM Steel* was "A person or

business cannot participate in a conspiracy to refuse to sell to another business to exclude the other business from the market even if they do so in response to what they believe is wrongful conduct of the other business, its owners, or employees." *MM Steel*, Dkt. No. 518, Instructions to the Jury at 8, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).   Defendants assert this language is inappropriate here in any form, but Plaintiff's modifications to the language used in *MM Steel* would cause significant prejudice to Defendants.

### D.   Per Se Violation[31]

Archer has alleged a per se illegal violation of the Sherman Act.  For the type of group boycott claim Archer is making in this case, Archer must also prove by a preponderance of the evidence that Defendants engaged in anticompetitive conduct by virtue of holding a dominant position in a relevant market or markets that enabled Defendants to cut off Archer's access to a supply of (1) core dental equipment; and (2) dental imaging equipment, both of which Archer must prove were necessary for Archer to compete.  Additionally, Archer must prove by a preponderance of the evidence that no generally plausible argument exists that the denial of products to Archer (if you find that Archer was denied products necessary to compete) was justified by efficiency considerations.[32]

---

[31] Plaintiff has submitted the case solely on a theory of per se liability and is not pursuing liability under a rule of reason standard.  Defendants therefore submit a proposed charge under a per se theory without waiving any arguments under the rule of reason.  This set of instructions are intended to explain to the jury what they must find under Plaintiff's alleged per se violation.

[32] *Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 U.S. 403, 414 (5th Cir. 2007); *Nw. Wholesale Stationers v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293-98 (1985); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877,886 (2007).  Archer objects to the submission of any form of this instruction.  To begin, the *Tunica* factors described in this instruction do not apply to this case, for the reasons described in Archer's summary judgment briefing. *See* Dkt. No. 353, at 62; *MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 n.7 (5th Cir. 2015). Even if they do apply, they are a question of law for the Court, not for the jury. The *Tunica* factors determine whether per se or rule of reason analysis applies, but that decision is undeniably a *legal* question. *See, e.g.*, *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 833 (3d Cir. 2010). For that reason, the ABA Model Jury Instructions in Civil Antitrust Cases specifically decline to propose an instruction on these types of issues. *See* C-5, Instruction 3B, n.2 (2016 ed.). The Fifth Circuit recently upheld a set of jury instructions against an objection that the Court should have instructed the jury on the *Tunica* factors. *See MM Steel L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 & n.7 (5th Cir. 2015). Moreover, even if an instruction were appropriate, Defendants' proposal wrongly instructs that Archer must prove all three of the *Tunica* factors to merit per se treatment. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294-95 (1985) ("[A] concerted refusal to deal need not necessarily possess all of these traits to merit per se treatment.").

### E.   "Direct Competitors" Defined

"Direct competitors" are businesses that function at the same level of the distribution chain. Although at least two of the parties to the conspiracy must be direct competitors, not every participant in the conspiracy must be a direct competitor. It is undisputed that Schein, Burkhart, Patterson, and Benco are direct competitors.[33]

As I instructed, at least two parties to a group boycott must be direct competitors of each other and of Archer and all parties to a group boycott must have agreed and conspired with each other.  Direct competitors are entities that occupy the same level of distribution in a supply chain, meaning that they are horizontal to each other in the supply chain.  A conspiracy involving direct competitors is therefore known as a horizontal conspiracy.   At least two members of an agreement that is alleged to be to a per se violation of the Sherman Act must be direct competitors.

When a manufacturer sells to a distributor, the manufacturer and the distributor are not considered direct competitors even if the manufacturer also sells some product directly to end users.[34]  You may find that one or more manufacturers entered into separate agreements with one

---

[33] Dkt. No. 518, Instructions to the Jury at 7, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014); *see NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209 (1959); *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088 (9th Cir. 2000); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000); *United States v. MMR Corp. (La.)*, 907 F.2d 489, 498 (5th Cir. 1990).  Defendants object to this instruction because it fails to adequately inform the jury about what must be shown to prove liability among direct competitors for a horizontal conspiracy.

[34] Defendants propose the instructions in blue as a more complete description of what is required to be a direct competitor and what that means in this case. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988); *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 420-21 (5th Cir. 2010); *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 1422 (5th Cir. 1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir. 1981); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006); *Elecs. Comm'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997).

or more distributors.  That type of agreement would not be considered an agreement between direct competitors and would not be a horizontal conspiracy. [35]

In this case, Burkhart and defendants Schein, Patterson, and Benco are direct competitors of Archer.   Danaher and dental equipment manufacturing companies, such as Dental Manufacturers Instrumentarium, Dental Equipment LLC, KaVo Dental, and Dental Imaging Technologies, are not direct competitors of Archer or of the other Defendants.

---

[35] *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730 (1988); *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 222-25 (5th Cir. 2001); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir. 1981); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1064 (N.D. Cal. 2007). Archer objects that this instruction unnecessarily and improperly emphasizes the "direct competitors" element, on which the jury has already been instructed (see section B, above). The instruction also is unnecessarily long and confusing given that there is no dispute regarding which entities are direct competitors.

### F.   "Dominant Position" Defined

A "dominant position" in the market is the power to control prices and exclude competition in a relevant antitrust market.  One or more firms have a dominant position if that firm or those firms can profitably raise prices substantially above the competitive market level for a significant period of time.[36]

---

[36] The definition of a "per se" violation uses the term "dominant position."  This instruction defines that term. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). Plaintiff objects to this instruction for the same reasons it objects to Defendants' per se instruction.

### G.   "Relevant Market" Defined[37]

Archer must prove the relevant antitrust market or markets by a preponderance of the evidence.  There are two aspects you must consider in determining whether Archer has met its burden of proving the relevant market by a preponderance of the evidence.  The first aspect is the relevant product market; the second aspect is the relevant geographic market.[38]  If you find that Archer failed to prove a relevant market, then you must find in the Defendants' favor on this claim.

A relevant market for a product includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.[39]

To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another.  Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some

---

[37]  Plaintiff objects to the submission of any form of this instruction and to the entirety of Defendants' proposed instruction for the same reasons it objects to Defendants' per se instruction.

[38]  The definition of a "per se" violation uses the term "relevant market."  This set of instructions defines that term. ABA Model Instructions in Civil Antitrust Cases § 3-A-3 (2016 ed.).

[39]  *United States v. E.I. duPont  de Nemours & Co.*, 351 U.S. 377, 395 (1956); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 52-54 (D.C. Cir. 2001); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1355 (Fed. Cir. 1999); *AD/SAT, A Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999).

other percentage is more applicable to the product at issue.  If you find that such switching would occur, then you may conclude that the products are in the same product market.[40]

In deciding whether Archer has proven a relevant product market, you may also consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to which the producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product.  Such producers, to the extent that they exist, can increase supply and, therefore, drive prices back to competitive levels—defeating any effort by a would-be monopolist to charge significantly higher prices.[41]

The relevant geographic market is the area in which a Defendant faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases.[42]  When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one area have substantial effects on prices or sales in another area, which would tend to show that both areas are in the same relevant geographic market.  The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.[43]

---

[40] *See du Pont*, 351 U.S. at 400; *see also Telecor Communs., Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002).

[41] *AD/SAT, A Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). *See generally* ABA Section of Antitrust Law, 1 Antitrust Law Developments 601-03 (8th ed. 2017) (collecting cases).

[42] *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563 (1966); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1026-27 (10th Cir. 2002); *ReMax Int'l, Inc. v. Realty One, Inc.*, 173 F.2d 995 (6th Cir. 1999); *Morgenstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994); *see also* ABA Section of Antitrust Law, 1 Antitrust Law Developments 604-14 (8th ed. 2017).

[43] *See, e.g., Grinnell*, 384 U.S. at 563 (finding a national geographic market); Morgenstern, 29 F.3d at 1291 (finding geographic market that included Lincoln and Omaha, Nebraska); *Battle v. Liberty Nat'l Life Ins. Co.*, 493 F.2d 39, 45 (5th Cir. 1974); *see also Apani Southwest, Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (finding alleged geographic market of 27 city-run facilities insufficient to support Clayton Act and Sherman Act § 1 claims).

In determining whether Archer has met its burden and demonstrated that its proposed geographic market is proper, you may consider several factors, including: (1) the geographic area in which Defendants sell and where Defendants' customers are located; (2) the geographic area to which  customers turn  for supply of the product; (3) the geographic area to which customers have turned or have seriously considered turning; and (4) the geographic areas that suppliers view  as potential sources of competition. [44]

---

[44] *See, e.g.*, ABA Section of Antitrust Law, 1 Antitrust Law Developments 577-89 (5th ed. 2002) (discussing these factors and collecting relevant cases); *see also FTC v. Tenet Health Care*, 186 F.3d 1045 (8th Cir. 1999) (holding that the government must present evidence concerning where consumers could practicably go for care, not where they actually do go).

### H.   Conspiracy – Definition, Existence, and Evidence

Archer alleges that the defendants and other businesses participated in a conspiracy to restrain trade by depriving Archer of its ability to purchase (1) core dental equipment; and (2) dental imaging equipment, which brands Archer alleges were necessary for it to compete. A conspiracy is an agreement or understanding between two or more persons to restrain trade. To establish that a defendant participated in a conspiracy,[45] Archer must prove both of the following elements by a preponderance of the evidence:

    1.        That the alleged conspiracy existed; and

    2.        As to each defendant,[46] that the defendant knowingly became a member of that conspiracy.  To act knowingly means to participate deliberately, and not because of mistake or accident or other innocent reason.

The basis of a conspiracy is an agreement or understanding between two or more persons. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement itself may have been entirely unspoken.[47]   An agreement can be inferred from evidence that, knowing that concerted action was contemplated and invited, the defendants manifested their assent to the

---

[45] Defendants suggest the language in blue as a substitute for Plaintiff's language in yellow to better inform the jury what must be shown to prove a conspiracy given the facts of this case. Defendants' proposal unnecessarily separates core equipment and imaging equipment, and wrongly incorporates the "necessary to compete" element from *Tunica* (which is objectionable for the reasons explained in Archer's objection to Defendants' per se instruction).

[46] Defendants suggest the addition of "as to each defendant" in order to make clear that the jury must make its decision individually as to each defendant and cannot lump the defendants together and treat them as a group. The instruction already incorporates this concept by referring to "a defendant" and "the defendant." Previous instructions also already noted that liability must be determined as to each defendant, as does the verdict form.

[47] This instruction generally is based on American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-A-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 8-9, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

scheme and participated in it.[48] A defendant's consent to an unlawful scheme can be inferred in part from evidence that the defendant confronted others about cheating on the agreement or reassured others that the defendant was abiding by the agreement.[49]  However, evidence that more than one defendant acted in similar or even identical ways is not enough to establish the existence of a conspiracy, even if those defendants knew of each other's actions.  Rather, to establish a conspiracy, you must find evidence tending to exclude the possibility of independent action.[50]

A person can become a member without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts such members played in the charged conspiracy. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose.[51] To prove a conspiracy existed, the evidence must show that the alleged members of the conspiracy came to an agreement or understanding among themselves to accomplish a common purpose.

---

[48] *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226-27 (1939).

[49] *United States v. Beaver*, 515 F.3d 730, 738 (2d Cir. 2008).

[50] *Bell Atl. v. Twombly*, 550 U.S. 544 (2007) (parallel conduct insufficient to demonstrate antitrust conspiracy); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (must be evidence tending to exclude possibility of independent action); *Monsanto Co. v. Spray-Rite Services Corp.*, 465 U.S. 752 (1984) (same).

[51]  This instruction is based on American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-A-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 8-9, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014). Defendants object to this language.  *See Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001) ("To prove conspiracy or 'concerted action' [for purposes of section 1], the plaintiff must prove that the conspirators had a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'"); *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 846 (5th Cir. 2015) ("Without knowing that another distributor was threatening manufacturers, or that other manufacturers were refusing to deal with [the plaintiff], [the defendant] could not consciously commit to a common scheme to foreclose [the plaintiff] from the market.")..

Archer may prove the existence of the alleged conspiracy through direct evidence, circumstantial evidence, or both.  Direct evidence is explicit and requires no inferences to establish the existence of the alleged conspiracy. Examples of direct evidence of a conspiracy include witness testimony that explicitly admits to an agreement between competitors, documents showing an unlawful agreement, guilty pleas, and admissions by a defendant.  Direct evidence of an agreement may not be available, and therefore a conspiracy may also be shown through circumstantial evidence. You may infer the existence of a conspiracy from the circumstances, including what you find the alleged members actually did and the words they used.[52] Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together and discussed common aims and interests, does not by itself establish the existence of a conspiracy unless the evidence tends to exclude the possibility that the persons were acting independently. [53]   If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy. [54]

---

[52] This instruction is based on American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-A-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 8-9, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[53] *Bell Atl. v. Twombly*, 550 U.S. 544 (2007) (parallel conduct insufficient to demonstrate antitrust conspiracy); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (must be evidence tending to exclude possibility of independent action); *Monsanto Co. v. Spray-Rite Services Corp.*, 465 U.S. 752 (1984) (same). Plaintiff's proposal is based on American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-A-1 (2016 ed.). No reason exists to depart from that language, particularly because Defendants' addition to the end of the sentence is unnecessarily repetitive  of the following sentence, which already makes clear that acting independently is not illegal.

[54] This instruction is generally based on ABA Model Instructions in Civil Antitrust Cases § 2-A-1 (and Note 4) (2016 ed.).

An agreement may be proven by circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination.[55] Parallel action—proof that defendants took identical actions within a time period suggestive of prearrangement—is a powerful form of circumstantial evidence.[56] Archer does not need to disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need only be sufficient to allow you to infer that the conspiratorial explanation is more likely than not.[57]

A manufacturer may as a matter of course communicate with its distributors about their businesses (and vice versa), and that alone does not constitute a conspiracy or evidence of a conspiracy.[58]

In determining whether a conspiracy has been proved, you must view the evidence as a whole and not piecemeal.[59]   If you conclude that the conspiracy did exist, you should next determine whether each party knowingly became a member of that conspiracy.[60]

---

[55] *Erie Cty. Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 867-68 (6th Cir. 2012).
[56] *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018).
[57] *United States v. Apple, Inc.*, 791 F.3d 290, 315-16 (2d Cir. 2015).  Defendants object to this instruction.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[L]awful parallel conduct fails to bespeak unlawful agreement."); *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 494 (5th Cir. 1982) ("[I]nference of a conspiracy is always unreasonable when it is based solely on parallel behavior that can be explained as the result of the independent business judgment of the defendants."); *TravelPass Group, LLC v. Caesars Entertainment Corp.*, ___ F.Supp. 3d ___, 2019 WL 5691996, *8 (E.D. Tex. Aug. 29, 2019) (slip opinion) ("Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action.").
[58] ABA Model Instructions in Civil Antitrust Cases § 2-D-9 (2016 ed.).  Plaintiff objects to the entirety of this paragraph. The instruction is unnecessary and unduly emphasizes the issue. Additionally, the proposed instruction presumes that the distributors "separately complained."
[59] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-A-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 8-9, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).
[60] ABA Model Instructions in Civil Antitrust Cases § 2-A-1 and 2-A-4 (2016 ed.).

A conspiracy may be formed without all parties coming to an agreement at the same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement. It is also not necessary that all of the means or methods claimed by Archer were agreed upon to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy were actually members. It is the agreement or understanding to restrain trade that constitutes a conspiracy. Therefore, you may find that a conspiracy existed regardless of whether it succeeded or failed.[61]

A person or business may be found to have participated in a conspiracy even if the person or business participated reluctantly or was coerced into doing so, because acquiescing in an illegal scheme violates the law just as creating or promoting the scheme does.[62] Witness denials of an agreement are given little weight when other evidence shows an agreement.[63]

---

[61] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-A-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 8-9, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[62] *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220-21 (5th Cir. 2001).

[63] *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395-96 (1948); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002); *FTC v. Qualcomm, Inc.*, 2019 WL 2206013, at *7 (N.D. Cal. May 21, 2019).

### I.    Conspiracy – Distributor Complaints to Suppliers

You may not infer an agreement between a manufacturer(s) and a complaining distributor(s) solely from the fact that the distributor(s) complained to the manufacturer(s) about Archer, regardless of how many times the distributor(s) complained or how many distributors separately complained.

You may not infer an agreement between a manufacturer and a complaining distributor(s) solely from the fact that the manufacturer acted in response to information that came from the distributor(s) or that the manufacturer acted exactly as the complaining distributor(s) wanted it to act or requested that it act.  A manufacturer who receives a complaint or information from a distributor(s) and decides, on its own and for its own business reasons, how it is going to act in response to that complaint or information, is acting alone and not pursuant to an agreement.[64]

---

[64] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 2-D-10 (2016 ed.)

### J.    Conspiracy – Parallel Conduct

Archer contends that the existence of a conspiracy can be inferred from the fact that some Defendants have refused to sell Archer (1) core dental equipment; and (2) dental imaging equipment.   Archer further contends that this conduct, when considered with other evidence, shows that a conspiracy existed among Defendants.  The mere fact that some Defendants may have refused to sell certain products to Archer does not by itself establish the existence of a conspiracy among Defendants.  Their behavior may be no more than the result of the exercise of independent judgment in response to identical or similar market conditions.  For example, as I previously instructed, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they had agreed or conspired to open their umbrellas.

A business may lawfully adopt the same prices, conditions of sale, or other practices, as its competitors as long as it does so independently and not as part of an agreement or understanding with one or more of its competitors.  A Defendant may even copy the prices of a competitor or follow and conform exactly to the prices or policies of its competitors.  Likewise, a Defendant does not violate the Sherman Act by taking some action in the hope or belief that its competitors will follow, so long as it has not reached an agreement with its competitors.  Parallel conduct, without more, does not violate the law.  If Defendants acted similarly but independently of one another, without any agreement or understanding between two or more of them, then there would not be a conspiracy.

To establish the existence of an agreement, Archer must produce evidence that tends to exclude the possibility that Defendants acted independently.  You should consider all of this evidence as a whole against the entire background in determining whether any similarity or identity of prices or conduct resulted from the independent business judgment of the individual

defendants freely competing in the open market, or whether it resulted from an agreement between two or more of them.[65]

---

[65] ABA Model Instructions in Civil Antitrust Cases §§ 2-A-2, 2-B-7 (2016 ed.). Plaintiff objects to the entirety of this instruction, because the issue of parallel conduct is adequately addressed in other instructions. Additionally, the ABA's notes to this instruction specifically state that "[t]his instruction is appropriate for a case in which plaintiff is attempting to prove the existence of a conspiracy *solely* through ambiguous circumstantial evidence of parallel conduct." This is not such a case. *See* Archer's summary judgment briefing, Dkt. No. 353, at 16-30. If the Court nevertheless decides to give a form of this instruction, it should use the ABA Model Instructions instead of Defendants' edited proposal, which excises relevant portions of the instruction. As in other instructions, Plaintiff also objects to splitting core equipment from imaging equipment.

### K.   Conspiracy – Corporations

A single corporation cannot agree, combine, or conspire with its own officers or employees.   Similarly, corporations that are commonly owned cannot agree, combine, or conspire with each other.   The Dental Manufacturers—Instrumentarium Dental, Dental Equipment, KaVo Dental, and Dental Imaging Technologies—were wholly owned subsidiaries of Danaher, and thus no conspiracy could have occurred between the subsidiaries and Danaher or between any of the subsidiaries themselves.

You should not infer that a defendant participated in a conspiracy from the mere fact that a related or affiliated business participated in the conspiracy. Rather, Archer must establish each defendant's participation in the alleged conspiracy. [66] Archer may establish a defendant's participation in the conspiracy, however, by establishing, among other things, that the defendant dominated or controlled a business that participated in the conspiracy, attended meetings related to the conspiracy on behalf of a group of related or affiliated businesses, or entered into agreements related to the conspiracy across a group of related or affiliated businesses.[67]

---

[66] ABA Model Instructions in Civil Antitrust Cases § 2-A-3 (and Note) (2016 ed.); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).

[67] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019-20 (N.D. Cal. 2010); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009); *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42 JG VVP, 2013 WL 6481195, at *17 (E.D.N.Y. Sept. 20, 2013), *report and rec. adopted*, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014).

**L.   Conspiracy – A Company's Right to Choose with Whom It Will Do Business**

A company has the right to choose with whom it will and will not do business.  It is entitled to refuse to deal with any business for any reason, no matter how good or bad the reason, so long as the company's decision was arrived at independently and not as a result of a conspiracy, if any.  Thus, unless a company acted as a result of a conspiracy (here, a conspiracy between distributors), its actions in refusing to sell to a product that is necessary to compete to another company cannot be illegal.[68]

To establish the existence of a conspiracy involving a manufacturer and two or more customers to boycott another customer, Archer must show, in addition to any customer communications, that the manufacturer's decision to cease dealings with the other customer was inconsistent with the manufacturer's independent self-interest. One legitimate reason for a manufacturer to terminate a relationship with a customer is to avoid losing the business of other disgruntled customers.[69]

Every company is allowed to operate for its own self-interests.  If your common-sense understanding of the facts of this case is that any shared conduct by Defendants took place

---

[68] *Coughlin v. Capital Cement Co.*, 571 F.2d 290, 301 n.20 (5th Cir. 1978). This instruction is unnecessary and repetitive of previous instructions, including the instructions given in subsection B. that refusal to deal must be pursuant to the conspiracy and various instructions that independent action is not illegal, and C, which explicitly says "A business has the right to deal, or refuse to deal, with whomever it likes, as long as it makes that decision on its own."

[69] *Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758, 763-64 and n.8 (5th Cir. 2002). This instruction misstates the law. The standard that Defendants cite applies only "in the absence of direct evidence of a conspiracy." *Viazis*, 314 F.3d at 763. Defendants' proposed instruction suggests that the standard applies in all cases. Additionally, even in the absence of direct evidence of a conspiracy, the plaintiff need only "present evidence tending to exclude the possibility of independent conduct." *Id.* Such evidence may be that the manufacturer acted inconsistently with its own self interests, but it might also be other evidence. Any need to present evidence tending to exclude the possibility of independent conduct is adequately addressed in other instructions.

because those Defendants were acting in their own independent self-interests, then the conspiracy alleged by Archer fails.[70]

---

[70]*See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010). This instruction misstates the law. First, the case cited for the proposition applies only if the complaint is premised entirely on parallel conduct. The proposed instruction implies it applies in all cases. Second, the case cited refers to "common economic experience," not a "common sense understanding of the facts." Third, a conspiracy is illegal even if it is in the Defendants' own independent self-interests. Whether an action is in a defendant's self-interest is relevant solely to whether circumstantial evidence alone is indicative of a conspiracy.

### M.   Conspiracy – Participation and Intent

Before you can find that any Defendant was a member of the conspiracy alleged by Archer, the evidence must show that the Defendant knowingly joined in the unlawful plan at its inception or at some later time with the intent to advance or further some object or purpose of the conspiracy.  Archer must prove that the defendant knew the essential nature and scope of the joint plan and joined it.  To do so, Archer must provide substantial evidence that tends to exclude the possibility the defendant's conduct was made independent of the alleged group boycott. Proof that a Defendant joined a conspiracy because of mistake or accident or other innocent reason is not sufficient.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he had been one of those who formed or began the conspiracy and participated in every part of it.  The membership of a person in a conspiracy must be based only on evidence of that person's own statements or conduct.  In determining whether any Defendant was a member of the conspiracy alleged by Archer, you should consider only the evidence of that Defendant's statements and conduct, including any evidence of that Defendant's knowledge or lack of knowledge, status, and participation in the events involved, and any other evidence of participation in the conspiracy alleged.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy.  But actions or statements of any conspirator that were not done or made in furtherance of the

conspiracy, or that were done or made before its existence or after its termination, may be considered as evidence only against the person who made them.[71]

---

[71] ABA Model Instructions in Civil Antitrust Cases § 2-A-4 (2016 ed.); *MM Steel v. JSW Steel (USA) Inc.*, 806 F.3d 835, 845 (5th Cir. 2015). The highlighted portion of this instruction is repetitive and unnecessary. Previous instructions already address the issue of showing a defendant knowingly joined the conspiracy. See subsection H. Previous instructions also address the issue of independent action. This proposal also improperly instructs the jury that Archer must provide "substantial evidence" to exclude the possibility of independent action. Archer's burden is a preponderance of the evidence, not "substantial evidence." If the Court decides to give some form of this instruction, it should follow the ABA Model Instruction in Civil Antitrust Cases § 2-A-4, rather than Defendants' edited version, which removes and redrafts relevant portions of the model instruction to favor defendants (e.g., by changing "Knowledge of the essential nature of the plan is enough" to "Archer must prove that the defendant knew the essential nature and scope of the joint plan and joined it").

## N.   Group Boycott - Firm Demand and Firm Refusal

To recover against any Defendant for that Defendant's refusal to sell to Archer, first, Archer must have made a firm demand to deal with that Defendant, and second, that same Defendant must have responded to Archer by making a firm refusal to deal with Archer.  If both a firm demand and a firm refusal did not occur, Archer cannot recover against that Defendant. General communications and casual inquiries are insufficient to constitute a firm demand or a firm refusal.[72]

---

[72]*Assoc. News, Inc. v. Curtis Circulation Co., Inc.*, No. H-80-1201, 1986 WL 13791, at *6 (S.D. Tex. Dec. 4, 1986); *Cleary v. Nat'l Distillers & Chem. Corp.*, 505 F.2d 695, 697 (9th Cir. 1974); *Windy City Circulating Co., Inc. v. Charles Levy Circulating Co.*, 550 F. Supp. 960, 963-64 (N.D. Ill. 1982); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 560-61 (5th Cir. 1980); *Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp. 2d 1086, 1090 (N.D. Cal. 2002); *Ayers v. Pastime Amusement Co.*, 283 F. Supp. 773, 792 (D.S.C. 1968). This instruction is repetitive and unnecessary. The instruction in subsection B requiring Archer to prove the element that "businesses refused to deal with Archer by preventing Archer from buying dental products" is sufficient. The ABA Model Instructions do not contain an instruction similar to the proposal because the elements are sufficiently laid out in other instructions.

**O.   Exclusive Dealing – Not at Issue**

At the trial of this case, you have heard the parties discuss exclusive dealer relationships. There are several forms of exclusive dealing arrangements.   Here, the exclusive dealer arrangement frequently took the form of manufacturers that sold certain products through a single distributor for a period of time.   In this action, there was nothing wrong with these exclusive dealer relationships, and Archer has asserted no claims based on those arrangements.[73]

---

[73] *See* ABA Model Instructions in Civil Antitrust Cases § 2-D-5 (2016 ed.). This instruction is unnecessary. It needlessly draws the jury's attention to an issue that is explicitly not in this case, and thus increases the likelihood of juror confusion. Moreover, other instructions explaining that manufacturers generally have the right to deal or refuse to deal with whomever they wish (so long as they do so independently) sufficiently addresses any concern about exclusive dealing.

### P.   Defensive Instruction:  Statute of Limitations—Accrual

A cause of action accrues when a defendant commits an act that injures a plaintiff's business.  The cause of action accrues when the wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur.[74]

---

[74] *Rx.com v. Medco Health Sols., Inc.*, 322 F. App'x 394 (5th Cir. 2009); *Note Inv. Grp., Inc. v. Assocs. First Capital Corp.*, 83 F. Supp. 3d 707, 731 (E.D. Tex. 2015).  There are different tolling agreements entered into on different dates, and Plaintiff did not sue all parties at the same time.  Accordingly, the jury will have to determine whether Plaintiff timely sued the various parties. Archer objects in whole to submission of this instruction. No reasonable jury could find that Archer's cause of action arose prior to February 23, 2008. Because Danaher signed a tolling agreement on February 23, 2012, under the four-year statute of limitations, Archer can recover damages at least back to February 23, 2008. The next instruction, which informs the jury that Archer is not entitled to recover for injuries suffered more than four years before the filing of its lawsuit (as extended by the tolling agreements) adequately addresses the issue to the extent it is necessary to do so.

## Q.  Defensive Instruction:  Statute of Limitations—General Standard

The statute of limitations for the antitrust laws does not permit recovery of damages for any injuries sustained by Archer prior to:

- February 23, 2008 as to the Manufacturer Defendants;

- April 13, 2008 as to Schein; and

- August 1, 2013 as to Patterson and Benco.[75]

---

[75] *Model Jury Instructions in Civil Antitrust Cases*, Certain Defenses and Exemptions 1:  Statute of Limitations. There are different tolling agreements entered into on different dates, and Plaintiff did not sue all parties at the same time.  Accordingly, the jury will have to determine whether Plaintiff timely sued the various parties. Archer objects to this instruction as unnecessary. As explained in its response to defendants' Daubert motion, Archer amended its expert report to remove damages claims prior to 2008, so there should be no statute of limitations dispute. Additionally, to the extent that any instruction is necessary, it need only include the February 23, 2008 date. Per Archer's motion-to-dismiss briefing, defendants are jointly and severally liable for damages dating back to February 23, 2008. Even if the instruction is given and defendants are not jointly and severally liable, a fraudulent concealment instruction would be necessary, along the lines of ABA Model Jury Instructions in Civil Antitrust Cases A-332, Instruction 2: Fraudulent Concealment.

### R.   Defensive Instruction:  Claims relating to Dynamic Dental Solutions, Inc.

As you consider the claims of Archer, you must exclude any claims that could have been asserted by Dynamic Dental.  Dynamic Dental is a corporation separate and apart from Archer, and Dynamic Dental sold the claims it might have owned.  Accordingly, you may not consider any claims arising from or connected to alleged refusals to deal with Dynamic Dental or any alleged injuries arising out of the business of Dynamic Dental, which would include any claims or damages arising out of the termination of or refusals to deal with Dynamic Dental.[76]

---

[76] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336–37 (1990); *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009); *Gardner v. Surnamer*, 608 F. Supp. 1385, 1391 n.4 (E.D. Pa.1985); *Beneficial Com. Corp. v. Railserv Mgt. Corp.*, 563 F. Supp. 114, 116 (E.D. Pa. 1983). Archer objects in whole to submission of any form of this instruction. Archer does not assert any claims belonging to Dynamic Dental or demand any damages suffered by Dynamic Dental. Instructing the jury to exclude claims not asserted by Archer is unnecessary and unfairly prejudicial. The standing cases relied upon by defendants are inapposite.

**S.   Defensive Instruction:  Ratification**

Archer is deemed to have ratified an act if it manifested its assent to confirm either its prior act or the act of another.  Ratification exists if Archer, with knowledge of all materials facts, adopts or confirms a prior act which did not then legally bind Archer and which Archer had the right to repudiate.  Ratification also exists if Archer accepted benefits under a changed contract or agreement after Archer learned that there had been a change to the contract or agreement. [77]

---

[77] *Samson Expl. LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 784-85 (Tex. 2017); *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980); *City of the Colony v N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 732 (Tex. App.—Fort Worth 2008, pet. dism'd). Because the motions to dismiss remain pending, Defendants have not yet filed formal answers.  Nevertheless, Defendants identified this defense long ago in its disclosures, thereby preventing any claims of unfair surprise.  Archer objects in whole to submission of any form of this instruction. First, ratification is not a defense to antitrust violations as a matter of law. *See Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 138-39 (1968), and cases cited therein ("We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. . . . [T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws."); *Trollinger v. Tyson Foods, Inc.*, 2007 U.S. Dist. LEXIS 26611, at *7-11 (E.D. Tenn. Apr. 10, 2007); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 296 F. Supp. 920, 925-26 (D. Haw. 1969); *see Gil Ramirez Grp. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 414 (5th Cir. 2015) (comparing ratification to quasi-estoppel). The Texas state-law cases that defendants cite do not involve antitrust claims. Second, the defendants did not adequately disclose this affirmative defense. No factual basis for this defense appears in any of the defendants' Initial Disclosures. While some of the defendants' Initial Disclosures list ratification, waiver, and estoppel, none of the Disclosures describe the facts underlying those defenses or how those defenses could apply to this case. *See Mary Kay, Inc. v. Dunlap*, 2012 U.S. Dist. LEXIS 86499, at *27-28 (N.D. Tex. June 21, 2012). Third, submission of an instruction on this affirmative defense is unjustified because it is unsupported by the evidence.

**T.   Defensive Instruction:  Waiver**

Archer may not recover if it has waived the right to complain about the actions that led to its harm.  To prove waiver, Defendants must show that:

(1)      Archer had an existing right or benefit;

(2)      Archer had actual or constructive notice of the existence that right or benefit; and

(3)      Archer actually intended to relinquish its right or benefit, which intent can be inferred from conduct.[78]

---

[78] *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 313 (5th Cir. 2005). Because the motions to dismiss remain pending, Defendants have not yet filed formal answers.  Nevertheless, Defendants identified this defense long ago in its disclosures, thereby preventing any claims of unfair surprise.  Archer objects in whole to submission of any form of this instruction. First, waiver is not a defense to antitrust violations as a matter of law. *See Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 138-39 (1968), and cases cited therein ("We have often indicated the inappropriateness of invoking broad common-law barriers to relief where a private suit serves important public purposes. . . . [T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws."); *Am. Motor Inss, Inc. v. Holiday Inns, Inc.*, 365 F. Supp. 1073, 1098 (D.N.J. 1973) ("The common law defenses of laches, waiver and estoppel have no application in a federal antitrust action."), *rev'd in part on other grounds*, 521 F.2d 1230 (3d Cir. 1975); *S.-E. Coal Co. v. Consol. Coal Co.*, 434 F.2d 767, 784 (6th Cir. 1970) (affirming district court's refusal to give instructions on waiver and estoppel in an antitrust case); *Miami Int'l Realty Co. v. Mt. Crested Butte*, 579 F. Supp. 68, 77 (D. Colo. 1984). The Texas state-law case that defendants cite did not involve antitrust claims. Second, the defendants did not adequately disclose this affirmative defense. No factual basis for this defense appears in any of the defendants' Initial Disclosures. While some of the defendants' Initial Disclosures list "ratification, waiver, and estoppel," none of the Disclosures describe the facts underlying those defenses or how those defenses could apply to this case. *See Mary Kay, Inc. v. Dunlap*, 2012 U.S. Dist. LEXIS 86499, at *27-28 (N.D. Tex. June 21, 2012). Third, submission of an instruction on this affirmative defense is unjustified because it is unsupported by the evidence.

## U.   Defensive Instruction:  Quasi Estoppel

Archer cannot assert to the defendants' disadvantage a right inconsistent with a position that Archer has previously taken.  Archer is precluded from asserting such a right when it would be unconscionable to allow Archer to maintain a position inconsistent with one in which it acquiesced or of which it accepted a benefit.[79]

---

[79] *Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 864 (Tex. 2000); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765-66 (Tex. App.—Texarkana 1992, writ denied).  Because the motions to dismiss remain pending, Defendants have not yet filed formal answers.  Nevertheless, Defendants identified this defense long ago in its disclosures, thereby preventing any claims of unfair surprise.  Archer objects in whole to submission of any form of this instruction. First, estoppel is not a defense to antitrust violations as a matter of law. *See Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 138-39 (1968), and cases cited therein; *S.-E. Coal Co. v. Consol. Coal Co.*, 434 F.2d 767, 784 (6th Cir. 1970) (affirming district court's refusal to give instructions on waiver and estoppel in an antitrust case); *Trollinger v. Tyson Foods, Inc.*, 2007 U.S. Dist. LEXIS 26611, at *7-11 (E.D. Tenn. Apr. 10, 2007); *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 296 F. Supp. 920, 925-26 (D. Haw. 1969). The Texas state-law cases that defendants cite do not involve antitrust claims.Second, quasi-estoppel is an equitable defense and therefore is not for the jury. *See Birk v. Hub Int'l Sw. Agency, Ltd.*, 2009 U.S. Dist. LEXIS 50221, at *47-50 (W.D. Tex. Apr. 1, 2009). Third, the defendants did not adequately disclose either the legal theory of or the factual bases supporting this affirmative defense. No factual basis for this defense appears in any of the defendants' Initial Disclosures. While some of the defendants' Initial Disclosures list ratification, waiver, and estoppel, none of the Disclosures describe the facts underlying those defenses or how those defenses could apply to this case. *See Mary Kay, Inc. v. Dunlap*, 2012 U.S. Dist. LEXIS 86499, at *27-28 (N.D. Tex. June 21, 2012). Fourth, submission of an instruction on this affirmative defense is unjustified because it is unsupported by the evidence.

## V.   Causation

If you find that any defendant or defendants have violated section 1 of the Sherman Act, then you must decide if Archer is entitled to recover damages from that defendant.

Archer is entitled to recover damages for an injury to its business if it can establish three elements of injury and causation:

>   (1)   Archer was in fact injured as a result of defendants' alleged violation of the antitrust laws;
>
>   (2)   defendants' alleged illegal conduct was a material cause of Archer's injury; and
>
>   (3)   Archer's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Archer to establish that it is entitled to recover damages, it must prove that it was injured as a result of defendants' alleged violation of the antitrust laws. Proving the fact of damage does not require Archer to prove the dollar value of its injury. It requires only that Archer prove that it was in fact injured by defendants' alleged antitrust violation. If you find that Archer has established that it was in fact injured, you may then consider the amount of Archer's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Archer has established that it was in fact injured.[80]

Archer must also prove by a preponderance of the evidence that Defendants' alleged antitrust violation was a material cause of Archer's injury.  An injury or damage is materially caused by an act, or a failure to act, if it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and

---

[80] ABA Model Instructions in Civil Antitrust Cases § 6-A-1 (2016 ed.).

that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.[81] This means that Archer must have proved that some damage occurred to it as a result of Defendants' alleged antitrust violation, and not some other cause. Archer is not required to prove that Defendants' alleged antitrust violation was the sole cause of its injury; nor does Archer need to eliminate all other possible causes of injury. It is enough if Archer has proved that the alleged antitrust violation was a material cause of its injury.[82]

Finally, Archer must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury." If Archer's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Archer's injuries are antitrust injuries. On the other hand, if Archer's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Archer's injuries are not antitrust injuries and Archer may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers

---

[81] Kevin F. O'Malley, et al., *Federal Jury Practice Instructions*, § 150:70, Antitrust-Private Action (6th ed. 2019) (cited with approval in the Comment to Civil Instruction 6 of the Fifth Circuit Pattern Jury Instructions (2014)) The following authorities support the application of a proximate cause standard, which this instruction embodies: *Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 983 (5th Cir. 1977); *Texas Carpenters Health Benefit Fund, IBEW-NECA v. Philip Morris, Inc.*, 21 F. Supp. 2d 664, 669 n. 9, 10 (E.D. Tex. 1998); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) ("Congress intended antitrust litigation 'would be subject to constraints comparable to well-accepted common law rules applied in comparable litigation,' including proximate cause." (quoting *Associated Gen. Contractors of California, Inc. v.California State Council of Carpenters*, 459 U.S. 519, 533 (1983)). In the antitrust context, "[a]n antitrust violation is a 'material cause' of an injury if it is a proximate cause of that injury." *Roxane Labs., Inc. v. Smithkline Beecham Corp.*, 798 F. Supp. 2d 619, 627 (E.D. Pa. 2011).

[82] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-A-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 10, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014)

better products or services.  The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

In summary, if Archer can establish that it was in fact injured by defendants' conduct, that defendants' conduct was a material cause of Archer's injury, and that defendants' injury was the type that the antitrust laws were intended to prevent, then Archer is entitled to recover damages for the injury to its business.[83]

---

[83] *Model Jury Instructions in Civil Antitrust Cases*, Causation and Damages, Instructions A-1 and B-4 (ABA 2016 ed.) (as modified).

### W.  Introduction to and purpose of damages

If you find that one or more defendants violated the Sherman Act and that this violation caused injury to Archer, then you must determine the amount of damages, if any, Archer is entitled to recover. The fact that I am giving you instructions concerning the issue of Archer's damages does not mean that I believe Archer should, or should not, prevail in this case. If you reach a verdict for all of the defendants on the issue of a Sherman Act violation, then you should not consider the issue of damages, and you may disregard the damages instruction I am about to give.[84]

The law provides that Archer should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning that their purpose is to put an injured plaintiff as near as possible to the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer— what we sometimes refer to as punitive damages—or to deter particular conduct in the future.[85] Furthermore, you are not permitted to award to Archer an amount for attorneys' fees or the costs of maintaining this lawsuit.[86]

---

[84] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-1 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 10-11, 14, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[85] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-1 (2016 ed.).

[86] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-1 (2016 ed.).

## X.   Settlement does not affect damages[87]

You have heard evidence that Burkhart settled Archer's claims against it. You should consider that evidence only to the extent that you find that it reveals a potential bias of any witness who works for the business that settled.

You should not speculate about whether any alleged member of the conspiracy paid money as a result of a settlement with Archer or as a result of any other settlement. The existence of any settlements is not relevant to your determination of damages in this case.[88]

---

[87] Defendants object to this instruction.  Plaintiff should not be permitted to introduce evidence regarding the settlement between Archer and Burkhart.  Fed. R. Evid. 408.  Accordingly, the jury should not hear the evidence referenced in this instruction and this instruction will have no purpose.

[88] Dkt. No. 622, Court's Instructions to the Jury at 35, *Costco Wholesale Corp. v. AU Optronics Corp., et al.*, No. C13-1207RAJ (W. D. Wash. Oct. 22, 2014).

### Y.   Basis for calculating damages

You are permitted to make just and reasonable estimates in calculating Archer's damages. You are not required to calculate damages with mathematical certainty or precision. But the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Archer must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that Archer has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by evidence.[89]

If you find that Archer has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.[90]

---

[89] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-3 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 14, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[90] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-3 (2016 ed.). This instruction is unnecessary and nonsensical in the context of the evidence in this case. Even Defendants' damages expert acknowledges that if Archer proves liability, the evidence would support an award of up to $1.1 million. If the Court nevertheless decides to instruct the jury with a version of this sentence, it should also instruct the jury that it "may award nominal damages, not to exceed one dollar," consistent with the ABA Model Jury Instruction 6-B-3.

### Z.   Disaggregation of damages

If you find that one or more defendants violated the Sherman Act and that Archer was injured by that violation, Archer is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of the defendant(s) who violated the Sherman Act. Archer bears the burden of showing that its injuries were caused by the defendants' Sherman Act violation, if any, as opposed to any other factors.  If you find that Archer's alleged injuries were caused in part by the defendants' alleged Sherman Act violation and in part by other factors, then you may award damages only for that portion of Archer's alleged injuries that were caused by the defendants' alleged Sherman Act violation.

Archer claims that it suffered injury because it lost sales and profits as a result of defendants' alleged Sherman Act violation.  Defendants claim that profits or sales lost by Archer, if any, occurred as a result of other factors that have nothing to do with the alleged Sherman Act violation.  These include that Archer is claiming damages based on lost sales of premium brands even though defendants assert many customers do not require or want premium brands; that Archer is claiming damages based on the termination of Dynamic Dental when Archer does not own Dynamic Dental's claims; and that Archer could lose sales in the normal course of competitive business activity.  Archer is not entitled to recover for lost profits that resulted solely from these or from other causes arising from the normal course of business activity.  Archer only may recover for damages caused by the alleged Sherman Act violation.

Archer bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes.  If you find that Archer was injured by defendants' alleged Sherman Act violation, and there is a reasonable basis to apportion Archer's alleged injury between lawful and unlawful causes, then you may award damages.

If you find that Archer's alleged injuries were caused by factors other than defendants' alleged Sherman Act violation, then you must return a verdict for the defendant.  If you find that there is no reasonable basis to apportion Archer's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.[91]

---

[91] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-4 (2016 ed.). This instruction is unnecessary, improper, and misstates the law. First, the instruction improperly summarizes and emphasizes Defendants' "disaggregation" arguments, which unduly draws the jury's attention to those arguments. Second, the sentence "If you find that Archer's alleged injuries were caused by factors other than defendants' alleged Sherman Act violation, then you must return a verdict for the defendant" is both wrong and misplaced. This sentence addresses the *fact* of damage, not the amount of damage. As Defendants' proposed instruction above indicates, the fact of damage and the amount of damage are different concepts. This instruction is about the latter. The sentence also misstates the law, because it wrongly suggests that any other contributing factor requires a complete verdict for the defense. In fact, "The plaintiff need not show that 'defendant's wrongful actions were the *sole* proximate cause of the injuries (sustained.) (The plaintiff) must show only, as a matter of fact and with a fair degree of certainty, that defendant's illegal conduct Materially contributed to the injury." *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979) (emphasis added). Third, the proposed instruction fails to recognize the proposition that "[o]nce the antitrust violation and its causal relation to the plaintiff's injury have been established, the cases in this circuit permit some latitude in the jury's determination of the quantum of damage." *Greene v. Gen. Foods Corp.*, 517 F.2d 635, 665 (5th Cir. 1975); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3d Cir. 2003) (rejecting argument that plaintiff improperly failed to disaggregate damages, because "plaintiffs are given some latitude in calculating damages" in these circumstances, "so long as their theory is not wholly speculative"). Finally, the concept of disaggregation is addressed sufficiently in the following instruction, which states: "If you find that any factors other than the Sherman Act violation impacted Archer's injury, then you may calculate Archer's lost profits using this measure only if you find that the evidence takes into account the other factors."

**AA. Measure of damages**

Archer claims that it was harmed because it lost profits as a result of the defendants' antitrust violation. Archer seeks to recover two kinds of lost profits in this case:

1) Lost profits from sales of dental equipment brands that Archer was prevented from buying (the affected equipment brands) by the refusal to deal; and

2) Lost profits from sales of "attached equipment," meaning equipment brands not directly affected by the refusal to deal, but that Archer nevertheless did not sell because it did not have access to the affected equipment brands.

If you find that the defendants violated the Sherman Act and that this violation caused injury to Archer, then you must calculate the profits, if any, that Archer lost as a result of the violation. To calculate lost profits, you must calculate net profit: the amount by which Archer's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues, including the costs of any expansion that Archer's business would have undergone to produce the revenues.

Archer has proposed to establish the net profits it would have earned if there had been no antitrust violation by presenting evidence of, among other things, Archer's performance both before and after it was affected by the antitrust violation. If you find that Archer's performance, and in particular its rate of growth, before it was affected by the alleged antitrust violation is a reliable guide to estimate what its profits would have been in the absence of the violation, then you may calculate Archer's lost profits by comparing (1) the profits that Archer earned on its past purchases of dental products and estimates it will earn on its projected future purchases of dental products; with (2) the estimated profits that Archer would have earned on its estimated purchases of dental products in the absence of the alleged antitrust violation. You may find, however, that Archer has not shown reasonable evidence of what its increased business would have been in the

absence of the alleged antitrust violation, such as in light of Archer's historical sales or if Archer's market share were impacted by changed economic conditions, mismanagement, increased competition, changing technology, or other factors.[92]   If you find that any factors other than the antitrust violation impacted Archer's injury, then you may calculate Archer's lost profits using this measure only if you find that the evidence takes into account the other factors.[93]

In calculating its lost net profits, Archer has proposed to compare its performance after it was affected by the alleged Sherman Act violation with Benco's sales growth.   If you find that the comparison of sales growth by Benco is a reliable guide to estimate what Archer's sales growth would have been in the absence of the alleged Sherman Act violation, then you may use that growth rate to calculate Archer's lost net profits.   You may find, however, Benco's growth rate is not representative of what Archer's growth rate would have been in the absence of the alleged Sherman Act violation, such as if Archer's profits were impacted by different economic conditions, mismanagement, different investment strategies, different levels of competition, or other factors.[94]

---

[92] Dkt. No. 161, Jury Instructions at 37, *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-CV-308 (E.D. Tex. April 26, 2017).  This instruction is unnecessary and inappropriate, particularly in unduly highlighting Defendants' theories and arguments on the merits.

[93] *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000); American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-8 (2016 ed.); Dkt. No. 518, Instructions to the Jury at 13-14, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[94] Dkt. 567, Charge of The Court at 33-34, *Retractable Technologies, Inc. v. Becton, Dickinson & Company*, No. 2:08-cv-16 (E.D. Tex. Sept. 18, 2013).  This instruction is unnecessary and inappropriate, particularly in unduly highlighting Defendants' theories and arguments on the merits.

### BB. Future Lost Profits[95]

Archer claims that it was harmed because, had it not been for defendants' alleged Sherman Act violation, Archer would have earned profits for five years into the future.  If you find that defendants violated the Sherman Act and that this violation caused injury to Archer in the future, you now must calculate the future profits, if any, that Archer will lose as a result of defendants' violation of the Sherman Act.  However, if you find that Archer will be able to make sales of products if it is given access to them, then you should not award any future lost profits.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that Archer would have earned in future years, and (2) the length of time for which Archer would have earned those profits.  In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation.  In making this determination, you must consider the various factors that could affect the future success of Archer's business, such as whether Archer would be permitted in the future to distribute the affected products, other general market or economic conditions, lawful competition Archer would face in the future, Archer's management of business, changes in technology or other business conditions, and other factors affecting Archer's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative.  If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

---

[95] Defendants object that Plaintiff is not entitled to future lost profits.  Archer purports to seek injunctive relief, which would be duplicative of future lost profit damages. However, in the event the Court disagrees, Defendants request that the jury be given this instruction on lost profits.

In calculating future lost profits, you must calculate net profit.  In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year.  This lower amount is known as an amount discounted to present value.[96]

---

[96] American Bar Association, Model Jury Instructions in Civil Antitrust Cases § 6-B-9 (2016 ed.). Plaintiff objects to the submission of any form of this instruction. First, the instruction improperly presumes that Archer will have access to products at the conclusion of this case. When the jury renders its verdict, it will not know whether the court will render injunctive relief, or what the injunctive relief will look like. Second, even if Archer gains access to products at the conclusion of this case, its sales will not immediately be at the same level that they would have been but for Defendants' anticompetitive conduct. A "ramp-up" period will be necessary, which is what Archer's future lost profits cover. The future lost profits issue is adequately covered by the instructions on calculating damages in general.

### CC. Mitigation of Damages

Archer may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence. Archer is not entitled to increase its damages claim through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If Archer failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to Archer than it would have suffered had it taken those steps, then Archer may not recover any damages for that part of the injury it could have avoided. Here, Defendants argue that Archer was obligated to take reasonable steps to secure an alternative supply of similar goods to replace those previously furnished by the terminating manufacturer.

Defendants have the burden of proof on this issue. Defendants must prove by a preponderance of the evidence:

   (1)    that Archer acted unreasonably in failing to take specific steps to minimize or limit its losses;

   (2)    that the failure to take those specific steps resulted in Archer's losses being greater than they would have been had Archer taken such steps; and

   (3)    the amount by which Archer's loss would have been reduced had Archer taken those steps.

In determining whether Archer failed to take reasonable measures to limit its damages, you must remember that the law does not require Archer to take every conceivable step that might reduce its damages. The evidence must show that Archer failed to take commercially reasonable measures that were open to it. Commercially reasonable measures mean those measures that a prudent businessperson in Archer's position would likely have adopted, given the circumstances as they appeared at that time. Archer should be given wide latitude in deciding

how to handle the situation, so long as what Archer did was not unreasonable in light of the existing circumstances.[97]

---

[97] *Model Jury Instructions in Civil Antitrust Cases*, Damages Instruction 14:  Mitigation (ABA 2016 ed.)

**Jury Instruction:  Closing Instructions**

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

Answer each question in the verdict form from the facts as you find them from this case, following the instructions that the Court has included. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. The law recognizes no distinction among types of parties. All corporations, partnerships and other organizations stand equal before the law, regardless of size or who owns them, and are to be treated as equals.

When you retire to the jury room to deliberate on your verdict, you will each have a copy of this charge to take with you. If you desire to review any of the exhibits which the Court has admitted into evidence, you should advise me by a written note delivered to the Court Security Officer, and I will send that exhibit or exhibits to you. Once you retire, you should select your Foreperson and conduct your deliberations.  If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during trial.

After you have reached your verdict, your Foreperson is to fill in on the verdict form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time, please give a written message or question to the Court Security Officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.[98]

---

[98] *Optis Wireless Tech., LLC v. Huawei Techs. Co.*, No. 2:17-cv-123-JRG-RSP (Final Jury Instructions).

## II.    ANTITRUST QUESTIONS

**QUESTION NO. 1:**    Do you find from a preponderance of the evidence that any of the following distributors participated in a conspiracy with another distributor to bar access by Archer to core dental equipment in the United States to persuade, induce, or coerce a distributor not to sell dental products to Archer?[99]

Answer "Yes" or "No" as to each distributor:

**Schein:**                    _____

**Patterson:**                _____

**Benco:**                     _____

**Burkhart:**                  _____ [100]

If you answered "Yes" to **two** of the distributors named in QUESTION NO. 1, then answer the following Question. If you answered "No" for two/three or more of the named distributors, do not answer the following Question, but proceed to Question No. 5

---

[99] *MM Steel*, Dkt. No. 518, Verdict Form, *MM Steel, LP, et al. v. Reliance Steel & Alum. Co., et al.*, No. 4:12-cv-01227 (S.D. Tex. Mar. 25, 2014).

[100] Subject to the motions in limine, Defendants do not believe that Burkhart should be listed. Plaintiff believes that if the question is submitted in this form, it must include Burkhart. Plaintiff is entitled to prove a horizontal conspiracy involving Burkhart (which is an unnamed co-conspirator – after having settled – as explained in the Complaint). Without including Burkhart, if the jury found a horizontal conspiracy between Burkhart and only one of Schein, Patterson, and Benco, the jury would then erroneously find no liability because they did not answer "yes" to two of the distributors.

**QUESTION NO. 2:** Did any of the following companies join in any conspiracy between distributors you have found in response to Question No. 1?

Answer "Yes" or "No" as to each company:

**Danaher (Parent):** _____

**Instrumentarium:** _____

**Dental Equipment (Pelton & Crane, Marus, and DCI):** _____

**KaVo:** _____

**Dental Imaging Technologies (Gendex):** _____

If you answered "Yes" to any part of Question No. 2, then answer the following Question as to the company or companies for whom you answered "Yes." Do not answer any of the following Questions as to any companies for whom you answered "No." If you answered "No" for all companies, do not answer the following Question, but proceed to Question No. 5[101].

---

[101] This question properly asks the jury about the vertical prong of the conspiracy separately from the horizontal prong. *MM Steel, LP v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848-49 (5th Cir. 2015) (requiring showing of both a horizontal conspiracy between distributors and a vertical conspiracy with manufacturers). The highlighted language is confusing and nonsensical in the context of the following question. The following question asks about companies that are not listed in this question (unnamed/non-defendant coconspirators), such as Aribex, SciCan, Ivoclar, and Midmark. The highlighted language suggests that because the jury did not answer "yes" to those companies in Question 2 (because it could not have – there is no line item for those companies because they are not defendants), then they cannot answer as to those companies in Question 3. That is incorrect. The companies named in Question 3 are unnamed coconspirators, and defendants are jointly and severally liable for that harm.

**QUESTION NO. 3:** Was Archer prevented from buying one or more of the core dental products manufactured by any of the following brands of dental products as a result of the conspiracy, if any, you have found in response to Question No. 1, thereby denying so that Archer was denied access to a supply of core dental products necessary for it Archer to compete effectively in the sale of core dental products?

Answer "Yes" or "No" as to each of the following:

**Instrumentarium:** _____

**Pelton & Crane:** _____

**KaVo:** _____

**Aribex** _____

**SciCan:** _____

**Ivoclar/Vivadent:** _____

**Midmark (sterilizer):** _____

If you answered "Yes" to any part of QUESTION NO. 3 then answer the following Question as to the brand(s) for which you answered "Yes."  Do not answer any of the following Questions as to brand(s) for which you answered "No". Otherwise If you answered "No" for all brands, do not answer the following Question, but proceed to Question No. 5.

**QUESTION NO. 4:** Was the conspiracy that you found, if any, in your response to Question No. 1 above a material cause of injury to Archer's business?

Answer "Yes" or "No":


**Answer:**        _____


     If you answered "Yes" to QUESTION NO. 4, then answer the following Question Otherwise, do not answer the following Question. Proceed to the next Question.

**QUESTION NO. 5:**     Do you find from a preponderance of the evidence that any of the following distributors participated in a conspiracy with another distributor to bar access by Archer to dental imaging equipment in the United States?[102]

Answer "Yes" or "No" as to each distributor:

**Schein:**                _____

**Patterson:**                _____

**Benco:**                _____

        If you answered "Yes" to **two** of the distributors named in Question No. 5, then answer the following Question. If you answered "No" for two or more of the named distributors, do not answer the following Question, but proceed to Question No. 9.

---

[102] This is the first of a second set of questions:  the first set dealt with core dental equipment; this set deals with dental imaging equipment.   Plaintiff objects because these questions unnecessarily break out core equipment and imaging equipment. That is unnecessary. If the Court nevertheless decides to submit separate questions, the same changes Archer proposes to Question 1 would be necessary here, including, most importantly, the inclusion of Burkhart.

**QUESTION NO. 6:** Did any of the following companies join in any conspiracy between distributors you have found in response to Question No. 5?

Answer "Yes" or "No" as to each company:

**Danaher (Parent):** _____

**Instrumentarium:** _____

**Dental Equipment (Pelton & Crane, Marus, and DCI):** _____

**KaVo:** _____

**Dental Imaging Technologies (Gendex):** _____

If you answered "Yes" to any part of Question  No. 6, then answer the following Question as to the company or companies for whom you answered "Yes."  Do not answer any of the following Interrogatories as to any companies for whom you answered "No." If you answered "No" for all companies, do not answer the following Question , but proceed to Question  No. 9.

**QUESTION   NO.  7:**  Was  Archer  prevented  from  buying  dental  imaging  equipment manufactured  by  any  of  the  following  brands  of  dental  products  as  a  result  of  the  conspiracy,  if any,  you  have  found  in  response  to  Question  No. 5,  so  that  Archer  was  denied  access  to  a  supply of  dental  imaging  equipment  necessary  for  Archer  to  compete  effectively  in  the  sale  of  dental imaging equipment?

Answer "Yes" or "No" as to each of the following:

**Instrumentarium:**  _____

**Pelton & Crane:**  _____

**KaVo:**  _____

**Aribex**  _____

**SciCan:**  _____

**Ivoclar/Vivadent:**  _____

**Midmark (sterilizer):**  _____

If you answered "Yes" to any part of Question No. 7, then answer the following Question as  to  the  brand(s)  for  which  you  answered  "Yes."   Do  not  answer  any  of  the  following Interrogatories as to brand(s) for which you answered "No". If you answered "No" for all brands, do not answer the following Question but proceed to Question No. 9.

**QUESTION NO. 8:** Was the conspiracy that you found, if any, in your response to Question No. 5 a material cause of injury to Archer's business?

Answer "Yes" or "No":


**Answer:** _____

Proceed to the next Question.

**QUESTION NO. 9:**   By what date do you find by a preponderance of the evidence that the antitrust claims at issue, if any, accrued?[103]

Answer by specifying the month, day, and year:

Answer: _____

---

[103]   See objection to accrual instruction.

**QUESTION NO. 5 10[104]:** What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Archer for the injury to its business that you have found was materially caused by the conspiracy?

Answer in dollars and cents, if any, for each of the following:

(a)      The total amount materially caused by the conspiracy:  $_____

(b) If you have answered the above question with an amount greater than $0, then answer the following questions   The total of the damages numbers you write below must add up to the amount you wrote in answer to question 9(a) above:

**Equipment affected
By refusal to deal:**      _____

| Manufacturer/Brand | Past Lost Profits for Core Dental and Dental Imaging Equipment | Future Lost Profits for Core Dental and Dental Imaging Equipment |
|---|---|---|
| Instrumentarium | | |
| Pelton & Crane | | |
| KaVo | | |
| Aribex | | |
| SciCan | | |
| Ivoclar/Vivadent | | |
| Midmark (Sterilizer) | | |

**Attached equipment:**      _____

---

[104] At the time of this submission, motions remain pending that will affect the submission of this question. As those motions are decided, Defendants will return to the issue of how to submit the damages question.   By removing the previously proposed jury question for consumables damages in light of the Court's *Daubert* ruling, Plaintiff does not waive its right to appeal that ruling or otherwise waive its right to seek consumables damages.

**Questions: Mitigation**

**QUESTION NO. 6:** Do you find, by a preponderance of the evidence that Archer failed to take commercially reasonable measures to limit its damages?

Answer "Yes" or "No":

Answer: _____

If you answer "Yes" to the preceding Question, then answer the following Question. Otherwise, do not answer the following Question.[105]

---

[105] Plaintiff proposes this and the following question because mitigation is an affirmative defense on which Defendants bear the burden. Breaking out this question ensures that the jury members separate in their minds damages (on which Plaintiff bears the burden), and mitigation (on which Defendants bear the burden). *See Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 2018 U.S. Dist. LEXIS 74174, at *20-23 (S.D. Tex. May 2, 2018) (discussing submission of jury questions on mitigation). Defendants objection because mitigation is typically handled through instructions and not questions.

**QUESTION NO. 7:** What amount of damages do you find, by a preponderance of the evidence, Archer could have avoided if it had taken commercially reasonable measures to limit its damages?

Answer in dollars and cents: _____

January 17, 2020

/s/      *Samuel F. Baxter* (with permission)
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
**McKool Smith, P.C.**
104 E. Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Lewis T. LeClair
Texas State Bar No. 12072500
lleclair@mckoolsmith.com
Gary Cruciani
Texas State Bar No. 05177300
gcruciani@McKoolSmith.com
Phillip Aurentz
Texas State Bar No. 24059404
paurentz@McKoolSmith.com
Travis E. DeArman
Texas State Bar No. 24074117
tdearman@McKoolSmith.com
Chelsea A. Priest
Texas State Bar No. 24102375
cpriest@McKoolSmith.com
**McKool Smith, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Charles E. Fowler, Jr.
Texas State Bar No. 24083014
cfowler@McKoolSmith.com
**McKool Smith, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

*/s/ Paul F. Schuster*
Paul F. Schuster
pschuster@lockelord.com
John P. McDonald
jpmcdonald@lockelord.com
Cynthia K. Timms
ctimms@lockelord.com
Matthew K. Hansen
mkhansen@lockelord.com
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201
Telephone:  (214) 740-8000
Facsimile:  (214) 740-8800

Harry L. Gillam, Jr.
TX Bar No. 07921800
**GILLAM & SMITH LLP**
303 S. Washington Ave.
Marshall, Texas 75670
Telephone:  (903) 934-8450
Facsimile:  (903) 934-9257
gil@gillamsmithlaw.com

Colin R. Kass (pro hac vice)
ckass@proskauer.com
**PROSKAUER ROSE LLP**
1001 Pennsylvania Avenue NW
Washington, DC 20016
Telephone: (202) 416-5865
Facsimile: (202) 416-6899

***ATTORNEYS FOR DEFENDANT HENRY SCHEIN, INC.***

*/s/ Kenneth L. Racowski (w/permission)*

**Kenneth L. Racowski (*pro hac vice*)**
**Thomas P. Manning (*pro hac vice*)**
**Mark A. Kasten (*pro hac vice*)**
Buchanan Ingersoll & Rooney, PC - Philadelphia
Two Liberty Place, Suite 3200
50 South 16th Street
Philadelphia, PA 19102
Tel:  (215) 665-8700
Fax:  (215) 665-8760
Email:  kenneth.racowski@bipc.com
Email:  thomas.manning@bicp.com
Email:  mark.kasten@bipc.com

T. John Ward
Claire Abernathy Henry
**WARD, SMITH & HILL, PLLC**
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400
tjw@wsfirm.com
claire@wsfirm.com

***ATTORNEYS    FOR    DEFENDANT
BENCO DENTAL SUPPLY COMPANY***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Cynthia K. Timms*